IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| TONY CABBIL, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | No. 2:05-cv-00513-MHT |
| | ) | |
| STATE OF ALABAMA DEPARTMENT | ) | |
| OF TRANSPORTATION, and | ) | |
| JOE MCINNES, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants State of Alabama Department of Transportation ("ALDOT") and Joe McInnes hereby file this memorandum brief in support of their motion for summary judgment, filed contemporaneously herewith, and show unto the Court as follows:

## FACTS

Plaintiff began his employment with the Alabama Department of Transportation (ALDOT) on July 30, 2001 having been selected from a list of eligibles furnished by the State Personnel Department. As reflected on his employment application form, the plaintiff's prior work experience included service in the U.S. Army from 1974 to 1976 (honorably discharged), employment as a mental health worker at Partlow State School from March 1976 to May 1986(plaintiff was discharged for excessive absenteeism); and employment as a mental health worker at Brewer Porch Children's Center from January 1989 to January 1990 (plaintiff was discharged for having been found in a female client's room without a female employee being present). Plaintiff failed to include on this employment application a term of employment one

and one-half to two years at Indian River Mental Health Center between his employment at

Partlow and Brewer (plaintiff was discharged/or quit after having been found to have left the

worksite to attend a wedding).  (Cabbil deposition at page 15:12-17, page 16:6 through page

18:12, page 19:16 through page 24:19)

On July 13, 2001, the plaintiff signed an ALDOT Attendance/Punctuality Guideline

form.  (Exhibit A)

Plaintiff was assigned to Division Five District Two in Tuscaloosa, Alabama.  Plaintiff's

first supervisor was George Talbert Essary.  Plaintiff states that he had no problems with Mr.

Essary's supervision and that Mr. Essary supervised him for about a year.  Mr. Essary gave the

plaintiff his first employee performance appraisal, an Employee Probationary Performance

Appraisal issued on November 9, 2001 in which the plaintiff was scored 20, or meets

standards.(Cabbil deposition at page 32:8-13, page 33:12 through page 34:6, Exhibit B)

In 2002, Project Engineer Donna Elliott became the plaintiff's supervisor.  Plaintiff got

along fine with Mrs. Elliott for a while.  The first problem that the plaintiff encountered with

Mrs. Elliott was when he complained to her about a co-worker, Michael Smelley.(Cabbil

deposition at page 34:7-20, page 37:20 though page 39:12)

On November 19, 2002, Mrs. Elliott gave the plaintiff an employee performance

appraisal for the appraisal period 12/01/01 through 12/01/02.   Mrs. Elliott based this assessment

on her own observations of plaintiff's performance and from information received from Mr.

Essary.  Mrs. Elliott gave the plaintiff a score of 20, or meets standards.  (D. Elliott affidavit,

Exhibit C)

On July 8, 2003, the plaintiff initiated a conversation with co-worker, Michael Smelley,

voicing his displeasure over Mr. Smelley having failed to assist another co-worker, Bostic, and

him in taking tickets for loads of materials that were delivered to the worksite.  The plaintiff alleged that Mr. Smelley had been sitting in his truck working crossword puzzles at the time. The plaintiff believed that he brought this matter to Mrs. Elliott's attention on the same day.  The plaintiff had not brought Mr. Smelley's alleged conduct to Mrs. Elliott's or any other supervisor's attention before that date.   Mrs. Elliott recalls, generally, having a conversation with the plaintiff about Mr. Smelley, but cannot recall the exact date or the exact nature of the conversation.  Mrs. Elliott was familiar with Mr. Smelley's work and performance and had received no other such reports that he was inattentive to his work assignments or that he was not performing his tasks properly, so Mrs. Elliott did not pursue the matter further.  (Cabbil deposition at page 58:20 through page 61:18, D. Elliott affidavit)

On August 4, 2003, the plaintiff initiated another "conversation" with Mr. Smelley in the office, after other employees had left the area.  The plaintiff accused Mr. Smelley of having put down the wrong number of hours that Smelley had worked on the office work board.  The plaintiff made references to Mr. Smelley' church attendance and Christianity and called him a hypocrite.  (Cabbil deposition at page 62:15 through page 65:11, page 94:20 through 95:8)  Mr. Smelley's account of this incident  does not describe the plaintiff's actions as a "conversation", but rather a verbal assault upon him,  by which he felt threatened by the plaintiff ( M. Smelley affidavit ).  Mr. Smelley reported this incident to Mrs. Elliott, who directed him to provide her with a written account of the incident, which he did.  Mrs. Elliot also met with Mr. Smelley, and the plaintiff, individually, to hear both sides of the matter.  The plaintiff does not recall what was actually said during his meeting with Mrs. Elliott, but recalls "that she didn't do or say anything that was to mean she was even concerned about what I even had told her." (Cabbil deposition at page 65:8-11)  In fact, Mr. Smelley had been given permission, by Mrs. Elliott, to come in early

on that day and to work through his lunch so that he could leave early. The same consideration would have been afforded the plaintiff had he asked. The plaintiff contends that after that incident, Mrs. Elliott would pass by him and roll her eyes and say things to him in negative tone which he took to be offensive. (D. Elliott affidavit, Cabbil deposition at page 115:18 through page 118:13)

On October 21, 2003, the plaintiff went to Mrs. Elliott to complaint about a comment that a co-worker, Nell Clemmons, had made about him to Mrs. Elliott. Mrs. Elliott did not remember the comment. The plaintiff does not recall the nature of the comment. No action was taken against the plaintiff on account of the information from Ms. Clemmons, whatever it may have been. (D. Elliott affidavit, Cabbil deposition at page 104:22 through page 106:8)

On October 24, 2003, Mrs. Elliott had to assign two other employees to take measurements on a project because the plaintiff had failed to record measurements for October 16, 17 and 20, 2003. (D. Elliott affidavit)

On October 22, 2003, the plaintiff was temporarily "loaned" to Chilton County to assist on a work project. Chilton County is within the area served by Division Five. The plaintiff was assigned to perform the type of work that he had previously performed. The plaintiff was provided with a truck, gasoline, and per diem payment. The plaintiff was compensated for any overtime worked while on "loan"; his day began when he picked up his truck at the District Two office and ended when he returned in the evening. Loaning an employee to another district within the division is not uncommon. Mrs. Elliott was requested to provide an employee for this project. The plaintiff was sufficiently experienced, in her opinion, to handle the job, so she picked him. The plaintiff did not have a problem with the assignment but later complained that

others should have been rotated with him.  (D. Elliott affidavit, Cabbil deposition at page 70:17 through page 72:2, page 131:18-22)

The plaintiff contends that he met with Lewis Rager, the District Engineer, on November 3, 2003, and told him that the felt as though Mrs. Elliott was prejudiced against him and also talked about his evaluation from the previous year as compared to Mr. Smelley's evaluation. According to the plaintiff, Mr. Rager asked for time to look into the matter; but, later, when the plaintiff met with Mr. Rager, Rager informed him that he had found nothing to show that Mrs. Elliott was prejudiced.   The plaintiff states that he asked if Mr. Rager had talked with any black employees and that he replied that he had not.  (Cabbil deposition at page 127:18 through page 130:3)

On November 18, 2003, Mrs. Elliott presented the plaintiff with his annual employee performance appraisal for the rating period 12/01/02 to 12/01/03; he received a score of 20 or meets standards.   The plaintiff did not agree with this rating and initially refused to sign the appraisal.  After being advised that the refusal to sign the appraisal could result in disciplinary action as per ALDOT/State Personnel Department rules, the plaintiff signed the appraisal.  In deposition, when asked what score, realistically, he should have received for the rating period, the plaintiff responded "Twenty-two or twenty-three would have been satisfactory to me, anything but the same twenty that I got the year before."  Scores of twenty-two or twenty-three fall within the range of "meets standards" and would not have resulted in an increase in salary different than what the plaintiff received with a score of 20.  (D. Elliott affidavit, Cabbil deposition at page 49:4 through page 52:10, Exhibit D)

On December 3, 2003, the plaintiff received a Supervisory Employee Assistance Program referral for absenteeism.   As reflected on the referral form, the plaintiff had received his sixth

sick call-in absence on May 16, 2003 and had received two additional sick call-ins, September 29, 2003 and November 20, 2003.  ALDOT policy requires that, after an employee has made six sick call-ins within a twelve month period, the employee is referred to the EAP for counseling. The plaintiff does not disagree with the dates that he called in sick and the plaintiff was familiar with the ALDOT policy.   (D. Elliott affidavit, Cabbil deposition at page 56:11 through page 58:12, Exhibit E)

On December 8, 2003 the plaintiff was issued a warning because the number of absence call-ins had reached seven within the time period.  (D. Elliott affidavit, Cabbil deposition at page 78:6 through page 79:7, Exhibit F)

On December 8, 2003, Site Manager Coordinator Robert Stringfellow sent a memorandum to Mrs. Elliott advising her that the plaintiff had not become proficient at syncing a SitePad Daily Work Report (DWR) despite having received one-on-one training from Mr. Stringfellow and having been provided a simple written step-by-step procedure to follow.  Mr. Stringfellow also advised that he had scheduled the plaintiff for training, but for various reasons, the plaintiff did not attend.  Mr. Stringfellow advised that the plaintiff continued to enlist the help of co-workers to assist him with this task.   The ability to use the SitePad in recording daily work documents is a vital function of the Engineering Assistant position; the DWRs are the official job record.  The plaintiff admits that he had severe problems with computers because he was computer illiterate and that syncing the SitePad was a function of the EA's job.  (D. Elliott affidavit, Cabbil deposition at page 79:8 through page 82:6, Exhibit G)

In December 2003, Mrs. Elliott was requested to "loan" an Engineering Assistant to work on the Hugh Thomas Bridge painting project in Tuscaloosa, Alabama.  Mrs. Elliott asked the plaintiff if he was interested and he agreed to go. (D. Elliott affidavit)

On December 12, 2003, the plaintiff began working on the bridge project; Chief Engineer Ken Edwards was assigned to train the plaintiff as to the requirements of the assignment. On January 13, 2004, the plaintiff began performing the required inspections. (Ken Edwards affidavit)

On December 16, 2003, the plaintiff submitted an ALDOT Complaint Form wherein he made complaints regarding Donna Elliott and Lewis Rager which centered around the Michael Smelley incidents. (Exhibit H pages 1-4)

On December 19, 2003, the plaintiff left his job site without permission and did not return for the remainder of the day. The plaintiff admits that he left the job site to go home for lunch, became ill and went to sleep. Nonetheless, he did not report his circumstance to his supervisors. This conduct resulted in the issuance of a Written Reprimand on January 5, 2004, by the bridge project supervisor, Gary Elliott. (G. Elliott affidavit, K. Edwards affidavit, Cabbil deposition at page 82:7 through page 84:5, Exhibit I)

On January 12, 2004, after an internal investigation by Division Engineer L. Dee Rowe, an investigative report and proposed resolution was presented to the plaintiff. The plaintiff rejected the proposed resolution. The matter was referred to the ALDOT Title VII Coordinator Sandi Dietz for further consideration. (Exhibit H page 5)

On January 30, 2004, a copy of Sandi Dietz investigative report was sent to the plaintiff in which it was recommended that the proposed resolutions of L. Dee Rowe be implemented. The plaintiff rejected the proposed resolution, and the matter was referred for a hearing. (Exhibit H pages 10-16)

On February 17, 2003, the Division bridge crew inspected the bridge project painting contractor's work that had been performed from January 15-27, 2004 and found the work to be

unacceptable.  The plaintiff had been assigned to perform shot-blasting and paint inspections during that time period and prepared daily inspection reports for each of those days, save one, January 16, 2004. The plaintiff was not at work on January 16, 2004 and Ken Edwards, Chief Engineer, inspected the work for the plaintiff on that date.  Mr. Edwards attests that he performed the inspections properly on that date. When Mr. Elliott questioned the plaintiff about this matter in February, the plaintiff advised him that he had not been in the containment area in the week prior to Mr. Elliott's questioning him.  Mr. Elliott states that it is not possible to accurately inspect the shot-blasted or painted areas without going into the containment area to visually inspect the work.  Gary Elliott reported this matter to his superiors.  (G. Elliott affidavit, Ken Edwards affidavit, Exhibit J pages 13-20, 32-34)

On March 4, 2004, District Engineer Lewis Rager sent a memorandum to Division Engineer, L. Dee Rowe, via Nicky Calhoun, recommending that the plaintiff's employment be terminated. (Exhibit J page 31)

On March 9, 2003, after having been previously advised to use the men's restroom, and not the ladies restroom, at the field office, the plaintiff used the ladies' restroom anyway and failed to clean up the mess he had made there.  Another employee, Anita Box, had to clean up after him.  (Ken Edwards affidavit, Anita Box affidavit)

On March 15, 2004, Mr. Calhoun sent a memorandum to L. Dee Rowe concurring with the recommendation that the plaintiff's employment be terminated.  (L. Dee Rowe affidavit, Nicky Calhoun affidavit, Exhibit J pages 27-30)

On March 16, 2004, Ms. Rowe sent a letter to ALDOT Director McInnes, along with documentation, recommending that the plaintiff's employment be terminated.  This matter was referred to Title VII Coordinator Sandi Dietz, for review and recommendation.  Ms. Dietz

concurred with the recommendation and referred the matter to Ron Green, Executive Assistant Transportation Director for review. Mr. Green concurred with the termination recommendation. (Affidavit of L. Dee. Rowe, Exhibit J at pages 25-26)

On April 7, 2004, a letter was sent to the plaintiff from Director McInnes advising him of a pre-termination conference scheduled for April 14, 2004 at the Division Five conference room. The letter advised the plaintiff that Director McInnes had designated L. Dee Rowe to conduct the conference. The conference took place as scheduled wherein the plaintiff was advised as to the reasons for the termination action. The plaintiff was also given the opportunity to present evidence on his behalf to contest the termination action. The plaintiff read from a prepared statement. (L. Dee Rowe affidavit, Exhibit J at pages 35-37)

On April 16, 2004, Ms. Rowe issued a memorandum to Director McInnes via Ron Green endorsing the dismissal. (Exhibit J at page 3)

On April 22, 2004, Director McInnes issued a letter to the plaintiff advising him that he endorsed the termination action and that the plaintiff's last work day would be April 28, 2004.(Exhibit J at page 2)

On May 10, 2004, the plaintiff filed notice of appeal with the State Personnel Board; however, he abandoned this appeal. (Cabbil deposition at page 114:8-15, Exhibit K)

On May 19, 2004, the plaintiff filed his complaint with the Equal Employment Opportunity Commission. (Exhibit L)

The plaintiff has not been gainfully employed since his termination from employment with ALDOT. The plaintiff was injured in a motor vehicle accident in December 2004 and has been unable to work since that time. He presently is receiving Social Security Disability benefits. (Cabbil deposition at page 131:23 through page 133:8)

## ARGUMENT

### PLAINTIFF CABBIL HAS FAILED TO PROVE A *PRIMA FACIE* CASE OF RACE DISCRIMINATION OR RETALIATION

As this Court has recently observed:

> An employee bringing a discrimination claim must initially establish a *prima facie* case of discrimination through one of three methods:  by presenting direct evidence of discriminatory intent, presenting circumstantial evidence of discrimination by satisfying the analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and its progeny, or by introducing statistical evidence of discrimination.  *Walker v. NationsBank of Florida, N.A.*, 53 F.3d 1548, 1556 (11th Cir 1995).

*Sanders v. City of Montgomery*, 319 F. Supp. 2d 1296 (M.D. Ala. 2004).  "Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption."  *Hall v. Lowder Realty Co., Inc.*, 160 F. Supp. 2d 1299, 1315 (M.D. Ala. 2001) (quoting *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998)).  The Eleventh Circuit regards "only the most blatant remarks, whose intent could be nothing other than to discriminate" as direct evidence.  *Damon v. Fleming Supermarkets, Inc.*, 196 F.3d 1354, 1359 (11th Cir. 1999).  To be direct evidence, a comment must be made by the decision maker about the particular employment decision at issue.  See *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (O'Connor, J., concurring) ("stray remarks in the workplace…, statements by non-decisionmakers, or statements by decisionmakers unrelated to the decisional process itself" do not constitute direct evidence of discrimination).

In this case, having failed to prove his case by direct evidence or statistical evidence, Plaintiff Cabbil must rely on circumstantial evidence.  *See McDonnell Douglas*, 411 U.S. at 802.  Proving a case of employment discrimination by circumstantial evidence requires a plaintiff to first demonstrate a *prima facie* case of discrimination.  *Id.*  The defendant may then produce non-

discriminatory reasons for having made the employment decision. *Id.* The plaintiff is then required to produce evidence to persuade the fact-finder either that the defendant's asserted reasons for the decision are pretextual or that the decision was motivated by a discriminatory intent. *Id.* at 804. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

The Eleventh Circuit has applied the *McDonnell Douglas* burden-shifting framework to both discrimination claims and retaliation claims. *See Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir 2002). Therefore, Defendants will first discuss whether Cabbil has proved a *prima facie* case of discrimination or retaliation, and then Defendants will discuss whether Cabbil has produced sufficient evidence of pretext to overcome Defendants' articulated reasons for their employment actions.

**1.    Plaintiff Cabbil has failed to prove a *prima facie* case of race discrimination.**

To prove a *prima facie* case of discrimination, Cabbil must show that he was treated differently from "similarly situated" persons outside of his protected class. *See Olmstead v. L.C. by Zimring*, 527 U.S. 581, 119 S. Ct. 2176, 2193, 144 L. Ed. 2d 540 (1999) (Kennedy, J., concurring in the judgment) (the "normal definition of discrimination" is "differential treatment of similarly situated groups"); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 258, 101 S. Ct. 1089, 1096, 67 L. Ed. 2d 207 (1981) ("*McDonnell Douglas* teaches that it is the plaintiff's task to demonstrate that similarly situated employees were not treated equally.")

Under *McDonnell Douglas*, a plaintiff establishes a *prima facie* case of race discrimination under Title VII by showing: (1) he or she belongs to a racial minority, (2) he or she was subjected to adverse job action, (3) his or her employer treated similarly situated

employees outside his classification more favorably, and (4) he was qualified to do the job.

*Mizell v. Miami-Dade County, Florida*, 342 F.Supp.2d 1084 (S.D. Fla. 2004); *Holifield v. Reno*

115 F.3d 1555 (11th Cir.1997); *Coutu v. Martin County Bd. of Cty. Comm'rs.*, 47 F.3d 1068,

1073 (11th Cir. 1995); *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1060 (11th Cir. 1994).

Demonstrating a *prima facie* case is not onerous; it requires only that the plaintiff establish facts

adequate to permit an inference of discrimination.  *Williams v. Ford Motor Co*., 14 F.3d 1305,

1308 (8th Cir. 1994); *Bass v. Bd. of County Comm'rs.*, 242 F.3d 996, 1004 (11th Cir. 2001).

    In *Holifield, supra*, the defendants noted that the plaintiff had failed to point to a similarly

situated non-minority employee who was treated more favorably than the plaintiff.  The *Holifield*

Court noted that:

> As part of the Title VII plaintiff's *prima facie* case, the plaintiff
> must show that his employer treated similarly situated employees
> outside his classification more favorably than himself.  …  To
> make a comparison of the plaintiff's treatment to that on non-
> minority employees, the plaintiff must show that he and the
> employees are similarly situated in all relevant respects.…In
> determining whether employees are similarly situated for purposes
> of establishing a *prima facie* case, it is necessary to consider
> whether the employees are involved in or accused of the same or
> similar conduct and are disciplined in different ways.  …

*Holifield*, 155 F.3d at 1562 (internal citations omitted.)  The Court went on to note:

> *If a plaintiff fails to show the existence of a similarly situated
> employee, summary judgment is appropriate where no other
> evidence of discrimination is present*."  *See, e.g., Mack v. Great
> Atlantic and Pacific Tea Co.*, 871 F.3d 179,182 (1st Cir. 1989).

*Id.* (emphasis in the original).

    As noted above, a plaintiff who fails to show that a comparator is actually similarly

situated fails to demonstrate a *prima facie* case.  *Nix v. WLCY Radio/Rahall Communications*,

738 F.2d 1181, 1186-87 (11th Cir.1984).   As this Court has held, "a plaintiff seeking to

demonstrate that similarly situated white employees were treated differently must produce

evidence that his comparators were 'similarly situated in all relevant respects.' " *Gibbons v. Auburn Univ. at Montgomery*, 108 F. Supp. 2d 1311, 1318 (M.D. Ala. 2000) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997)). In the case at bar, Cabbil has failed to name a comparator that complies with the above mentioned case law.

In deposition, the plaintiff stated that Michael Smelley was the center of the whole matter. The plaintiff stated that Mr. Smelley was the only other Engineering Assistant the he had a problem with. (Cabbil deposition at page 66:6-8) The plaintiff admitted that Mr. Smelley was more proficient than he because of Mr. Smelley's previous experience with a county road crew. (Cabbil deposition at page 119:13-22). The plaintiff does not allege that he should have received as good an appraisal as Mr. Smelley, nor was he comparing himself to Mr. Smelley. (Cabbil deposition at page 106:15-22)

When asked directly if he could name a white employee who was similarly situated to him and had committed similar acts of misconduct that was treated more favorably than him, the plaintiff's response was: "I don't have no idea." (Cabbil deposition 141:14-19)

Although the plaintiff does not appear to be naming Mr. Smelley as a comparator, assuming, *arguendo*, that he does, Mr. Smelley is not a proper comparator. Unlike the plaintiff, Mr. Smelley was an experienced employee when he became employed by ALDOT, he was proficient in the work he performed, he had an excellent work record, his evaluations exceeded standards and he had no disciplinary or attendance problems.

While the reprimand issued to the plaintiff for leaving the work site on December 19, 2003 and his ultimate termination are obviously adverse employment actions, the other matters complained of by the plaintiff, and upon which he also bases his complaint, are not.

"An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Gupta v. Florida Bd. of Regents* 212 F. 3d 571, 587 (11th Cir. 2000). "Not all conduct taken by an employer which causes a negative effect on an employee constitutes an adverse employment action." *Davis v. Town of Lake Park, Florida*, 245 F.3d 1232 (11th Cir. 2001). "There must be some threshold level of substantiality that must be met for unlawful discrimination to be cognizable." *Wideman v. Wal-Mart Stores, Inc.* 141 F.3d 1453, 1456 (11th Cir. 1998). "This limitation is consistent with the basic principle that Title VII is...neither a general civility code nor a statute making actionable for the 'ordinary tribulations of the workplace.'" *Davis*, 245 F.3d at 1239 (quoting *Gupta*, 212 F.3d at 587); see also *Wu v. Thomas*, 996 F.2d 271, 273-274 (11th Cir. 1993) (noting that an adverse employment action does not result from every unkind act, even those without economic consequences). In *Davis*, the Eleventh Circuit emphasized that for an employment action to be adverse it "must impact the 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way." 245 F. 3d at 1239. The asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." *Id.* Thus, to prove an adverse employment action "an employee must show a serious and material change in terms, conditions, or privileges of employment." *Id.* For example, in *Smith v. State of Alabama* 252 F. Supp. 2d 1317 (M.D. Ala. 2003), D.H.R. Director's alleged acts of verbal assault, humiliation, lashing out, and writing up the plaintiff, were not held to have constituted adverse employment actions.

The plaintiff appears to assert that Mrs. Elliott's failure to give credence to his complaint about Mr. Smelley's failure to assist Ms. Bostic and him on a particular day, constituted an

adverse employment action.  Defendants argue otherwise and contend that this alleged failure on the part of Mrs. Elliott to believe the plaintiff did not affect the plaintiff's work, pay or other conditions of employment.  Mrs. Elliott merely gave Mr. Smelley, a good employee with no prior disciplinary history or poor performance problems, the benefit of the doubt.

When Mr. Smelley reported to Ms. Elliott that the plaintiff had confronted him regarding his (Smelley's) work hours, Mrs. Elliott listened to both sides.  She also advised the plaintiff that he had been out of line in his handling of the matter.  Moreover, Mr. Smelley had been given permission to come in early and work through lunch.  Plaintiff complains that during the course of the discussion, Mrs. Elliott questioned his integrity.  However, neither the discussion nor the questioning of his integrity, constituted an adverse employment action against the plaintiff.

That Mrs. Elliott would roll her eyes at him when they passed, that she would say things in a negative tone and that she may have pointed her finger at him during a discussion do not constitute adverse employment actions against the plaintiff.

The plaintiff's assignment to work in Chilton County was not an adverse employment action.  The loan of an employee to work out of his district is not uncommon.  The plaintiff was not required to perform work different from what he had performed in the past, he was furnished a truck to travel to and from the job site, he was furnished gasoline for the truck, he was paid a per diem allowance and he was paid overtime and/or compensatory time for his work.  His work day included the travel time to and from District Two.  At worst, this temporary transfer may have inconvenienced the plaintiff.

Plaintiff's assignment to the Hugh Thomas bridge painting project did not constitute an adverse employment action; the plaintiff agreed to the assignment.  This work site was within a

few miles of the District Office and, apparently, close to his residence as evidenced by the December 19, 2003 incident wherein he left work to go home for lunch.

The plaintiff's receipt of a score of 20, or "meets standards," on his 12/01/2002 – 12/01/2003 annual appraisal did not constitute an adverse employment action. The plaintiff believed that he should have gotten a higher evaluation that he had the previous year; however, he indicated that he would have been satisfied with a score of 22 or 23. Either score would still have been in the meets standards range and would have entitled the plaintiff to no greater salary increase than he received with the score of 20.

Neither the warning for the excessive sick call-ins nor the referral to the Employee Assistance Program for counseling constituted adverse employment actions. Neither affected the plaintiff's pay nor working conditions. Obviously, the object of the warning and referral was to prevent an absenteeism problem from becoming worse and perhaps, resulting in more extreme disciplinary sanctions.

## 2.     Plaintiff Cabbil has failed to prove a *prima facie* case of retaliation.

Retaliation is a separate offense under Title VII. 42 U.S.C.A. § 2000e-3(a). To prove his retaliation claim, Cabbil must first prove a *prima facie* case by showing that (1) he engaged in protected activity, (2) he was subjected to an adverse employment action, and (3) the adverse employment action was causally related to the protected activity. *Little v. United Technologies, Carrier Transicold Div.*, 103 F.3d 956, 959 (11th Cir. 1997) (citing *Coutu v. Martin County Bd. of County Com'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995).

The second prong of the proof requires the plaintiff to show that an adverse employment action occurred as a result of the protected activity. The plaintiff has alleged that he suffered

retaliation (1) as a result of his making complaints to Mrs. Elliott about Mr. Smelley in July 2003, (2) as a result of his meeting with Mrs. Elliott on August 4, 2003 following his "conversation" with Mr. Smelley, (3) as a result of his meeting in November with Mr. Rager and (4) as a result of his filing of the internal complaint on December 16, 2003.

Any actions on the part of Mrs. Elliott, which are claimed by the plaintiff to have been discriminatory or retaliatory, must be based upon the July 2003 and August 4, 2003 discussions regarding Mr. Smelley and not the internal complaint filed on December 16, 2003. At the time of the filing of the internal complaint, the plaintiff had already been loaned to the Hugh Thomas bridge project and was not under Mrs. Elliott's supervision. The reprimand in February 2004 and the termination in April 2004 were based upon the plaintiff's misconduct while working under the supervision of Gary Elliott on the Hugh Thomas bridge project. There is no evidence that Mrs. Elliott took part in either of these disciplinary actions or that Gary Elliott was influenced by Mrs. Elliott to take any unwarranted actions.

What adverse employment actions were imposed upon the plaintiff by Mrs. Elliott that support the plaintiff's claim of retaliation? Defendants contend that Mrs. Elliott's failure to believe the plaintiff or to act on his July 2003 complaint regarding Mr. Smelley did not affect the plaintiff's pay or other terms or conditions of employment and, thus, was not an adverse employment action. Mrs. Elliott's failure to give credence to the plaintiff's version of the August 4, 2003 "conversation" with Mr. Smelley and her admonishment of the plaintiff did not constitute an adverse employment action; the plaintiff was not disciplined nor did the conditions of his work markedly change. The finger pointing, the rolling of her eyes and the negative tone of voice the plaintiff attributed to Mrs. Elliott did not constitute adverse employment actions. Loaning the plaintiff to the Chilton County project was not an adverse employment action. Mrs.

Elliott's annual appraisal of the plaintiff was not an adverse employment action. The "loaning" of the plaintiff to the bridge project did not constitute an adverse employment action. In summary, Mrs. Elliott took no adverse employment actions against the plaintiff.

Mr. Rager's alleged failure to investigate the plaintiff's allegations of prejudice on the part of Mrs. Elliott over the Smelley incidents is not evidence of an adverse employment action. Mr. Rager's alleged inaction did not impose upon the plaintiff any onerous or changed conditions of employment.

In order to satisfy the causal link prong of a *prima facie* retaliation case, a plaintiff must, at a minimum, generally establish that the defendant was actually aware of the protected expression at the time the defendant took the adverse employment action. Since corporate defendants act only through authorized agents, in a case involving a corporate defendant, the plaintiff must show that the corporate agent who took the adverse action was aware of the plaintiff's protected expression and acted within the scope of his or her agency when taking the action. *Raney v. Vinson Guard Service, Inc.*, 120 F.3d 1192(11th Cir. 1997); *Goldsmith v. City of Atmore*, 996 F2d 1155 (11th Cir. 1993).

Mr. Elliott's decision to reprimand the plaintiff was solely based upon the plaintiff's misconduct of leaving the work site. There is no evidence that the July or August 2003 events or the December grievance influenced his decision in this matter.

The decision to terminate the plaintiff's employment was warranted (1) by the bridge inspectors' and Chief Engineer Edwards' reports that the plaintiff had failed to inspect or failed to properly inspect the contractor's work and (2) the plaintiff's false work reports reflecting that he had inspected the work and found it to be satisfactory. There is no evidence that either Nicky Calhoun or L. Dee Rowe made their decisions to recommend plaintiff's dismissal on other that

the misconduct presented to them.  Nor is there any evidence that  Sandi Dietz or Ron Green, who reviewed the recommendation from Ms. Rowe, and who concurred with the recommendation, did so because of the plaintiff's complaints to Mrs. Elliott, Mr. Rager or on account of the plaintiff's grievance.  Likewise, there is no evidence that Director McInnes, in directing the pre-termination hearing be held, and in ultimately authorizing the plaintiff's termination, did so on account of the complaints and grievance filed by the plaintiff.


## PLAINTIFF CABBIL HAS FAILED TO PROVE THAT THE LEGITIMATE REASONS STATED BY DEFENDANTS FOR THEIR ACTIONS WERE A PRETEXT FOR UNLAWFUL DISCRIMINATION

Once a plaintiff establishes a *prima facie* case of race discrimination or retaliation, the burden shifts to the defendant to present a legitimate, nondiscrimination reason for its action. *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir 2002) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 1824 (1973).  Once the defendant does so, the plaintiff bears the burden of showing that the reasons given by the defendant were a mere pretext for unlawful discrimination or retaliation.  *Id.  See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981) (a plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely [than not] motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence"); *see also Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984).  Plaintiff Cabbil's conclusory assertions that his termination was retaliatory are not a substitute for concrete evidence in the form of specific facts showing that the defendant's proffered reason for her termination is a mere pretext.  *Earley v. Champion International Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990).

The Eleventh Circuit cautions that, in analyzing Title VII discrimination and retaliation claims:

> "[W]e must be careful not to allow Title VII plaintiffs simply to litigate whether they are, in fact, good employees. The factual issue to be resolved is not the wisdom or accuracy of [the defendant's] conclusion that [the plaintiff] was an unsatisfactory employee. We are not interested in whether the conclusion is a correct one, but whether it is an honest one. Like all Title VII cases where pretext is an issue, the question the factfinder must answer is whether Fleming's proffered reasons were 'a coverup for a ... discriminatory decision.' *McDonnell Douglas,* 93 S.Ct. at 1826. 'We are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision.' *Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354, 1361 (11th Cir.1999)."

*Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir 2002). In the case at bar, Defendants' "legitimate, nondiscrimination reason for its action" for their action are undisputed.

The three employment actions which this Court should consider are the warning issued to the plaintiff for absenteeism, the reprimand for leaving the work site without permission and the termination action. The defendants have offered legitimate, nondiscriminatory reasons for each of these actions. The rest of the complaints made by the plaintiff involve non-adverse employment actions.

First, the warning for excessive sick call-ins is a matter of ALDOT policy. The plaintiff does not dispute that the called in sick on the dates in question. The actions taken by Mrs. Elliott in this matter were in accordance with ALDOT policy as was the referral to EAP.

Second, the reprimand for leaving the work site without permission was justified by the plaintiff's conduct. He admits that the left the job site to go home, that he got sick, went to sleep and did not contact his supervisors to advise them of his situation. The plaintiff's actions were improper, in violation of ALDOT policy and resulted in appropriate disciplinary action.

Third, the plaintiff was assigned to perform vital inspections on the bridge project; inspections which he had been trained to perform by Ken Edwards. Reports received by Mr. Elliott from the bridge inspector and Mr. Edwards indicated that the areas which the plaintiff should have inspected were not acceptable, although the plaintiff's daily work reports indicated that the areas had been inspected and were acceptable. The plaintiff has denied the allegation and has attempted to shift the blame for this deficiency upon Mr. Edwards; however, Mr. Edwards performed inspections on only one day, January 16, 2004; the plaintiff was responsible for the other days. Mr. Elliott's conversation with the plaintiff in February, when the deficiency was discovered, revealed that the plaintiff had not been in the containment area, currently under inspection, for a week. As noted by Mr. Elliott, a proper inspection could not be accomplished without physically going into the containment area. The plaintiff's failure to inspect the assigned areas and his false entries on the daily work reports reflecting that he had performed the inspections and found the work to be satisfactory constituted serious, and potentially costly, violations of departmental rules.

As noted above, the evidence reflects that Nicky Calhoun, L. Dee Rowe, Sandi Dietz, Ron Green and, finally, Director McInnes relied on written communications from management employees in making their respective decisions. Even a showing that the information provided these upper management personnel as incorrect is insufficient to overcome Defendants' proffer of a legitimate, nondiscriminatory reason for their actions.

The Eleventh Circuit, in *EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171 (11th Cir. 2000), recognized that employers have the authority to act on information provided to them, even if their conclusions about the facts are wrong. (Defendants are not acknowledging false or incorrect statements on the part of any management personnel; they are asserting, however, that

the Court's rationale is pertinent in that it reflects that mistake or reliance on incorrect

information does not give rise to a claim of discrimination. Nor is a showing of error sufficient

to overcome Defendants' proffer of a nondiscriminatory reason for their action):

> False statements impair the employer's ability to make
> sound judgments that may be important to the employer's legal,
> ethical and economic well-being. So, an employer is entitled to
> expect and to require truthfulness and accuracy from its employees
> in an internal investigation that is exploring possibly improper
> conduct in the business's own workplace. (For example, we
> readily suppose an employee--a nonharassing employee--could be
> fired if the employer had reason to believe the employee was
> concealing harassing conduct from the employer's investigation.)
> And, in carrying out its business and in making business decisions
> (including personnel decisions), the employer can lawfully act on a
> level of certainty that might not be enough in a court of law. In the
> workaday world, not every personnel decision involving a false
> statement (or a cover-up) has to be treated as something like a trial
> for perjury. Therefore, an employer, in these situations, is entitled
> to rely on its good faith belief about falsity, concealment, and so
> forth. *Cf. Damon,* 196 F.3d at 1363, n. 3 ("*An employer who fires
> an employee under the mistaken but honest impression that the
> employee violated a work rule is not liable for discriminatory
> conduct*."); *Sempier v. Johnson & Higgins,* 45 F.3d 724, 731 (3d
> Cir.1995).

*EEOC*, 221 F.3d at 1776 (emphasis added).

As noted above, "Pretext is not demonstrated by showing simply that the employer was

mistaken." *Total Sys. Servs., Inc*., 221 F.3d at 1176. Thus, even if the information relied upon

by McInnes and others was incorrect, Defendants' decision to terminate Cabbil's employment is

entitled to deference as a decision made by an employer faced with such evidence.

## <u>CONCLUSION</u>

Assuming *arguendo* that the plaintiff in this case has proved a *prima facie* case of either

race discrimination or retaliation, Defendants submit that Cabbil failed to meet his burden to

prove that the legitimate reasons given by Defendants for their actions were mere pretext. Summary judgment should be granted in favor of Defendants ALDOT and McInnes.

Defendants further assert that the plaintiff's claims under 42 U.S.C. Section 1981 have the same requirements of proof and are subject to the same analytical framework as the Title VII claims of discrimination and retaliation. *Richardson v. Leeds Police Dept.*, 71 F.3d 801, 805 (11th. Cir. 1995); *Turnes v. AmSouth Bank N.A.*, 36 F.3d 1057, 1060 (11th Cir.1994); *Howard v. BP Oil Co., Inc.*, 32 F.3d. 520, 524 n. 2 (11th.Cir. 1994).

Defendants, therefore, assert the same facts and arguments as presented above with respect to the plaintiff's Section 1981 claims.

Defendants further contend that the plaintiff is prohibited from asserting claims for reinstatement, back pay and other compensation from the date of his injury in December 2004. Based upon his own statements, he has been unable to engage in gainful employment since that time and clearly would have been able to resume his employment as an Engineering Assistant.

RESPECTFULLY SUBMITTED
TROY KING (KIN001)
ATTORNEY GENERAL

s/ Andrew W. Redd
Jim R. Ippolito, Jr. (IPP001)
Assistant Attorney General
Chief Counsel

Andrew W. Redd (RED001)
Robert Prescott
Assistant Attorney General
Assistant Counsel

**ADDRESS OF COUNSEL:**
State of Alabama Department of Transportation
1409 Coliseum Boulevard
Montgomery, Alabama  36110
Telephone:  (334) 242-6350
Facsimile:  (334) 264-4359
redda@dot.state.al.us

**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **TONY CABBIL,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **No. 2:05cv-513-MHT** |
| | ) | |
| | ) | |
| **STATE OF ALABAMA DEPARTMENT** | ) | |
| **OF TRANSPORTATION, and** | ) | |
| **JOE MCINNES,** *etc.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on June 12, 2006, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECT system, which will send notification to the following:  Kell

Simon, Esq., WIGGINS, CHILDS, QUINN & PANTAZIS, P.C., 301 Nineteenth Street, North,

Birmingham, Alabama  35203.

s/Andrew W. Redd
ANDREW W. REDD (RED001)
Assistant Attorney General
Assistant Counsel

**ADDRESS OF COUNSEL:**

State of Alabama Department of Transportation
1409 Coliseum Boulevard
Montgomery, Alabama  36110
Telephone:  (334) 242-6350
Facsimile:  (334) 264-4359
redda@dot.state.al.us