1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

TONY CABBIL,

     Plaintiff,

vs.          CIVIL ACTION NO.: 2:05CV513-C

STATE OF ALABAMA

DEPARTMENT OF TRANSPORTATION,

JOE MCINNES, in his official

capacity as Director of the

State of Alabama Department

of Transportation;

     Defendants.


\*   \*   \*   \*   \*   \*


DEPOSITION OF TONY CABBIL

VOLUME I,

taken pursuant to notice and stipulation on behalf of

the Defendant, Alabama Department of Transportation and

Joe Mcinnes in the Offices of Wiggins, Childs, Quinn &

Pantazis, 301 19th Street North, Birmingham, Alabama,

35244 before Angela Abbott Blankenship, Certified

15

1    A.    Yes, sir.

2    Q.    What high school did you graduate from?

3    A.    Holt High School in Holt, Alabama.

4    Q.    What year?

5    A.    1973.

6    Q.    College or technical school?

7    A.    I have some technical training C.A. Fredd State

8    Technical College, Tuscaloosa, Alabama.

9    Q.    What was your course of study?

10   A.    Auto body and fender repair from 1978 until 1982,

11   which was a part-time course.

12   Q.    And I think just from glancing through your

13   records, you were in the military, United States Army?

14   A.    Yes, sir.

15   Q.    From approximately October of '74 until February

16   of '76?

17   A.    Yes, sir.

18   Q.    What was your M.O.S. or specialty while you were

19   in the army?

20   A.    Equipment maintenance, which was, to break it

21   down, a dispatcher at the motor pool.

22   Q.    Okay, while you were in the military, did you ever

23   receive any punishments pursuant to the Uniform Code of

TONY CABBIL, VOL.I - 5/2/2006

16

1    Military Justice?

2    A.    No, sir.

3    Q.    Okay, no Article 15's, coputive** punishment, or

4    anything like that?

5    A.    No, sir.

6    Q.    Starting from the time you left high school, could

7    you tell me where you have worked?

8    A.    Partlow State School.

9    Q.    What did you do at Partlow?

10    A.    I was a mental health worker.  Back then it was

11    called something else.  The title has changed so much.

12    A mental health worker.

13    Q.    And how long did you work at Partlow State School?

14    A.    For me, from March of '76 until May of '86.

15    Q.    And were you fired?

16    A.    Yes.

17    Q.    What was the reason for your dismissal?

18    A.    I think absenteeism.

19    Q.    Absenteeism, is that what you recall?

20    A.    I think so.

21    Q.    What was the next job that you held after you left

22    Partlow State School?

23    A.    Brewer Children's Home from 1989 until 2000.

17

1   Q.   What kind of work did you do there?

2   A.   Worked with emotionally disturbed children.

3   Q.   Was it similar to what you had done at Partlow?

4   A.   Totally different.

5   Q.   Were you classified similarly though?

6   A.   It's in the same, I guess, category as mental

7   health. I guess they rate it the same as mental

8   health.

9   Q.   But the duties were different?

10   A.   The duties were different.

11   Q.   Why did you leave that job?

12   A.   Terminated.

13   Q.   Why were you terminated?

14   A.   I'm not certain, at this time.  I'm not certain.

15   Q.   You weren't given a reason?

16   A.   I was given a reason, but I didn't understand the

17   reason and I still don't understand the reason.

18   Q.   Were you accused of some type of misconduct or

19   failure to follow the rules and regulations of that

20   particular facility?

21   A.   Well, some kind of code of conduct.

22   Q.   But as we sit here today, you have no recollection

23   of the reason for your termination?

18

1   A.   My only recollection is my supervisor said I went

2   into a female's room without a female employee going in

3   there with me.

4   Q.   Do you recall from your work at Brewer that if a

5   male worker went a female's room, he should have been

6   accompanied by a female worker?

7   A.   No, sir.

8   Q.   That was not part of the rules?

9   A.   Not to my knowledge.

10  Q.   But as we sit here today, that's your recollection

11  of the basis for your termination?

12  A.   Yes, sir.

13  Q.   Do you remember what your supervisor's name was at

14  Brewer?

15  A.   Dr. Michael Mauldin --

16  Q.   Mauldin?

17  A.   M-a-u-l-d-i-n.  And Sarah McPherson.

18  Q.   Sarah McPherson?

19  A.   M-c-p-h-e-r-s-o-n.

20  Q.   Was she a doctor or just an administrative

21  supervisor?

22  A.   Right, a supervisor.

23  Q.   Let me back up just a minute.  After you left

19

1    Partlow State School, did you apply for unemployment

2    compensation?

3    A.   That was in '89, right?

4    Q.   Yes, sir, well, '86, I think.

5    A.   I think so.

6    Q.   Do you remember getting unemployment compensation

7    from that job?

8    A.   I think so.

9    Q.   Then after you were terminated from Brewer, do you

10   remember applying for unemployment compensation from

11   there?

12   A.   I think so.

13   Q.   Do you recall receiving that unemployment

14   compensation?

15   A.   I did.

16   Q.   Between the time you left Partlow State School in

17   '86 and the time you started working at Brewer, what

18   kind of -- did you do any work at all?

19   A.   How many years was that?

20   Q.   There's about a three-year gap there that --

21   A.   I think I worked at Indian River Mental Health

22   Center.

23   Q.   Indian River?

20

1   A.   Yeah, now --

2   Q.   Where is that?

3   A.   It's in Tuscaloosa.  I don't know -- I don't know

4   the dates.  I think I worked there over a year, right

5   at maybe a year and a half to two years.  It was on the

6   weekends.

7   Q.   Part-time?

8   A.   Yeah, it was -- it was part-time with the complete

9   weekend, so it as considered -- I wasn't getting forty

10  hours.

11  Q.   How many hours do you think you got?  Thirty?

12  A.   I was there from Friday evening until Monday

13  morning, however many hours, I done forgot.

14  Q.   Okay.

15  A.   Friday evening at 4:00 until, say, Monday morning

16  at 8:00.

17  Q.   Okay.  Let me back up to Partlow.  Was Partlow a

18  merit-type job?  Did you have to get on a registry

19  either with the State or University or --

20  A.   I think so, I think so.

21  Q.   What about Indian River, did you have to get on a

22  merit-type --

23  A.   No, I think I just filled out an application at

21

1    Indian River.

2    Q.    And Brewer, was that a merit position?

3    A.    I filled out an application.

4    Q.    Is there any reason why you would not have put

5    Indian River on your job application for employment

6    with the State of Alabama Department of Transportation?

7    A.    No, probably just like right now, I just forgot

8    it.

9    Q.    Okay, why did you leave Indian River?

10   A.    Let me think.  Like I said earlier, I worked from

11   4:00 Friday evening until 8:00 Monday morning.  After

12   their clients were in bed, it was what they call, staff

13   had -- that was their own time.  I left and went to a

14   wedding and came back and the supervisor was there and

15   we had a disagreement about me leaving, so I left.

16   Q.    Would it be fair to say, then, was that when you

17   left employment with Indian River?

18   A.    Yes.

19   Q.    Would that be fair to categorize that as leaving

20   your job without permission?

21   A.    No.

22   Q.    Did you have permission to go to the wedding?

23   A.    No.

TONY CABBIL, VOL.I - 5/2/2006

22

1   Q.   How would you categorize that activity, if you can

2   categorize it?

3   A.   Because I thought I was on my own time because the

4   clients were -- I had done what I was supposed to have

5   done for my clients.

6   Q.   Was your job to supervise your clients even though

7   they might have been asleep?  Did you have any

8   responsibilities there for tending to clients if they

9   woke up at night or had an emergency or had a problem,

10  would you have been required to assist them?

11  A.   The majority of my -- well, all of my clients that

12  I had were mostly self-sufficient.  My primary reason

13  for being there was to take them grocery shopping,

14  making sure they had their medication, making sure they

15  had their lunches packed for the next day to go to

16  work.

17  Q.   But was your job responsibility to be on-site so

18  that you would be there to assist when necessary?

19  A.   I would say so, but after a given hour, that's why

20  we had the disagreement, because after a certain hour,

21  which was considered my sleep time, I thought I could

22  leave and that's where the disagreement came in at.  I

23  wasn't getting paid for what they call your sleep time.

23

1   Q.   Okay, and when was the sleep time?

2   A.   I think it was from 10:00 until 6:00.

3   Q.   10:00 p.m. until 6:00 a.m.?

4   A.   Yes.

5   Q.   Okay.  And when was the wedding that you went to?

6   A.   I left there probably about 9:30 going to the

7   wedding.

8   Q.   At night?

9   A.   Yes, the reception, not the wedding, the

10   reception.

11   Q.   Do you remember whose wedding that was?

12   A.   No, I don't.  It was a friend of a friend, and I

13   don't know who, exactly who it was.

14   Q.   But suffice it to say whether you were at fault,

15   you did leave the job site for a period of time to

16   attend the wedding and then you came back and your

17   supervisor chastised you for not being at your position

18   at the work site?

19   A.   Yes, sir.

20        MR. SIMON:  Object to the form.

21   Q.   What was the next job of any type, whether

22   part-time or full-time, that you had after you left

23   Brewer?

24

1    A.    After Brewer Ports?

2    Q.    I guess I'm asking did you have any other jobs

3    before you came to work with ALDOT?

4    A.    No.

5    Q.    So you left Brewer Ports in 2000, and do you

6    remember your first day or when you first began working

7    for the Department of Transportation?

8    A.    I think it was July the 30th or July the 31st, I'm

9    not sure.

10    Q.    Of 2001?

11    A.    Yes.

12    Q.    What did you do to support yourself between 2000

13    in July and 2001?

14    A.    Odd jobs.

15    Q.    Do you remember any of the odd jobs you had during

16    that interim?

17    A.    Doing yard work for friends, doing yard work

18    around the house.

19    Q.    Let me rephrase that.  Did you work for any

20    business concern or did you work for any supervisor

21    other than the individuals that might hire you to do a

22    specific job?

23    A.    No, sir.

1   A.   As far as I know.

2   Q.   But would the Tuscaloosa office be where you

3   generally reported to or turned in your paperwork to or

4   got your paycheck from?

5   A.   I got my paycheck from the Tuscaloosa -- I went to

6    -- I always had to leave from Division IV because

7   that's where the vehicle was.

8   Q.   Okay.  That's kind of what I'm asking.  Was that

9   your starting point every day?

10   A.   Right.

11   Q.   The Division IV and the District II office, are

12   they in the same complex?

13   A.   Right.

14   Q.   Division IV and District II are together and you

15   might have other districts at other places that are

16   still under the Division IV supervisors; am I right in

17   that regard?

18   A.   Different -- Division IV, District II, I worked

19   primarily in -- well, on 69, some on 43.  I left there

20   and went from --

21   Q.   And you're talking about highways; correct?

22   A.   Highway 43, right.  Then at the same time, at one

23   point, I went from Highway 43 to Interstate 65 which

33

1    was in Chilton County or Shelby County, whichever, but

2    it was still in Division IV because I had to leave

3    Division IV to get to where I was going.

4    Q.   Because you had to get in your truck to travel?

5    A.   That's right.

6    Q.   So you were furnished a truck to go to and from

7    your job sites, wherever they might be on any given

8    day?

9    A.   Yeah.

10   Q.   You didn't have to put gas or use your own car?

11   A.   At some point, I did.

12   Q.   Do you remember who your immediate supervisors

13   were when you first started working for DOT?

14   A.   Talbert Essary, E-s-s-a-r-y, I think.

15   Q.   Okay, and when did Talbert Essary -- that's a he,

16   I'm assuming -- when was he your supervisor?

17   A.   From the time I was hired until probably --

18   Q.   Or how long?

19   A.   Maybe a year, I think a year or better, I don't

20   know.

21   Q.   Is Talbert black or white?

22   A.   White.

23   Q.   How did you get along with Talbert Essary?

34

1    A.    Fine.

2    Q.    No problems whatsoever?

3    A.    None that I can recall.

4    Q.    Did he ever have to discipline you or counsel you

5    on the job?

6    A.    Not to my memory.

7    Q.    After Mr. Essary was your supervisor, who next

8    became your supervisor?

9    A.    Donna Elliott.

10    Q.    And let me back up to Mr. Essary.  Do you know

11    what his job title was?

12    A.    Project engineer, I think.  I'm not certain.

13    Q.    Now, is Donna Elliott a project engineer?

14    A.    As far as I know.

15    Q.    And is Donna Elliott a white female?

16    A.    Yes.

17    Q.    How long did you or was Donna Elliott your

18    supervisor?

19    A.    Give or take, a year, a little over a year, I

20    don't remember.

21    Q.    Now let me just get a little handle on how your

22    normal workday would pan out.  Now, you would report to

23    the division to get the vehicle to go to wherever you

35

1  were going to be working on a given day, right, is that

2  correct?

3  A.   Yes, sometimes.

4  Q.   Okay, and I'll let you tell me when that wasn't

5  the case, but usually that would be the process?

6  A.   Yes.

7  Q.   And you would have been given instructions as to

8  where you were supposed to be on that particular day so

9  that you would know where to go; correct?

10  A.   Once we got to the -- once we leave the division

11  office, we had to drive to the site office.  And when

12  you get to the site office, they would tell you where

13  you need to go or what you need to do out on a project.

14  Q.   So let me just see if I've got this straight in my

15  mind.  If your job was to oversee and perform a

16  function at a road project, and that's what these are,

17  road projects; right?

18  A.   Right.

19  Q.   It might be putting a bridge in, it might be

20  digging a ditch along the side, or whatever it was,

21  part of your function as an EA was to, I guess, inspect

22  and review the work as it was in progress; correct?

23  A.   Correct.

36

1    Q.    And take daily notes to ensure that the contractor

2    or whoever was performing the job was doing what he was

3    supposed to do; correct?

4    A.    Correct.

5    Q.    So wherever that particular project was going on

6    on the particular highway would be where your actual

7    work would be that day; right?

8    A.    Correct.

9    Q.    So who would be, if there was any, your supervisor

10   when you actually got out to that particular work

11   project?  Would Donna Elliott be out there supervising

12   you directly when you were out at an actual work site?

13   A.    Not all the time.

14   Q.    Sometimes though?

15   A.    Sometimes.  She had two different projects going

16   on; one on Highway 69 and one on Highway 43, I think,

17   so she wouldn't be there --

18   Q.    Your best recollection and judgment, how often

19   would you see Donna Elliott out on the work site while

20   you were performing your tasks?

21   A.    Maybe daily, but not all day.  She might

22   sometimes.

23   Q.    She might come by for a brief period of time every

37

1   day?

2   A.   Mostly every day, not every day.

3   Q.   Okay.  And were you required to keep any kind of

4   logs or records or notes as to what you had inspected,

5   reviewed, or taken care of on any given day?

6   A.   Yes, sir.

7   Q.   Is there a name for that particular record or log,

8   or how did you maintain what you were --

9   A.   We used to call it the orange book.

10   Q.   Orange book, okay.  And would it be sort of like a

11   calendar book with dates or just a journal where you

12   would put the date and the activity?

13   A.   We would put the date and activities that would be

14   going on.

15   Q.   I'm just trying to get a visual of the orange

16   book.  Is it basically just a notebook that you would

17   keep?  I know there's a copy of it.  I'm just trying to

18   visualize it in my mind.

19   A.   Yes.

20   Q.   Now, do you know who -- well, let me back up a

21   minute.  You got along well with Essary and you didn't

22   get along well with Elliott; is that correct?

23   A.   At some point.

38

1  Q.  When she first became your supervisor, did y'all

2  work okay together?

3  A.  Fine, we did fine.

4  Q.  And how long, if you could put your finger on it,

5  how long did you and she work okay together without

6  problems, a year, six months?

7  A.  I can't recollect exactly how long it was.

8  Q.  You can't recollect when you first starting having

9  any problems with Mrs. Elliott?

10  A.  I don't know how long she had been there, but --

11  I'm trying to remember when she came.

12  Q.  Well, did Essary retire or transfer or --

13  A.  No, he went to another position.  I don't remember

14  the exact time frame in between when he left and she

15  came and how long she had been there before we started

16  having problems.

17  Q.  What is the first thing you remember being a

18  problem with Donna Elliott?

19  A.  I went to her with a concern or issue concerning a

20  coworker.

21  Q.  Is that going to be Mr. Smelley?

22  A.  Yes, sir.

23  Q.  Would that be when you first began or first

39

1    believe you were having or had problems with Mrs.

2    Elliott?  I'm just trying to get a time frame as to

3    when --

4    A.   That would be one of the times, yes.

5    Q.   Okay.  And I guess I'm just trying to clarify when

6    you began having work-related problems.

7    A.   Okay.

8    Q.   And if we know when you went to her about Mr.

9    Smelley, do you remember any problems or complaints

10   that you might have had with Mrs. Elliott before the

11   situation with Mr. Smelley?

12   A.   No, I can't remember.

13   Q.   Now, who is Gary Elliott?  Is he in the

14   supervisory chain?

15   A.   Gary Elliott is Donna Elliott's husband.

16   Q.   Do you know what his job is?

17   A.   He's a project engineer too.

18   Q.   Now, how many other EA's did you work with while

19   you were with the Department of Transportation?  Were

20   there others that would have been on the job site with

21   you, I guess that's what I'm asking?

22   A.   Yes.

23   Q.   And if you can remember, who were the EA's that

49

1    Appraisals you received while you were working with

2    DOT?  I only found two.  Do you think you got more than

3    two?

4    A.   I don't know.  I should have had -- maybe I should

5    have had one from Talbert Essary, I'm not sure, and

6    maybe I should have had maybe two from Donna, I don't

7    know.

8    Q.   I saw two in which you received an evaluation of

9    twenty which is meets standards from, I think, Donna

10   Elliott.

11   A.   Okay.

12   Q.   Did you have any disagreement with the evaluation

13   you received of twenty from Donna?

14   A.   Yes, I think it was the second one.

15   Q.   Can you tell me why you or what you thought you

16   should have received and why?

17   A.   I told Donna I thought I should have received more

18   than a twenty because we had a whole year to try to

19   work on anything that I wasn't doing right.  She could

20   have came to me and told me what was my shortcomings

21   and she didn't.  And I ended up with a twenty again and

22   if I'm not doing no better than I did last year, why

23   can't you bringing it to my attention so I can try to

50

1  improve on it.

2  Q.  But you think that might have been the second one

3  that you --

4  A.  I think so.

5  Q.  Did you have a preappraisal conference at the

6  beginning of the rating period that you got that twenty

7  on?  Do you know what I'm talking about?

8  A.  Yeah, I think I did, I think so, I can't remember.

9  I remember -- I might be up here on -- oh, that's

10  somewhere else I worked at, up on Interstate 20-59.  I

11  might have been up there.  She called on the radio to

12  somebody else and they come and called me, come to my

13  truck and told me Donna wanted to see me.  I think that

14  was a preappraisal, I'm not sure.

15  Q.  Did you go over what your job responsibilities

16  were and what was expected of you at the beginning of

17  the rating period?

18  A.  I think so.

19  Q.  Do you know what a mid-appraisal is?

20  A.  I heard of it.

21  Q.  Do you remember getting a mid-appraisal?

22  A.  I can't remember.

23  Q.  So basically, you're saying you got a twenty at

1   the end of the appraisal period and you believe Mrs.

2   Elliott should have told you what you were doing wrong

3   so you could have improved on it and got a better

4   rating?

5   A.   What I'm saying is I felt as though if I got a

6   twenty last year and I haven't improved nowhere from

7   last year to this year, at some point, you could have

8   came to me and told me what I could have been doing

9   different to try to get a higher rating at the end of

10  the year.

11  Q.   But a twenty, though, is a meets standards, it

12  means you are doing what you're supposed to; right?

13  A.   Yes, sir.

14  Q.   So you are meetings the standards that are

15  expected of you?

16  A.   Yes.

17  Q.   You just felt like you were doing more than you

18  should have or more than was required of you to meet

19  standards?

20  A.   I did in certain instances.

21  Q.   So can you tell me realistically what you think

22  your evaluation should have been numerically?

23       .MR. SIMON:  Object to the form.  You can

52

1           answer.

2    A.    Twenty-two or twenty-three would have been

3    satisfactory to me, anything other than the same twenty

4    that I got the year before.

5    Q.    And would a twenty-two or twenty-three have been

6    an exceeds standards?

7    A.    I don't know what it would have been.

8    Q.    But you just thought you did better than a twenty?

9    A.    I thought I did better than a twenty the year

10   before.

11   Q.    What was your usual work week, Monday through

12   Friday in general?

13   A.    Yes, sir.

14   Q.    Sometimes you might have to work other days,

15   Saturday and Sunday; is that right?

16   A.    Saturday but never Sunday.

17   Q.    Did you have any set work hours when you were

18   supposed to be on the job and when you could get off?

19   A.    It would vary.  Sometimes -- the majority of the

20   time, you knew what time you were getting off and if

21   you had to work over, they would notify you -- you

22   would be notified early enough to make arrangements for

23   what I might have to take care of that evening.

56

1    A.    That's what they -- yes.

2    Q.    That's what they said you did to justify firing

3    you?

4    A.    Yes, sir.

5    Q.    And you remember getting a copy of that particular

6    letter?

7    A.    Yes, sir.

8    Q.    Let me ask you a few questions about that if I may

9    and I'll just start with the top (referring to

10   document), and you may want to look on this form to

11   follow along with me, but it indicates that on December

12   16, 2002, you didn't report for work but you called in

13   sick?

14   A.    Yes.

15   Q.    Do you remember that being true?

16   A.    Pretty much so.

17   Q.    Okay, January 13, 2003, didn't report for work,

18   called in sick?

19   A.    I guess so.

20   Q.    You have nothing that would dispute that

21   particular entry?

22   A.    No.

23   Q.    Next, February 19, 2003, didn't report for work,

57

1  called in sick?

2  A.  Yes.

3  Q.  March 18th, '03, didn't report, called in sick?

4  A.  Yes.

5  Q.  March 22nd, 2003, didn't report for work, called

6  in sick?

7  A.  Yes.

8  Q.  March 16, 2003, didn't report, called in sick?

9  A.  Yes.

10      MR. SIMON:  Are you asking him if he did that

11          or that's what the letter said?

12      MR. REDD:  No, I'm just asking him if he has

13          any reason to dispute the fact that

14          those were days where he didn't report

15          for work but did call in sick.

16  Q.  As we sit here today, there's nothing that you

17  have that would dispute that you were off on sick days

18  and that you did call in?

19  A.  Okay.

20  Q.  Do you know whether or not the Department of

21  Transportation had a policy concerning sick call

22  call-ins?

23  A.  Yes, sir.

58

1    Q.   And what was the policy concerning calling in

2    sick?

3    A.   I can't quote it verbatim, but it was like after

4    you get up to seven, you would get, I think, verbal

5    counseling or written counseling or something to that

6    effect and then it would go on and on through the

7    process.

8    Q.   So your best recollection, as we sit here today,

9    is that after a certain number of call-ins sick, you

10   would be subject to some progressive-type disciplinary

11   action?

12   A.   Yes, sir.

13   Q.   Now, there's an entry concerning an August 4, 2003

14   incident where it's alleged that you initiated a

15   confrontation with a coworker and that you engaged in

16   disruptive behavior.  Now, is this the incident with

17   Michael Smelley?

18   A.   To the best of my knowledge, it must be.  I'm not

19   sure.

20   Q.   What do you remember about this situation with

21   Michael Smelley?  Did you initiate a conversation or a

22   confrontation with him?

23   A.   Not a confrontation, but a conversation, and I

59

1    only asked him why couldn't he get out of his truck and

2    help sign -- we had to sign tickets on loads of

3    whatever was being brought in that day and he wasn't

4    doing his part in what he should have been doing.

5    Q.    Tell me what you mean by signing tickets.    What

6    does that mean?  What did you physically have to do?

7    A.    You physically have to sign -- you have to get a

8    ticket from the driver, sign it, and give it back to

9    the driver making sure -- you're making sure he's

10    bringing what he says he's bringing out on that

11    project.

12    Q.    That did not entail you having to unload anything

13    or do any physical labor; correct?

14    A.    No.

15    Q.    Basically just --

16    A.    Signing a ticket.

17    Q.    -- noting that something had come in as specified?

18    A.    What actually happened, there would be like three

19    copies, I think a white copy, a green copy, a pink

20    copy.  You keep two copies.  One copy goes to the

21    project office, one copy goes to the contractor, and

22    one copy goes back to the driver.

23    Q.    So everybody has got proof that the load was

60

1   delivered?

2   A.   Exactly.

3   Q.   And you had a problem because Mr. Smelley was not

4   helping you or you and some others?

5   A.   Me.  I think on that particular day, it was me,

6   Michael Smelley, and Toreatha Bostic.

7   Q.   Now, was Bostic taking tickets like you were?

8   A.   Yes, sir.

9   Q.   Okay, and what do you say Mr. Smelley was doing in

10   lieu of helping y'all do the tickets?

11   A.   He was sitting in his truck working a crossword

12   puzzle.

13   Q.   And this has August 4, 2003 as the date, and it

14   calls it a confrontation, but I'll just call it a

15   conversation with Smelley.  Do you remember that being

16   about the time?

17   A.   To the best of my ability, to the best of my

18   knowledge.

19   Q.   And the quote, "conversation" would have been over

20   him not helping y'all do the work?

21   A.   Yes, sir.

22   Q.   And sitting in his vehicle doing a crossword

23   puzzle?

61

1    A.    That was part of the conversation.

2    Q.    What else was involved in that conversation?

3    A.    That was most of the conversation, why can't you

4    get out and help us sign these tickets.

5    Q.    Did you have any other issue with Mr. Smelley on

6    that particular day?

7    A.    To the best of my knowledge, no.

8    Q.    And before the particular day where you had the

9    conversation with Mr. Smelley, had you brought to any

10   supervisor's attention that Mr. Smelley was not

11   performing his job like he should?

12   A.    I think it was on that same day, I brought it to

13   Donna Elliott's attention.

14   Q.    But before that day, you had not brought that to

15   -- Mr. Smelley's, let's say, laziness or inability to

16   help y'all work, you hadn't brought that to your

17   supervisor's attention?

18   A.    I can't recall.

19   Q.    Okay.  But on this particular day, and I have it

20   listed as August 4, 2003, you had a conversation with

21   Mr. Smelley.  What did he say to you, if anything?

22   A.    I can't remember exactly what he said because the

23   conversation went on something to the point why can't

62

1    you get out and help us sign these tickets and he said

2    I'll get out sooner or later, I ain't finished with

3    this puzzle yet.

4    Q.   Do you recall anything else about the conversation

5    you had with Mr. Smelley on that particular day?

6    A.   No, sir, that's all I can recollect right now.

7    Q.   Did you raise your voice to him?

8    A.   No, sir.

9    Q.   Did he raise his voice to you?

10   A.   No, sir, not that I can recollect.

11   Q.   Now, at that particular point in time, you and Mr.

12   Smelley were coworkers as opposed to you being his

13   supervisor; is that right?

14   A.   I never was his supervisor.

15   Q.   Did you have or have you had any other

16   confrontations with or conversations with Mr. Smelley

17   about what you thought was his lack of performance on

18   the job?

19   A.   Yes, sir.

20   Q.   And when would that have been?

21   A.   I don't remember, but --

22   Q.   Well, do you remember the nature of any

23   conversation or confrontation that you might have had

63

1    with Mr. Smelley over what you believe to be his

2    ineffectual work?

3    A.   Yes, yes, sir, I do.

4    Q.   Tell me what you talked to him about.

5    A.   I talked to him about putting down hours that he

6    hadn't actually worked.

7    Q.   Okay, and how would you come to know that he had

8    put down hours that were not actually worked?

9    A.   We had this board in the office.  Everybody put

10   down with a magic marker the hours they have worked and

11   you could erase it or you could, you know, it was just

12   a bulletin board and you do it because you are being

13   honest.  You don't have no time card that you had to

14   just punch.

15        And that particular morning -- he had been

16   doing it for a while.  And me and him was in the office

17   alone that morning and I asked him Michael, it's about

18   time for you to put down the hours that you actually

19   worked.  He said what do you mean.  I said you didn't

20   work the hours that you've got up there.  So he went up

21    -- he got up and went and changed it and put the hours

22   he actually worked.

23   Q.   Was that less or --

64

1    A.   Less, less.

2    Q.   Do you remember when that was?  Was it before or

3    after the conversation about the tickets?

4    A.   It was after.

5    Q.   How long after, a month, a week?

6    A.   It ought to be on here (referring to document).  I

7    forgot.  I done forgot how long it was, but it was

8    afterwards.

9    Q.   Well, to your best judgment, was it more than a

10   month?

11   A.   Yes, I think so.

12   Q.   More than three months?

13   A.   I'm not sure.

14   Q.   You've identified two occasions when you had a

15   conversation with Mr. Smelley about his job, one being

16   the tickets and the second being him putting down

17   erroneous amount of time worked on the time board, I'll

18   call it.  Did you have any other conversations or

19   confrontations with Michael Smelley concerning work?

20   A.   No.

21   Q.   When you talked about the time, you were not Mr.

22   Smelley's supervisor?

23   A.   No.

65

1   Q.   After the ticket conversation, you indicated

2   before that you went to Donna Elliott and complained

3   about Mr. Smelley not, I guess, pulling his fair share

4   of the work.

5   A.   Right.

6   Q.   What did Mrs. Elliott say to you, or what did you

7   tell her and what did she say to you?

8   A.   I don't recollect what was actually said, but to

9   the best of my -- the best I can remember, she didn't

10  do or say anything that was to mean she was even

11  concerned about what I even had told her.

12  Q.   Okay.  Well, let me ask you this: have you ever

13  worked crossword puzzles while you were on the job?

14  A.   No, sir.

15  Q.   Ever?

16  A.   No, sir.

17  Q.   Have you ever left work early without permission?

18  A.   No, sir.

19  Q.   Have you ever put down more hours on the job board

20  than what you had actually worked?

21  A.   No, sir.

22  Q.   Have there been any other instances where you have

23  had conversations with Smelley other than what you just

66

1  told me?

2  A.  No, sir.

3  Q.  Have you had any similar type conversations with

4  any of the other EAs that you worked with?

5  A.  No, sir.

6  Q.  Basically, Michael Smelley is the only one that

7  you really had a problem with regarding work?

8  A.  Yes, sir.

9  Q.  Now, when you had the conversation with Smelley

10  about putting the wrong number of hours on the board,

11  did you go tell your supervisor about that?

12  A.  No, sir.

13  Q.  On the sheet, the form letter that I gave you, it

14  says September 21st, '03 through October 3rd, '03, you

15  didn't report for work, called in sick.  Do you

16  remember being sick for that period of time or do you

17  remember that particular illness you might have had

18  during that time period?

19  A.  I can't remember right now.

20  Q.  Were you having any kind of medical problems

21  during that time period that required you to be out

22  sick?

23  A.  Yes, sir.

70

1  Q.  And did you understand that signing an appraisal

2  was not necessarily an agreement with the appraisal,

3  but an indication that you had received one?

4  A.  I think I was just frustrated because of the fact

5  that I got another twenty.

6  Q.  But after it was explained to you that you could

7  receive disciplinary action for failure to sign that,

8  you did, in fact, sign it?

9  A.  Yes, sir.

10  Q.  November 20th, 2003, do you remember calling in

11  sick?

12  A.  Not really.

13  Q.  If there's a document or leave slip that shows

14  that you called in sick, you wouldn't dispute that,

15  would you?

16  A.  No.

17  Q.  Now, and I don't know if this is correct or not,

18  it says on November 25th, you complained about being

19  assigned to work in Tuscaloosa instead of Chilton

20  County.  Is that just the opposite?

21  A.  It's backwards.

22  Q.  So you had been assigned to work in Chilton County

23  instead of Tuscaloosa and you didn't think that was

71

1    fair?

2    A.   Not fair, right.

3    Q.   Tell me why you didn't think that was fair.

4    A.   Mostly because I didn't have no problem with doing

5    it for a while.

6    Q.   Okay.

7    A.   I went to Donna and talked to Donna about it.  I

8    told her about -- she was aware of my body producing

9    too much blood and I didn't have no kind of means of

10   communication if I broke down or got sick on the road.

11   She told me well, try your best to get to a service

12   station or something.  Didn't show no kind of sympathy

13   or empathy about my health, and that was my main

14   concern.

15   Q.   So your main reason for not wanting to be over in

16   Chilton County was because of your health and an

17   inability to get assistance if you had some kind of

18   medical emergency?

19   A.   And for her to try to locate other employees, you

20   know, where it wouldn't have to be on me every day week

21   after week.

22   Q.   How many times do you remember during this time

23   period were you actually required to go over to Chilton

1   County to do work?

2   A.   Probably, I'm estimating, a month and a half.

3   Q.   And were you the only person that was required to

4   go over to Chilton County?

5   A.   Yes, sir.

6   Q.   You were the only EA on that job?

7   A.   From Donna's office, yes, sir.

8   Q.   Okay, but there were other EA's on the job?

9   A.   From the area, from the Chilton County area or

10   that division or whatever.

11   Q.   Do you recall that being out of Division IV or in

12   Division IV?

13   A.   I don't know.

14   Q.   Do you believe the rotation should have been done

15   on a -- I guess, do you believe white EAs should have

16   been required to be in that rotation?

17   A.   If necessary.

18   Q.   Were white EAs ever sent over to Chilton County to

19   work that project?

20   A.   Not to my knowledge.

21   Q.   Were white EAs from the Tuscaloosa office ever

22   sent to work on projects that were a similar distance

23   from Tuscaloosa as was the Chilton County project?

78

1    A.   Exactly, and within a week or two, one of them was

2    fixing to come off.

3         (Whereupon, Defendant's Exhibit No. 4  was

4    marked for identification, a copy of which is attached

5    to the deposition.)

6    Q.   Let me show you what's marked as Defendant's

7    Exhibit No. 4 and just ask you if you can identify that

8    particular document?

9    A.   (Examining document:) Yes.

10   Q.   Is that a warning for absenteeism?

11   A.   Yes.  See, during this time, that's when I was

12   talking to the --

13   Q.   The EA person, Employee Assistance?

14   A.   It was during this same period of time when I had

15   to go and talk to Mr. Taylor and one of them occasions

16   was going to come off and instead of it being seven, it

17   would have put it back to six.

18   Q.   But this is a warning, correct --

19   A.   Yes.

20   Q.   -- that's basically telling you that you need to

21   be prudent about your call-ins?

22   A.   Yes, sir.

23   Q.   And that further such action would result likely

1  in a reprimand; correct?

2  A.   I imagine so.

3  Q.   I mean it kind of warns you right there that next

4  time we have a problem like this, you're going to get a

5  reprimand and that a reprimand can have an effect on

6  evaluations; is that correct?

7  A.   Correct.

8  Q.   Now, who is Mr. Stringfellow?  Do you know anybody

9  named Stringfellow?

10  A.   Yeah, he's, I think, a case manager.

11  Q.   Site manager?

12  A.   Site manager, yeah.

13  Q.   Is he a DOT employee or was he?

14  A.   As far as I know.

15  Q.   Did you have some problem learning how to do --

16  it's called Site Pad DWR, what's a DWR?  Daily Work

17  Record?

18  A.   Yeah.  See, it's like you've got a little

19  hand-held computer and you have to enter all of your

20  daily activities onto that and when you get back to the

21  office, you've got to transfer it from that to your

22  main computer.

23       And yes, I had severe problems with computers

80

1   because I am computer illiterate and I made that aware

2   to both Donna and Lewis Rager.  Lewis Rager said it was

3   not a problem, just continue to do it the best I could

4   in my other records, either in my log book or my orange

5   book.

6   Q.   Did Mr. Stringfellow try to give you assistance

7   and training on how to -- I think he calls it sinking

8   the site pad DWR?

9   A.   Where are we at now?

10   Q.   It's -- well, have you ever heard the term sinking

11   the site pad DWR?

12   A.   Something to that effect.

13   Q.   I think that's what you described, in other words,

14   putting your daily records from the computer into the

15   mainframe computer for a permanent record?

16   A.   Right.

17   Q.   But you would admit you had a problem with doing

18   that?

19   A.   Yes, sir.

20   Q.   And is it true that you were scheduled for

21   training several times but didn't get to go to

22   training?

23   A.   Not to my knowledge.  Not to my knowledge was I

81

1    scheduled several times.

2    Q.    Several?

3    A.    Several times, that was not to my knowledge.

4    Q.    Did Mr. Stringfellow attempt to give you

5    one-on-one training to assist you in how to do that

6    function?

7    A.    He did.

8    Q.    And you still did not get it?

9    A.    Well --

10   Q.    You didn't become proficient or adept at doing

11   that function?

12   A.    He thought so.

13   Q.    Stringfellow thought you --

14   A.    He thought so at the time that I was getting

15   better.

16   Q.    Okay.  Did you still have to have coworkers assist

17   you in doing that function?

18   A.    During that time when I was back and forward to

19   Chilton County doing different things that didn't even

20   require no site pad.  It required a daily log and that

21   was it.

22   Q.    But at some point in time, would the sinking the

23   site pad been a part or function of the DAs job?

82

1   A.   Yes.

2   Q.   Including you?

3   A.   Right.

4   Q.   To your knowledge, were other EAs required to do

5   that function?

6   A.   Yes, sir.

7   Q.   December 19th, 2003 -- let me let you identify

8   this particular document.

9         (Whereupon, Defendant's Exhibit No. 5 was

10   marked for identification, a copy of which is attached

11   to the deposition.)

12   Q.   Tell me what that is (referring to document).

13   A.   I left the job on lunch break.  I got sick while I

14   was on lunch break.  I took some medication and

15   overslept.  When I went back to the job site, nobody

16   was there so I went back to the office and had to go

17   see, I think, Lewis Rager or Gary Elliott.

18   Q.   Okay.

19   A.   And I explained to them what had happened.

20   Q.   Where was the job site that you were supposed to

21   be on?

22   A.   A bridge on the Northport side.

23   Q.   And when you left the job site, where did you go?

83

1    A.    I went home on lunch break.

2    Q.    Are you normally permitted to go home on lunch

3    breaks?

4    A.    Wherever you -- as far as I knew, as long as you

5    could go anywhere and be back within an hour, you could

6    go where you wanted to go.

7    Q.    Suffice it to say you didn't make it back within

8    an hour?

9    A.    No.

10   Q.    When you went home, you said you got sick?

11   A.    Yes, sir.

12   Q.    While you were at home and before you -- I guess

13   you took a nap?

14   A.    Yeah, that's what made me late.

15   Q.    Before that, did you call your supervisor and say

16   I'm not feeling too well, I'm at home, I might not be

17   back?

18   A.    No, I didn't.

19   Q.    Why not?

20   A.    I was feeling bad and I didn't know I as going to

21   over sleep and it didn't dawn on me that I was going to

22   oversleep.

23   Q.    So albeit you might have had a good excuse for not

84

1    being back on the job site, you were not there when you

2    were supposed to be?

3    A.    Exactly.

4    Q.    Hence the reprimand?

5    A.    Right.

6    Q.    Now, it goes on, your pretermination notice,

7    January 15th through 27th, 2004, it said that you were

8    responsible for inspecting a contractor's work.

9    Documentation by you indicated that you had inspected

10    each phase before allowing the work to proceed when, in

11    fact, you had not inspected the work.  Is that the

12    paint project that was referenced in your files, a

13    painting project by a contractor that they say you did

14    not check?

15    A.    Yes, sir, it should be in my file.  There should

16    be some documentation somewhere.

17    Q.    But that's what they're referencing in January?

18    A.    Yes, sir.

19    Q.    Did you, in fact, check each phase of that

20    contractor's work?

21    A.    I sure did.

22    Q.    And was that annotated on your DWRs?

23    A.    Not only I checked it, but Ken Edwards checked it

94

1    on that project that day, I think all the EAs should be

2    taking part in doing that.  Don't single out two people

3    to have them doing it and the other person is sitting

4    over there on his own free will doing what he wants to

5    do but he's still on State time.

6    Q.    And that's Mr. Smelley?

7    A.    Exactly.

8    Q.    Besides Mr. Smelley, there were no other EAs that

9    were doing a similar type --

10   A.    Not to my knowledge.

11   Q.    That's fair and equal.  Are there any other things

12   that you thought were unfair about how you were treated

13   that you referenced in that particular complaint?

14   We've got, as a result, you want everybody to have to

15   kick in like everybody else to work.

16   A.    Yes.

17   Q.    Anything else?

18   A.    Be fair about putting down your time that you done

19   worked instead of cheat.

20   Q.    So you had a beef with Smelley putting down more

21   time than he actually worked; correct?

22   A.    Right.

23   Q.    But that was something he was doing which you

95

1   contend was being dishonest?

2   A.   Right, and then his response was I didn't mean to

3   offend you.  You're not offending me is what I told him

4   and I also told him this, you come to me on a Monday

5   morning and a Thursday morning and tell me what you

6   have talked about in church.  You're trying to live the

7   life of a Christian, but to me, you're being a

8   hypocrite.

9         And when I said that, he just blowed up.  You

10  people.  What you mean, you people, who are you people.

11  Q.   Mr. Smelley blew up at you?

12  A.   Yes, sir.

13  Q.   Now, is this different than what you told me Mr.

14  Smelley had done when we first started talking about

15  it?

16  A.   No, we didn't get to that point.

17  Q.   Well, let's get to it now.  When did Smelley blow

18  up?  Is this when he was putting the hours on the

19  board?

20  A.   Exactly.

21  Q.   And he said you people?

22  A.   Yeah, he told me you people, I don't have to

23  answer to you people.  I asked him who are you people,

104

1    A.   And I told you about him putting the --

2    Q.   Cheated hours, and that's Smelley?

3    A.   Yes.

4    Q.   What else?

5    A.   It's probably in my -- can I say -- go back to the

6    documentation that I provided would be some of the

7    other things that I would want.

8    Q.   So whatever you had provided in connection with

9    that particular grievance --

10   A.   Yes.

11   Q.   -- would be what you wanted?

12   A.   Yes.

13   Q.   And that should be spelled out in the documents

14   that were involved in that particular grievance?

15   A.   As far as I know.  To the best of my knowledge.

16   Q.   And the grievance was more than just one step;

17   right?

18   A.   Yes.

19   Q.   And you were dissatisfied with the results at

20   every step?

21   A.   Yes, sir.  I got tangled up for a second.

22   Q.   What was the, and I think it was in that complaint

23   there (indicating document), what complaints did you

105

1    have about a coworker Nell Clemmons saying something to

2    Elliott about you?  Do you remember that?  What are we

3    talking about there?  I didn't quite understand that.

4    Maybe you can shed a little light on that for me.

5    A.    (Examining document.)  I done forgot exactly what

6    comment was made to Donna by Nell.  I done forgot.

7    Q.    So you're basically saying that Nell --

8    A.    I remember this (referring to document), but I

9    don't remember the comment.

10   Q.    But Nell Clemmons would have said something about

11   you to Donna Elliott?

12   A.    Yes.

13   Q.    Was it derogatory as you remember?

14   A.    I'm trying to think of this specific thing that

15   she said.  I done forgot.  I done forgot what it was

16   she said.

17   Q.    Was what she supposedly said something that caused

18   you to be reprimanded or disciplined in any fashion?

19   A.    It was -- no, I wasn't reprimanded.  I done forgot

20   exactly.  Whatever it was she said, I didn't take -- I

21   didn't kind to what she had said.  That's why I went to

22   Donna with it to keep down a disturbance between her

23   and myself.

106

1  Q.  How did you learn that Nell Clemmons had said

2  something to Donna about you?  Did someone else tell

3  you that?

4  A.  Yeah.

5  Q.  But you don't remember what it was?

6  A.  No, and I forgot who told me, but it didn't amount

7  to no reprimand or nothing disciplinary as far as I'm

8  aware of.

9  Q.  I think in there you also make reference and bring

10  up as an issue that you were being sent over to Chilton

11  County when it should have been a rotation among the

12  EAs for that particular job and you've already told me

13  about that; right?

14  A.  Yes.

15  Q.  Then you also complained that you should have

16  gotten at least as good an evaluation as Smelley; is

17  that right?

18  A.  Well, I didn't say as good as his.  I said I

19  shouldn't have got the same twenty that I got the year

20  before.

21  Q.  So were you not comparing yourself to Smelley?

22  A.  No.

23  Q.  Now, you also said that -- you complained that you

114

1    that to them, do you not?

2    A.    Right.

3    Q.    And there's an envelope that shows it was directed

4    to the Alabama Personnel Department, Montgomery,

5    Alabama.  Do you remember mailing that?

6    A.    Yeah, but I done forgot why I did it, I don't

7    know.

8    Q.    But suffice it to say you didn't follow up on that

9    appeal because no subsequent hearings were held before

10    the State Personnel Board or one of its hearing

11    officers?

12    A.    Right.

13    Q.    And I guess my question, again, is why did you not

14    go forward with that appeal?

15    A.    I don't remember.

16    Q.    Ultimately, you filed an EEOC charge, which I've

17    shown you the document that you would agree is what you

18    filed with them and your claim is discrimination on

19    account of your race, being black; correct?

20    A.    Yes.

21    Q.    And you claim that you were retaliated against for

22    having filed a complaint concerning racial

23    discrimination; correct?

115

1   A.   Right.

2   Q.   And have you told me everything about the

3   complaints that you have filed concerning

4   discrimination?

5        MR. SIMON:  Object to the form.

6   A.   As far as I can remember right, yes, as far as I

7   can remember.

8   Q.   You filed the internal grievance that we've shown

9   you as one of the exhibits; correct?

10  A.   Correct.

11  Q.   And you also indicate that you have also made

12  complaints about racial discrimination to your

13  supervisors?

14  A.   Correct.

15  Q.   And that would be which supervisors, Donna

16  Elliott?

17  A.   I made -- repeat that question.

18  Q.   What I'm asking is you're claiming retaliation for

19  having voiced complaints about racial discrimination

20  and I just want to know what complaints were voiced by

21  you that you believe was followed by retaliatory

22  conduct on the part of DOT employees?  Now, we know

23  about the complaint and the internal grievance.  What

TONY CABBIL, VOL.I - 5/2/2006

116

1   else?

2   A.   The complaints that I made toward Michael Smelley

3   to Donna Elliott.

4   Q.   So correct me if I'm wrong, correct my

5   recollection, but you testified that you told Donna

6   Elliott about Michael Smelley doing puzzles and not

7   helping y'all out and basically, she disregarded that?

8   A.   Yes, sir.

9   Q.   And did you tell her about Michael Smelley padding

10  the books and not showing proper hours?  You didn't

11  tell her about that, did you?

12  A.   He told her about that.

13  Q.   Smelley told her?

14  A.   He told her about that in about a

15  three-and-a-half-hour conference in her office and then

16  about an hour and a half later, she called me into her

17  office wanting to hear my side after he talked to her

18  about three and a half hours.

19  Q.   And then you told your side?

20  A.   And then I told my side.  That's when she

21  questioned my integrity, and I asked her why are you

22  questioning my integrity.

23  Q.   Do you claim that that particular conversation

117

1   with Donna Elliott prompted retaliation on the part of

2   Donna Elliott or any other DOT employee?

3   A.   Yes, sir.

4   Q.   How so?

5   A.   To the fact from that point on, it seemed as

6   though I was being treated totally, totally different.

7   Donna would pass by me and would roll her eyes at me.

8   She would say things in a negative tone which I took to

9   be offensive.

10  Q.   Explain to me what you mean by she talked to you

11  in a negative tone.

12  A.   For instance, the way in which she told me about

13   -- after I had had this meeting with her and George

14  Blanton I think, or John something, she came -- she

15  passed by me afterwards and said you better go get you

16  an EEOC rep now because you are really going to need

17  it.  And I responded well, that's my next move.  It's

18  the way in which she said things and how she said it I

19  took to be offensive.  I watched her body gestures and

20  her tone of voice.

21  Q.   What body gestures?

22  A.   The way in which she doing things, saying things

23  to me as she was passing by, not no little gentle stuff

118

1    like that (indicating).

2    Q.   Well, I mean you've got to describe for me in

3    words, what was she talking like?

4    A.   She was walking past me, you better go ahead and

5    get you an EEOC representative because you're going to

6    really need one now.

7    Q.   You seem to be pointing your finger.  Did she

8    point her finger?

9    A.   Exactly, the same way that she did to me when she

10   pointed her finger when I listed in my complaint about

11   when I was telling her about Michael Smelley.

12   Q.   Did she ever touch you?

13   A.   No, she didn't.

14   Q.   Have you ever seen her point her finger at other

15   employees?

16   A.   No, I haven't.

17   Q.   So we've got tone of voice, negative manner of

18   talking to you, pointing her fingers at you when she's

19   talking with you.  What else about Donna Elliott do you

20   contend was either discriminatory or retaliatory?

21   A.   I'll tell you about the way she treated me -- the

22   way I felt retaliated against was because of the

23   previous complaints I had made about discrimination

119

1   including my grievance.

2   Q.   But what you've told me, basically, is about

3   Michael Smelley and your complaints about him.

4   A.   Michael Smelley is the center of the whole -- the

5   way the whole issue got started.

6   Q.   Michael Smelley, was he a favorite of everybody's

7   or --

8   A.   I can't answer that.

9   Q.   Had he been working there longer than you?

10  A.   Somewhat, but I don't know how long.

11  Q.   Do you have a guess, five years, three years?

12  A.   I have no idea, I don't know.

13  Q.   Was he more proficient than you in your work?

14  A.   I guess some of it because I think, I think he

15  came from a county road crew that referred him to the

16  state and had some kind of more knowledge.  I don't

17  know.  I'm not even sure of that.

18  Q.   So he may have been more experienced than you on

19  the job because of his prior work?  He may have been

20  more proficient in certain functions than you because

21  of his prior work; correct?

22  A.   Correct, but that didn't give him the right to not

23  do his part on the job he was on at that particular

127

1  Q.  Are you saying that's an evidence of

2  discrimination?

3  A.  I say this: I say I think if it had been a white

4  employee down there, he would have showed some kind of

5  consideration or concern.

6  Q.  But you don't know that for sure, do you?

7  A.  That's my belief.

8  Q.  He might not have said anything to a white

9  employee?  He might have been able to see that you

10  weren't hurt; right?

11  A.  I doubt it, not from where he was at.  He heard

12  the rocks though.

13  Q.  You don't know that, do you?

14  A.  From where he was standing, he didn't know whether

15  or not I was hit.

16  Q.  But you believe it's discriminatory on his part

17  because he did not ask you if you were okay?

18  A.  He didn't show enough concern.

19  Q.  Are there any other instances concerning Nicky

20  Calhoun that you believe were discriminatory?

21  A.  I barely know of him.

22  Q.  What about retaliation, did Nicky Calhoun

23  retaliate against you in any way for having filed

128

1   grievances or complaints?

2   A.   I have no idea.  I don't know who was all involved

3   in the decision-making.  I have no idea.  He could

4   have.

5   Q.   What about Lewis Rager?

6   A.   Lewis Rager, I feel as though he retaliated

7   against me.

8   Q.   Let me back up and stop you there and just ask you

9   did he discriminate against you?

10  A.   I think so.

11  Q.   And tell me how.

12  A.   I think he discriminated against me because I

13  filed this grievance against Donna.

14  Q.   So any activity discriminatory or retaliatory on

15  the part of Lewis Rager would have come after you filed

16  the complaint?

17  A.   Yes, sir.

18  Q.   And tell me how or what actions on the part of

19  Lewis Rager that you consider to be discriminatory or

20  retaliatory.

21  A.   (Examining document:) When I went to Lewis Rager

22  to voice my opinions to him about how I felt Donna was

23  being prejudice and she was treating her staff

129

1   different, he told me he would -- he said that was a

2   serious allegation, give him some time and he would do

3   an investigation.

4        Three weeks later, he came back to me and

5   said that he didn't find no evidence of no prejudice on

6   Donna's part. And I asked him how could he justify

7   saying that he didn't find no evidence, did you ask any

8   white employees about Donna and he didn't respond and

9   there was not response.

10       So I turned and asked him did you ask any

11  people of color and he said no. So I asked him again

12  how can you justify that Donna is not prejudice if you

13  only asked white employees and he didn't respond.

14  Q.   So is that discriminatory or is that retaliatory

15  or both?

16       MR. SIMON:  Object to the form.

17  A.   To me, it's both.

18  Q.   Do you know whether or not he did an

19  investigation, albeit by not asking black people? Do

20  you know whether or not he asked any white people?

21  A.   Well, in my opinion --

22  Q.   No, I'm not asking for your opinion.

23  A.   I don't know if he did or not, no, I don't.

131

1    Q.   But we're not talking about two distinct job

2    sites, we're talking a job that might have crossed

3    those counties?

4    A.   Right.

5    Q.   You indicated that you have a complaint that white

6    employees were paid for lunch hours and permitted to

7    work crossword puzzles on the job, and we're talking

8    about Smelley?

9    A.   Yeah.

10   Q.   Nobody else but Smelley?

11   A.   Right.

12   Q.   And you have given me all the names of the EAs

13   that you can remember who worked on the job with you?

14   A.   Right, now, as far as I can remember.

15   Q.   And you've specified whether they are white or

16   black, the people I asked you?

17   A.   Yes.

18   Q.   Was the work you had to do in Shelby/Chilton

19   County the same kind of work that you would have had to

20   do in other locations?

21   A.   It's the same kind I had done in other locations,

22   right.

23   Q.   Have you been employed at all since you were

132

1    terminated from the Department of Transportation?

2    A.    No.

3    Q.    Did you get unemployment compensation?

4    A.    Yes.

5    Q.    Was that protested by the Department?

6    A.    No.

7    Q.    Are you still getting unemployment?

8    A.    No.

9    Q.    How long did that last?

10   A.    Six months.

11   Q.    How are you supporting yourself?

12   A.    Right now?

13   Q.    Right now.

14   A.    On disability.

15   Q.    What kind of disability?

16   A.    I get Social Security for -- I fractured three

17   vertebras in my neck and a bruised spine and got part

18   of my left arm.  Do you need to know when?

19   Q.    Yes.

20   A.    The accident was December '04.  I only started

21   getting my disability January '06.

22   Q.    But you got the right of payment, didn't from the

23   day of your disability onset until the date you

133

1   received your first payment?

2   A.   Yes.

3   Q.   What was your disability onset date, do you know?

4   A.   I think July.  See, you don't get paid for the

5   first five or six months.  I think it goes back to June

6   or July.

7   Q.   Now, are you on straight disability or SSI?

8   A.   Straight disability.

9   Q.   Were you represented by counsel in filing your

10  disability claim?

11  A.   Yes.

12  Q.   Who?

13  A.   Kitty Whitehurst.

14  Q.   What firm is that with or is it a firm?

15  A.   Whitehurst & Whitehurst.

16  Q.   Tuscaloosa?

17  A.   Yes.

18  Q.   Explain to me the nature of your disability.

19  A.   Meaning?

20  Q.   I think you described where you were injured.  Are

21  you disabled to perform any type work?

22  A.   Yes.

23  Q.   What was the date -- you said the accident was

141

1   assignments.  Now, have you told me the job assignments

2   we're talking about?  Is that going to be the

3   Clinton/Shelby County deal?

4   A.   Yes, exactly.

5   Q.   Is that it?  Are there any other job assignments

6   you think were given to you that weren't given to white

7   employees?

8   A.   That's primarily it right there.

9   Q.   And that's the Chilton/Shelby County time that you

10  were required to go over there and work?

11  A.   Yeah, right.

12  Q.   And you believe it should have been rotated?

13  A.   Exactly.

14  Q.   Can you name me a white employee who was similarly

15  situated to you and had committed similar acts of

16  misconduct that was treated more favorably than you?

17       MR. SIMON:  Object to the form.

18  Q.   Do you understand my question?

19  A.   Yes, but I don't have no idea.

20  Q.   Do you contend that Michael Smelley is similarly

21  situated to you with respect to his employment and

22  disciplinary history?

23       MR. SIMON:  Object to the form.