IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| TONY CABBIL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NUMBER: |
| | ) | 2:05-cv-513-T |
| | ) | |
| STATE OF ALABAMA DEPARTMENT | ) | |
| OF TRANSPORTATION and JOE | ) | |
| MCINNES, in his official capacity as | ) | |
| Director of the State of | ) | |
| Alabama Department of | ) | |
| Transportation; | ) | |
| | ) | |
| Defendants. | ) | |

PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

I.    **Introduction**

Plaintiff, Tony Cabbil, and another employee, Kenneth Edwards, inspected a bridge painting

job together; Mr. Cabbil had recently filed a discrimination complaint, while Edwards had not.

When errors appeared in the inspection work, plaintiff was terminated, while Edwards was not even

disciplined.  Everyone who recommended Mr. Cabbil's termination admitted that they could not tell

who had made the errors.  The question in this case is a simple one: why was Tony Cabbil terminated

for the errors on this project, while his co-worker, Ken Edwards, was not?   None of the

recommending officials could give a reason.  There is no testimony from the final decisionmaker

As such, this question is one which can only be answered by a jury and for that reason alone,

summary judgment must be denied.

II.    **Statement of Facts**

A.    **Tony Cabbil's work history with ALDOT**

Tony Cabbil was hired to work at the Alabama Department of Transportation as an Engineering Assistant on July 30, 2001. Mr. Cabbil's first supervisor was Project Engineer Talbert Essary. Cabbil depo. at 32:8-13. Approximately one year after he was hired, Mr. Cabbil began being supervised by another Project Engineer, Donna Elliott. Cabbil depo. at 34:7--20. Ms. Elliott is white.

In December 2003, Mr. Cabbil was transferred to work under Gary Elliott a Project Engineer who is also Donna Elliott's husband. Mr. Cabbil was transferred to work on one specific project - the painting of the Hugh Thomas Bridge which spans the Black Warrior River in Tuscaloosa. Gary Elliott depo. at 13:13-17 (attached hereto as Attachment 8). When Mr. Cabbil went to work for Mr. Elliott, Mr. Elliott already knew who Mr. Cabbil was because Mr. Cabbil had worked under his wife. Gary Elliott depo. at 13:18-23 - 14:1-11.

Mr. Elliott knew when Mr. Cabbil came to work under him that he had not had any experience on a bridge painting job. Gary Elliott depo. at 15:21-23 - 1-8. Elliott testified that "I learned that when he came to me, but I knew that we were going to train him to do his job." Gary Elliott depo. at 16:7-8. Elliott assigned Ken Edwards, the Chief Inspector on the Hugh Thomas painting project, to supervise and train Mr. Cabbil on how to perform the bridge inspection duties. Gary Elliott depo. at 17:6-8; 18:15-23 - 19:1-7. Mr. Elliott monitored Mr. Edwards' supervision of Mr. Cabbil, asking him on occasion how Mr. Cabbil was doing, and Mr. Edwards told Mr. Elliott that Mr. Cabbil was doing okay and that he seemed to be learning. Gary Elliott depo. at 20:4-19. Mr. Elliott also testified that he would go by the bridge project almost every day. Gary Elliott depo. at 21:3-4. When Edwards was training Cabbil on the bridge project, they would be working directly

2

together inspecting the same spans of bridge.  Gary Elliott depo. at 25:10-14.  ALDOT's records show that Mr. Cabbil began inspecting the bridge on Friday, December 12, 2003.  Plaintiff's Exhibit 23.  Once Mr. Cabbil began the bridge inspection, Mr. Cabbil and Mr. Edwards were the only ALDOT employees who worked on that project.  Gary Elliott depo. at 26:5-11.

On March 4, 2004, while Mr. Cabbil was still working on the Hugh Thomas Bridge project, Lewis Rager recommended that Mr. Cabbil be terminated for failing to perform his job properly, inattention to his job, and falsification of records.  Exhibit 5 (Attachment 1 hereto).  Mr. Cabbil was officially terminated on April 27, 2004.  The reasons for Mr. Cabbil's termination will be discussed more fully *infra*.

### B.    Tony Cabbil's complaints of discrimination

While working under Donna Elliott, in late 2003 Mr. Cabbil complained to Lewis Rager, the District Engineer, who was Donna Elliott's direct supervisor, that he felt that Ms. Elliott was discriminating against him because of his race.  According to Rager, "The complaint was how he – he was treated by Ms. Elliot, and he described that he was – felt that she was racist toward the blacks in her office and that he wasn't treated equally like the other engineers in her office."  Rager depo. at 17:14-18 (attached hereto as Attachment 9).  Rager spoke with Ms. Elliott about the complaint, but admitted in his deposition that he did not speak with anyone else about it.  Rager depo. at 19:1-15.  Ms. Elliott did have other black employees working under her at the time, but Rager did not speak with them.  Rager depo. at 19:16 - 20:13.  Rager did not speak with the other black employees in Elliott's office because he felt that Cabbil's allegations were untrue.  Rager depo. at 20:12-16.  On November 26, 2003, Rager reported the results of his conversation with Ms. Elliott to Mr. Cabbil, and told him that he found that Ms. Elliott was not treating Mr. Cabbil or the other black employees differently because of their African-American race.

3

After receiving this response from Mr. Rager, Mr. Cabbil filed a formal complaint of discrimination internally with ALDOT's Human Resources Bureau. Defendants' Exhibit H-H4 attached to defendants' Evidentiary Materials. This complaint was submitted on December 16, 2003, and states that "This complaint involves Donna Elliott Project Engineer, and Lewis Rager District Engineer." *Id.* Mr. Cabbil checked the box on the Complaint Form indicating that his complaint was based on race discrimination. *Id.*

On January 12, 2004, L. Dee Rowe, the Fifth Division Engineer, submitted to Mr. Cabbil an Initial Response to his grievance. Defendants' Exhibit H5-H9, attached to defendants' Evidentiary Materials. In her Initial Response, Ms. Rowe found that "It appears that Ms. Elliott may have responded to Mr. Cabbil's concerns in a reactionary manner on occasion." *See* Exhibit H8 to Defendants' Evidentiary Materials. Ms. Rowe found further that another black employee under Ms. Elliott believed that Ms. Elliott harbored prejudices against African-Americans, and "expressed her dislike of Ms. Elliott referring to her as 'girl' and to the black men as 'boy' . . ." *Id.* Despite these findings, Ms. Rowe's Response proposed no substantive relief. Mr. Cabbil rejected Ms. Rowe's Response and, as required under the grievance procedure, the grievance was then investigated by ALDOT's Human Resources Bureau. Sandi Dietz, ALDOT's Title VII Coordinator in the Human Resources Bureau, then prepared an Investigative Determination, which Mr. Cabbil also rejected.

The Investigative Determination by Ms. Dietz states that "According to Ms. Rowe, she has since counseled with Mr. Rager, and instructed him to be more inquisitive or seek assistance with claims of this nature in the future." *See* Exhibit H13 to Defendants' Evidentiary Materials. However, Rager testified at his deposition this year that Ms. Rowe did not instruct him to be more inquisitive when an employee makes a complaint or to seek assistance with claims of the type that Mr. Cabbil raised in the future. Rager depo. at 44:7-14. Rager testified that Ms. Rowe did not ever

4

counsel him about the way he handled Mr. Cabbil's verbal complaints of discrimination. Rager depo. at 44:1-5. The Investigative Determination did not propose any substantive relief, and Mr. Cabbil rejected it as a resolution to his grievance. No further action was taken on Mr. Cabbil's complaint.

### C.    Decisionmaking process for termination

As noted above, Mr. Cabbil was recommended for termination on March 4, 2004 by Lewis Rager, and terminated on April 27. The reasons offered by Mr. Rager for terminating Mr. Cabbil were that he did not perform his job duties properly when he inspected the Hugh Thomas Bridge project from January 15-27, 2004. Plaintiffs' Exhibit 5.

### Discovery of problems on the bridge

The contractor who performed the painting work on the bridge, P & H Stucco & Painting, had asked Gary Elliott to have an ALDOT bridge inspector inspect P & H's work on the project, so that P & H could know when it was appropriate to take down its containment system down and move to another part of the bridge. Gary Elliott depo. at 29:11 - 31:22. Gary Elliott depo. at 30:15 - 32:1-15. ALDOT therefore sent Derek Tilley, a full-time bridge inspector employed by ALDOT, to inspect portions of the project. Gary Elliott depo. at 29:11 - 31:22.

Tilley alerted Gary Elliott to problems with the bridge painting in February of 2004 by telephone. Tilley told Elliott that the bridge had not been cleaned properly in several places and there were spots that had not been painted. Gary Elliott depo. at 33:17 - 34:7. Tilley then made a written report, dated February 20, 2004, which outlined where the problems with the inspection were located. Gary Elliott depo. at 35:17 - 36:11. The report reflects problems with painting on Spans 22, 23, and 24 of the bridge. Defendants' Exhibit J33. These problems were thin and missed spots, spots which were "still green (Not touched)", spots where the primer was thin or had not been

5

applied at all, and steel shot being primed over around some bearings. Defendants' Exhibit J33. After he received this report, Mr. Elliott had Mr. Edwards re-inspect the bridge to see what the problems were. Gary Elliott depo. at 38:18-22. Mr. Elliott then contacted the contractor and tell him that he was going to have to go back and fix the deficient areas. Gary Elliott depo. at 39:6-11.

### 1.    Lewis Rager's recommendation for termination

On March 4, 2004, Lewis Rager recommended in writing to Nicky Calhoun, the Fifth Division Construction Engineer, that Mr. Cabbil's employment with ALDOT be terminated. Plaintiffs' Exhibit 5. Calhoun was Rager's direct supervisor. The grounds stated in the recommendation for termination were (1) that Mr. Cabbil was inattentive to his job, (2) that he failed to perform his job properly, and (3) that he falsified records. *Id.* Rager did not mention any other reasons to terminate Mr. Cabbil when he recommended termination to Calhoun. Calhoun depo. at 58:3-6 (attached hereto as Attachment 11). As stated in Mr. Rager's letter, these rule violations occurred between January 15 and 27, 2004, and all related to the inspection of the bridge project. Rager testified in his deposition that he recommended that Mr. Cabbil be terminated because of the "severity" of the offenses he committed during his inspection of the bridge project from January 15-27, 2004. Rager depo. at 45:4-17. The only grounds for termination suggested by Mr. Rager were those related to the inspection work performed by Mr. Cabbil from January 15-27, 2004. *Id.* As reflected in Mr. Rager's letter and his deposition testimony, the only documents on which he relied in deciding to recommend Mr. Cabbil's termination were the Inspectors' Daily Reports from January 15-27, 2004 (*see infra* at §II(D)(1) for a summary of such reports). Rager depo. at 59:14 - 60:6; Plaintiffs' Exhibit 5.

### 2.    Nicky Calhoun also determines that termination is appropriate, and forwards a recommendation for termination to Division Engineer L. Dee Rowe

Once Nicky Calhoun had received Rager's recommendation to terminate Mr. Cabbil, Calhoun began to "compile everything we had" to build up a record to terminate Mr. Cabbil. Calhoun depo. at 56:9-14. Calhoun testified that he made requests for documentation to Rager, Donna Elliott, and Gary Elliott. Calhoun depo. at 61:2-6. He asked them for "whatever they could come up with to support the termination of Mr. Cabbil." Calhoun depo. at 61:14-16. At that time, Calhoun already knew of Mr. Cabbil's complaints of race discrimination. Calhoun depo. at 65:8-11.

Calhoun forwarded his termination recommendation to Rowe on March 15, 2004, attaching employee work rules, Mr. Rager's recommendation, Derek Tilley's report, the Inspector Daily Reports for January 15-27, and other memoranda. Plaintiffs' Exhibit 21 (Attachment 4 hereto). Calhoun testified that he made his own independent evaluation of the record he and the other supervisors had built up, and made his recommendation for termination based on that record. Calhoun depo. at 66:23 - 67:1-2; 80:20-23. Calhoun based his conclusion that it was Mr. Cabbil who had improperly inspected the bridge painting from the Inspector Daily Reports from January 15-27, 2004 and Mr. Tilley's report of inspection of the bridge project. Calhoun depo. at 33:17 - 34:5.

Nicky Calhoun testified that he was aware of Mr. Cabbil's grievance, but is not sure when he became aware of it. Calhoun depo. at 95:13-22.

### 3.     L. Dee Rowe forwards the termination recommendation to the Central Office

On March 16, 2004, L. Dee Rowe sent a letter to ALDOT Director Joe McInnes stating that Nicky Calhoun had recommended that Mr. Cabbil be terminated, and that she concurred with Mr. Calhoun's recommendation. Defendants' Exhibit J26.

### 4.     Mr. Cabbil is terminated and replaced by a white employee

7

On April 12, 2004, Mr. Cabbil was given a letter notifying him that he had been recommended for termination from ALDOT. Plaintiff's Exhibit 6 (Attachment 2 hereto). Mr. Cabbil was given his termination letter in the presence of Nicky Calhoun, Lewis Rager, Gary Elliott, Donna Elliott, and Tiffany Ramsay. Gary Elliott depo. at 76:10-20; Plaintiff's Exhibit 6. The termination letter offered Mr. Cabbil a hearing to object to the termination. Mr. Cabbil attended the hearing, which was presided over by L. Dee Rowe, who served as the Hearing Officer. Rowe depo. at 7:13-19 (attached hereto as Attachment 10). Ms. Rowe upheld the termination decision, and Mr. Cabbil's employment was terminated on April 27, 2004.

Mr. Cabbil's replacement was Rhonda Davis, a white Engineering Assistant I. Gary Elliott depo. at 26:16-23 - 27:1-9.

### a.    The reason given for Mr. Cabbil's termination

The event that caused Mr. Cabbil to be terminated, according to Ms. Rowe, was his alleged failure to perform his bridge inspection duties properly Rowe depo. at 13:19 - 14:13. This is also the reason stated for Mr. Cabbil's termination in the defendants' Memorandum Brief. *See* Memorandum Brief at 18 ("The decision to terminate the plaintiff's employment was warranted (1) by the bridge inspectors' and Chief Engineer Edwards' reports that the plaintiff had failed to inspect or failed to properly inspect the contractor's work and (2) the plaintiff's false work reports reflecting that he had inspected the work and found it to be satisfactory."[1])

### 5.    Who made the decision to terminate Mr. Cabbil?

ALDOT has not identified the individual who actually made the decision to terminate Mr.

---

[1] It should be noted that the Inspector Daily Reports do not reflect that Mr. Cabbil or anyone else found the contractor's work to be "satisfactory." These reports simply state what the contractor was doing on the particular day, along with other information such as weather conditions.

Cabbil's employment.  Ms. Rowe, the individual highest in the chain of command who has offered

testimony in this case, testified in her deposition that she was not the individual who decided to

terminate Tony Cabbil, and that she did not know who made the termination decision.  Rowe depo.

at 11-12, 54.  Gary Elliott testified that he was not one of the people who made the decision that Mr.

Cabbil should be terminated, and no one consulted him about his opinion about whether Mr. Cabbil

should be terminated.  Gary Elliott depo. at 77:1-10. According to Nicky Calhoun, D. J. McInnes,

the Director of the Alabama Department of Transportation, made the decision to terminate Mr.

Cabbil.  Calhoun depo. at 84:10-16.  However, Calhoun did not talk with McInnes about the

termination and did not know which documents Mr. McInnes reviewed when he decided to terminate

Mr. Cabbil.  Calhoun depo. at 84:17-22.  McInnes has not offered any testimony in this case.

> **D.      Gary Elliott, Lewis Rager, Nicky Calhoun, and L. Dee Rowe all admitted during
> their depositions that they could not determine that Mr. Cabbil had actually
> made any errors in his inspection of the bridge project**.

> **1.      The Inspector Daily Reports**

The Inspector Daily Reports for the Hugh Thomas Bridge Project were the documents upon

which all of the supervisors relied in deciding to terminate Mr. Cabbil.  *See* Plaintiff's Exhibit 11

(attachment 3 hereto)[2].    Gary Elliott depo. at 55:1-4, 56:7-14; Rager depo. at 59:14 - 60:6; Rowe

depo. at 27:8 - 29:4.  Those Reports are the only Inspector Daily Reports filled out for the Hugh

Thomas Bridge project.  Gary Elliott depo. at 72:18-21.  These reports reflect that the  following

individuals were the "Engineering Personnel" on the project on the following dates, the spans of the

bridge worked on, and the number of hours each charged to the project on that date:

---

[2]  The copies of the Inspectors Daily Reports which were used during the depositions as
Exhibit 11 are unreadable in some spots because of the copying.  These documents are also
attached to defendants' Evidentiary Submission at Exhibit J13-20.

January 15, 2004 - Tony Cabbil (8 hours); Kenneth Edwards (8 hours) (Span 23, 24, 25, 26)
January 16, 2004 - Kenneth Edwards (8 hours) (Span 23)
January 20, 2004 - Tony Cabbil (8 hours) (Span 23)
January 21, 2004 - Tony Cabbil (8 hours) (Span 23 & 24)
January 22, 2004 - Tony Cabbil (8 hours), Kenneth Edwards (8 hours) (Span 24)
January 23, 2004 - Tony Cabbil (8 hours) (Span 24)
January 24, 2004 - Tony Cabbil (8 hours) (Span 24)
January 26, 2004 - Tony Cabbil (8 hours); Kenneth Edwards (9 hours) (Span 24)
January 27, 2004 - Tony Cabbil (8 hours); Kenneth Edwards (8 hours) (Span 24)

Plaintiffs' Exhibit 11.

### 2.    Gary Elliott's testimony

Gary Elliott testified in his deposition that he determined, based on his review of Mr. Cabbil's Inspector Daily Reports, that Mr. Cabbil had failed to perform his job properly. Gary Elliott depo. at 55:1-4, 56:7-14. However, when asked to review those Reports in his deposition, Elliott admitted that he could not tell who was doing the inspection of the bridge project. Gary Elliott depo. at 63:10-14, 94:17 - 95:2.

Elliott admitted that for the days when Edwards' name is on the Inspector Daily Reports, he didn't know whether it was Mr. Cabbil or Mr. Edwards who had not done the inspection. Gary Elliott depo. at 94:17 - 95:2.

When questioned about why Cabbil was terminated for improper work on the bridge project when he could not determine whether it was Cabbil or Edwards who made the mistakes, Elliott testified as follows:

> Q:    What did Mr. Cabbil do wrong that Mr. Edwards didn't do wrong?
> A:    Well, it is my opinion that Tony didn't do his job properly and that he let some spots go and Derek caught them.
> Q:    How can you tell that Mr. Cabbil let the spots go and not Mr. Edwards when Mr. Edwards was the only person working on this project during this specific time span referenced in Mr. Cabbil's termination letter recommendation?
> A:    I don't know.

> Q:    You don't know?
> A:    No, sir.

Gary Elliott depo. at 66:13 - 67:13.  Though he could not determine whether it was Mr. Cabbil or Mr. Edwards who had performed the improper inspections, Gary Elliott did not discipline Edwards in any way for the improper work on this bridge project, because "I didn't see where he had done anything wrong."  Gary Elliott depo. at 66:5-9.

Even after he found out about the problems with the bridge inspection, Gary Elliott felt that he could trust Tony Cabbil to continue the inspection work on the bridge project.  Gary Elliott depo. at 96:2-9.

### 3.    Lewis Rager's testimony

Lewis Rager testified that he went back and looked at the daily reports from January 15-27 when he was deciding to terminate Mr. Cabbil, and that those reports show that Mr. Cabbil failed to perform his job properly on those dates.  Rager depo. at 48:11 - 49:10, 51:20 - 52:3.  He also testified regarding this review that he could determine from the reports that Mr. Cabbil inspected the bridge and approved each span, but could not remember whether Mr. Edwards had also inspected the project.  Rager depo. at 52:4-11.

The Inspector Daily Report for January 16, one of the days for which Rager said that he should be terminated, reflects that Mr. Cabbil was not even working on the Hugh Thomas Bridge project at all on that day.  Plaintiffs' Exhibit 11 at 2.  Edwards was the only inspector on the Project on January 16.  Rager testified as follows regarding that day:

> Q:    Let me ask you to turn to the next page which is the inspection
> report for January 16th for the same project, correct?
> A:    Yes.
>                              * * *
> Q:    Okay.  What was Mr. Cabbil doing on the project that day?
> A:    Wasn't there.

> Q:      What was Mr. Edwards doing on the project that day?
> A:      Inspecting the work being performed.
> Q:      Okay. Look at your termination letter again. Tell me whether
> the spans that Mr. Edwards was inspecting on that day were some of
> the spans that were improperly inspected.
>         (Pause)
> Q:      Span twenty-three.
> A:      Uh-huh (yes).
> Q:      Is that right?
> A:      That's what it says. I am not through reading.
>         (Pause)
> A:      Okay.
> Q:      Okay. Tell me what Tony Cabbil did wrong on that project
> that day.
> A:      Nothing.

Rager depo. at 53:23 - 55:4. Regarding the Inspector's Daily Report for January 22, 2004, Rager

testified as follows:

> Q:      Who were the inspectors on the project that day?
> A:      Mr. Cabbil and Mr. Edwards.
>                          * * *
> Q:      What had Mr. Cabbil done on the project that day?
> A:      Specifically, it doesn't reflect it.
> Q:      What had Mr. Edwards done on the project that day?
> A:      It doesn't reflect it.
> Q:      Okay. So you don't know who did the improper inspection on
> Thursday, January 22nd, 2004, do you?
> A:      No.

Rager depo. at 55:16-18; 56:1-10. His testimony was the same for the report dated January 26:

> Q:      What did Mr. Cabbil do on the project that day?
> A:      Doesn't specifically say.
> Q:      What did Mr. Edwards do on the project that day?
> A:      Same thing.
> Q:      So you can't tell from this report who did the improper
> inspection on the project on January 26th, can you?
> A:      No.
> Q:      Are there any other documents from which you could get that
> information?
> A:      No.

Rager depo. at 56:17 - 57:6. Rager's testimony was the same for January 27, 2004. Rager depo. at

12

57:7-18.  Though Rager reviewed these reports prior to recommending Mr. Cabbil's termination, he

did not recommend termination for Mr. Edwards:

> Q:     Was Mr. Cabbil's inattention and failures from January 15
> through 27th, 2004, were those in and of themselves severe enough
> to warrant termination?
> A:     Yes.
> Q:     Why were they not then severe enough to warrant termination
> of Kenneth Edwards, too?
> A:     I wasn't informed.
> Q:     You weren't informed, but you looked at those daily reports
> records before you wrote this termination recommendation, you have
> already testified?
> A:     Yes.
> Q:     So you were informed through those documents, weren't you?
> A:     Yes.

Rager depo. at 63:3-18.  Edwards had never complained to Rager regarding discrimination. Rager

depo. at 63:19-21.

With respect to the falsification of records, Rager testified that he recommended that Mr.

Cabbil be terminated for falsifying his Inspectors Daily Reports for January 15-27.  Rager depo. at

70:7-13.  When asked about Mr. Edwards, and particularly the Report he submitted for January 16,

Rager testified as follows:

> Q:     In what way did Mr. Cabbil falsify records that Mr. Edwards
> did not also falsify records.
> A:     ***He did the same***
> Q:     Okay.  And yet Mr. Edwards was never disciplined for any of
> this, was he?
> A:     No.

Rager depo. at 70:16 - 71:13 (emphasis supplied).  Rager also testified that he reviewed Kenneth

Edwards' handwritten notes prior to deciding to recommend Mr. Cabbil's termination, and that they

were one of the reasons he decided to terminate Mr. Cabbil, but then during his deposition admitted

that he could not tell from those records whether the problems were caused by Edwards or Cabbil:

> Q:    How can you tell that the problems that occurred from January 15th to the 27th weren't just as much the result of Mr. Edwards's failures as Mr. Cabbil's based on this note?
>
> A:    I cannot.

Rager depo. at 67:13 - 70:6.

Mr. Rager's termination letter also contains a notation stating that "Mr. Cabbil was properly trained by Mr. Kenneth Edwards", but when asked how he could determine that Mr. Cabbil was properly trained by Kenneth Edwards when Mr. Edwards was doing inspections and falsifying records in the same way that Mr. Cabbil was accused of, Mr. Rager simply stated "Can't." Rager depo. at 72:14-19.

### 5.    Nicky Calhoun's testimony

Nicky Calhoun concluded that it was Tony Cabbil who had improperly inspected the bridge project based on the Inspector Daily Reports sent by Lewis Rager and Derrick Tilley's memorandum concerning the inspection on the bridge. Calhoun depo. at 33:17 - 34:5. Calhoun testified that he believed that Edwards was "there with Tony as engineering personnel on the job." Calhoun depo. at 36:20-21.

Calhoun admitted that for the January 15 Report, some of Edwards' time may have been spent inspecting spans 23-24 and inspecting the sandblasting of span 23. Calhoun depo. at 37:21-23 - 38:1-5, 6-9.

Calhoun further admitted that the records showed that on January 16, 2004, Kenneth Edwards, who signed the inspection report, inspected contractor blasting and painting at Span 23 of the bridge project. Calhoun depo. at 39:16-23 - 40:1-2. Tilley's report reflects that Span 23 was one of the areas that was improperly inspected. Calhoun depo. at 40:3-9. Concerning January 16, Calhoun testified:

Q:      How can you tell, then, given that Mr. Edwards was the only inspector on the 16th, that it was not Mr. Edwards' poor inspection that caused the contractor to have to redo the work?

      MR. PRESCOTT: Object to form.  You can answer.

A:      At this point, I can't tell.

                 * * *

Q:      You cannot tell that Kenneth Edwards did not do improper inspection on that project, can you?

      MR. PRESCOTT: Same objection.

A:      Looking at these two sheets, no.

Calhoun depo. at 41:2-9; 43:5-8..  Nor did Mr. Calhoun know which day the improper inspection occurred.  Calhoun depo. at 42:10-12.  Calhoun never disciplined Edwards for poor inspection on this project.  Calhoun depo. at 41:17-19.

While Calhoun attempted to say that the completion of Span 23 on January 20 showed that Cabbil was the one who performed the improper inspections, he was forced to admit that he could not conclude from the January 20 report that Kenneth Edwards did not do improper inspections on the project.  Calhoun depo. at 45:11-16.  Calhoun's final conclusion regarding the improper inspections, after reviewing the same documents he himself said formed the basis for his recommendation to terminate Cabbil, was that he could not tell from any of the documents that Kenneth Edwards was not the one who performed the improper inspections on the project.  Calhoun depo. at 45:11-21.  Nevertheless, Calhoun did not recommend that Edwards be terminated or even suspended or given a written reprimand.  Calhoun depo. at 53:3-13; 54:1-4.  He testified:

Q:      And we have already established that the part of the project that Ken Edwards inspected alone on Friday, January 16th, was part of the project that had the mistakes on it, correct?

A:      That's correct, the same part that was said on this day [January 20] by Tony.

Q:      Then why was Ken Edwards not disciplined for improper inspection on this project?

      MR. PRESCOTT: Object to form.

A:      I don't know.

Calhoun depo. at 47:1-10. Calhoun did not speak with Edwards about the inspection work on the bridge project and did not talk to Edwards after he received the termination recommendation for Mr. Cabbil. 54:16-23.

### 6.    L. Dee Rowe's testimony

Dee Rowe, Nicky Calhoun's supervisor, concurred with Calhoun's recommendation for termination based on "the documentation provided to me." Rowe depo. at 12:3-8. The only documentation provided to her reflecting work on the bridge project was the Inspector Daily Reports. Exhibit 21 (attachment 4 hereto)[3]. Ms. Rowe testified that based on her review of these documents, there was *no way* to determine whether it had been Mr. Cabbil or Mr. Edwards who had been inattentive to the jobs, had failed to perform their jobs properly, or had falsified records in violation of the State Personnel Board's rules. Rowe depo. at 27:8 - 29:4. Ms. Rowe's testimony on each of these points is unequivocal:

> Q:    Based on your review that we have just conducted of these inspector's daily reports, is there any way for you to tell whether it was Mr. Cabbil's inattention to job or Mr. Edwards inattention to the job that led to the contractor having to redo the work?
>         MR. PRESCOTT: Same objection.
> A:    No.
> Q:    Based on your review of these documents, is there any way for you to determine whether it was Mr. Cabbil's failure to perform job properly or Mr. Edwards' failure to perform the job properly that led to the contractor having to redo the work?
>         MR. PRESCOTT: Object to the form.
> A:    Bear with me a minute.
> Q:    Sure.
>             (Pause.)
> A:    No.
>                         * * *

---

[3] Exhibit 21 is a complete set of the documents forwarded with Mr. Calhoun's recommendation that Mr. Cabbil be terminated. These documents came directly from the Fifth Division EEO Officer's file on Mr. Cabbil. Rowe depo. at 12:14-21.

> Q:      Based on your review of the inspector's daily reports,
> is there any way for you to determine whether it was
> Mr. Cabbil or Mr. Edwards who committed a
> falsification of records in violation of the personnel
> board rule referenced in the March 4th letter?
> MR. PRESCOTT: Object to the form.
> A:      No.

Rowe depo. at 27-29.  She testified about several of the individual Reports as follows:

> Q:      Can you tell who did the inspection work on this bridge
> project on this particular day from the document that you are looking
> at?
> A:      Tony Cabbil and Ken Edwards.
> Q:      Okay.  Can you tell which of them failed to perform their job
> properly in doing the inspection on January 15th?
> A:      Specifically, no.
> Q:      And January 15th is one of the days referenced in Mr. Rager's
> recommendation for termination, correct?
> A:      Yes.

Rowe depo. at 18.

Rowe testified that when she was doing the review of Mr. Cabbil's termination, she did not

request any additional daily inspection reports other than the ones supplied to her by Nicky Calhoun

in his termination recommendation.  Rowe depo. at 20:21-23.  The documents forwarded to Rowe

by Calhoun did not contain any documents other than the Inspector Daily Reports that showed which

employees worked on the Hugh Thomas Bridge Project.  Plaintiffs' Exhibit 21.

Edwards and Cabbil were both doing inspection work on January 27, which is the last day

on which Cabbil was alleged to have committed inspection errors.  Rowe depo. at 23:14-17.  (Q: Mr.

Edwards and Mr. Cabbil were both inspecting on that day [January 27] on that project, correct?"  A:

Yes, sir.")  While Rowe attempted to insinuate that she could tell that it was Cabbil's errors that

caused the work to have to be re-done ("What Derek Tilley saw was the final.  And since January

20th comes after January 16th, what he saw is what Tony left behind."  Rowe depo. at 22:1 - 23:1).

17

However, when asked to review the documents concerning January 27, the last day on which Cabbil allegedly mis-inspected the project, Rowe testified as follows:

> Q:     Now, how can you tell whether it was Mr. Cabbil or Mr. Edwards who on January 27th agreed that the work that the contractor had done was complete and that they could remove the containment system at that time?
> MR. PRESCOTT: Object to the form.
> A:     I cannot.

Rowe depo. at 24.

> Q:     In reviewing these documents when you were attempting to determine whether you thought the termination of Mr. Cabbil was proper, did it enter your mind that Mr. Cabbil and Mr. Edwards were both doing this inspection work?
> A:     No.
> Q:     Did you ask anybody whether Mr. Edwards had been disciplined for anything relating to the inspection of this bridge project?
> A:     No.

Rowe depo. at 25.  Rowe agreed that Ken Edwards was not disciplined in any way for his inspection on this bridge project.  Rowe depo. at 19:1-3.

### 5.     Mr. Cabbil's mistake did not cost ALDOT any money

Though Mr. Cabbil's termination letter stated that his alleged mistakes may have cost ALDOT between $4000 and $5000, when the project was completed it turned out that the mistake did not cost ALDOT anything, as the contractor absorbed the cost.  Calhoun depo. at 55:5-17; Gary Elliott depo. at 41:13-15.  When asked what the actual cost to ALDOT of having the contractor come back to resand or repaint, Lewis Rager testified "My understanding, none."  Rager depo. at 72:1-3. The contractor's bid for the total cost of the bridge project was $1,578,559.00.  Exhibit 22 (attachment 5 hereto).  Thus, the  costs incurred (by the contractor) for the painting and blasting errors represented less than one percent of the total estimated project cost.

18

**E.     Tony Cabbil continued to inspect the Hugh Thomas Bridge project after his alleged inspection deficiencies resulted in his being recommended for termination.**

Plaintiff's Exhibit 23 (attachment 6 hereto) is a collection of all of the Inspectors' Daily Reports for the Hugh Thomas Bridge project from December 8, 2003 until April 27, 2004, the date of Mr. Cabbil's termination.  These reports show that on almost every work day after February 20, 2004, when Derrick Tilley made his report of errors, and March 4, 2004, the day Rager recommended Mr. Cabbil for termination, Mr. Cabbil continued to inspect the project.  Indeed, Mr. Cabbil inspected the project *by himself* on April 16, April 15, March 20, and March 6, 2004.  Exhibit 23 at pp. 8, 9, 22, and 33. Gary Elliott testified that he trusted Mr. Cabbil to perform those duties. Gary Elliott depo. at 44:3-7; 96:2-9.

**F.     Calhoun's termination recommendation fails to reflect the facts about Mr. Cabbil's behavior according to Mr. Cabbil's direct supervisor, Gary Elliott.**

Nicky Calhoun, in his termination recommendation, added several reasons for terminating which had not been cited by Mr. Rager, including Mr. Cabbil's alleged use of a women's restroom, and his attitude, which Mr. Calhoun characterized as threatening and authority-questioning. Calhoun's termination recommendation states "Due to Mr. Cabbil's threatening attitude, his co-workers do not want to work around him."  Exhibit 21.  However, when asked whether Mr. Cabbil had a threatening attitude, Gary Elliott testified as follows:

> Q:     Did you ever see Mr. Cabbil exhibit a threatening attitude?
> A:     I don't know what you are talking about, "a threatening attitude."  Do you mean did I ever hear him threaten anyone?
> Q:     Yeah.
> A:     I didn't ever hear him threaten anyone, no, sir.

Gary Elliott depo. at 96:13 - 20.  Gary Elliott did not remember whether any of Mr. Cabbil's co-workers had said they did not want to work with him.  Gary Elliott depo. at 97:2-5.

Calhoun's recommendation for termination also states that "Due to the pattern exhibited by Mr. Cabbil towards regulations I do not forsee him taking constructive criticism." Exhibit 21. However, Gary Elliott testified:

> Q:    When you – When you explained to Mr. Cabbil what he really needed to be doing on that inspection work, did he seem to be receptive to what you were telling him?
> A:    Yes, I thought so.
> Q:    And you thought that you would be able to – I mean, you thought that he could take that constructive criticism –
> A:    Yes, sir.
> Q:    – and apply it to his work?
> A:    Yes, sir.

Gary Elliott depo. at 97: 6-16. Even after he found out about the problems with the bridge inspection, Gary Elliott felt that he could trust Tony Cabbil to continue the inspection work on the bridge project, and indeed Mr. Cabbil performed the inspection work on the project from January 15, 2004 up until his termination on April 27, 2004, throughout the entire termination process which took nearly two months from the initial recommendation to the final termination. Gary Elliott depo. at 96:2-9.

Calhoun's recommendation for termination further states that "Mr. Cabbil has an attitude that he is being picked on or singled out. In my opinion, this causes him to retaliate by questioning his supervisors' authority . . ." Exhibit 21. However, Gary Elliott testified as follows:

> Q:    Did you think that – Did Mr. Cabbil, while he was working with you, display an attitude that he was being picked on or singled out in any way?
> A:    I don't remember him saying that he was picked on or singled out.
> Q:    Okay. Did he ever - Did you feel like he ever questioned your authority?
> A:    No, sir.

Gary Elliott depo. at 97:17 - 98:2.

**G.**     **White employees who committed the same errors as those for which Mr. Cabbil was terminated have not been fired for them.**

During his deposition, Gary Elliott testified that Jeremy Akins, a white Engineering Assistant working under Mr. Elliott, failed to perform his job properly in a manner that required the contractor to go back and do work over again, just as Mr. Cabbil was accused of. Gary Elliott depo. at 80:14-21. Akins had not inspected a contractor's work properly, leading to it having to be re-done. Gary Elliott depo. at 82:22 - 83:4. Elliott did not know how much Akins' oversights cost the contractor, but, according to Elliott, the contractor "did have to go back and redo a section and reroll it and fix it." Gary Elliott depo. at 80:14-81:1. Though Akins was later terminated, he was not terminated for his mistakes that led to the contractor having to re-do his work. Gary Elliott depo. at 81:2-6. Elliott did report Akins' mistakes to Lewis Rager. Gary Elliott depo. at 81:16-19.

## III.     ARGUMENT

### A.     Defendants' arguments

Defendants spend much of their brief arguing that events occurring prior to Mr. Cabbil's termination are not actionable, and discussing the events underlying Mr. Cabbil's complaints of discrimination. *See* Def. Brief at 13-18. Plaintiff will not address these arguments herein, as Mr. Cabbil's claims of both discrimination and retaliation concern the termination of his employment from ALDOT. While the events discussed by the defendants do provide some of the evidence of defendants' discriminatory and retaliatory animus, and are thus relevant to the case as background evidence, Mr. Cabbil does not claim that he is entitled to any relief for discrimination in the terms, conditions, and privileges of his employment. As such, defendants' Motion for Summary Judgment should be denied insofar as it seeks summary judgment on matters which are not at issue in this case.

### B.     Mr. Cabbil has presented a *prima facie* case of retaliation under the circumstantial evidence model.

To prove a *prima facie* case of retaliation through circumstantial evidence, Mr. Cabbil must show that (1) he engaged in protected activity, (2) he was subjected to an adverse employment action, and (3) the adverse employment action was causally related to the protected activity. *Cooper v. Southern Co.*, 390 F.3d 695, 740 (11th Cir. 2004).

There is no dispute that Mr. Cabbil engaged in protected activity. He complained verbally to his supervisors in late 2003 about what he perceived to be racially discriminatory attitudes and actions on the part of Donna Elliott and Lewis Rager, and then filed a formal grievance alleging race discrimination and naming Ms. Elliott and Mr. Rager on December 19, 2003.

Nor can it be disputed that ALDOT took an adverse action against Mr. Cabbil when ALDOT terminated his employment.

**Causal connection.** The law in this Circuit is that to satisfy the causal connection element, the plaintiff "merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997).

The simplest way for a plaintiff to prove the causation element of the *prima facie* case of retaliation is through the temporal proximity of his complaints to his termination. "A plaintiff satisfies this [causation] element if [s]he provides sufficient evidence of knowledge of the protected expression and that there was a close temporal proximity between this awareness and the adverse action." *Higdon v. Jackson,* 393 F.3d 1211, 1220 (11th Cir.2004). "Close temporal proximity between the protected activity and the adverse action may be sufficient to show that the two were not wholly unrelated." *Bass v. Bd. of County Comm'rs,* 256 F.3d 1095, 1119 (11th Cir.2001) (citation omitted). Here, a two-and-one-half month period elapsed between the filing of Mr. Cabbil's grievance (December 19, 2003) and the initial termination recommendation (March 4, 2004). While the question of the precise temporal proximity which will allow the plaintiff to state a *prima facie*

case is unsettled, the two-and-one-half month period appears to still be valid. *See Clark Cty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (citing with approval circuit court cases invalidating temporal proximities of three and four months)(*cited in Hammons v. George C. Wallace State Community College*, Slip Copy, 2006 WL 655061 (11th Cir. 2006).

However, Mr. Cabbil need not rely solely on temporal proximity to establish causation, as there is ample additional evidence of the causal connection between Mr. Cabbil's complaints of discrimination and his termination.

First, and most importantly, there is the fact that, though all of the recommending officials – Elliott, Rager, Calhoun, and Rowe -- admitted that they could not determine from the documents they reviewed during the termination process whether it was Mr. Cabbil or Mr. Edwards (or both) who committed the inspection errors on the bridge project, only Mr. Cabbil was terminated for these errors. Evidence that defendant treated the plaintiff differently from similarly situated employees is relevant to causation. *See, e.g. Moon v. Transport Drivers, Inc.,* 836 F.2d 226, 230 (6th Cir.1987); *Sumner v. United States Postal Service,* 899 F.2d 203, 209 (2d Cir.1990). The testimony quoted at length above shows that every supervisor in the chain of command – Gary Elliott, Lewis Rager, Nicky Calhoun, and Dee Rowe – relied on the Inspectors' Daily Reports from January 15 to 27th as the grounds on which they decided to terminate Mr. Cabbil. Each of those supervisors then admitted during their depositions that they could not determine, upon review of those same documents, whether it had been Mr. Cabbil or Mr. Edwards who made the errors in inspection. Yet, as they all testified, Mr. Edwards was not disciplined in any way for the inspection errors. Both Mr. Edwards and Mr. Cabbil were ALDOT engineers assigned to inspect the bridge project. Both charged time to the project through the Inspector Daily Reports, and both were given the responsibility for ensuring that the inspection of the project was done properly. The only fact which distinguishes Mr.

23

Edwards from Mr. Cabbil is that Mr. Cabbil had recently filed a grievance, while Mr. Edwards had not.

The complete breakdown of the alleged justification for Mr. Cabbil's termination gives rise to the inference that Mr. Cabbil's complaints and his termination were not "completely unrelated." A reasonable jury could conclude, upon hearing Mr. Rager, Mr. Elliott, Mr. Calhoun, and Ms. Rowe all admit that the main reason for Mr. Cabbil's termination - the inspection errors - could not be ascribed to Mr. Cabbil with any degree of certainty, and that Mr. Edwards could just as easily have been the one who committed the errors, that these officials were simply seeking information to build a documentary record to terminate Mr. Cabbil, and found it in the inspectors' reports on which his signature appeared.

There are numerous other facts which support the finding of a causal connection between Mr. Cabbil's complaints of discrimination and his termination. These include:

- The fact that Mr. Cabbil continued to inspect the Hugh Thomas Bridge project, sometimes by himself, after Derrick Tilley's February 20, 2004 report and Mr. Rager's recommendation that Mr. Cabbil be terminated for his inability to inspect properly;

- Calhoun's admission that after receiving the termination recommendation, he commenced to seek out documentation to build a record to terminate Mr. Cabbil;

- The inconsistencies between Calhoun's description of Mr. Cabbil's work behaviors and those of his supervisor, Gary Elliott;

- The inconsistencies about the justifications for Mr. Cabbil's termination, including Dee Rowe's testimony that neither the referral to EAP for absenteeism nor the warning for absenteeism on December 8, 2003 were reasons for Mr. Cabbil's

termination, despite their appearance on the final termination letter (Rowe depo. at 42, 45-46.

- Rager's testimony that he did not feel that the warning letter regarding absences and the written reprimand regarding leaving the job were significant enough to warrant terminating Mr. Cabbil "according to our policies and procedures." Rager depo. at 46:13-18.

These facts, in addition to the temporal proximity of the complaint to the termination recommendation, and the admissions that it could not be determined who was at fault for the inspection problems, would allow a reasonable factfinder to find that there is a causal connection between Mr. Cabbil's complaints of discrimination and the decision to terminate his employment. Mr. Cabbil has therefore established each prong of the retaliation prima facie case, and the burden now shifts to the defendant to articulate a legitimate, nonretaliatory reason for the termination.

### C.     Defendant has not articulated a legitimate, nondiscriminatory reason for Mr. Cabbil's termination.

Once the plaintiff has established his prima facie case of discrimination, "the defendant must clearly set forth, through the introduction of *admissible evidence*, the reason for its adverse employment decision, and that reason 'must be legally sufficient to justify a judgment for the defendant.'"*Walker v. Mortham*, 158 F.3d 1177, 1184 (11th Cir. 1998)(quoting *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 255 (1981))(emphasis supplied). This reason must be articulated by the individual who made the decision to take the adverse action. *See Walker,*158 F.3d at 1181 &n.8 ("The defendant cannot testify in abstract terms as to what might have motivated the decision-maker; it must present specific evidence regarding the decision-maker's actual motivations with regard to each challenged employment decision."). The articulation must also include evidence

of what the decisionmaker knew and when he knew it. *Steger v. General Elec. Co.*, 318 F.3d 1066, 1076 (11th Cir. 2003)(emphasis supplied)("The evidence must include facts which show **what the decision-maker knew at the time when the decision was made**"); *Turnes v. AmSouth Bank NA*, 36 F.3d 1057 (11th Cir. 1994)("AmSouth came forward with no explanation of why it rejected Turnes based on what it knew when it rejected him. Therefore, Turnes' 'prima facie case stands unrebutted, and discrimination is established.'")(citation omitted). The reason must also be the reason that was "actually relied on" by the decisionmaker in deciding to discharge the plaintiff. *Increase Minority Participation by Change Today of Northwest Florida (IMPACT) v. Firestone*, 893 F.2d 1189, 1194 (11th Cir. 1990)("This Court has expressly held that under *Burdine*, there must be `evidence that asserted reasons for discharge **were actually relied on**' or `the reasons are not sufficient to meet the defendant's rebuttal burden.")(emphasis supplied). As held in *Lee v. Russell County Board of Education*, 684 F.2d 769, 775 (11th Cir. 1982), "[i]f there was no evidence that asserted reasons for discharge were actually relied on, the reasons are not sufficient to meet defendant's rebuttal burden." *Id.* All of these parameters exist to allow the defendant to satisfy its intermediate burden under *McDonnell Douglas*, to "produce admissible evidence which would allow the trier of fact to conclude that the employment decision *had not been motivated* by discriminatory animus." *Burdine*, 450 U.S. at 257 (cited, with emphasis added, in *Turnes v. AmSouth Bank, NA*, 36 F.3d 1057, 1062 (11th Cir. 1994)).

D. J. McInnes appears to have been the individual who made the decision to terminate Tony Cabbil. In response to plaintiffs' Interrogatory to "Identify all individuals who made the decision to terminate the plaintiff's employment", defendants responded "**Lewis Rager (recommendation), Nicky Calhoun, L. Dee Rowe and D. J. McInnes**." However, both Ms. Rowe and Mr. Calhoun testified that they did not make the final decision to terminate Mr. Cabbil, and Mr. Calhoun testified

that the decision was made by Mr. McInnes.

If McInnes was truly the ultimate decisionmaker, there is no evidence in the record as to what information or documents were available to him at the time that he decided to terminate Mr. Cabbil, or of why he decided to terminate Mr. Cabbil. As discussed above, at the defendant's articulation stage in the *McDonnell Douglas* model, "The evidence must include facts which show ***what the decision-maker knew at the time when the decision was made***." *Steger*, *supra* at 1076. Was Cabbil terminated because of the errors in the inspection? For his absenteeism? For using the women's restroom instead of the men's? There are documents concerning each of these incidents in Mr. Cabbil's file, but, as the Eleventh Circuit has cautioned, "a court may not assume, based on its own perusal of the record, that the decision-maker in a particular case was motivated by a legitimate reason when the defendant has offered none." *Walker* at 1182 & n.8 (citing *IMPACT*, *Lee*, and *Eastland*). "The introduction of 'personnel records which ***may*** have indicated that the employer based its decisions on one or more of the possible valid grounds' will not suffice to meet the defendant's rebuttal burden." *Steger v. General Electric Co.*, 318 F.3d 1066,1076 (11th Cir. 2003). Without evidence of the decisionmaker's motivations and what he, she, or they knew at the time the decision was made, defendants have failed to meet their burden of producing a legitimate, non-retaliatory reason for their termination of Mr. Cabbil, and summary judgment must be denied.

**D.    Defendants' articulated reason for her termination – her "performance" – is a pretext for retaliation and race discrimination.**

Assuming *arguendo* that defendants have articulated a legitimate, non-discriminatory or retaliatory reason for Mr. Cabbil's termination, the burden then shifts back to Mr. Cabbil to demonstrate pretext – "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's legitimate reasons for its action that a reasonable factfinder could

find [all of those reasons] unworthy of credence.'" *Watkins v. Sverdrup Technology, Inc.*, 153 F.3d

1308, 1314 (11th Cir. 1998)(*quoting Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir.

1997)*, cert. denied*, 522 U.S. 1045 (1998)).  As the Eleventh Circuit held in *Hairston*:

> The burden to avoid summary judgment is not to show by a
> preponderance of the evidence that the reasons stated were pretext.
> Rather, plaintiff's burden at summary judgment is met by introducing
> evidence that could form the basis for a finding of facts, which when
> taken in the light most favorable to the non-moving party, could allow
> a jury to find by a preponderance of the evidence that the plaintiff has
> established pretext, and that the action taken was in retaliation for
> engaging in the protected activity. Issues of fact and sufficiency of
> evidence are properly reserved for the jury. The only issue to be
> considered by the judge at summary judgment is whether the
> plaintiff's evidence has placed material facts at issue.

*Hairston* at 921. Plaintiff has satisfied that burden here.

    In this case, the primary weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions are the same ones discussed *supra* which demonstrated the causal connection between

the plaintiff's complaints of discrimination and his termination.  All of the supervisors in the chain

of command agreed that the documents which they contended during the termination process showed

that Mr. Cabbil had failed to perform his job properly in fact did not show that at all.  All of them

admitted that they recommended Mr. Cabbil's termination based on the Inspector Daily Reports, but

then all testified that they could not determine that Mr. Cabbil had been responsible for the

inspection errors, because those reports reflect that Kenneth Edwards worked just as much on the

bridge project as Mr. Cabbil, and the reports don't delineate which inspections were performed by

Mr. Edwards and which by Mr. Cabbil.  A reasonable inference from these facts is that Mr. Rager,

unhappy with the grievance that Mr. Cabbil had filed against him and with Mr. Cabbil's prior

complaints, seized on the first available opportunity to terminate him - Mr. Tilley's report and Mr.

Cabbil's signatures on the Inspector Daily Reports.  Mr. Rager testified that the other rule violations

committed by Mr. Cabbil around the same time frame - leaving the job site without permission and the attendance problems - were not sufficient to fire him, so Mr. Rager needed more - the inspection errors. A reasonable supervisor, faced with documentation showing that it was equally likely that one or both of two employees had committed serious errors, would not simply have terminated one of those employees and not discipline the other one at all. Mr. Rager's focus on Mr. Cabbil, and complete exclusion of Mr. Edwards, shows that he was not actually concerned about the failures to perform job properly and falsification of records that led to the errors on the bridge painting, but that there was some ulterior motive to terminate Mr. Cabbil. A reasonable jury could find that that motive was Mr. Cabbil's grievance and other complaints.

Defendants contend in their Memorandum that Mr. Cabbil has improperly attempted to "shift the blame for this deficiency upon Mr. Edwards; however, Mr. Edwards performed inspections on only one day, January 16, 2004; the plaintiff was responsible for the other days." Def. Memorandum at 21. This contention is incorrect, for several reasons. First, Mr. Edwards did not perform inspections only on January 16 - all of the recommending officials testified that they could not determine from the documentation they had who performed the inspection work on the days when both Mr. Cabbil and Mr. Edwards are listed on the Inspector Daily Reports. Both are listed on the Reports on the following dates: January 15, 22, 26, and 27. Plaintiffs' Exhibit 11. It is important to remember that none of the recommending officials ever spoke with Mr. Edwards or Mr. Cabbil about who was actually doing the inspection work at that time - all they had in front of them were the Inspector Reports which do not show that Mr. Edwards only performed inspections on January 16.

Defendants' contention that "plaintiff was responsible for the other days" is also incorrect, for the same reasons. Kenneth Edwards was the plaintiff's supervisor, was training him on how to perform the inspections, and, as far as can be gleaned from the documents, was working side by side

with Mr. Cabbil on the inspections.  Edwards' affidavit, submitted with defendants' Memorandum,

attempts to cast the blame on Mr. Cabbil, but even Mr. Edwards cannot deny that he may have

participated in the inspections on the days from January 15-27:

> In reviewing these reports for the dates January 15, 2004 through
> January 25, 2004, my name appears on several reports.  That my
> name is on these reports does not signify that I performed the
> shotblast/paint inspections.  This merely served as a method by which
> to reflect the number of hours that I worked on that date.  As I may
> have been at several sites on a day, for simplicities' sake, my hours
> would have been annotated on one project's daily report.  I noted only
> one day, January 16, 2004, when I actually signed the daily report.
> On this date, I performed the inspections because Mr. Cabbil was not
> on the job that date.  To my knowledge, there were not deficiencies
> in the contractor's performance on the date that I inspected the job.

Edwards' Affidavit at 2 (attached to defendants' Evidentiary Materials).  As can be seen, Mr.

Edwards does not testify here that he did not perform the inspection work alongside Mr. Cabbil, but

only that the fact that his name appears on the report does not necessarily mean that he did

inspections on that project on that day.  This fact, however, was apparently not known to the

recommending officials even at the time of their depositions, when they all testified that they could

not determine who did the inspection work.  Thus, Mr. Edwards' status and whereabouts on January

15-27 were certainly not known to them at the time they decided to terminate Mr. Cabbil and not Mr.

Edwards, and each appeared equally at fault in the documents.  Mr. Edwards' statement that "To my

knowledge, there were not deficiencies in the contractor's performance on the date that I inspected

the job" does not help the defendants either, as neither Edwards nor Cabbil had any knowledge of

any deficiencies in the inspections until February 20, when Derrick Tilley made his report.  It cannot

be known today, nor could it at the time the termination was recommended and completed, who

made the inspection errors.  The recommenders knew that at the time, and still terminated only Mr.

Cabbil.  A reasonable jury could conclude, based on this evidence, that defendants' proffered

justification for Mr. Cabbil's termination was a pretext for retaliation.

Numerous other facts support a finding of pretext.  As early on as Mr. Cabbil's initial complaints of discrimination, Mr. Rager demonstrated his animosity toward Mr. Cabbil's complaints by determining, without speaking with anyone besides Donna Elliott, that he simply did not believe Mr. Cabbil's complaints of discrimination by Donna Elliott, and therefore refused to investigate them further.  Rager depo. at 20:12-16.  Ms. Rowe found Mr. Rager's investigation to have been flawed, and that Ms. Elliott had been using language which could be construed as racially offensive (her references to African-American employees as "boy" and "girl").  Ms. Rowe also claimed to have counseled Mr. Rager about his investigations of such complaints in the future, but Rager testified that she in fact had not.  Both Rowe's and Rager's attitudes about complaints of race discrimination – Rager's failure to investigate and Rowe's failure to even attempt to cure – show that both supervisors approached complaints of discrimination dismissively, and even with animosity.

Furthermore, while defendants claim in their brief that Mr. Cabbil was legitimately terminated because he made errors on "vital inspections" on the bridge project (Def. Memorandum at 21), if the inspections were so vital, and Mr. Cabbil's failures so serious, why did defendants continue to allow him to inspect the project every day, and for four days by himself, after he had been recommended for termination for his failures with respect to these "vital inspections"?  Gary Elliott testified even after Mr. Tilley's report, he trusted Mr. Cabbil to continue to perform the bridge inspection work.  A finding of pretext is further supported by this contradiction.

While defendants, and Mr. Rager in particular, focused on the "severity" of the inspection problems, subsequent inspection reports reveal that the missed spots and deficiencies appear to be routine.  In January 2005, Derek Tilley inspected the Hugh Thomas Bridge painting project again, and noted similar deficiencies to those identified in his February 20 report which was the basis for

31

Mr. Cabbil's termination.  Plaintiff's Exhibit 24 is Mr. Tilley's January 2005 report, and it finds bearings needing final coats in spots, spots needing touch ups, spots missed, spots not painted, and lower angles of X frames needing paint.  Plaintiff's Exhibit 24 at 1-2.  Gary Elliott's notes concerning Mr. Tilley's inspections reflect "vertical supports at bearings have areas of packed rust with areas of no paint," gusset plates with areas missed around bolts, and "lots of areas of missed paint on stringers in numerous areas."  Plaintiff's Exhibit 24 at 3.  There is no evidence that anyone was disciplined in any way for these apparent oversights, which appear no more severe than those alleged to have been committed by Mr. Cabbil from January 15-27, 2004.

Defendants also contend that Mr. Cabbil's failure to perform his job properly is reflected in Mr. Elliott's conversation with Mr. Cabbil in February 2004 which showed that Mr. Cabbil had not been in the containment area "for a week."  Def. Memorandum at 21.  This "week", however, was not during the time period at issue - January 15-27, but rather several weeks after that, after Mr. Tilley had submitted his report, and during a period when Mr. Elliott testified that he trusted Mr. Cabbil's work.

Nor are the reasons other than those related to the bridge inspection given for Mr. Cabbil's termination free of pretextual underpinnings.  Nicky Calhoun's recommendation, created after he requested documentation from all supervisors so he could build up a record to terminate Mr. Cabbil, states that Mr. Cabbil is not only being terminated for inspection failures, but also for absenteeism, leaving the job without permission, absenteeism, disruptive conduct, poor housekeeping, insubordination, and use of abusive or threatening language.  With respect to the absenteeism and leaving the job without permission, Rager has already testified that those incidents would not support the termination of an employee  "according to our policies and procedures."  Rager depo. at 46:13-18.  The other allegedly improper behaviors - insubordination, use of abusive or threatening

32

language, and disruptive conduct - are belied both by Mr. Cabbil's performance appraisals and Gary Elliott's testimony about Mr. Cabbil's behavior.  On November 18, 2003, Donna Elliott evaluated Mr. Cabbil's performance, and stated that he was compliant with the guidelines on attendance, punctuality, cooperation with co-workers, and compliance with rules.  Defendants' Exhibit D-D2, attached to defendants' Evidentiary Materials.  Ms. Elliott also found that Mr. Cabbil's work performance met standards in each of responsibilities measured.  *Id.*  These ratings matched those Mr. Cabbil had received from Ms. Elliott on November 19, 2002.  Defendants' Exhibit C-C2, attached to defendants' Evidentiary Materials.  Ms. Elliott's performance appraisal of Mr. Cabbil at the end of 2003 offered no criticisms of his work, work habits, and did not mention, though there was space for it, any difficult behaviors displayed by Mr. Cabbil.  Less than one month after this appraisal, Mr. Cabbil was transferred to work under Gary Elliott, who testified during his deposition that Mr. Cabbil was not abusive or threatening, that he did not question his supervisors' authority, and that he took constructive criticism, Gary Elliott depo. at 96:13 - 20; 97: 6-16; 97:17 - 98:2. Thus, defendants' own records concerning Mr. Cabbil's performance under Donna Elliott and the testimony of Gary Elliott establish that Mr. Cabbil was not viewed by his supervisors as the difficult, threatening employee he is portrayed as in his termination letters, or at least that he was not so viewed until Calhoun began compiling a record to terminate Mr. Cabbil.  This glaring inconsistency is further grounds for this Court to find that defendants' articulated reason for Mr. Cabbil's termination is a pretext for their true reason for terminating him - that he complained that his supervisors discriminated against him.

The women's restroom incident also supports a finding of pretext, in that the individual who reported it - Anita Box - testified that she wrote a memo about it on her own, but Nicky Calhoun testified that he had instructed her to write the memo.  Calhoun depo. at 77:8-22.  When asked "If

Ms. Box testified that she just wrote it up on her own because she felt like it, that wouldn't be true, would it?" Mr. Calhoun answered "No." Calhoun depo. at 77:23-78-1-4 (objections to the form omitted). Ms. Box, however, testified that she had not even discussed the incident with Calhoun. Box depo. at 10: 4-18 (attached hereto as Attachment 12). Box testified that she wrote up the statement not because she had been asked to do so, but "because this was something that I had never, you know, had happen before and I thought this was just a – just something that was uncalled for." Box depo. at 7:21-23 - 8:1-9. When asked directly "Did someone ask you to prepare that document", Ms. Box testified, "No." Box depo. at 7:13-20.

"Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination and it may be quite persuasive." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000) (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 517 (1993)). "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose," and further that "once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Id.* at 2108-2109. For all of the reasons discussed above, a reasonable fact finder could easily find the defendants' explanation for Mr. Cabbil's termination "unworthy of credence." The fact that, to the officials who recommended Mr. Cabbil's termination, it was not possible to tell whether it was Mr. Cabbil or Mr. Edwards who committed the inspection errors, their decision to terminate Mr. Cabbil and not to discipline Mr. Edwards simply makes no sense at all, and shows that they were biased against Mr. Cabbil. This bias can reasonably be ascribed to the grievance Mr. Cabbil filed less than three months before he was recommended for termination. All of the other inconsistencies and irregularities discussed

34

herein support such a finding.  As such, summary judgment must be denied, and plaintiff permitted to proceed to trial on his retaliatory termination claim.

     **E.**     **Summary judgment should be denied on plaintiff's claim that he was terminated because of his race**

     **1.**     **Plaintiff has set forth a *prima facie* case of race discrimination**

A prima facie case of discrimination in termination is established where the plaintiff proves by a preponderance of the evidence that he or she is a member of a protected class, was qualified for the position held, and was discharged and replaced by a person outside of the protected class *or* was discharged while a person outside of the class with equal or lesser qualifications was retained. *Lee v. Russell County Bd. of Educ.,* 684 F.2d 769, 773 (11th Cir.1982).  Defendants' brief discusses an additional *prima facie* element of proving that "he was treated differently from 'similarly situated' persons outside of his protected class."  Def. Memorandum at 11.

Here, Plaintiff has shown that he is African-American, was qualified for his job (having met the posted qualifications for it), was discharged, and was replaced by a white employee, Rhonda Davis.  Mr. Cabbil has also shown that a white employee accused of similar misconduct to that for which he was terminated was treated differently.  Jeremy Akins, a white Engineering Assistant working under Gary Elliott, failed to perform his job properly in a manner that required the contractor to go back and do work over again, just as Mr. Cabbil was accused of.  Gary Elliott depo. at 80:14-21.  Akins had not inspected a contractor's work properly, leading to it having to be re-done.  Gary Elliott depo. at 82:22 - 83:4.  Elliott did not know how much Akins' oversights cost the contractor, but, according to Elliott, the contractor "did have to go back and redo a section and reroll it and fix it."  Gary Elliott depo. at 80:14-81:1.  Akins was not terminated for these errors.  Gary Elliott depo. at 81:2-6.  Elliott did report Akins' mistakes to Lewis Rager.  Gary Elliott depo. at

81:16-19.  Here, even under the defendants' version of the facts, Mr. Cabbil's inspection errors

caused the contractor to have to re-do some of its painting and shot/sandblasting work, at no cost to

ALDOT.  Neither Mr. Elliott nor any other ALDOT official has offered any explanation as to why

Mr. Akins was not terminated for his failure to perform his job properly, when Mr. Cabbil was.  As

such, Mr. Cabbil has set forth a *prima facie* case of discrimination.

For the same reasons as those set forth in the analysis of Mr. Cabbil's retaliation claims, this

Court should find that defendants did not articulate a legitimate, non-discriminatory reason for Mr.

Cabbil's termination, or, alternatively, that plaintiff has demonstrated the existence of a genuine

issue of material fact as to whether defendants' justification for Mr. Cabbil's termination was a

pretext for illegal discrimination.  Summary judgment must therefore be denied on plaintiff's claim

that he was terminated because of his race.

## IV.  CONCLUSION

For the foregoing reasons, defendants' Motion for Summary Judgment should be denied, and

plaintiff permitted to proceed to trial on his claims of race discrimination and retaliation.

.                                            Respectfully submitted,


  s/ Kell A. Simon
Kell A. Simon
Alabama State Bar No. SIM-061



OF COUNSEL:

WIGGINS, CHILDS, QUINN & PANTAZIS
301 19th Street North
Birmingham, Alabama 35203
(205) 314-0500

36

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 30th day of June, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following (or by U.S. Mail to the non-CM-ECF participants):

Jim R. Ippolito
Andrew Redd
Robert Prescott
Alabama Department of Transportation
1409 Coliseum Boulevard
Montgomery, Alabama 36110

        s/ Kell A. Simon
       Counsel for the Plaintiff