# FREEDOM COURT REPORTING

**Page 1**

1  IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3       NORTHERN DIVISION
4
5
6  TONY CABBIL
7    vs.        CASE NO. 2:05-CV-513-T
8  STATE OF ALABAMA DEPARTMENT OF TRANSPORTATION
9
10
11
12      DEPOSITION OF GARY ELLIOT
13
14    The following deposition in the
15  above-styled case was held on May 10, 2006,
16  beginning at 11:40 a.m., at the offices of
17  Alabama Department of Transportation, located
18  at 2715 Skyland Boulevard, Tuscaloosa, Alabama
19  35401.
20
21
22      REPORTED BY:
23      DAVID S. NORTHINGTON, CCR

**Page 2**

1        STIPULATIONS
2
3        It was stipulated and agreed by and
4  between the parties through their respective
5  counsel that the deposition of Gary Elliot may
6  be taken at the date, time and location
7  indicated on the preceding title page.
8        Further, that the signature to and the
9  reading of this deposition by the witness is
10  waived and that this deposition is to have the
11  same force and effect as if full compliance had
12  been had with all laws and rules of court
13  relating to the taking of depositions.
14        Further, that it shall not be
15  necessary for any objections to be made by
16  counsel to any questions, except as to form or
17  leading questions, and that counsel for the
18  parties may make objections and assign grounds
19  at the time of the trial or at the time this
20  deposition is offered into evidence or prior
21  thereto.
22        Further, that notice of filing of this
23  deposition by the Commissioner is waived.

**Page 3**

1      A P P E A R A N C E S
2
3
4
5  FOR THE PLAINTIFF:
6    MR. KELL SIMON
7    WIGGINS, CHILDS, QUINN & PANTAZIS
8
9
10
11
12  FOR THE DEFENDANT:
13    MR. ANDY REDD
14    ATTORNEY AT LAW
15
16
17
18
19  ALSO PRESENT:
20    MR. TONY CABBIL
21    THE PLAINTIFF
22
23

**Page 4**

1          INDEX
2
3
4  TITLE PAGE              1
5
6  STIPULATIONS           2
7
8  APPEARANCES            3
9
10  INDEX          4
11
12  WITNESS GARY ELLIOT
13    X BY MR. SIMON       5 - 99
14    X BY MR. REDD        99 - 105
15    RX BY MR. SIMON      106 - 109
16    RX BY MR. REDD       109
17
18  REPORTER'S CERTIFICATE       110
19
20
21
22
23

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

## Page 5

1  I, David S. Northington, Certified
2  Court Reporter and Notary Public for the
3  State of Alabama at Large, acting as
4  Commissioner, certify that as provided by Rule
5  30 of the Alabama Rules of Civil Procedure,
6  and the foregoing stipulations of counsel,
7  there came before me at the date, time and
8  location indicated on the preceding title page,
9  Gary Elliot, witness in this previously-styled
10  cause, for oral examination, and the following
11  proceedings occurred:
12
13      GARY ELLIOT,
14  was called as a witness and after having been
15  first duly sworn to testify to the truth, the
16  whole truth and nothing but the truth,
17  testified as follows, to-wit:
18
19  THE COURT REPORTER: Usual stipulations?
20  MR. REDD: That's fine.
21  MR. SIMON: That's fine.
22      EXAMINATION
23  BY MR. SIMON:

## Page 6

1  Q. Mr. Elliot, we met a minute ago.
2  A. Yes.
3  Q. I am Kell Simon and I represent Mr. Cabbil in
4      his lawsuit against the transportation
5      department.
6  A. Yes, sir.
7  Q. Have you ever given a deposition before?
8  A. No, sir, I have not.
9  Q. I will give you just the ground rules that we
10      are going to be operating under.
11      I don't expect your deposition to last
12      very long.
13  A. Okay.
14  Q. But if at any time during the deposition you
15      need a break —
16  A. Okay.
17  Q. — restroom break to get a drink or whatever —
18  A. Okay.
19  Q. — just let me know and we can take a break.
20  A. Yes, sir.
21  Q. I will ask you, though, if I ask you a question
22      before you ask for the break, that you answer
23      the question that is on the floor.

## Page 7

1  A. Yes, sir.
2  Q. Okay. Also, the court reporter can't take down
3      nonverbal responses to my questions, so make
4      sure that you don't shake your head and nod
5      your head —
6  A. Yes, sir.
7  Q. — in response. You will have to answer out
8      loud. And if your answer is going to be a
9      "yes" or "no" answer, make sure that you say
10      "yes" or "no" rather than "huh-huh" or
11      "uh-huh" —
12  A. Okay.
13  Q. — because the court reporter also has trouble
14      taking those kind of things.
15  A. Yes, sir.
16  Q. Not this particular court reporter, but court
17      reporters in general.
18      Are you taking any medications today
19      that might impair your ability to testify
20      truthfully?
21  A. No, sir, I don't think so.
22  Q. What is your current address?
23  A. My current address is 3114 31st Street,

## Page 8

1      Northport, Alabama.
2  Q. And how long have you lived at that address?
3  A. About three years, I think. I think this is
4      our third year there.
5  Q. Do you have any plans to move in the near
6      future?
7  A. No, sir.
8  Q. When did you first become employed with the
9      Alabama Department of Transportation?
10  A. In January of 1973.
11  Q. All right. And what was your job
12      classification when you were first hired?
13  A. When I started out, I was a laborer.
14  Q. How long were you a laborer?
15  A. I think that it was about two months.
16  Q. Okay. Were you promoted after that?
17  A. Yes, sir.
18  Q. What classification were you promoted to?
19  A. EA one.
20  Q. How long were you an EA one?
21  A. I think it was maybe around two years.
22  Q. And were you then promoted to EA two?
23  A. Yes, sir.

2 (Pages 5 to 8)

# FREEDOM COURT REPORTING

## Page 9

1 Q. How long were you an EA two?

2 A. The best of my recollection, I think that it

3 was about seven or eight years I was an EA

4 two.

5 Q. And then were you promoted to EA three?

6 A. Yes, sir.

7 Q. How long were you an EA three?

8 A. Well, let me think. How many years is that all

9 together?

10 Q. You have given me nine to ten years.

11 A. Okay.

12 Q. Yes, sir.

13 A. Around nine to ten years?

14 Q. Yeah.

15 A. I think around ten years, maybe, as -- Let's

16 see, maybe twelve years as an EA three.

17 Q. Okay. So up until the early nineties?

18 A. Yes, sir, I think that's correct.

19 Q. Okay. And, at that time, were you promoted to

20 the CE one classification?

21 A. Yes, sir, a CE one.

22 Q. Okay. How long were you a CE one?

23 A. I was a CE one probably three or four years and

## Page 10

1 they reclassified -- I did not get a promotion

2 after that. I went to a CE --

3 Q. Okay.

4 A. -- after that.

5 Q. And what's your current job classification?

6 A. My current job classification is a

7 transportation technologist senior.

8 Q. Okay. And when did you become a transportation

9 technologist senior?

10 A. (No response.)

11 Q. Let me ask this --

12 A. Okay.

13 Q. -- and it might help you remember --

14 A. I am not sure how long ago it's been.

15 Q. Did you become a technologist transportation

16 senior at the time they split out the CE

17 classification --

18 A. Yes, sir, that's correct.

19 Q. -- into --

20 A. Yes, sir.

21 Q. Okay. And what is your current in-house job

22 title?

23 A. My in-house job title is project operation

## Page 11

1 engineer.

2 Q. And how long have you held that particular

3 job?

4 A. A year and five months.

5 Q. Who is your supervisor in that job?

6 A. Keith Hoggle.

7 Q. What do you do as a project operations

8 engineer?

9 A. Do you want a list of the duties?

10 Q. Yeah.

11 A. Okay. I hold preconstruction conferences. I

12 help train other project engineers. This

13 classification is kind of like -- a senior

14 project engineer is what it is.

15 Q. Okay.

16 A. And I help train other project engineers and

17 their staff.

18 Q. Okay. And before you were the project

19 operations engineer, were you a project

20 engineer?

21 A. Yes, sir.

22 Q. Okay. Were how long were you a project

23 engineer?

## Page 12

1 A. I think about nine years.

2 Q. Were all those years working in the fifth

3 division?

4 A. Well, all those years that I was project

5 engineer, yes, sir.

6 Q. Yes, okay. And did you work out of district

7 two when you were a project engineer?

8 A. Worked out of district two and some in district

9 three, which is Carrollton area.

10 Q. Okay. Now, during the time that you were

11 supervising Tony Cabbil, which was, I believe,

12 late 2003 to mid 2004, were you working out of

13 district two that entire time?

14 A. Yes, sir.

15 Q. Okay. And you were one of five or six project

16 engineers in district two at that time?

17 A. Yes, sir, I think that's right.

18 Q. Okay. Tell me what your duties were as a

19 project engineer.

20 A. I was in charge of at that particular time two

21 or three projects, I think, and the personnel

22 that were assigned to them, making sure that

23 the inspection work was done properly and that

3 (Pages 9 to 12)

# FREEDOM COURT REPORTING

## Page 13

1  personnel were assigned where they needed to be
2  and the contractors operations were what were
3  supposed to be going on.
4  Q. When did you first meet Mr. Cabbil?
5  A. I think the first time I met Mr. Cabbil was the
6  first day he came to my office, and I am not
7  sure what date that was.
8  Q. Was that the first day that he was assigned to
9  work on the bridge painting project?
10 A. Yes, sir.
11 Q. Okay. And how did Mr. Cabbil come to be
12 assigned to work on that bridge project?
13 A. I had asked for some help to -- A lot -- All of
14 my people were tied up on other projects and I
15 had asked for some help and I think Mr. Calhoun
16 is the one that told me that Mr. Cabbil was
17 coming to my office.
18 Q. Did you know where Mr. Cabbil was coming from?
19 A. Before that day, no, sir, I didn't know that
20 anybody was coming.
21 Q. Okay.
22 A. But when he came, yes, sir, I knew that he had
23 -- that he was coming from Donna's office, yes.

## Page 14

1  Q. Okay. Did you learn that through talking to
2  Mr. Cabbil, that he had come from your wife's
3  office?
4  A. I -- I don't remember. I think I -- I knew
5  that he worked there but I don't know that Tony
6  ever said that, you know, I worked for Donna,
7  but I think I just knew that.
8  Q. Okay. How did you know that?
9  A. Well, just from -- just from knowing Donna's
10 personnel and I knew most of the personnel on
11 other people's projects.
12 Q. Okay. When Mr. Cabbil got there that first day
13 to work with you, did you know that he had
14 already filed a grievance concerning Donna and
15 Mr. Rager?
16 A. I don't remember if I knew it then or if I
17 learned later.
18 Q. Okay. When do you think that you learned about
19 that?
20 A. I think it was after Tony had gone to work with
21 me, but I -- I didn't know that a grievance had
22 been filed.
23 Q. Okay. How did you learn that Mr. Cabbil had

## Page 15

1  filed a grievance?
2  A. I don't remember. That's -- It's been a long
3  time ago and I really don't remember.
4  Q. When Tony came to work for you, did you have
5  any conversations with Donna about Mr. Cabbil?
6  A. If I did, they were very limited, just, you
7  know, I am glad to get the help, that type
8  thing. But, you know, nothing about anything
9  else that I can remember.
10 Q. Okay. Do you recall discussing the quality of
11 Mr. Cabbil's work with your wife?
12 A. No.
13 Q. Do you recall discussing the length of Mr.
14 Cabbil's employment with your wife?
15 A. I don't think I ever knew how long he had been
16 working.
17 Q. Do you recall asking her anything about whether
18 Mr. Cabbil had ever done an inspection on a
19 bridge painting job before?
20 A. No, I didn't know if he had or not.
21 Q. Okay. Do you know today whether Mr. Cabbil had
22 ever had experience on a bridge painting job
23 before?

## Page 16

1  A. Do I know today?
2  Q. Yes, sir.
3  A. Yes, sir, I know today --
4  Q. Okay.
5  A. -- that he had not.
6  Q. How do you know that?
7  A. I learned that when he came to me, but I knew
8  that we were going to train him to do his job.
9  Q. Okay. How did you come to learn that he had
10 not had any experience in that?
11 A. In talking to him after he came to work with
12 me.
13 Q. Was that on the first day when he had come to
14 work with you?
15 A. I don't remember if it was the first day or
16 not, but it was probably shortly thereafter or
17 it might have been that first day.
18 Q. It wasn't a problem that he hadn't had
19 experience?
20 A. No, sir. No, sir, it was not.
21 Q. You were prepared to give him the training --
22 A. Yes, sir.
23 Q. -- that he needed to do the work?

4 (Pages 13 to 16)

# FREEDOM COURT REPORTING

## Page 17

1  A. Yes, sir. .
2  Q. Okay. What was the training -- I am sorry.
3     What was the training that you determined that
4     he needed in order to perform his job
5     successfully?
6  A. I was going to assign Ken Edwards to train him
7     in what to look for and the tests that needed
8     to be run of which there were several that --
9     and it didn't take long to train anybody.
10 Q. Now, Mr. Cabbil's disciplinary records indicate
11    that from January 15th to January 27th was when
12    he did not inspect the job properly. Was that
13    the -- Was January 15th the date that he
14    actually started working on the bridge
15    inspection job?
16 A. I don't remember what date he started working,
17    but I think it was before that.
18 Q. It was before January 15th?
19 A. Yes, sir, I think it was. I am not sure.
20 Q. Okay. Were you ever out on the job with Mr.
21    Cabbil and Mr. Edwards to give them any
22    direction or instruction on how the job was to
23    be done?

## Page 18

1  A. Yes, sir.
2  Q. Okay. When did you first go out on the job
3     with them together?
4  A. I don't remember. Shortly after -- I guess
5     maybe the day that Tony went out there the
6     first time. I don't remember when the
7     contractor went to work or if he was already
8     working or what, I am not sure.
9  Q. But it was early on?
10 A. Yes, sir.
11 Q. Okay. And am I correct that you only needed
12    one engineering assistant to work with Mr.
13    Edwards on that job?
14 A. Yes, sir.
15 Q. What's Mr. Edwards' in-house job title?
16 A. Now?
17 Q. Yes.
18 A. He is a transportation technologist.
19 Q. And what is his in-house title?
20 A. He is a -- He is a chief inspector.
21 Q. Okay. What was his job title at the time that
22    he was working with Mr. Cabbil?
23 A. CE.

## Page 19

1  Q. Okay. And what was his in-house job title at
2     the time that he was --
3  A. Chief inspector.
4  Q. So he was a chief inspector --
5  A. Yes.
6  Q. -- when he worked with Mr. Cabbil?
7  A. Right.
8  Q. Okay. What sort of direction had you given Mr.
9     Edwards on how to train Mr. Cabbil to do the
10    job?
11 A. I just told him to train -- Now, Ken knew what
12    to look for. Ken had read books on the
13    cleanness of it, how it had to be cleaned
14    before it was painted, and Ken was going to
15    tell Mr. Cabbil you know how to -- how to
16    inspect the job. I had instructed Mr. Edwards
17    to do that.
18 Q. Okay. Had Mr. Cabbil read those same books
19    that Mr. Edwards had read?
20 A. I don't know.
21 Q. Okay. Do you know -- You didn't know at the --
22    or you did know at the time that you assigned
23    Mr. Cabbil to go out and work with Mr. Edwards

## Page 20

1     that he did not have any experience in working
2     with a bridge; is that right?
3  A. I believe so, yes, sir.
4  Q. Okay. After that first occasion when you went
5     out on the bridge with Mr. Cabbil and Mr.
6     Edwards, did you monitor periodically Mr.
7     Edwards' supervision of Mr. Cabbil?
8  A. Yes.
9  Q. Okay. How often did you monitor Mr. Edwards'
10    supervision of Mr. Cabbil?
11 A. Just on occasion, I would ask him how Tony was
12    doing and he would say, you know, he seems to
13    be doing okay. He seems to be learning.
14 Q. Okay. How often would you ask him about that?
15 A. Just on occasion. I am not sure if it was once
16    a week or once every two weeks but just, you
17    know, I would just say how is Tony doing --
18 Q. Okay.
19 A. -- on occasion.
20 Q. Were these conversations that you had out on
21    the project itself or in the project office?
22 A. Most of the time, probably out on the project.
23 Q. Okay. So you would go by periodically and look

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 21

1 at the work that was progressing on the
2 project?
3 A. Yes, I would go by almost everyday unless I was
4 tied up on another project.
5 Q. What was the other project that you were
6 working on at that time?
7 A. I had a bridge project on Highway 171 and a
8 project at Mercedes. I think that was the only
9 two I had.
10 Q. So, now, the bridge project on 171, is that the
11 one that Mr. Cabbil was assigned to?
12 A. No, it was not. It was a separate one.
13 Q. So it was —
14 A. I think I had three jobs at that time, yes,
15 sir.
16 Q. Okay. The bridge — The bridge project that
17 you had on 171, was that also a painting
18 project?
19 A. No, sir.
20 Q. Okay.
21 A. No, sir.
22 Q. So if I refer to the bridge painting project,
23 you will understand that I mean —

Page 23

1 Q. Now, was Mr. Cabbil supposed to inspect the
2 blasting of the steel?
3 A. Yes, sir.
4 Q. And was Mr. Cabbil supposed to inspect the
5 cleaning?
6 A. Yes, sir.
7 Q. Okay. And then was Mr. Cabbil supposed to give
8 the approval for the painting work to be done?
9 A. Yes, sir. After he inspected it, yes, sir.
10 Q. Okay. Was Mr. Cabbil then to inspect the
11 painting coat-by-coat to ensure that there were
12 no missed spots?
13 A. Yes, sir.
14 Q. Okay. Now, what was Mr. Edwards'
15 responsibility on this project?
16 A. His main interest was to train Tony at that
17 time and then, after Tony was trained, I used
18 Ken on other projects and that one.
19 Q. How much of the time would you say — Well, let
20 me ask this: For how long did Mr. Edwards
21 train Tony Cabbil to —
22 A. I'm — I'm not sure. I don't know how long —
23 at what time period it was.

Page 22

1 A. Yes, sir.
2 Q. — the one that Mr. Cabbil was assigned to?
3 A. Yes, sir.
4 Q. That is the only bridge painting project that
5 you had going on at that time?
6 A. Yes, sir.
7 Q. Okay. I just don't want to be confusing.
8 A. Right.
9 Q. And tell me exactly what Mr. Cabbil was
10 supposed to do on this bridge painting
11 project.
12 A. After the contractor -- not sandblasted, but
13 steel-shot blasted all the steel on the bridge,
14 it was supposed to be cleaned and then approved
15 to be painted.
16 Q. Then what was supposed to happen?
17 A. After it was painted?
18 Q. After it was approved to be painted.
19 A. After it was approved to be painted, then the
20 contractor was allowed to paint it and then it
21 was supposed to be inspected again after that
22 to make sure that no spots were missed after
23 each coat.

Page 24

1 Q. How long after Mr. Edwards was assigned to
2 train Tony did Mr. Edwards start working on
3 other projects in addition to the bridge
4 painting project?
5 A. Probably three to four weeks, maybe. Three
6 weeks.
7 Q. So Mr. Edwards and Mr. Cabbil worked together
8 on the painting project for at least three to
9 four weeks?
10 A. Yes.
11 Q. Could it have been longer than that?
12 A. Possibly could have. I am not sure exactly how
13 long.
14 Q. Okay. What was Mr. Edwards' assignment after
15 he had worked with Mr. Cabbil on the bridge
16 painting project?
17 A. Was to -- to periodically check on all the
18 projects that we had going on --
19 Q. Okay.
20 A. -- to see if they had problems or needed help.
21 Q. Okay. How much time was he to spend on the
22 painting project?
23 A. I didn't give him any time limit.

6 (Pages 21 to 24)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

## Page 25

1 Q. Okay. Was he to check on it everyday?

2 A. When he had the chance, yes, sir.

3 Q. How often did Mr. Edwards make reports to you

4 about the progress of the bridge painting

5 project when he was working with Mr. Cabbil?

6 A. Probably every couple of days, he'd say we

7 painted this span or we got this span ready, so

8 I would say every couple of days he would give

9 me an update.

10 Q. Now, when Mr. Edwards was training Mr. Cabbil

11 on the bridge painting project, would they be

12 working directly together inspecting the same

13 spans of bridge?

14 A. Yes.

15 Q. The work on the bridge?

16 A. Yes.

17 Q. After Mr. Edwards -- After this approximately

18 three to four week period when Mr. Edwards

19 started working on other projects, too, when he

20 would check on the painting project, would he

21 again inspect the project with Mr. Cabbil as he

22 did when they worked together?

23 A. I don't know if that -- if that happened all

## Page 26

1 the time, I don't know.

2 Q. Okay. Who was Mr. Edwards' direct supervisor

3 for the painting of the bridge project?

4 A. I was.

5 Q. Who -- Who else -- What other ALDOT employees

6 worked on the inspection or any other aspect of

7 the painting of the bridge project while Mr.

8 Cabbil did it?

9 A. While Mr. Cabbil did?

10 Q. Yes.

11 A. I don't think anybody else did.

12 Q. Okay. So it was -- The employees who worked on

13 that project while Mr. Cabbil was working on it

14 were just Mr. Cabbil, Mr. Edwards and yourself?

15 A. I think that's correct.

16 Q. Okay. After Mr. Cabbil left, did somebody take

17 his place inspecting that project?

18 A. Yes.

19 Q. Okay. Who took his place?

20 A. Rhonda Davis.

21 Q. And what is her job classification?

22 A. Now? I think she is -- she is an EA one, I

23 think.

## Page 27

1 Q. Was she an EA one at the time she took Mr.

2 Cabbil's place?

3 A. No, sir, she was an EA at that time, I think,

4 and I think all of them were EA's and then they

5 split out to the EA one and two and three's.

6 Q. Okay. What is Ms. Davis's race?

7 A. Sir?

8 Q. Is Ms. Davis -- what is her race?

9 A. She's white.

10 Q. And was she an employee on -- within your

11 project office or was she also --

12 A. Yes.

13 Q. -- on loan from another office?

14 A. She was a new hired employee and I -- and I

15 don't know how long she had been working before

16 I assigned her to the job.

17 Q. Okay.

18 A. But a newer hire employee.

19 Q. Okay. And she is the individual who replaced

20 Mr. Cabbil on the bridge inspection job --

21 A. Right.

22 Q. -- after he was terminated?

23 A. Right.

## Page 28

1 Q. How much longer did that bridge inspection

2 project go after he was terminated?

3 A. A long time. This was on the first three of

4 four spans that we had the problem and it was

5 several months later before they finished the

6 job.

7 Q. Okay. During the time that Mr. Edwards was

8 training Mr. Cabbil on the inspection of the

9 bridge painting, did Mr. Edwards ever report to

10 you that he thought that Mr. Cabbil was making

11 mistakes in doing the painting?

12 A. No, sir, not during his training period.

13 Q. Okay. During the training period, did Mr.

14 Edwards ever report to you that he believed

15 that Mr. Cabbil was falsifying any reports?

16 A. During his -- During his training?

17 Q. During the training period.

18 A. Not that I recall.

19 Q. Was Mr. Edwards considered to be Mr. Cabbil's

20 supervisor during that time?

21 A. I was his direct supervisor but Ken was the

22 chief inspector so he would have been his

23 supervisor, yes, on the project.

# FREEDOM COURT REPORTING

## Page 29

1  Q. On the project?
2  A. Yes.
3  Q. Okay. Is Mr. Edwards a management employee at
4     the department?
5  A. Is he a what?
6  Q. A management employee.
7  A. Meaning?
8  Q. Is he -- Does he manage staff or individuals?
9  A. On the projects, yes, sir, he is in charge of
10    assigning duties to employees, yes, sir.
11 Q. Okay. Now, when did it first come to your
12    attention that Mr. Cabbil may have improperly
13    inspected portions of this bridge project?
14 A. When Derek Tilley contacted me.
15 Q. Who is Derek Tilley?
16 A. He is the division -- one of the division
17    bridge inspectors.
18 Q. What is his job classification?
19 A. I'm not sure what his classification is.
20 Q. Is he -- Is he in the engineering field?
21 A. Yes, he is.
22 Q. And you say that he is a division bridge
23    inspector?

## Page 30

1  A. Yes, sir.
2  Q. Okay. As a division bridge inspector, what are
3     Mr. Tilley's duties as you understand them?
4  A. As I understand them?
5  Q. Yes.
6  A. They do -- They do inspections on all the
7     bridges in this division and annual
8     inspections, or whatever they do, and so that
9     -- that, so far as I know, is what his job
10    title is -- or what his job duties are.
11 Q. Were you aware that Mr. Tilley was doing
12    inspections on the work that Mr. Edwards and
13    Mr. Cabbil were doing?
14 A. Yes.
15 Q. How did you know that Mr. Tilley was doing
16    those inspections?
17 A. We had asked them to come and inspect what was
18    completed before the contractor moved ahead
19    where the contractor wouldn't have to come back
20    if there was a problem.
21 Q. Okay. Who had put in that request?
22 A. I think I had.
23 Q. Who did you make that request to?

## Page 31

1  A. Blake Galloway.
2  Q. Who is Mr. Galloway?
3  A. At that time, he was the -- the chief bridge
4     inspector for the division and Mr. Tilley
5     worked under him.
6  Q. Now, Mr. Tilley and Mr. Galloway, they are both
7     ALDOT employees, correct?
8  A. Mr. -- Yes, Mr. Tilley is. Mr. Galloway is
9     retired.
10 Q. Okay. At the time that -- in early 2004 when
11    these incidents were occurring, was Mr.
12    Galloway an ALDOT employee?
13 A. Yes, sir, he was.
14 Q. So he wasn't a consultant at that time?
15 A. No, sir. No, sir.
16 Q. Now, why did you make a request to have a
17    division bridge inspector to come and inspect
18    the work before it continued?
19 A. The contractor had asked me to have it
20    inspected, if I could have it inspected, before
21    he took down all of his containment system and
22    moved.
23 Q. So you made this request for Mr. Tilley or

## Page 32

1     somebody to come inspect --
2  A. Yes, yes.
3  Q. -- at the request of the contractor?
4  A. Right.
5  Q. When did you have that conversation with the
6     contractor?
7  A. I'm not sure. It was during -- during the
8     period that -- probably that they had started
9     painting and he had asked me if we could --
10    when he got through with a section, if they
11    could have it inspected before they moved
12    ahead, but I don't know when. And that was
13    normal practice.
14 Q. Okay. What was the contractor's name?
15 A. I think it was P and H Stucco and Painting.
16 Q. Are they out of Florida?
17 A. *** tar tan Springs, Florida, yes, sir.
18 Q. And do you recall the name of the individuals
19    who you had contact with at that time?
20 A. No, sir.
21 Q. Okay.
22 A. I -- They were Greek and I don't know their
23    names. I always called him Mr. Paul.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

## Page 33

1 Q. Mr. Paul?
2 A. Right. I don't know what his last name was.
3 Q. Was there a woman who worked with him as well?
4 A. His wife.
5 Q. Okay. And do you remember her name?
6 A. No, sir, I do not.
7 Q. Did anybody else from that company work on the
8 project?
9 A. Sir?
10 Q. Did anybody else from P and H Stucco and
11 Painting work on that bridge painting project?
12 A. There were other employees there, yes, sir.
13 Q. Okay. Do you recall about how many employees
14 worked on it?
15 A. At any one time, maybe four to five, maybe
16 five.
17 Q. Okay. Now, you say that it was from Mr. Tilley
18 that you first heard that there were problems
19 with the inspection?
20 A. Yes, sir.
21 Q. Okay. How did you hear that from Mr. Tilley?
22 A. I think he called me on the radio.
23 Q. What did he say?

## Page 34

1 A. He said that the areas that he had inspected
2 that had been painted, that we had some
3 problems with it.
4 Q. What kind of problems did he say?
5 A. Well, he said that it wasn't cleaned properly
6 in several places and the paint had — and
7 there were spots that had not been painted.
8 Q. Okay. What else did he say during that
9 conversation?
10 A. I don't remember what else. That was the main
11 thing that we talked about.
12 Q. Okay. What action did you take at that point?
13 A. I think I contacted Ken Edwards and asked him,
14 you know, where — if he was out there when
15 Derek was inspecting. And I can't remember if
16 he said he was there or was there maybe the
17 next day. And I asked him where the areas were
18 at and what was wrong. And then he told me he
19 — he had already talked to Derek Tilley as
20 well, I think.
21 Q. Okay.
22 A. So he knew the areas that were deficient.
23 Q. Okay. Had Edwards been working on the areas

## Page 35

1 that were deficient?
2 A. I don't think so, no, sir.
3 Q. Who had worked on the areas that were
4 deficient?
5 A. Tony.
6 Q. How do you know that?
7 A. Because I had — I think I asked Ken Edwards --
8 I think I asked him if Tony had inspected and
9 he said that he was supposed to have and looked
10 at it and okayed it to be painted.
11 Q. Okay. Had -- Why was Ken Edwards not also
12 supposed to inspect those areas?
13 A. I think that he was probably on another job or
14 maybe at that time Tony had been trained and
15 Ken did not side-by-side inspect with him any
16 more.
17 Q. Okay. Let me show you what I have marked as
18 plaintiff's exhibit nine to your deposition.
19 (Pause.)
20 Q. Do you recognize that document?
21 A. Yes, sir, I've seen it.
22 Q. What is that document?
23 A. This is the report, I guess, that Derek Tilley

## Page 36

1 made when he inspected spans twenty-two and
2 twenty-three and twenty-four.
3 Q. Did you make your request for him to make that
4 report?
5 A. No, sir, I did not.
6 Q. Why did he make this report?
7 A. I am assuming that it was his job to make it
8 after he inspected it.
9 Q. Where did this -- Where was this report filed,
10 do you know?
11 A. In my file or in Derek's file.
12 Q. Does this document that is plaintiff's exhibit
13 nine go in your file?
14 A. I think I got a copy of it.
15 Q. Okay.
16 A. And it may have gone in the bridge
17 correspondence file.
18 Q. Okay. Is there — Is there a sort of central
19 file maintained for all of the documents
20 relating to a particular project?
21 A. Yes.
22 Q. Okay. Where is the central file located for
23 the bridge project that Mr. Cabbil worked on?

9 (Pages 33 to 36)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 37

1   A.   I'm not sure now.  At that time, it was in my
2        project office that I had that we were working
3        out of.
4   Q.   Okay.  How big of a file was it when it was
5        completed?
6   A.   Not very big.  It was a small project —
7   Q.   Okay.
8   A.   — so it didn't have a lot of correspondence in
9        it.
10  Q.   Okay.  Just in terms of the number of pages of
11       paperwork that might be in there, can you give
12       me a sense of —
13  A.   No, sir.  I would have no idea, no, sir.
14  Q.   Would it be something that would take up more
15       than one banker's box full of documents?
16  A.   I wouldn't think so.
17  Q.   And you will have to forgive my not being
18       familiar with how these projects are
19       designated, but at the top of plaintiff's
20       exhibit nine where Mr. Tilley discusses the
21       structure number, that's different from the
22       project number, correct?
23  A.   Yes, sir, that's — I don't know where they

Page 38

1        come up with that number.
2   Q.   Okay.  But do you know what — Does that number
3        refer to — is it a designation for the actual
4        bridge that was being worked on?
5   A.   I don't know.  I am not familiar with that
6        number.
7   Q.   Okay.  And does this — does this report by Mr.
8        Tilley that is marked plaintiff's exhibit nine,
9        is this the — does it contain the same
10       information that he discussed with you over the
11       phone?
12  A.   I think so.  I'm not positive, but he just said
13       there were some areas that were deficient.
14  Q.   Okay.  When he said that there were some areas
15       that were deficient, did you ask him
16       specifically which areas he was talking about?
17  A.   I don't remember.
18  Q.   What did you do to follow up on Mr. Tilley's
19       report that there were areas that were
20       deficient?
21  A.   I think I had Ken Edwards to go up and
22       reinspect it to see what all the problem was.
23  Q.   And did Mr. Edwards then make a report to you

Page 39

1        concerning his reinspection?
2   A.   Just a verbal report.
3   Q.   Okay.
4   A.   Now, wait a minute.  I'm not sure if he give me
5        a written report or just a verbal report.
6   Q.   Okay.  After Mr. Edwards made the report to
7        you, what was — what was the next thing that
8        you did?
9   A.   The next thing we had to do was to contact the
10       contractor and tell him that he was going to
11       have to go back and fix the deficient areas.
12  Q.   Now, what did the contractor say about that —
13       Well, let me ask you this first:  Was this a
14       conversation that you had verbally with the
15       contractor?
16  A.   Yes, sir.
17  Q.   And it was you and Mr. Paul?
18  A.   Me and the — and he was the owner of the
19       company, and I — and I am not sure what his
20       name was.  I just always called him Mr. Paul —
21  Q.   Okay.
22  A.   — because that is what his wife called him.
23  Q.   Okay.  Well, we will call him Mr. Paul —

Page 40

1   A.   Okay.
2   Q.   — for purposes of is this deposition.
3   A.   Okay.  Yes, sir.
4   Q.   Did you — Did you — Was it just you and Mr.
5        Paul who —
6   A.   I think Ken Edwards was with me.
7   Q.   Okay.
8   A.   And I think we just had a meeting on the
9        project and Tony might have been there, also.
10       I am not sure who was there, but I do remember
11       that me and Mr. Paul discussed this.
12  Q.   Okay.  Would this have been close to February
13       20th, 2004?
14  A.   I am not sure what date it was.
15  Q.   Okay.  When you and Mr. Paul and possibly
16       others being present met, what was your — how
17       did your conversation go?
18  A.   I just told him that Derek Tilley had found
19       some areas up there that were deficient that
20       they had sand — or had shot-blasted and
21       supposed to have cleaned and painted, and that
22       they weren't cleaned and they were painted
23       over, and that there was a lot of areas that

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

## Page 41

1 they were going to have to go back and refix.
2 Q. Okay. What was Mr. Paul's response?
3 A. Well, he — he wasn't happy about it but he
4 said that he would do it. He said he thought
5 he was through with it.
6 Q. Did he place the blame on anybody for it not
7 getting done?
8 A. I don't think he placed any blame on anyone,
9 but he — I mean, he was — like I say, he was
10 upset about it but he said that he would go
11 back and fix it, he said, because he wanted to
12 go a good job.
13 Q. Okay. Did he wind up charging ALDOT for having
14 to redo the work?
15 A. No, sir, he did not charge us.
16 Q. Okay. At the time that -- when — when P and H
17 Stucco?
18 A. Yes, sir.
19 Q. Is that right?
20 A. Yes, sir.
21 Q. When P and H Stucco started redoing the work,
22 was Mr. Cabbil still working at the department?
23 A. Yes, sir.

## Page 42

1 Q. Okay. And did he do the inspection on the
2 redoing of the work?
3 A. I think maybe along with Ken Edwards at that
4 time.
5 Q. Okay. So Ken Edwards was there with him?
6 A. I think he got back into it, yes, sir, into
7 looking at it.
8 Q. After — After you had the meeting with Mr.
9 Paul when he said that he would redo the work,
10 what was your — what was your next step that
11 you took concerning this incident, specifically
12 with Mr. Cabbil?
13 A. Well, I — I wrote in my notes that, you know,
14 Tony was supposed to have inspected it and that
15 it did not get properly inspected, and I think
16 then I gave that note to Lewis Rager.
17 Q. Why did you give the note to Mr. Rager?
18 A. That — That was my job is if I had found
19 anything that was wrong on a project, I needed
20 to report it to my supervisor.
21 Q. Okay. Let me show you what I have marked as
22 plaintiff's exhibit ten and I will ask you if
23 you recognize that document?

## Page 43

1 A. Yes, sir, I do.
2 Q. Okay. And can you tell me what that document
3 is?
4 A. It's — It's a handwritten document that I made
5 on Friday, February 20th, regarding the lack of
6 inspection on the Hugh Thomas Bridge project.
7 Q. Was this the documentation that you had
8 discussed just a minute ago that you
9 transmitted to Mr. Rager?
10 A. Yes, sir.
11 Q. Did you make any other handwritten notes
12 concerning this particular incident?
13 A. I'm not sure.
14 Q. And in this letter that we have marked as
15 plaintiff's exhibit ten, you told Mr. Rager
16 that this was an estimated cost to the
17 contractor, four to five thousand dollars,
18 correct?
19 A. Yes, sir.
20 Q. Okay. And that amount was not charged back to
21 the department of transportation?
22 A. No, sir, it was not.
23 Q. That was a cost that wound up being borne by

## Page 44

1 the contractor?
2 A. Yes, sir.
3 Q. After you made this report on February 20th,
4 2004, to Mr. Rager, did Mr. Cabbil continue to
5 perform inspection work on that bridge
6 project?
7 A. Yes, sir, he did.
8 Q. Okay. And did he — did you do any additional
9 training for Mr. Cabbil after you learned of
10 these mistakes?
11 A. I think Mr. Edwards stayed out there with him
12 another while to be sure that he was
13 understanding what needed to be done.
14 Q. Okay. Did Mr. Edwards report to you as to
15 whether Mr. Cabbil seemed to have gained an
16 understanding of what needed to be done?
17 A. I don't remember. He and I may have talked
18 about it, but I don't remember.
19 Q. Okay. At the time that you made this report to
20 Mr. Rager, did you recommend to Mr. Rager that
21 Mr. Cabbil's employment be terminated?
22 A. No, sir.
23 Q. Okay. Did you believe at the time that you

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 45

1  made this report to Mr. Rager that termination
2  of Mr. Cabbil's employment was appropriate for
3  the —
4  A.  I don't make recommendations on terminations
5  for anybody.
6  Q.  Okay.  Did you discuss this situation with Mr.
7  Rager after you made the written report to
8  him?
9  A.  Probably at the time I made the written report
10  to him.
11  Q.  Okay.  What was your conversation with Mr.
12  Rager at that time?
13  A.  I think I just told him that Tony was in charge
14  of inspecting and some inspection had gone
15  lacking, not being done, and that it was --
16  that we were having to make the -- I just
17  informed him of what was -- of what was going
18  on, that we were having to make the contractor
19  go back and fix something.
20  Q.  What was the next communication that you had
21  with Mr. Rager about Mr. Cabbil?
22  A.  I don't know.  I don't remember.
23  Q.  Okay.  Did you have any other conversations

Page 46

1  with Mr. Rager about Mr. Cabbil prior to Mr.
2  Cabbil being recommended for termination?
3  A.  I had talked to Lewis about the day Tony left
4  the project and didn't come back, but I don't
5  know what day that was.
6  Q.  Okay.
7  A.  I don't have my records and I am not sure.
8  Q.  Okay.  Did you talk to Mr. Rager any more about
9  the problems with the inspection on the bridge
10  painting?
11  A.  I don't know.
12  Q.  When did you first learn that ALDOT was
13  considering terminating Mr. Cabbil for the
14  inspection work that he had done on the bridge
15  project?
16  A.  I don't remember what date it was.
17  Q.  Okay.  How did you first learn about it?
18  A.  I think Lewis told me that he was going to
19  recommend termination of Tony Cabbil.
20  Q.  Okay.  And was that a in-person conversation or
21  a conversation over the phone?
22  A.  I don't remember.
23  Q.  Okay.  What did Mr. Rager say during that

Page 47

1  conversation?
2  A.  I don't remember what all was said but I -- you
3  know, he just told me that he was going to
4  recommend termination of Mr. Cabbil.
5  Q.  Did you ask him why?
6  A.  I don't remember.
7  Q.  Okay.  Did you -- Did you find out why during
8  that conversation?
9  A.  I don't remember.  I really -- I really don't
10  remember the conversation, but I know I had a
11  conversation with him.
12  Q.  Okay.
13  A.  But I don't remember all of the conversation.
14  Q.  Now, Tony Cabbil was an employee working under
15  your supervision at that time?
16  A.  Right.
17  Q.  Correct?
18  A.  (Nodded head in the affirmative.)
19  Q.  Okay.  And Mr. Rager talks to you either in
20  person or on the phone and says I am going to
21  recommend that we fire Tony Cabbil?
22  A.  Right.
23  Q.  Right?  Did you not say well, you know, what's

Page 48

1  -- what is going on?  Why are you firing him?
2  A.  Well, like I say, I don't remember when the
3  incident happened and maybe him abandoning his job
4  and not coming back to work that day, and Lewis
5  probably told me that due to the lack of
6  inspection and maybe the job abandonment or
7  inattention to his job, but I don't know that I
8  asked him why.  He may have told me why.
9  Q.  Okay.  All right.  Apart from that -- Before
10  that conversation, had you had any
11  conversations with Mr. Rager any more about
12  that inspection work that Mr. Cabbil had?
13  A.  I don't remember about that particular time.
14  Q.  Okay.  Let's look at plaintiff's exhibit five
15  which was marked during Donna Elliot's
16  deposition earlier.  Let me ask you if you
17  recognize that document.
18  A.  Yes, sir.
19  Q.  Okay.  And what is it?
20  A.  It is a letter written by Mr. Rager regarding
21  termination of Mr. Tony Cabbil.
22  Q.  Okay.  And this letter is dated March 4th,
23  2004, correct?

12  (Pages 45 to 48)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 49

1　A.　That's right, yes, sir.
2　Q.　Okay. And what are the reasons that Mr. Cabbil
3　　　is recommended for termination in this letter?
4　A.　Well, for violation of ALDOT employee work
5　　　rules.
6　Q.　Okay. He is not being recommended for
7　　　termination because of anything about job
8　　　abandonment, is he?
9　A.　I don't see anything here that says that, no,
10　　　sir.
11　Q.　What he — What it does say on here is that
12　　　there's three different personnel rules that
13　　　he's violated, correct? inattention to jobs,
14　　　failure to perform job properly, and
15　　　falsification of records, correct?
16　A.　Yes, sir. Yes, sir.
17　Q.　Those all concern the inspection work that was
18　　　being done from January 15th to January 27th,
19　　　correct?
20　A.　I guess so.
21　Q.　Okay. In your opinion, was Mr. Cabbil -- did
22　　　he display inattention to his job?
23　A.　In my opinion, yes.

Page 50

1　Q.　Okay. How can you tell us that Mr. Cabbil
2　　　displayed inattention to his job?
3　A.　Because he told me on this date that I talked
4　　　with him, February the 20th, that the section
5　　　they were working on, he had not been in that
6　　　containment system to inspect it in a week.
7　Q.　What is the containment system?
8　A.　That is the enclosed system that the contractor
9　　　is working inside sandblasting and painting.
10　Q.　Okay. That was -- He told you that on February
11　　　20th, correct?
12　A.　Right.
13　Q.　Okay. What do you know that would show that
14　　　during the period of January 15th to the 27th,
15　　　that Mr. Cabbil had displayed inattention to
16　　　his job?
17　A.　Ask me that again, please, sir.
18　Q.　Well, let me ask this first: Mr. Cabbil told
19　　　you on February 20th —
20　A.　Right.
21　Q.　— that he hadn't been in the containment
22　　　system for a week?
23　A.　Right.

Page 51

1　Q.　Right?
2　A.　Right.
3　Q.　Did you tell him at that time that that was
4　　　improper?
5　A.　I instructed — I wrote him that I told him
6　　　that he needed to be up inspecting the beams
7　　　everyday, yes, sir.
8　Q.　Okay. Were you surprised to hear that he
9　　　hadn't been in the containment system for a
10　　　week?
11　A.　Yes, sir, I was.
12　Q.　Do you know whether he had been instructed
13　　　previously to get in the containment system
14　　　everyday?
15　A.　I think he had.
16　Q.　What makes you think that?
17　A.　I think that Mr. Edwards told him that he had
18　　　to inspect it everyday.
19　Q.　Do you know for sure that Mr. Edwards had told
20　　　Mr. Cabbil?
21　A.　No, sir, I do not know for sure.
22　Q.　Okay. So you don't know for sure whether Mr.
23　　　Edwards told Mr. Cabbil to get in the

Page 52

1　　　containment system everyday?
2　A.　No, sir, I -- I don't know what Mr. Edwards
3　　　told him.
4　Q.　Now, Mr. Cabbil then told you that he hadn't
5　　　been in the containment system for a week.
6　　　That would put us back to approximately
7　　　February 13th, correct?
8　A.　I am assuming, yes, sir.
9　Q.　Okay. What do you know that makes you think
10　　　that Mr. Cabbil was inattentive to his job
11　　　between January 15th and 27th, the time period
12　　　referenced on the termination letter?
13　A.　I guess I am not sure I understand the
14　　　question.
15　Q.　Okay. You told us that for the -- for the week
16　　　of February 13th to February 20th —
17　A.　Uh-huh (yes).
18　Q.　— Mr. Cabbil had not been in the containment
19　　　system?
20　A.　Right.
21　Q.　Right?
22　A.　(Nodded head in the affirmative.)
23　Q.　Okay. I am asking you now because the

13　(Pages 49 to 52)

# FREEDOM COURT REPORTING

## Page 53

1    termination letter says that he was inattentive
2    to his job on January 15th to 27th --
3    A.   Right.
4    Q.   -- which is outside of that time period from
5    February 13th to 20th.  What information do you
6    have that would show that Mr. Cabbil was
7    inattentive to his job from January 15th to
8    27th?
9    A.   I don't have anything here that -- I mean, I
10   don't know what you are asking for.
11   Q.   I am asking for you to tell me -- You said that
12   you believed that Mr. Cabbil was inattentive to
13   his job?
14   A.   Right.
15   Q.   I am asking you to tell me what Mr. Cabbil did
16   that displayed inattention to his job between
17   January 15th and January 27th.
18   A.   I am not sure.  I don't know the answer to that
19   question.
20   Q.   Okay.  Who would know the answer to that
21   question?
22   A.   I guess Mr. Rager, he is the one that wrote
23   this letter.

## Page 54

1    Q.   Okay.  All right.  This letter also states that
2    Mr. Cabbil, from January 15th through 27th,
3    2004, failed to perform his job properly in
4    violation of state personnel rule six seven oh
5    dash X dash nineteen dash point oh one
6    parentheses one dash E.  I guess I really
7    didn't have to read all that.  What information
8    do you have that would show that Mr. Cabbil
9    failed to perform his job properly from January
10   15th to the 27th?
11   A.   It would probably be in the diaries that Mr.
12   Cabbil turned in that said that he -- that the
13   contractor worked on these spans and that he
14   inspected them and then when it was painted --
15   or when it was painted, after that is when the
16   deficiencies were found.
17   Q.   Okay.
18   A.   And the records would show that Tony had done
19   the inspection on it from the 15th through the
20   27th.
21   Q.   Did you review those diaries from January 15th
22   through the 27th of Mr. Cabbil's?
23   A.   Yes.

## Page 55

1    Q.   Did you determine, based on your review of
2    those diaries, that Mr. Cabbil had failed to
3    perform his job properly?
4    A.   Yes.
5    Q.   All right.  Let me show you what I have marked
6    as plaintiff's exhibit eleven.
7    A.   Okay.
8    Q.   Are those the diaries of Mr. Cabbil that you
9    reviewed?
10   A.   Yes, sir, I think it is.
11   Q.   Okay.  And based on your review of those
12   diaries, you determined that Mr. Cabbil had
13   failed to perform his job properly?
14   A.   Based on these?
15   Q.   Yes.
16   A.   No, sir.
17   Q.   Okay.  Tell me again, then, what -- on what
18   basis did you decide that Mr. Cabbil had failed
19   to perform his job properly from January 15th
20   to January 27th, 2004.
21   A.   When Derek Tilley inspected the sections that
22   Tony was in charge of inspecting and found
23   deficiencies.

## Page 56

1    Q.   Okay.  So it's your contention that, then,
2    these diaries that I have just marked as
3    plaintiff's exhibit eleven do not show that Mr.
4    Cabbil failed to perform his job properly?
5    A.   Well, it says that he performed his job and
6    apparently it wasn't done properly.
7    Q.   Okay.  Earlier, before I marked this exhibit,
8    you testified that you determined that Mr.
9    Cabbil had failed to perform his job properly
10   in violation of the SPD rule that I read to you
11   from January 15th through 27th, 2004.  You
12   determined that by going back and looking at
13   his inspector daily reports or his diaries?
14   A.   That was one thing, yes sir.
15   Q.   Okay.  What were the other things that allowed
16   you to conclude that Mr. Cabbil had not done
17   his job properly?
18   A.   When Derek Tilley told me that he had inspected
19   the area during this time and found
20   deficiencies.
21   Q.   Okay.  Anything else besides the diaries and
22   Mr. Tilley's report to you?
23   A.   Well, and in my conversation with Tony on

14  (Pages 53 to 56)

# FREEDOM COURT REPORTING

Page 57

1  February the 20th, not necessarily speaking of
2  that section, but the section they were working
3  in at that time.
4  Q. Okay. Now, let me ask you to look back at Mr.
5  Tilley's note —
6  A. Okay.
7  Q. — which is plaintiff's exhibit nine. The
8  spans that were not done properly are
9  twenty-two, twenty-three and twenty-four,
10  right?
11  A. That is what I see, yes.
12  Q. Okay. Let me just ask you to look through this
13  plaintiff's exhibit eleven, which is the
14  inspector's daily reports by Mr. Cabbil from
15  January 15th to 27th, and tell me whether Mr.
16  Cabbil was working on spans twenty-two,
17  twenty-three and twenty-four during that time
18  period.
19      (Pause.)
20  A. Yes, sir.
21  Q. Okay. Was he — During that time, he was also
22  working on a little bit on span twenty-five and
23  twenty-six, correct?

Page 58

1  A. Looks like they had started cleaning on
2  twenty-five and twenty-six.
3  Q. Does that mean that the painting on those spans
4  had all been completed?
5  A. I'm not sure what he meant here by contractor
6  cleaning up in span twenty-five, twenty-five A
7  and twenty-six.
8  Q. Okay. Now, these inspector's daily reports
9  indicate that Mr. Edwards was also working on
10  these bridge spans — these spans twenty-two,
11  twenty-four and twenty-five during those time
12  periods, correct?
13  A. I think this one day was — Here I see that Ken
14  Edwards said that the contractor was blasting
15  at span twenty-three and painting span
16  twenty-three northbound lane, right.
17  Q. Okay. That is the page that's got a marking on
18  the bottom left that says zero zero seven
19  seven, right?
20  A. I think you're right.
21  Q. And I will just let you know those are the page
22  number designations that we put on these
23  documents before we sent them to the D.O.T.'s

Page 59

1  lawyers.
2  A. Okay.
3  Q. Page zero zero seven six shows that Mr. Edwards
4  also spent eight hours on this project on
5  Thursday, January 15th, correct?
6  A. That's right.
7  Q. That appears to be Mr. Edwards's handwriting,
8  does it not?
9  A. Yes, it does.
10  Q. Okay. So Mr. Edwards put his name down on the
11  inspection — the inspector's daily report on
12  January 15th, 2004, correct?
13  A. I don't know if it was that day or the next
14  but, yeah, it is on this report.
15  Q. Okay. He did put his name down —
16  A. Yes.
17  Q. — on that report, correct?
18  A. Yes.
19  Q. And that shows that they were working on spans
20  twenty-three and twenty-four on that day,
21  correct?
22  A. Right.
23  Q. Okay. Doing inspection reports on those spans

Page 60

1  that day?
2  A. Yes.
3  Q. And then, on January 16th, does it not appear
4  that Mr. Edwards was the only person doing the
5  inspection work on spans twenty-three — I am
6  sorry, on span twenty-three on that bridge
7  project?
8  A. That is what it appears, yes, sir.
9  Q. All right. And Mr. Tilley's notes indicated
10  that span twenty-three was one of the places
11  where there were problems, correct?
12  A. Yes.
13  Q. Okay. Specifically it states that for span
14  twenty-three, numerous spots the parameters are
15  very thin, not primed at all, locations are
16  mainly vertical stiffeners, diaphragms and
17  outside of sidewalk I beams, correct?
18  A. Right.
19  Q. Okay. How is it that Mr. Cabbil performed his
20  job improperly on January 16th with regard to
21  the inspection of January 23?
22  A. Well, they were sandblasting the day before
23  that and the day after that that Tony was the

15 (Pages 57 to 60)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 61

1  inspector on also.
2  Q.  Okay.  But I am talking specifically about
3     Friday, January 16th.  Do you even know if Tony
4     Cabbil was at work that day?
5  A.  No, sir, I don't.
6  Q.  Mr. Edwards is listed as the engineering
7     personnel on that property on that day,
8     correct?
9  A.  Right.  Yes, sir.
10 Q.  He is the only engineering personnel listed on
11    that project for that day?
12 A.  Right.
13 Q.  Correct?
14 A.  Right.
15 Q.  Okay.  How can we tell from this document that
16    Mr. Cabbil did not perform his job properly on
17    that day when Mr. Edwards was doing the
18    inspection?
19 A.  Well, Tony wasn't here, he didn't.
20 Q.  Okay.  So Mr. Edwards was the one in charge of
21    the inspection on that span twenty-three on
22    that day, correct?
23 A.  Yes, sir.

Page 62

1  Q.  Okay.  Now, can you tell — Flip back to that
2     first page on the exhibit marked zero zero
3     seven six.  Mr. Cabbil and Mr. Edwards were
4     doing the inspection work together for eight
5     hours each, correct?
6  A.  I don't know that they were doing the
7     inspection work together.
8  Q.  Okay.  But they were each inspecting that
9     bridge project for eight hours?
10 A.  They each charged time on it, yes, sir.
11 Q.  They each charged eight hours of time?
12 A.  Right.
13 Q.  Okay.  How can you tell from this document
14    whether it was Mr. Cabbil or Mr. Edwards who
15    did not perform the job properly in doing the
16    inspection on spans twenty-three and
17    twenty-four on Thursday, January 15th?
18 A.  Because Tony was supposed to be doing the
19    inspection work.
20 Q.  Well, he is listed as doing the same numbers of
21    hours as Mr. Edwards, is he not?
22 A.  Right, yes, sir.
23 Q.  Okay.  How can you tell that it was Mr. Cabbil

Page 63

1     and not Mr. Edwards who made the mistakes?
2  A.  Tony is the one that signed it and said that
3     the contractor was sandblasting, cleaning up,
4     contractor put down containment.
5  Q.  Okay.  Mr. Edwards wrote his name on there and
6     wrote eight hours next to it?
7  A.  Yes.
8  Q.  Correct?
9  A.  Yes, sir.
10 Q.  Okay.  Is there any way that you can know from
11    this document whether it was Mr. Cabbil or Mr.
12    Edwards who failed to perform the job properly
13    on this bridge inspection on January 15th?
14 A.  I don't know who was doing the inspection.
15 Q.  Okay.  Let me ask you to flip over to the page
16    marked zero zero eight zero which is Thursday,
17    January 22nd.  Tony Cabbil and Kenneth Edwards
18    both charged eight hours to this inspection
19    project, correct?
20 A.  Right.
21 Q.  Okay.  And they were inspecting the beginning
22    of sandblasting on span twenty-four, correct?
23 A.  That's correct.

Page 64

1  Q.  Okay.  And was span twenty-four one of the
2     areas in which the -- Mr. Tilley had reported
3     that the work had not been done properly?
4  A.  Yes.
5  Q.  Okay.  Can you tell from this document whether
6     it was Mr. Cabbil or Mr. Edwards who didn't do
7     the inspection work correctly?
8  A.  It was Mr. Cabbil's job to do the inspection.
9  Q.  Okay.
10 A.  Just because Ken charged time to it doesn't
11    mean that he was doing actual inspection work.
12 Q.  What else would Mr. Edwards have been doing on
13    this project?
14 A.  I don't know.
15 Q.  He was the chief inspector, correct?
16 A.  Right.
17 Q.  He was the chief inspector on this bridge
18    project, correct?
19 A.  Well, on several projects, yes, sir.
20 Q.  But he was the chief inspector on this bridge
21    project?
22 A.  Yes.
23 Q.  And he charged eight hours to this bridge

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

## Page 65

1     project?

2    A.   Yes.

3    Q.   ALDOT is an eight-hour day?

4    A.   That's correct.

5    Q.   So Mr. Edwards is not likely to have worked on

6     other projects on this day, correct?

7    A.   I am not sure if he did or not or if he charged

8     eight hours to it.

9    Q.   So he may have worked some overtime as well?

10   A.   He could have.

11   Q.   Okay. But Mr. Edwards worked the same amount

12     of time as Mr. Cabbil on this project,

13     correct?

14   A.   Right. Right.

15   Q.   Okay. How could we tell whether it was Mr.

16     Edwards or Mr. Cabbil who had improperly

17     inspected the bridge work on this day,

18     Thursday, January 22nd?

19   A.   Because it was Tony Cabbil's job to do the

20     inspection.

21   Q.   Okay. That was a job assigned him by Mr.

22     Edwards, correct?

23   A.   Right.

## Page 66

1    Q.   And Mr. Edwards was supposed to be training

2     Mr. Cabbil on how to do that inspection,

3     correct?

4    A.   Right.

5    Q.   Was Mr. Edwards ever given any discipline at

6     all for improper work on this bridge project?

7    A.   No.

8    Q.   Why not?

9    A.   I didn't see where he had done anything wrong.

10   Q.   Okay. But you saw where Mr. Cabbil had done

11     something wrong?

12   A.   Right.

13   Q.   Okay. And you wouldn't think that it would be

14     anything wrong for Mr. Edwards to spend eight

15     hours by himself on this particular bridge

16     project on the 17th where we noted that he was

17     the only person out there doing the inspection

18     work, you wouldn't think that would be anything

19     wrong for him to be the only person out there

20     and have Mr. Tilley's inspection report come

21     back that there will be problems with the very

22     spans that Mr. Edwards had been inspecting?

23   A.   I -- I -- I don't know. I don't know.

## Page 67

1    Q.   What did Mr. Cabbil do wrong that Mr. Edwards

2     didn't do wrong?

3    A.   Well, it is my opinion that Tony didn't do his

4     job properly and that he let some spots go and

5     Derek caught them.

6    Q.   How can you tell that Mr. Cabbil let the spots

7     go and not Mr. Edwards when Mr. Edwards was the

8     only person working on this project during this

9     specific time span referenced in Mr. Cabbil's

10     termination letter recommendation?

11   A.   I don't know.

12   Q.   You don't know?

13   A.   No, sir.

14       (Pause.)

15   Q.   All right. Let's turn over to page zero zero

16     eight three --

17   A.   Okay.

18   Q.   -- which is the daily report for January 26th,

19     2004. It indicates that Mr. Cabbil charged

20     eight hours to the bridge project and Mr.

21     Edwards charged nine hours to the bridge

22     project, correct?

23   A.   Right.

## Page 68

1    Q.   Okay. And it indicates that the work that was

2     being performed was the sandblasting of the

3     remaining half of span number twenty-four and

4     painting the remaining half of span number

5     twenty-four, first coat, correct?

6    A.   Right.

7    Q.   And Mr. Cabbil and Mr. Edwards were both doing

8     the inspection work on this project, correct?

9    A.   They both charged time to this project.

10   Q.   Okay. Do you know which of them was in charge

11     of inspecting the specific spots that the

12     contractor missed that Mr. Tilley identified?

13   A.   Mr. Cabbil was supposed to be.

14   Q.   Okay. How do you know that?

15   A.   That was his assigned job.

16   Q.   Okay. Mr. Edwards was charging nine hours to

17     this project on that day, correct?

18   A.   Right.

19   Q.   Would Mr. Edwards have been doing anything on

20     this project other than inspecting the work of

21     the contractor?

22   A.   No, sir.

23   Q.   Okay.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

## Page 69

1  A. Not as I know of.

2  Q. Okay. And would Mr. Cabbil have been doing

3     anything on this project during that day except

4     for inspecting the work of the contractor?

5  A. No, sir.

6  Q. So both Mr. Edwards and Mr. Cabbil charged a

7     full day's time for inspecting the work on the

8     bridge project that day?

9  A. That's correct, yes.

10 Q. Okay. How can you tell that it was Mr. Cabbil

11    who didn't properly inspect the work when both

12    of them were inspecting on the project that

13    day?

14 A. Because Mr. Cabbil is the one that signed the

15    report and that was his job to do.

16 Q. Okay. Did Mr. Edwards have to sign a report

17    like this?

18 A. Did he have to?

19 Q. Yes?

20 A. No.

21 Q. So this inspector's daily report page zero zero

22    eight three is the only daily report that goes

23    in for this project on this particular day?

## Page 70

1  A. Right.

2  Q. Okay. Why would you have Mr. Cabbil signing as

3     the inspector on behalf of Mr. Edwards when

4     both of them were doing the inspection work on

5     that day?

6  A. I don't know that Ken was doing the inspection

7     work that day. He charged time to the project.

8  Q. So you think maybe Mr. Edwards might have been

9     working on some other project but charging time

10    to this project?

11 A. No, he might have been on that project but not

12    doing the inspection work.

13 Q. Well, I just asked you what would Mr. Edwards

14    have been doing other than inspecting the

15    contractor's work on this project and you said

16    there was nothing else that he would be doing.

17 A. Right, there was no other project that he would

18    be on.

19 Q. Well, what else would he —

20 A. He might have been on the ground and not up in

21    the — not up in the containment system doing

22    the inspection work.

23 Q. Okay. Do you know whether he was on the

## Page 71

1     ground?

2  A. No, sir, I do not.

3  Q. Do you know whether Mr. Cabbil he was on the

4     ground?

5  A. No, sir, I do not.

6  Q. Do you know which of them was up in the

7     containment system?

8  A. No, sir.

9  Q. So why, again, would Mr. Cabbil be disciplined

10    for this situation and not Mr. Edwards?

11 A. Because that was his job to do.

12 Q. Because Mr. Cabbil signed the report?

13 A. Right.

14 Q. Okay.

15 A. And that was what he had been trained to do was

16    to go up and do the inspection work and not Ken

17    when he was trained.

18 Q. And the person who had trained him was Mr. Ken

19    Edwards?

20 A. Right.

21 Q. So Mr. Edwards, in theory, was sitting on the

22    ground doing nothing while Mr. Cabbil was up

23    doing the inspection work?

## Page 72

1        MR. REDD: Object to the form.

2        You can answer if you know.

3  A. I don't know.

4  Q. You don't know?

5  A. At that particular point in time, no, sir, I

6     don't.

7  Q. You have no idea whether he was up there in the

8     containment system or not?

9  A. No, sir, I do not.

10 Q. Okay. Now, turn over to the last page, which

11    is page zero zero eight four. This is the

12    inspection report for Tuesday, January 27,

13    2004, signed by Tony Cabbil, correct?

14 A. Right.

15 Q. And it would be the only inspector's dailey

16    report for this project on this date?

17 A. Yes, sir.

18 Q. That is true of all of these reports that we

19    have looked at, they are the only inspector's

20    daily reports on this project?

21 A. That's right.

22 Q. Again, Mr. Cabbil and Mr. Edwards both charged

23    eight hours to the project, correct?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

## Page 73

1  A.  Right.
2  Q.  And you don't know which one of them was
3      inspecting the project that day?
4  A.  No, sir, I personally don't, no, sir.
5  Q.  And they were working on span number
6      twenty-four together, correct?
7  A.  Right.
8  Q.  And this is one of the ways that you believe
9      you can tell that Mr. Cabbil didn't perform his
10     job properly?
11 A.  Right.
12 Q.  But you don't know whether Mr. Edwards perform
13     his job properly on this day or not?
14 A.  I don't know that Mr. Edwards was inspecting.
15 Q.  Mr. Edwards could have been, again, sitting on
16     the ground not inspecting?
17 A.  Right.
18 Q.  But he still charged the eight hours to the
19     project?
20 A.  That's correct.
21 Q.  And Mr. Edwards was the one who was supposed to
22     be training Mr. Cabbil on how to do this
23     inspection work?

## Page 74

1  A.  That's correct, yes.
2  Q.  Mr. Cabbil was also terminated for
3      falsification of records, correct?
4  A.  That is what they said, yes, sir.
5  Q.  Okay.  In your opinion, did Mr. Cabbil falsify
6      records?
7  A.  Well, it says that he did the inspection work
8      and that it was -- and that it was okay to
9      paint and that is falsification of records.
10     That is what I think -- That is where I think
11     this is talking about.
12 Q.  Okay.  You don't know, though, because you
13     didn't write this particular letter?
14 A.  No, sir, I don't know, that's correct.
15 Q.  Now, the state personnel board rule six seventy
16     dash X dash nineteen dash point oh two dash two
17     F, which I will show you, right here lists
18     falsification of records --
19 A.  Okay.
20 Q.  -- as a violation of the rules, correct?  And
21     it lists specifically application for
22     employment, time card, doctor's excuse,
23     et cetera, correct?

## Page 75

1  A.  Okay.
2  Q.  You would agree with me those are
3      employment-related documents, correct?
4  A.  That is, yes.
5  Q.  Okay.  Mr. Cabbil didn't falsify any
6      employment-related documents so far as you
7      know, correct?
8          MR. REDD:  Object to the form of the
9      question.
10 Q.  Did he?  I just didn't hear your answer.
11         MR. REDD:  If you know, you can answer.
12 A.  I don't know.
13         MR. REDD:  If you don't know, say that.
14 A.  Can I take just a few minute bathroom break?
15 Q.  Sure, yeah.
16 A.  Needing to go.
17 Q.  Yeah.
18         (Recess.)
19         MR. REDD:  We are ready?
20         MR. SIMON:  I don't think I have too much
21     more.
22         THE WITNESS:  Okay.
23     (BY MR. SIMON:)

## Page 76

1  Q.  Let me ask you to look at what I will get out
2      here, plaintiff's exhibit six.  Let me ask you
3      if you recognize that document?
4  A.  I have seen it, yes, sir.
5  Q.  Okay.  Can you tell me what it is?
6  A.  It looks like it's a letter to Tony Cabbil from
7      Mr. D. J. McInnes concerning a notice of
8      proposed termination and pretermination
9      conference.
10 Q.  Okay.  And you were present when this letter
11     was given to Mr. Cabbil, correct?
12 A.  (No response.)
13 Q.  Look at the last page.
14 A.  I think that the --
15 Q.  You signed it as a witness?
16 A.  Okay.  Yeah, that's right.  I was there.
17 Q.  Okay.  And it was you and also Mr. Calhoun and
18     Mr. Rager, your wife, Ms. Elliot, and Ms.
19     Ramsey, correct?
20 A.  Right.
21 Q.  Okay.  Did you have any part in drafting this
22     letter?
23 A.  No, sir.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

## Page 77

1  Q.  Were you one of the people who made the
2      decision that Mr. Cabbil should be
3      terminated --
4  A.  No, sir.
5  Q.  -- from the department?
6  A.  (Shook head in the negative.)
7  Q.  Did anybody consult you as to your opinion
8      about whether Mr. Cabbil should be terminated
9      from the department?
10 A.  No, sir.
11 Q.  Let me ask you to look at item number eighteen.
12 A.  Eighteen?
13 Q.  Yes.
14 A.  Okay.
15 Q.  Which starts:  On February 17th, 18th, 19th,
16     2004, the division bridge crew.  Do you see
17     that there?
18 A.  Yes, sir.
19 Q.  February 17th, 18th and 19th was while Mr.
20     Cabbil was under your supervision, correct?
21 A.  Right.
22 Q.  Okay.  And the letter states -- the last
23     sentence of eighteen states:  As a result, it

## Page 78

1      was estimated it would cost the department four
2      to five thousand dollars to correct the
3      problems.  Do you see that on there?
4  A.  Yes, sir.
5  Q.  Who estimated that it would cost the department
6      four to five thousand dollars to correct the
7      problems?
8  A.  Well, sometime during the process, I asked the
9      contractor how much he thought it was going to
10     cost him to go back and redo this, or he either
11     told me.  I am not sure if I asked him.  And we
12     possibly could have been charged that due to
13     lack of inspection and allowing the contractor
14     to go on and paint and not -- and not have to
15     go back.
16 Q.  Okay.  When did you find out that you were not
17     going to be charged that four to five thousand
18     dollars?
19 A.  Maybe at the end of the job.  The contractor
20     has time to go back and if he had filed a
21     claim, we would have -- we might have had to
22     pay that.
23 Q.  Okay.  Did you give the estimate of the cost of

## Page 79

1      four to five thousand dollars?
2  A.  Did I give it?
3  Q.  Yes.
4  A.  Well --
5  Q.  Who made the estimate?
6  A.  The contractor.
7  Q.  Okay.  Did you tell somebody that it was
8      estimated that it would cost the department
9      four to five thousand dollars to correct the
10     problems?
11 A.  I told Lewis Rager that it could cost us that
12     much if the contractor filed a claim.
13 Q.  Okay.  You didn't tell him that it would cost
14     that?
15 A.  No, sir, I did not.  No, sir.
16 Q.  Okay.  Have you ever had an engineering
17     assistant working under you make a mistake that
18     cost the department five thousand dollars or
19     less?
20 A.  I don't remember.  Not -- Maybe not
21     specifically for me, but I -- but maybe
22     somebody else has, I don't know.
23 Q.  Okay.  Have you ever -- Have you ever had an

## Page 80

1      engineering assistant working under you fail to
2      perform their job properly?
3  A.  Yes.
4  Q.  Okay.  Has any engineering assistant working
5      under you ever failed to perform their job
6      properly in a way that cost the transportation
7      department money?
8  A.  Not that I remember.
9  Q.  Okay.  Has any engineering assistant working
10     under you ever failed to perform their job
11     properly in a way that wound up having -- that
12     wound up causing work to have to be redone?
13 A.  Yes.
14 Q.  Okay.  What -- Who -- Which engineering
15     assistant working under you failed to perform
16     their job properly in a way that caused work to
17     have to be redone?
18 A.  Well, the one incident I can remember is Jeremy
19     Akins, he was letting a contractor do some
20     backfilling without running compactions on it
21     properly.
22 Q.  How much did that cost the contractor?
23 A.  I am not sure, but he did have to go back and

20  (Pages 77 to 80)

# FREEDOM COURT REPORTING

Page 81

1    redo a section and reroll it and fix it.
2    Q.   Okay. Was Mr. Akins fired as a result of that
3    incident?
4    A.   I think he got a reprimand for that. I am not
5    sure that that was the reason he was
6    terminated.
7    Q.   Was he working under you when he got
8    terminated?
9    A.   No, sir. I had already -- I think I had
10   already moved up here to the division office at
11   that time.
12   Q.   Okay. Okay. Do you know if there was an
13   estimated cost of what the contractor had to
14   redo?
15   A.   No, sir, I don't know.
16   Q.   Was -- Was -- Was this what the contractor had
17   to redo that Mr. Akins missed, was it reported
18   to Mr. Rager?
19   A.   Yes, sir, I think so.
20   Q.   At the time that it was reported to Mr. Rager,
21   had Mr. Akins been under your supervision for
22   the whole duration of his employment with the
23   Department of Transportation?

Page 82

1    A.   No, sir. He had worked under other people,
2    too.
3    Q.   Okay. How long did Mr. Akins work under you?
4    A.   I don't remember.
5    Q.   Was it more or less than a year?
6    A.   I would think more than a year. I am not
7    positive.
8    Q.   How long of a period of time did Mr. Akins fail
9    to perform his job properly that led to the
10   contractor having to redo that section?
11   A.   Say that again?
12   Q.   I am sorry. That was a very poorly-worded
13   question.
14   A.   I didn't understand what you said.
15   Q.   For how many days did Mr. Akins let the
16   contractor do this backfilling that had to be
17   redone?
18   A.   I don't know. At the time that it was brought
19   to my attention, that day is the only one I
20   know of, but I don't know how much before that,
21   maybe --
22   Q.   Okay. Was what Mr. Akins did, was it a fault
23   in the inspection work that he was doing?

Page 83

1    A.   Yes.
2    Q.   He hadn't inspected the contractor's work
3    properly?
4    A.   That's correct, yes.
5    Q.   Have any other engineering assistants working
6    under you ever failed to perform their job
7    properly with the result that the contractor
8    had to redo some work?
9    A.   I don't think so. You know, the contractor may
10   have had to redo some work, minor things,
11   maybe, in the past, but I am not sure of
12   anything major.
13   Q.   Okay. Have any engineering assistants under
14   you failed to properly inspect the work of a
15   contractor besides Jeremy Akins and Mr.
16   Cabbil?
17   A.   I am sure they have and I may not be aware of
18   it.
19   Q.   Okay. Are there any that you are aware of
20   beside Mrs. Akins and Mr. Cabbil?
21   A.   None that I know of that were maybe reprimanded
22   but, you know, I may have had some brought to
23   my attention and I corrected them, told them to

Page 84

1    not do it or -- I am not sure. I don't
2    remember that.
3    Q.   Okay. Why was Mr. Cabbil not issued a
4    reprimand when you found out that he wasn't
5    doing the inspection work properly?
6    A.   It was -- I guess in the chain -- I didn't have
7    anything to do with a reprimand, but I am
8    assuming that it was in the chain of
9    discipline.
10   Q.   Okay. You would be, as the project engineer,
11   the person who had the authority to write a
12   written reprimand of Mr. Cabbil had you felt
13   one was necessary, correct?
14   A.   I don't write a letter of reprimand for anybody
15   unless I am instructed to do so by my
16   supervisor.
17   Q.   Did you ask -- At the time that you reported
18   the problems that you perceived to Mr. Cabbil's
19   inspection, did you ask Mr. Rager if he wanted
20   you to write a letter of reprimand?
21   A.   I don't remember.
22   Q.   Did Mr. Rager ever tell you to write a letter
23   of reprimand?

21 (Pages 81 to 84)

# FREEDOM COURT REPORTING

## Page 85

1  A. No, sir.
2  Q. Okay. What is your understanding of what
3     happened through the chain of command that led
4     to Mr. Cabbil being terminated?
5  A. I don't know that because I wasn't his direct
6     supervisor. I didn't -- I had no idea of what
7     his -- what his prior reprimands or whatever,
8     you know, I didn't know what he had.
9  Q. Okay.
10 A. I didn't know. I wasn't sure.
11 Q. What do you know -- What do you understand to
12    have been the process that Mr. Rager used to
13    decide to terminate Mr. Cabbil?
14 A. I don't know what process he used. You will
15    have to ask Mr. Rager that.
16 Q. Okay. Now, Mr. Rager did not recommend that
17    Mr. Cabbil be terminated because of any prior
18    disciplines, did he?
19 A. I don't know.
20 Q. Well, look at the --
21 A. Well, according to that letter, yeah.
22 Q. Okay.
23 A. But I don't know what he used to determine

## Page 86

1     that.
2  Q. Okay. The letter that Mr. Rager wrote to Ms.
3     Rowe does not reference any other disciplinary
4     actions taken against Mr. Cabbil, does it?
5  A. That letter there doesn't, no, sir.
6  Q. Okay.
7  A. Not that I am aware of.
8  Q. So, to your understanding, Mr. Rager was
9     recommending Mr. Cabbil be terminated based on
10    the inspection problems from January 15th to
11    the 27th?
12 A. So far as --
13    MR. REDD: Object to the form.
14        You can answer it.
15 Q. Is that your understanding?
16 A. Like I say, I don't know what -- you know, I
17    don't know how he determined to terminate
18    anybody. I don't decide that.
19 Q. Okay. Were you present for Mr. Cabbil's
20    termination proceeding or pretermination
21    hearing, I guess I should call it?
22 A. Is that where he was given this?
23 Q. I believe that there was a hearing conducted to

## Page 87

1     determine whether it was appropriate to
2     terminate Mr. Cabbil. Were you involved in
3     that?
4  A. I wasn't involved in a hearing, no, sir. Not
5     that I remember.
6  Q. You didn't go and testify concerning --
7  A. No, sir.
8  Q. -- Mr. Cabbil's work habits?
9  A. No, sir.
10 Q. Or his performance?
11 A. No.
12 Q. Did you ever prepare a performance appraisal
13    for Mr. Cabbil?
14 A. No, sir.
15 Q. Did you yourself ever, apart from what we have
16    already looked at that's been marked as
17    plaintiff's exhibit ten, which is the February
18    20th memo --
19 A. Uh-huh (yes).
20 Q. -- did you yourself make any other
21    documentation concerning Mr. Cabbil's
22    inspection of the bridge painting project?
23 A. I don't think so. Not that I remember.

## Page 88

1  Q. Have you had any conversations with your wife
2     concerning Mr. Cabbil's termination?
3  A. Have I ever had?
4  Q. Yes, sir.
5  A. Yes.
6  Q. Okay. When did you speak with Ms. Elliot about
7     Mr. Cabbil's termination?
8  A. I don't remember. Probably after this process
9     had started. I did not -- You know, I -- I
10    don't remember when.
11 Q. Okay. What was the conversation that you had
12    with her?
13 A. Well, I -- when I had the problems that I had,
14    I reported it to her because she was his direct
15    supervisor. She was the one that he worked
16    for. And she and I and I guess Lewis all
17    discussed some of these problems.
18 Q. Okay. And which problems were those that you
19    reported to your wife?
20 A. Well, I told her about the -- the inattention
21    to the job and the contractor having to go back
22    and redo and about him not reporting -- well,
23    reporting to work that day but not showing up

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 89

1  on the job all day.
2  Q.  And that was what he received the written
3  reprimand for?
4  A.  I am not sure.  Let me look.
5  (Pause.)
6  A.  It says here that he received a written
7  reprimand for inattention to job and leaving
8  work without permission on December 19th.
9  (Pause.)
10  Q.  Okay.  Let me show you what I have marked as
11  exhibit twelve.
12  A.  Okay.
13  Q.  Is that the letter of reprimand that you are
14  referring to?
15  A.  I think it is, yes.
16  Q.  Okay.  Did Mr. Rager instruct you to give Mr.
17  Cabbil this letter of reprimand?
18  A.  Yes.
19  Q.  Okay.  Why did Mr. Rager instruct you to give
20  Mr. Cabbil this letter of reprimand?
21  A.  Why did he?
22  Q.  Yes.
23  A.  I don't know why he did.

Page 90

1  Q.  Okay.  Had you reported to Mr. Rager that Mr.
2  Cabbil had left the project?
3  A.  Yes.
4  Q.  Okay.  And that occurred on December 19th,
5  2003, correct?
6  A.  That is what this says here, yes, sir.
7  Q.  Okay.  Did you discuss this particular incident
8  with Donna Elliot?
9  A.  Yes, I did.
10  Q.  Okay.  Tell me about that conversation.
11  A.  I am not sure exactly what we discussed but I
12  think I had called her and asked her if she had
13  seen Tony, that he didn't show up on the job
14  when he was supposed to, and I wondered if he
15  had gone by her office to sign some paperwork,
16  payroll or something like that.  And if I
17  remember, she told me that she hadn't seen him.
18  And I got to looking for him and I don't -- I
19  don't remember -- He had -- Somebody -- He had
20  gone to the shop and had something done, I
21  think, to his truck, but he didn't let me know
22  where he was at.  And then he had left, I
23  think, I guess going home for lunch, and didn't

Page 91

1  show back up till late in the afternoon.
2  Q.  Okay.  Did you talk to Mr. Cabbil about this
3  situation?
4  A.  I -- I don't think I did that day but Mr. Rager
5  did.
6  Q.  Okay.  And then Mr. Rager instructed you to
7  draft this written reprimand?
8  A.  No, sir, I did not draft this.
9  Q.  You didn't draft it?
10  A.  No, sir.
11  Q.  Who drafted it?
12  A.  I think Mr. Rager did.
13  Q.  Okay.  It says that it's from you, correct?
14  A.  Right.
15  Q.  Okay.  But Mr. Rager drafted it for you?
16  A.  I think that's correct.
17  Q.  Okay.
18  A.  I don't remember drafting it.
19  Q.  Okay.  Was that the only conversation with your
20  wife, Donna Elliot, about Mr. Cabbil leaving
21  the project?
22  A.  I think so.
23  Q.  Now, apart from that conversation that was just

Page 92

1  discussed, what other conversations with your
2  wife did you have concerning Mr. Cabbil's
3  termination?
4  A.  Concerning his termination?
5  Q.  Yes, sir.
6  A.  Not that -- None that I remember.  I mean, we
7  just don't discuss, you know, the -- maybe
8  things at home or whatever, so I don't know
9  that we had another discussion about it.  We
10  may have a casual discussion or something, but
11  nothing -- nothing I can remember.
12  Q.  Okay.  Did you guys ever share with each other
13  or did you ever share with her any opinions
14  about whether it was proper to terminate Mr.
15  Cabbil?
16  A.  Whether it was proper to?
17  Q.  Yeah.
18  A.  No, sir, not that I remember.
19  Q.  Did she ever share with you any opinions as to
20  whether she thought that it was proper to
21  terminate Mr. Cabbil?
22  A.  No, sir.
23  Q.  Did you ever talk to Nicky Calhoun about Mr.

23  (Pages 89 to 92)

# FREEDOM COURT REPORTING

## Page 93

1　Cabbil being terminated?

2　A.　I may have after the decision was made to

3　　terminate him, but I — I — I had all of my

4　　dealings with Mr. Rager.

5　Q.　I am sorry?

6　A.　I had my — My conversations were with Mr.

7　　Rager.

8　Q.　Okay.  But you may have had a conversation with

9　　Mr. Calhoun about Mr. Cabbil's termination?

10　A.　Right.

11　Q.　When would this have occurred?

12　A.　I don't — After I had heard that he was going

13　　to be terminated.

14　Q.　What was the conversation?

15　A.　I don't remember.  Like I say, I don't even

16　　know that I had one but I may have — may have

17　　talked with him about it, but I don't think so.

18　　I think I -- that I had just talked with Lewis

19　　about and it Lewis maybe talked to Mr. Rager --

20　　to Mr. Calhoun.

21　Q.　Okay.  Did anybody from the central office in

22　　Montgomery ever contact you to discuss Mr.

23　　Cabbil's termination with you?

## Page 94

1　A.　I don't remember if I talked to Sandy Dietz or

2　　not, I am not sure.

3　Q.　Okay.  What makes you think that you might

4　　have?

5　A.　I have talked to Sandy Dietz several times

6　　about — about problems over the last years and

7　　I don't know if I — I don't remember if I did

8　　about this case or not.

9　Q.　Okay.  Have you ever discussed Mr. Cabbil with

10　　Sandy Dietz?

11　A.　I don't know.

12　　　MR. SIMON:  One second here.

13　　　(Pause.)

14　Q.　Explain to me again the way in which Mr. Cabbil

15　　falsified records.

16　A.　In his daily reports.

17　Q.　Okay.  How — How — How did he falsify those

18　　records?

19　A.　In saying that he had done the inspection when

20　　he had not.

21　Q.　Okay.  But, again, you don't know whether it

22　　was Mr. Cabbil on Mr. Edwards who hadn't done

23　　the inspection, correct?

## Page 95

1　A.　On the days that Ken Edwards' name was on the

2　　diary, yes, sir.

3　Q.　Had Mr. Edwards ever filed a grievance?

4　A.　I don't know.

5　Q.　Had Mr. Edwards ever complained of

6　　discrimination?

7　A.　No, sir, not to me.

8　Q.　After — After you learned that Mr. Cabbil had

9　　improperly inspected that bridge project, did

10　　you ask Mr. Edwards to supervise him more

11　　carefully?

12　A.　Yes, sir.

13　Q.　Okay.  Did Mr. Edwards do that?

14　A.　Yes, sir.

15　Q.　Did Mr. Edwards make reports back to you about

16　　his —

17　A.　Verbal reports.

18　Q.　Verbal reports?

19　A.　Yes.

20　Q.　And when did he — When did he start making

21　　those verbal reports?  Was it just sometime --

22　A.　Yes, sir.

23　Q.　— February 28th?

## Page 96

1　A.　Yes, sir.

2　Q.　Okay.  And based on Mr. Edwards' verbal

3　　reports, did you feel that you could trust Tony

4　　Cabbil to continue that inspection report?

5　A.　Yes, sir, I think so.  Yeah.  And I had

6　　instructed Tony, also.  I said, you know, you

7　　need to go up in there everyday and inspect it.

8　　So -- And I just figured that he would do

9　　better.

10　Q.　Sure.  And so, based on that, you trusted him

11　　to go and do that work properly?

12　A.　At that point, yes.

13　Q.　Okay.  Did you ever see Mr. Cabbil exhibit a

14　　threatening attitude?

15　A.　I don't know what you are talking about, "a

16　　threatening attitude".  Do you mean did I ever

17　　hear him threaten anyone?

18　Q.　Yeah.

19　A.　I didn't ever hear him threaten anyone, no,

20　　sir.

21　Q.　Okay.  Do you know if any of Mr. Cabbil's

22　　coworkers didn't want to work with him?

23　A.　I had had some that had expressed concern, just

24　(Pages 93 to 96)

# FREEDOM COURT REPORTING

Page 97

1  about an attitude.
2  Q.  Were there any that told you that they didn't
3  want to work with him?
4  A.  I don't remember if they said they didn't want
5  to work with him.
6  Q.  When you -- When you explained to Mr. Cabbil
7  what he really needed to be doing on that
8  inspection work, did he seem to be receptive to
9  what you were telling him?
10  A.  Yes, I thought so.
11  Q.  And you thought that you would be able to -- I
12  mean, you thought that he could take that
13  constructive criticism --
14  A.  Yes, sir.
15  Q.  -- and apply it to his work?
16  A.  Yes, sir.
17  Q.  Did you think that -- Did Mr. Cabbil, while he
18  was working with you, display an attitude that
19  he was being picked on or singled out in any
20  way?
21  A.  I don't remember him saying that he was picked
22  on or singled out.
23  Q.  Okay.  Did he ever -- Did you feel like he ever

Page 98

1  questioned your authority?
2  A.  No, sir.
3  Q.  Apart from the -- from the problems with the
4  inspection work, did you have any problems with
5  Mr. Cabbil as an employee?  I am sorry, the
6  inspection work and the incident of leaving the
7  job without permission.
8  A.  That was the only problems I had with him.
9  Some of my other employees, I think, had --
10  maybe had some problems.
11  Q.  Some of your other employees?
12  A.  Right.
13  Q.  Okay.  Did they ever report those problems to
14  you?
15  A.  Yeah, the -- about him using the ladies
16  restrooms.  A couple of the ladies had
17  complained to me that he was using the ladies
18  restroom instead of the men's restroom.
19  Q.  Okay.  Did you attempt to correct him on that?
20  A.  I can't remember if I -- if I said something or
21  maybe some of the ladies had asked him.  I
22  can't remember exactly what conversation took
23  place.

Page 99

1  Q.  Okay.  Did you feel like that was any reason to
2  terminate him?
3  A.  That?
4  Q.  Yeah.
5  A.  Well, no, sir.
6  MR. SIMON:  I don't have anything further.
7  A.  Okay.
8  EXAMINATION
9  BY MR. REDD:
10  Q.  Just a few from me, if you don't mind.
11  A.  Okay.
12  Q.  Did you work out of the same office as Anita
13  Box?
14  A.  Yes, sir.
15  Q.  You kind of worked as an EA and worked your way
16  up through --
17  A.  Yes, sir.
18  Q.  -- the position that you are on now?
19  Have you ever done bridge inspection
20  work?
21  A.  Yes, sir.
22  Q.  Ever checked the painting behind a contractor
23  who shot-blasted it?

Page 100

1  A.  No, sir, not shot-blasted.
2  Q.  Sandblasted, maybe?
3  A.  The only bridge painting job that I was on,
4  there was an old bridge, they did not do any
5  sandblasting on it, all they did was just they
6  hand-scraped it down and sprayed it.
7  Q.  Okay.  Okay.  Okay.
8  A.  All the others were new construction, I think.
9  Q.  I think that you indicated earlier that Ken
10  Edwards was familiar with the process of
11  shot-blasting to clean a bridge?
12  A.  Right.
13  MR. SIMON:  Object to the form.
14  Q.  How long do you think it'd take to train
15  somebody on what to look for to inspect the
16  bridge to make sure that the shot-blasting had
17  been done adequately and correctly?
18  MR. SIMON:  Object to the form.
19  A.  Well --
20  Q.  Would it take months?
21  A.  No, sir.
22  Q.  Couple days, maybe?
23  MR. SIMON:  Object to the form.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

## Page 101

1  A.  Couple of days.

2  Q.  The same with painting. How long would it take

3     someone to be trained on inspecting a paint job

4     to make sure that it was properly done?

5        MR. SIMON:  Object to the form.

6  A.  Probably the same amount of time, maybe a

7     couple of days.

8  Q.  Okay. Now, the time frame on the bridge job

9     that you were asking -- asked about --

10    questions about, I think, was January 15th

11    through January 27 as reflected on Lewis

12    Rager's letter of March 4th 2004.

13 A.  Right.

14 Q.  Is that the same frame that they were working

15    on those particular spans or the time frame for

16    that particular job?

17 A.  I think it --

18       MR. SIMON:  Object to the form.

19 A.  Those particular spans.

20 Q.  Okay. All right. You mentioned the

21    containment area.

22 A.  Yes, sir.

23 Q.  And those are -- Let me see if I understand

## Page 102

1     that. When you're shot-blasting a bridge, you

2     have to put some kind of a barrier or a catch

3     canvas, whatever, to keep the shot from falling

4     down on the road or --

5  A.  And the paint, yes, sir.

6  Q.  Okay. And that's underneath the bridge --

7  A.  Yes, sir.

8  Q.  -- structure itself?

9  A.  Yes, sir.

10 Q.  Okay. Is it -- Is it -- In order to properly

11    inspect the bridge painting areas that are

12    within the containment area, you have got to

13    get up there in that area?

14 A.  Yes, sir.

15 Q.  You have got to climb up in there --

16 A.  That's correct.

17 Q.  -- and physically look at the metal?

18 A.  That's correct.

19 Q.  All right, sir. And you can't properly inspect

20    it without doing that, can you?

21 A.  That's correct.

22 Q.  Would it be fair to say that if one had --

23    well, if one is paying attention to the job,

## Page 103

1     would one have noticed the areas that had not

2     been properly shot-blasted?

3        MR. SIMON:  Object to the form.

4  A.  Would ask you that again, please, sir?

5  Q.  Okay. If a person, an EA oh or whomever --

6  A.  Okay.

7  Q.  -- is properly inspecting --

8  A.  Okay.

9  Q.  -- or properly being attentive to his job,

10    would he have noticed the areas that were not

11    properly shot-blasted?

12 A.  Yes, sir.

13       MR. SIMON:  Object to the form. That

14    calls for speculation and is a leading

15    question.

16       MR. REDD:  Okay.

17 (BY MR. REDD:)

18 Q.  Okay. Do you know that from experience on the

19    job?

20       MR. SIMON:  Object to the form.

21 A.  Yes, sir.

22 Q.  Okay. Would the same hold true for paint?

23       MR. SIMON:  Object to the form.

## Page 104

1  Q.  Painting, would a person who is being attentive

2     to his job have noticed areas that were not

3     properly painted?

4        MR. SIMON:  Object to the form. That

5     question contains the answer and is confusing

6     and is leading.

7  Q.  And you can answer.

8  A.  Yes, sir.

9  Q.  Would you have any idea -- Well, strike that.

10       The reprimand for leaving the job

11    site, you were asked a few questions about that

12    and I believe that you indicated that you had

13    not actually, physically written that letter?

14 A.  I don't think I did.

15 Q.  Okay.

16 A.  I don't remember doing that.

17 Q.  Okay. Does that reprimand, though, accurately

18    reflect the conduct that was exhibited by Mr.

19    Cabbil that resulted in that reprimand?

20 A.  Yes.

21       MR. SIMON:  Object to the form.

22 Q.  When I think you -- You testified earlier that

23    you had had a conversation with Mr. Cabbil in

26 (Pages 101 to 104)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

## Page 105

1  which he had indicated that he had not been up
2  in the containment area in a week?
3  A.  Right.
4  Q.  And I can't remember the day that you said that
5  you had that conversation, sometime in
6  February?
7  A.  Right.  I believe that it was February 20th,
8  according to this.
9  Q.  At the time of the conversation, do you know
10  what type work was still being done on that
11  bridge?
12  A.  I don't know what they were doing that day, no,
13  sir.
14  Q.  Okay.
15  A.  You know, it --
16  Q.  Well, during the week preceding that, were they
17  -- was the contractor doing any shot-blasting
18  or any painting of the bridge?
19  A.  Probably so.
20  Q.  Okay.
21  A.  Yes, sir.
22  Q.  Okay.
23      MR. REDD:  That's all I have.

## Page 106

1      RE-EXAMINATION
2  BY MR. SIMON:
3  Q.  Did you feel that Mr. Cabbil should have been
4  terminated for leaving the job on December
5  19th, 2003?
6      MR. REDD:  Object to the form.
7      You can answer if you know or have an
8  opinion.
9  A.  I -- In my opinion?
10  Q.  Yes.
11  A.  I don't know.
12  Q.  Okay.  Was leaving the --
13  A.  We have had a lot of employees terminated for
14  things that -- I don't -- I don't have an
15  opinion about terminations.
16  Q.  Okay.  Do you know whether leaving the job in
17  the way that Mr. Cabbil did was a terminable
18  offense?
19  A.  I think it is.
20  Q.  Okay.
21  A.  I think so.
22  Q.  But he was not terminated just for that
23  incident, was he?

## Page 107

1  A.  Well, I don't know.  You would have to see Mr.
2  McInnes's letter.
3  Q.  Okay.
4  A.  I think that was the reasons for termination.
5  The letter that Lewis wrote, I -- that was what
6  he put in his recommendation, but I don't know
7  why he was terminated.
8  Q.  Okay.
9  A.  You would have to see Mr. McInnes's letter.
10  Q.  Okay.
11      (Pause.)
12      MR. SIMON:  Hang on one second.
13      MR. REDD:  Sure.
14      (Recess.)
15  (BY MR. SIMON:)
16  Q.  Did -- Back on the record.  Did Ken Edwards
17  ever report to you that he had completed the
18  process of training Tony Cabbil to do the
19  inspection work on the bridge?
20  A.  Yes, sir, he -- he wrote -- Yes, sir, but I
21  can't remember what date it was.
22  Q.  But he made a written report to you that he had
23  completed --

## Page 108

1  A.  Well, he told me verbally that he had trained
2  Tony and so I think -- He said I think that he
3  can do the job now.  And then I think he -- he
4  made a -- just a little handwritten report that
5  I -- you know, I trained Tony on these days and
6  -- I think so.
7  Q.  Okay.  When did he make that verbal report to
8  you that he thought Tony could do the job now?
9  A.  I don't remember what date it was, but --
10  Q.  Do you remember whether it was before or after
11  January 15th?
12  A.  I don't remember.
13  Q.  Do you remember whether it was before or after
14  January 27th?
15  A.  I don't remember what date it was, no, sir.  I
16  don't know.
17  Q.  So, so far as you can recall today, Mr. Cabbil
18  may still have been in training on the bridge
19  inspection from January 15th through the 27th,
20  correct?
21  A.  I would have to see what dates Ken wrote down
22  that he trained Tony.  Like I say, from memory,
23  I don't have any idea.  I don't even remember

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 109

1   what day Tony went to work with me.
2   Q.   Okay.  And do you know how long it actually
3        took Kenneth Edwards to train Tony Cabbil on
4        how to do those bridge inspections?
5   A.   No, sir, not without looking at Ken's note
6        where he said, you know, I trained Tony from
7        and to, and I am not sure.
8   Q.   Okay.  That's all I have.
9                 RE-EXAMINATION
10   MR. REDD:
11   Q.   Is Ken Edwards black or white?
12   A.   Black.
13   Q.   Okay.  That's all.
14            (Whereupon, the deposition concluded
15            at 1:55 p.m.)
16
17
18
19
20
21
22
23

Page 110

1            CERTIFICATE
2
3   TONY CABBIL
4        vs.        CASE NO. 2:05-CV-513-T
5   STATE OF ALABAMA DEPARTMENT OF TRANSPORTATION
6
7
8        I certify that the foregoing
9   proceedings were truly and correctly reported
10   and transcribed, and that the witness was first
11   duly sworn.
12        I further certify that I am not kin to
13   any party nor am I in any way interested in
14   this case.
15
16
17
18   Dated this _____ day of _____, 2006.
19
20
21
22   _____
23   DAVID S. NORTHINGTON, CCR

28 (Pages 109 to 110)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**