# FREEDOM COURT REPORTING

## Page 1

1   IN THE UNITED STATES DISTRICT COURT

2   FOR THE MIDDLE DISTRICT OF ALABAMA

3        NORTHERN DIVISION

4

5

6   TONY CABBIL

7   vs.        CASE NO. 2:05-CV-513-T

8   STATE OF ALABAMA DEPARTMENT OF TRANSPORTATION

9

10

11

12   DEPOSITION OF LEWIS S. RAGER, JR.

13

14   The following deposition in the

15   above-styled case was held on May 10, 2006,

16   beginning at 2:16 p.m., at the offices of

17   Alabama Department of Transportation, located

18   at 2715 Skyland Boulevard, Tuscaloosa, Alabama

19   35401.

20

21

22        REPORTED BY:

23        DAVID S. NORTHINGTON, CCR

## Page 2

1        STIPULATIONS

2

3        It was stipulated and agreed by and

4   between the parties through their respective

5   counsel that the deposition of Lewis S. Rager,

6   Jr., may be taken at the date, time and

7   location indicated on the preceding title page.

8        Further, that the signature to and the

9   reading of this deposition by the witness is

10   waived and that this deposition is to have the

11   same force and effect as if full compliance had

12   been had with all laws and rules of court

13   relating to the taking of depositions.

14        Further, that it shall not be

15   necessary for any objections to be made by

16   counsel to any questions, except as to form or

17   leading questions, and that counsel for the

18   parties may make objections and assign grounds

19   at the time of the trial or at the time this

20   deposition is offered into evidence or prior

21   thereto.

22        Further, that notice of filing of this

23   deposition by the Commissioner is waived.

## Page 3

1        A P P E A R A N C E S

2

3

4

5   FOR THE PLAINTIFF:

6     MR. KELL SIMON

7     WIGGINS, CHILDS, QUINN & PANTAZIS

8

9

10

11

12   FOR THE DEFENDANT:

13     MR. ANDY REDD

14     ATTORNEY AT LAW

15

16

17

18

19

20

21

22

23

## Page 4

1        I N D E X

2

3

4   TITLE PAGE              1

5

6   STIPULATIONS            2

7

8   APPEARANCES             3

9

10   INDEX                  4

11

12   WITNESS LEWIS S. RAGER, JR.,

13     X BY MR. SIMON        5 - 88

14

15   REPORTER'S CERTIFICATE       89

16

17

18

19

20

21

22

23

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

| Page 5 |
|---|
| 1   I, David S. Northington, Certified |
| 2  Court Reporter and Notary Public for the |
| 3  State of Alabama at Large, acting as |
| 4  Commissioner, certify that as provided by Rule |
| 5  30 of the Alabama Rules of Civil Procedure, |
| 6  and the foregoing stipulations of counsel, |
| 7  there came before me at the date, time and |
| 8  location indicated on the preceding title page, |
| 9  Lewis S. Rager, Jr., witness in this |
| 10  previously-styled cause, for oral examination, |
| 11  and the following proceedings occurred: |
| 12 |
| 13       LEWIS S. RAGER, JR., |
| 14  was called as a witness and after having been |
| 15  first duly sworn to testify the truth, the |
| 16  whole truth and nothing but the truth, |
| 17  testified as follows, to-wit: |
| 18 |
| 19       THE COURT REPORTER: Usual stipulations? |
| 20       MR. REDD: That's fine. |
| 21       MR. SIMON: That's fine. |
| 22           EXAMINATION |
| 23  BY MR. SIMON: |

| Page 6 |
|---|
| 1  Q.  I think we have met before.  You might not |
| 2      remember me; I am not sure I remember you. |
| 3  A.  You look familiar but I can't remember when. |
| 4  Q.  Would you state your full name, please? |
| 5  A.  Lewis S. Rager, Jr. |
| 6  Q.  And have you ever given a deposition before? |
| 7  A.  Yes. |
| 8  Q.  Okay.  When have you given a deposition? |
| 9  A.  I don't really remember the date.  I am going |
| 10     to say a year and a half, two years ago? |
| 11  Q.  Okay.  What kind of case was it? |
| 12  A.  It was on an accident -- |
| 13  Q.  Okay. |
| 14  A.  -- concerning a guardrail. |
| 15  Q.  Okay.  Have you given any other depositions? |
| 16  A.  No. |
| 17  Q.  I will go ahead and go over the sort of ground |
| 18     rules for the deposition. |
| 19       If you need a break at any time, just |
| 20     let me know and we will take a break.  I will |
| 21     ask, though, if I've asked you a question, that |
| 22     you will answer the question that is on the |
| 23     table before we break. |

| Page 7 |
|---|
| 1       You know the court reporter can't take |
| 2  down when you shake your head or nod your head, |
| 3  so you have got to give verbal responses to all |
| 4  my questions. |
| 5       And if you're going to give a "yes" or |
| 6  "no," answer I will ask that you say "yes" or |
| 7  "no" rather than "huh-huh" or "uh-huh" because |
| 8  that is also hard for him to take down, as good |
| 9  of a court reporter as he is. |
| 10       Could you state your address, please? |
| 11  A.  17274 Deer Meadow Lane, Moundville, Alabama. |
| 12  Q.  Moundville? |
| 13  A.  Moundville.  35474. |
| 14  Q.  Okay. How long have you lived at that address? |
| 15  A.  Little over a year. |
| 16  Q.  Do you have any plans to move in the near |
| 17      future? |
| 18  A.  No. |
| 19  Q.  Who is your current employer? |
| 20  A.  ALDOT. |
| 21  Q.  And how long have you worked for ALDOT? |
| 22  A.  Nineteen years. |
| 23  Q.  Okay.  What was — What job classification were |

| Page 8 |
|---|
| 1      you hired into? |
| 2  A.  EA. |
| 3  Q.  Was that EA one at the time? |
| 4  A.  Yes. |
| 5  Q.  And what year was that? '84? '85? |
| 6  A.  '85. |
| 7  Q.  And have you spent your whole career in the |
| 8      fifth division? |
| 9  A.  Yes. |
| 10  Q.  In district two? |
| 11  A.  No. |
| 12  Q.  After you were hired as an EA one in 1985, how |
| 13      long did you spend as an EA one? |
| 14  A.  I really — I don't — If I had the stuff in |
| 15      front of me, I could really tell you. |
| 16  Q.  Okay.  At some point, you were promoted to EA |
| 17      two, right? |
| 18  A.  No. |
| 19  Q.  What was your next promotion? |
| 20  A.  PCET. |
| 21  Q.  What does that stand for? |
| 22  A.  Professional civil engineer training. |
| 23  Q.  That is the co-op classification, right? |

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 9

1  A.  Yes.
2  Q.  Were you in college at the same time that you
3      are working?
4  A.  Yes.
5  Q.  Okay.  Do you remember when you became a PCET?
6      What year?
7  A.  Let's see.  I am going to say '95, '96 -- I am
8      sorry.  That ain't right.  I graduated in '94,
9      go back seven years, my -- from '94.
10 Q.  Okay.  So around the time of your graduation,
11     did you become a GCE?
12 A.  Yes.
13 Q.  Okay.  And at some point in time, were you
14     promoted to the civil engineer manager
15     classification?
16 A.  It was -- I am going to say it was about two
17     years after that and it was a transportation --
18     what was it?  What was it classified as?  Not
19     transportation manager.  What was it?  The
20     name's changed.
21 Q.  But in a level -- transportation manager level?
22 A.  Yes.  Yes.
23 Q.  Okay.  All right.  And so how long have you

Page 10

1      been at the transportation manager level?
2  A.  About six years.
3  Q.  Have you spent all of those six years as the
4      district engineer for district two?
5  A.  No.
6  Q.  Okay.  When did you become the district
7      engineer for district two?
8  A.  I think it was -- the year, I think, was '99,
9      1999.
10 Q.  What job did you hold before you were the
11     district engineer for district two?
12 A.  Before?
13 Q.  Yeah.
14 A.  District one in Fayette.
15 Q.  Okay.  When did you become the district
16     engineer for Fayette?
17 A.  Three years prior of '99.
18 Q.  1996?
19 A.  Uh-huh (yes).
20 Q.  Okay.  Were you classified as a transportation
21     manager equivalent level at that time?
22 A.  Yes.
23 Q.  Okay.  What job did you hold before you were

Page 11

1      the district engineer for Fayette?
2  A.  Graduate civil engineer.
3  Q.  So upon your promotion to transportation
4      manager level, you assumed the district?
5  A.  Repeat that.
6  Q.  Did you assume the district engineer position
7      for district one at the time that you were
8      promoted to the transportation manager level?
9  A.  Yes.
10 Q.  Okay.  Had you done that job on an acting or
11     out-of-class basis prior to your promotion?
12 A.  A short period of time.
13 Q.  Okay.  While you were a GCE?
14 A.  Yes.
15 Q.  All right.  Now, who gave you that out-of-class
16     assignment?
17 A.  ALDOT.
18 Q.  Okay.  Do you know who specifically at ALDOT
19     assigned you to that position?
20 A.  No.
21 Q.  How many months would you say that you were
22     out-of-class in that position before you were
23     promoted to transportation manager?

Page 12

1  A.  And I am just guessing, I am thinking three to
2      four months.
3  Q.  Okay.  What are your job duties as a district
4      engineer?
5  A.  To oversee the district responsibilities
6      concerning roadways, right-of-ways, the
7      district personnel.  Also, the construction
8      activities and construction personnel.
9  Q.  How many people do you directly supervise?
10 A.  When?
11 Q.  Right now.
12 A.  Ten.
13 Q.  Who are they?
14 A.  Do you want names?
15 Q.  Yes, please.
16 A.  Chris Perkins.
17 Q.  Let's make it easy:  name, job title and race,
18     then that way I won't have to go back and ask
19     you.
20 A.  Name and --
21 Q.  Name, job title and race.
22 A.  Okay.  Chris Perkins, GCE, white.  Ron Sherrod,
23     TT, black.  Alesha Watts, GCE, black.  Valerie

3  (Pages 9 to 12)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

## Page 13

1  Mason, EA two three, black. Alvis Cantrell,
2  retired state employee, white. Ed Carson, TT,
3  white. Rodney Barnes, TT, black. Walter
4  Alexander, GCE, black. Is that ten?
5  Q. It is actually eight.
6      MR. REDD: Two more to go.
7  A. Oh, I forgot the PCET's. Brian Machen, PCET,
8  white. Jennifer Elliot, PCET, black.
9  Q. Okay. And you are the district engineer for
10  district two right now; is that right?
11 A. No.
12 Q. Okay. Which district are you the district
13  engineer for now?
14 A. I'm not.
15 Q. Okay. What is your job now?
16 A. I am a plans and design engineer.
17 Q. Okay. Is that the position that Geneva Brown
18  held prior to her going to Montgomery?
19 A. Yes.
20 Q. Okay.
21      MR. SIMON: We represent her, too.
22 Q. When did you take over that plans and design
23  engineer job?

## Page 14

1  A. August of '94 -- I mean, '04.
2  Q. Okay. Now, did you go from the district
3  engineer for district two straight to the plans
4  and designs engineer job?
5  A. Yes.
6  Q. Okay. When you left the district engineer
7  position, who were you supervising?
8  A. I hope you don't want names and --
9      MR. REDD: He does.
10 Q. How many people was it?
11 A. Oh, I'm thinking when I filled out my
12  application, I think I put down a hundred and
13  four people.
14 Q. That were the people who you directly
15  supervised?
16 A. Directly supervised was, yeah, a handful,
17  you're right.
18 Q. I am not talking about your puffery on your
19  application here, I am talking about the people
20  that you actually supervised directly, who were
21  they?
22 A. Okay. The same way, names and all that?
23 Q. Yeah, please.

## Page 15

1  A. Jimmy Watts, TT, black. And part of the time,
2  it was Donna Elliot, TT, white. Kay Alton, ASA
3  two, white. And what is her name? New
4  secretary over there. Johnson is her last
5  name. White.
6  Q. She an ASA?
7  A. Yes. Richard Kemp, highway superintendent,
8  white. Josh -- Oh, man, what is Josh's last
9  name? I can't think of his name right now.
10  But Josh, he is assistant highway
11  superintendent, black. Ray Jacobs, and he was
12  HMT two three, he is our rest area
13  superintendent, title only, white. And then
14  project engineers.
15 Q. Okay. Now, what was -- What was Jimmy Watts'
16  job title? Was he a --
17 A. He was the permit engineer and also Donna was
18  the assistant permit engineer. Sorry about
19  that.
20 Q. That's okay. And how many project engineers
21  did you supervise when you were in district
22  two?
23 A. Let me see. Going to be Dan Edwards, project

## Page 16

1  engineer, black. Gary Elliot, project
2  engineer, white. Jerry -- I can't think of his
3  last name right now. Jerry, project engineer,
4  white. Randy Milligan, project engineer,
5  white. Ronald -- What the heck is his last
6  name? Ronald, I can't think of his last name
7  -- Jackson, I think. I am not positive on
8  that.
9  Q. That's okay.
10 A. Black.
11 Q. And Donna Elliot was a project engineer for
12  sometime, correct?
13 A. You're right, Donna Elliot was also.
14 Q. Anybody else?
15 A. Averett is -- Jerry Averett.
16 Q. Okay.
17 A. Let's see, I think that's it.
18 Q. Okay. So at the time you left district two,
19  you were supervising six project engineers; is
20  that right?
21 A. I'm thinking -- Well, Jerry Averett and Ronald,
22  they swapped out.
23 Q. Okay.

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

## Page 17

1　A.　The same thing with Donna -- no, I think --
2　　　yeah -- no, Donna was an add-on. Yeah, just
3　　　those two swapped out.
4　Q.　Okay.
5　A.　So it was five.
6　Q.　Okay. Now, when did you first meet Tony
7　　　Cabbil?
8　A.　First met him on the first complaint that was
9　　　filed against him -- or when he came to me,
10　　　really, talking about a complaint.
11　Q.　Okay. When was that?
12　A.　I don't remember.
13　Q.　What was his complaint?
14　A.　The complaint was how he -- he was treated by
15　　　Ms. Elliot, and he described that he was --
16　　　felt that she was racist toward the blacks in
17　　　her office and that he wasn't treated equally
18　　　like the other engineers in her office.
19　Q.　Was this a written complaint or a verbal
20　　　complaint?
21　A.　Verbal.
22　Q.　Okay. Did he come to your office to talk to
23　　　you about that?

## Page 18

1　A.　Yes.
2　Q.　Do you know how long he had been employed at
3　　　ALDOT at the time that he made that complaint?
4　A.　No.
5　Q.　Do you know how long he had been working under
6　　　Donna when he made that complaint?
7　A.　No.
8　Q.　What did you tell him after he expressed his
9　　　complaint to you?
10　A.　That I would talk with Ms. Elliot about this
11　　　complaint.
12　Q.　Did you tell him anything else?
13　A.　No, not that I remember.
14　Q.　How long was the conversation that you had with
15　　　Mr. Cabbil at that time?
16　A.　I don't remember.
17　Q.　And it was in your office? In the district
18　　　office; is that right?
19　A.　Yes.
20　Q.　What -- Did you talk with Ms. Elliot as you
21　　　said -- as you told Mr. Cabbil you would?
22　A.　Yes.
23　Q.　Okay. Tell me about that conversation.

## Page 19

1　A.　I just brought up exactly what Mr. Cabbil was
2　　　claiming that she -- how she acts toward him
3　　　and other employees and asked her was it true
4　　　or if she had anything to -- you know, to say
5　　　about it, and she said -- she told me it wasn't
6　　　true. Of course, I worked with Ms. Elliot off
7　　　and on for years but I had -- and I felt like
8　　　it wasn't true, but I still had to go through
9　　　the questioning and she answered those -- or,
10　　　you know, defended her answers on the -- what
11　　　Cabbil has claimed against her and she said it
12　　　wasn't true.
13　Q.　Did you speak with anyone besides Donna about
14　　　the complaint that Mr. Cabbil had made?
15　A.　No.
16　Q.　He did say that he felt that she had expressed
17　　　a prejudiced or racist attitude towards the
18　　　blacks in the office, right?
19　A.　I don't remember.
20　Q.　I think that is what you just testified to, is
21　　　it not?
22　A.　What did I say?
23　Q.　Well, I have it written down: felt she was

## Page 20

1　　　racist towards blacks in the office.
2　A.　Oh, okay. You're right. Yes.
3　Q.　Okay. Who were the blacks in the office at
4　　　that time?
5　A.　I don't remember their names but I think she
6　　　had two females, I think that's all she had in
7　　　there.
8　Q.　Okay.
9　A.　Besides him was two females.
10　Q.　Two females plus Mr. Cabbil?
11　A.　Yes.
12　Q.　Okay. Did you talk to either of those two
13　　　female employees?
14　A.　No.
15　Q.　Okay. Why not?
16　A.　I felt like that it was untrue.
17　Q.　And did you feel like it was untrue because you
18　　　had worked with Donna before and not seen her
19　　　do anything like that?
20　A.　Yes.
21　Q.　Was there any other reason that you felt it was
22　　　untrue?
23　A.　No.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

## Page 21

1 Q. Why would you think that Mr. Cabbil would come
2    to you with an untrue statement about how he
3    felt Donna treated the blacks in the office?
4 A. Could you repeat that please?
5 Q. Yeah. Why — Why did you think that Tony
6    Cabbil would have come to you with untrue
7    statements about how Donna treated blacks in
8    the office?
9 A. I wouldn't have thought that he would have came
10   to me with an untrue statement. After we
11   talked and I talked with Ms. Elliot, I felt
12   like it was untrue.
13 Q. What would be the benefit to Mr. Cabbil of
14    coming to you with untrue statements about how
15    his supervisor was treating him?
16 A. None.
17 Q. Did you think that he was just making it up out
18    of thin air?
19 A. Well, that is why I had to go ahead and ask —
20    call Ms. Elliot in and ask her the same
21    questions.
22 Q. So — And you just chose to believe Ms.
23    Elliot's side of the story rather than Mr.

## Page 22

1    Cabbil's?
2 A. Yes.
3 Q. And you didn't ask any of the other black
4    employees in the office how they had been
5    treated?
6 A. No.
7 Q. Correct?
8 A. (Shook head in the negative.)
9 Q. After you had that conversation with Donna
10    Elliot, did you report back to Mr. Cabbil what
11    you had determined?
12 A. I didn't remember the conversation but after we
13    had talked prior to this meeting, it did come
14    back that we did talk and he did ask me did I
15    talk to any others, like you're asking me now,
16    and I did tell him no, I didn't.
17 Q. Okay. When did that conversation with Mr.
18    Cabbil occur?
19 A. I don't remember.
20 Q. Was it before or after he was transferred to
21    work with Gary Elliot?
22 A. I don't remember that. I don't know when that
23    happened.

## Page 23

1 Q. Okay. When you reported back to him —
2    about your conversation with Donna, did that
3    conversation happen in your office as well?
4 A. Yes.
5 Q. Had you called Mr. Cabbil there to talk to him
6    about it?
7 A. I really don't remember. I am thinking that he
8    — that he showed up and asked me have I — or
9    have I — yeah, have I talked with Ms. Elliot,
10    and then we sat down and we talked about it.
11 Q. Okay. We have got a little collection of
12    exhibits already going from the previous two
13    depositions. This one was previously marked as
14    exhibit three. I am going to make it exhibit
15    three to your deposition as well. Do you
16    recognize this document?
17 A. No.
18 Q. Okay. Have you never — Do you not think that
19    you have ever seen it before?
20 A. First time I saw it was when Mr. Redd showed it
21    to me.
22 Q. Okay. Do you recognize it now as a complaint
23    form that Mr. Cabbil filed?

## Page 24

1 A. Yes.
2 Q. Okay. And he states that this complaint
3    involves Donna Elliot and Lewis Rager,
4    correct?
5 A. Yes.
6 Q. Okay. Let me ask you to flip over to the third
7    page which is marked at the very bottom:
8    Cabbil versus ALDOT zero zero two two. Do you
9    see that?
10    MR. REDD: Down there.
11 A. Yes.
12 Q. Okay. Let me ask you to just read over the
13    very last paragraph starting on that page where
14    it says on November 26th, 2003, I met with
15    Lewis Rager again. He stated that he could not
16    find in his investigation nothing to show that
17    Donna was prejudiced. I asked him did he talk
18    to people of color, no response from him. He
19    then began talking about my evaluation. Is
20    this the conversation that you're talking about
21    where you told him about the conversation that
22    you had had with Donna?
23 A. Yes.

6 (Pages 21 to 24)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

### Page 25

1  Q.  Does reading that refresh your recollection
2      about your conversation that you had with Mr.
3      Cabbil at that time?
4  A.  Some.
5  Q.  Okay.  Did he also complain to you during that
6      conversation that he was unhappy about being
7      assigned to work in Chilton County?
8  A.  Yes.
9  Q.  Okay.  And did he not complain to you during
10     that conversation that he thought that it was
11     because of his race that he had been assigned
12     as the only project employee to work in Chilton
13     County?
14 A.  I don't remember that.
15 Q.  What do you remember about his complaint about
16     having to go to work in Chilton County?
17 A.  Just that he didn't want to go.
18 Q.  Okay.  And he did say, did he not, that he
19     thought that he was having to go because Donna
20     was prejudiced against him?
21 A.  I don't remember that statement.
22 Q.  Did he also mention that he felt that it was
23     unfair that he had to go to Chilton County and

### Page 26

1      had no way of communicating with the employees
2      at his office through a Southern LINC phone or
3      media?
4  A.  Yes.
5  Q.  And he also did say then that he felt that not
6      having that line of communication was a result
7      of Donna Elliot's prejudice, too; is that
8      correct?
9  A.  No.
10 Q.  He didn't say that?
11 A.  I don't remember him saying that.
12 Q.  Okay.  He could have, you just don't remember?
13 A.  I don't remember him saying it.
14 Q.  Okay.  He did, though, ask you during that
15     conversation whether you had talked to any
16     black employees while you did your
17     investigation, correct?
18 A.  Yes.
19 Q.  Okay.  Do you have any written notes of this
20     conversation with Mr. Cabbil?
21 A.  No.
22 Q.  When did you first become aware that Mr. Cabbil
23     had filed a grievance against you in part about

### Page 27

1      this conversation?
2  A.  The other day when Mr. Redd showed me this.
3  Q.  Okay.  So you didn't have any idea that Mr.
4      Cabbil had filed a grievance?
5  A.  No.
6  Q.  So nobody from the central office ever
7      contacted you to discuss the grievance that Mr.
8      Cabbil had filed?
9  A.  I don't remember them contacting me, no.
10 Q.  Let me show you what I have marked here as
11     plaintiff's exhibit thirteen and I will ask you
12     if you recognize that document?
13 A.  No, I don't.
14 Q.  Okay.  Let me ask you to turn to the page in
15     that document that is marked at the bottom:
16     Cabbil versus ALDOT zero zero two seven.
17         (Pause.)
18 Q.  Are you on that page?
19 A.  Yes.
20 Q.  And look at the -- I think that it's the third
21     full paragraph.  It says:  According to Mr.
22     Rager, Mr. Cabbil told him on November 3rd
23     that he felt Ms. Elliot was prejudiced.

### Page 28

1      However, Mr. Cabbil did not provide any
2      examples of discriminatory treatment and
3      apparently Mr. Rager did not ask Mr. Cabbil for
4      any.  Mr. Rager stated that neither he or Ms.
5      Elliot had ever received any complaints of
6      discrimination indicating that Ms. Elliot's
7      behavior was discriminatory.
8          Do you know where -- Well, let me ask
9      you this:  Sandra M. Dietz, who is the person
10     who signed this investigation, did she ever
11     talk to you about Mr. Cabbil's complaint?
12 A.  I don't remember.
13 Q.  You don't remember whether Ms. Dietz ever
14     talked to you about it or not?
15 A.  Right.
16 Q.  Okay.  She could have, though?  Is that right?
17 A.  This was two years ago.
18 Q.  Are you saying she never talked to you about
19     it?
20 A.  I don't remember.
21 Q.  You just don't know, okay.
22         After Mr. Cabbil came and talked to
23     you on November 26th, did Mr. Cabbil make any

7 (Pages 25 to 28)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

## Page 29

1  other complaints to you about Mrs. Elliot?
2  A. Not that I can remember.
3  Q. Okay. So far as you knew at that point, were
4  Mr. Cabbil's complaints about Ms. Elliot
5  resolved?
6  A. (No response.)
7  Q. Let me ask it a different way. That wasn't a
8  very good question. As of November 26th, when
9  you and Mr. Cabbil met to talk about Ms.
10  Elliot, was it your understanding that after
11  your conversation with Mr. Cabbil, his
12  complaints about Ms. Elliot were resolved?
13  A. Yes.
14  Q. And you never — And he never came to you to
15  complain about Ms. Elliot after that?
16  A. No.
17  Q. Let me ask you to look at plaintiff's exhibit
18  four which was identified earlier, not in your
19  deposition but in Ms. Elliot's. Have you ever
20  seen that document before?
21  A. No.
22  Q. Okay. Did Dee Rowe ever discuss with you Mr.
23  Cabbil's complaints about Ms. Elliot?

## Page 30

1  A. Not that I remember.
2  Q. Okay. And Ms. Rowe never told you that Mr.
3  Cabbil had filed a grievance?
4  A. Not that I remember.
5  Q. When an individual files a grievance at ALDOT,
6  what is ALDOT's practice so far as notifying
7  the individual supervisor about the grievance
8  having been filed?
9  A. Do you want to restate that?
10  Q. Yeah. When — What is — What does ALDOT do
11  when an employee files a formal grievance such
12  as the one Mr. Cabbil filed? What does ALDOT
13  do to alert the employee's supervisors that the
14  grievance has been filed?
15  A. On the ones that I have been notified on, I
16  have been asked to do a — my response, written
17  response.
18  Q. Sitting here today, do you know why you were
19  not asked to do a written response to Mr.
20  Cabbil's grievance that he filed?
21  A. I don't know.
22  Q. Apart from Mr. Cabbil's complaint to you in
23  late 2003 and in your subsequent conversation

## Page 31

1  on November 26th, 2003, where you discussed Mr.
2  Cabbil's complaints about Donna Elliot being
3  prejudiced, did you have any other
4  conversations with Mr. Cabbil about Donna
5  Elliot being prejudiced or racist?
6  A. No.
7  Q. So it was just those two conversations, is that
8  all?
9  A. What I remember.
10  Q. Apart from those two conversations with Mr.
11  Cabbil about Ms. Elliot, have you had any other
12  conversations with Mr. Cabbil while he was an
13  ALDOT employee?
14  A. I had to confront him about leaving the job and
15  nobody could find him when he was working with
16  Gary Elliot. And Gary called me and he parks
17  his car at the district office and picks up his
18  state truck. So what I did is I went and put a
19  note on his car to come see me when he comes
20  in, and then I just asked him where has he
21  been. And he told me where he — what
22  happened, and then I notified Gary — I don't
23  know if it was that day or the next day what I

## Page 32

1  found out.
2  Q. Okay. And what had Mr. Cabbil told you?
3  A. That he got sick, went home, and had stomach
4  problems or something like that, and lost track
5  of time and then came back to work.
6  Q. Okay. What were -- What would have been the
7  proper procedure for Mr. Cabbil to have
8  followed if he had gotten sick with stomach
9  problems while he was away from the job site?
10  A. Normally, you would call your supervisor or the
11  -- in that — in some cases, the projects had a
12  senior project inspectors, if they were around,
13  he would tell them; or not, he would go -- he
14  would work the -- the -- whatever you call it,
15  the ladder, I guess what you're talking about.
16  You start with the senior project engineer or
17  inspector, then the project engineer and then
18  myself and on up is what he should have done.
19  Q. Okay. And he should have tried to contact you
20  by phone; is that right?
21  A. Some way.
22  Q. Okay. And he received a written reprimand for
23  not making that contact, correct?

8 (Pages 29 to 32)

# FREEDOM COURT REPORTING

## Page 33

1   A.  My understanding was that it was just one of
2       several on leaving the job and unexcused —
3       well, maybe not just leaving the job, but
4       unexcused absences.
5   Q.  Okay.  Where do you get that understanding
6       from?
7   A.  The — We keep a leave record of call-in's.
8   Q.  Okay.  Let me show you what's been marked as
9       plaintiff's exhibit twelve.  Do you recognize
10      that document?
11  A.  Yes.
12  Q.  Okay.  That is the reprimand that he got for
13      leaving the job on that day, correct?
14  A.  Yes.
15  Q.  He got a written reprimand for leaving the job
16      on December 19th, correct?
17  A.  Yes.
18  Q.  Tell me where it says in there that he had
19      other occasions where he left the job
20      improperly.
21          (Pause.)
22  A.  It doesn't.
23  Q.  Okay.  So he received the written reprimand

## Page 34

1       just for leaving the job on December 19th,
2       correct?
3   A.  That was -- Can I elaborate?
4   Q.  Sure.
5   A.  This is one of the steps in our discipline
6       actions.  We started out with probably several
7       verbals, then we have a warning and then we
8       have a reprimand and then we have a suspension,
9       or whatever, and termination depending upon the
10      severity of the violating the work rules.  And
11      in answer to your question:  He was given this
12      reprimand because of him leaving the job
13      without permission.
14  Q.  Okay.  Had he received other verbal reprimands
15      about leaving the job without permission?
16  A.  I would have to have the paperwork in front of
17      me to remember.
18  Q.  Are verbal reprimands something that would be
19      documented?
20  A.  Not necessarily.
21  Q.  Okay.  So -- But you don't know of any verbal
22      reprimands that he received for leaving the job
23      without permission before he received this

## Page 35

1       written reprimand for the December 19th
2       incident, do you?
3   A.  No.
4   Q.  Do you know of any other written discipline
5       that he received prior to this memorandum
6       concerning the December 19th absences?
7   A.  Well, following our sequence of disciplinary
8       action, he should have a warning —
9   Q.  Okay.
10  A.  — in his file.
11  Q.  And you are saying it would be — that under
12      the department's progressive discipline
13      policies, in order for him to have gotten this
14      reprimand on January 5th, he should have first
15      received a warning?
16  A.  Let me say it depends on the severity of the —
17      of what he was being reprimanded for but,
18      normally, yes, he should have got a warning.
19  Q.  Okay.  Did you believe when you issued him this
20      written reprimand that what he did on December
21      19th was of sufficient severity to warrant
22      giving him a written reprimand without first
23      verbal warnings?

## Page 36

1   A.  According to Mr. Gary Elliot, yes.
2   Q.  Okay.  Who wrote this written reprimand?
3   A.  Gary Elliot.
4   Q.  Okay.  If Mr. Elliot testified that you had
5       written it, is that something that you would --
6       that would not be true?
7   A.  I don't remember if I did.  In the past, I have
8       written them for them for their approval, but I
9       don't remember if I did this one or not.
10  Q.  But you may have written that one?
11  A.  I may have.
12  Q.  Okay.  You did sign it, correct?
13  A.  Yes.
14  Q.  You were one of the supervisors who issued the
15      reprimand to Mr. Cabbil, correct?
16  A.  Yes.
17  Q.  Okay.  Was -- In your opinion, was the incident
18      on December 19th of sufficient severity to
19      warrant a written reprimand with no previous
20      discipline concerning attendance?
21  A.  In following our sequence of disciplinary
22      actions, that would be the next step no matter
23      if it was leaving the job or if it was

9 (Pages 33 to 36)

# FREEDOM COURT REPORTING

## Page 37

1    absenteeism, stealing, fighting, whatever it
2    is, we just follow the rules.
3  Q.  Okay. But in order to have issued this
4    reprimand to him, he should have had some
5    previous verbal discipline, correct?
6  A.  Yes.
7  Q.  Okay. At the time that you issued this written
8    reprimand, had you determined that Mr. Cabbil
9    should be terminated from employment?
10  A.  No.
11  Q.  Okay. Did you feel that what he had done on
12    December 19th was grounds for termination at
13    this time?
14  A.  No.
15  Q.  Now, the way that this originally came up was I
16    had asked you what other conversations that you
17    had had with Mr. Cabbil apart from his
18    complaints about Donna Elliot, and I will ask
19    that question again. In addition to the
20    complaints about Donna Elliot and your
21    confronting him about leaving the job without
22    permission, what other conversations did you
23    have with Mr. Cabbil while he was employed with

## Page 38

1    ALDOT?
2  A.  I don't remember.
3  Q.  Did you have any conversations with Mr. Cabbil
4    concerning his inspection of the painting —
5    bridge painting project that Gary Elliot
6    supervised him on?
7  A.  I can't say no because I don't remember.
8  Q.  Okay. Did you have any conversations — Did
9    you have any conversations with Mr. Cabbil
10    about him being reassigned from working with
11    Donna Elliot to working with Gary Elliot?
12  A.  No.
13  Q.  Why did you decide to reassign Mr. Cabbil to
14    Gary Elliot's project after he had been working
15    with Donna Elliot?
16  A.  I wasn't involved in that.
17  Q.  Okay. Who made the decision to reassign Mr.
18    Cabbil?
19  A.  Don't know.
20  Q.  You were not responsible for training Mr.
21    Cabbil on his job duties, were you?
22  A.  No.
23  Q.  Were you responsible for ensuring that the

## Page 39

1    engineering assistants who worked on the
2    projects in your district are properly trained?
3  A.  No.
4  Q.  No?
5  A.  (Shook head in the negative.)
6  Q.  Whose responsibility is that?
7  A.  It would be the project engineers.
8  Q.  Do you know whether Mr. Cabbil's transfer to
9    work under Gary Elliot had anything to do with
10    the complaint that he had made about Donna
11    Elliot?
12  A.  I don't know.
13  Q.  At the time that Mr. Cabbil was transferred to
14    work under Gary Elliot, did you understand
15    whether Mr. Cabbil had any problems with his
16    job performance?
17  A.  No — But let me rephrase that. I think the
18    warning came from Ms. Elliot on attendance.
19  Q.  There was a warning from Ms. Elliot on
20    attendance?
21  A.  I think.
22  Q.  Was that a warning that you had any part in
23    issuing?

## Page 40

1  A.  No, I don't think so. I just remember Ms.
2    Elliot telling me about it.
3    (Pause.)
4  Q.  Let me show you what I have marked here as
5    plaintiff's exhibit fourteen. Was that the
6    reprimand — or the warning that you were
7    referring to?
8  A.  Yes.
9  Q.  Now, is this a warning under the department's
10    progressive disciplinary policy?
11  A.  Yes.
12  Q.  Okay. And it states that if Mr. Cabbil
13    continues along this same behavior, the next
14    step that will be taken is a reprimand,
15    correct?
16  A.  Yes.
17  Q.  Okay. Was the written reprimand that we
18    referred to earlier as plaintiff's exhibit
19    thirteen, was that the next step taken along
20    the progressive disciplinary steps?
21  A.  Yes.
22  Q.  Now, does Ms. Elliot, as Mr. Cabbil's project
23    engineer, does she have the authority to issue

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

## Page 41

1    this warning to Mr. Cabbil?
2  A.  Yes.
3  Q.  She has the authority to do that without
4    consulting with you, correct?
5  A.  Yes.
6  Q.  Okay.  Does she also have the authority to
7    issue a written reprimand without consulting
8    with you?
9  A.  Yes.
10 Q.  Okay.  Did Mr. Gary Elliot have that same
11   authority?
12 A.  Yes.
13 Q.  Okay.  So Mr. Gary Elliot could have issued Mr.
14   Cabbil a written reprimand without first
15   consulting with you?
16 A.  Yes.
17 Q.  All right.  Do you have -- Do you know of
18   anything that would indicate to you up through
19   November of 2003 Mr. Cabbil was anything but a
20   fine employee?
21 A.  Repeat that, please.
22 Q.  Do you know of any information that would
23   indicate to you that up through November of

## Page 42

1    2003, Mr. Cabbil was anything but a fine
2    employee?
3      MR. REDD:  Object to the form.
4        You can answer if you have an opinion
5    or have any knowledge.
6  A.  (Shook head in the negative.)
7  Q.  Is that a "no"?
8  A.  Oh, no.
9  Q.  You don't have any knowledge about the quality
10   of Mr. Cabbil's performance up through
11   November, 2003, correct?
12 A.  Well, besides of the warning and the reprimand
13   and --
14 Q.  The warning was dated December of 2003,
15   correct?
16 A.  What was the date on the reprimand?  November
17   what?
18 Q.  You have got it in front of you.
19 A.  Oh, sorry.
20 Q.  I think that it was January 2004?
21     MR. REDD:  January 5.
22 A.  Okay.  And the date for November referenced
23   that back to what?

## Page 43

1  Q.  I just asked for the month.  Do you have any
2    knowledge that Mr. Cabbil's job performance or
3    anything about his job was anything other than
4    satisfactory up through the end of November of
5    2003?
6  A.  Nothing but satisfactory.
7  Q.  Okay.  And did you get a copy of the warning
8    that Donna Elliot gave Tony Cabbil about his
9    attendance?
10 A.  No.
11 Q.  Okay.  That memo about the attendance, that was
12   for sort of a strict violation of the
13   attendance policy where he was calling in sick
14   and he had done that more times than was
15   allowed under the attendance policy, correct?
16 A.  Yes.
17 Q.  Okay.  Let me ask you to look again at -- Well,
18   hang on.  I've got to find it.
19     (Pause.)
20 A.  While you're looking, can I go to the bathroom?
21 Q.  Yeah, sure.
22     (Recess.)
23 Q.  Okay.  Back on the record.

## Page 44

1      Did Ms. Rowe ever counsel you --
2    "counsel", not "cancel" -- counsel you about
3    the way you handled Mr. Cabbil's complaints
4    about Ms. Elliot's --
5  A.  Not that I remember.
6  Q.  -- attitude?
7        Okay.  Did Mrs. Rowe ever instruct you
8    to be more inquisitive when an employee makes a
9    complaint?
10 A.  Not that I remember.
11 Q.  Did Ms. Rowe ever instruct you to seek
12   assistance with claims of the type that Mr.
13   Cabbil raised in the future?
14 A.  Not that I remember.
15 Q.  Did you ever discuss Mr. Cabbil with Mrs. Rowe?
16 A.  Not that I remember, no.
17 Q.  Okay.  Did you ever have any written
18   correspondence or E-mail with Ms. Rowe about
19   the complaints that Mr. Cabbil had made about
20   Ms. Elliot?
21 A.  Not that I remember.
22 Q.  And did you ever receive any correspondence
23   from her or electronic mail or anything from

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

### Page 45

1  her counseling you about the way that you had
2  handled Mr. Cabbil's claims about Ms. Elliot?
3  A. Not that I remember.
4  Q. Okay. Why did you decide to recommend Mr.
5  Cabbil's employment be terminated?
6  A. Based on the information that I was given from
7  Mr. Elliot and then looking back at his -- in
8  his -- in his history and the severity of the
9  latest offense, termination was warranted.
10  Q. And what was that latest offense?
11  A. Failure to do his job, falsifying records. If
12  I had the document in front of me, I could read
13  it to you.
14  Q. It concerned his inspection of the bridge
15  project from January 15th to 27, 2004,
16  correct?
17  A. Yes.
18  Q. What was it that you found when you looked back
19  at his history that caused you to recommend his
20  termination?
21  A. Just following our procedure of discipline with
22  the warning and the reprimand and then, like I
23  said, the severity of this, it warranted --

### Page 46

1  according to our policies and procedures, it
2  warranted termination.
3  Q. Okay. Rather than suspension?
4  A. Rather than suspension.
5  Q. Okay. Suspension would have been the next step
6  in the progressive disciplinary policy,
7  correct?
8  A. Yes.
9  Q. Why didn't you mention the warning and the
10  reprimand in the letter that you wrote
11  recommending that Mr. Cabbil be terminated?
12  A. I don't know.
13  Q. Okay. Did you feel that those events were not
14  significant enough to warrant terminating Mr.
15  Cabbil? When I say "those events", I mean the
16  warning and the reprimand.
17  A. Not according to our policies and procedures,
18  no.
19  Q. But you didn't mention it in the letter that
20  you wrote recommending the termination, did
21  you?
22  A. I don't remember. I need the letter in front
23  of me.

### Page 47

1  Q. Well, let's get that out. I've got it.
2  MR. REDD: He's got it marked.
3  MR. SIMON: Yeah, I have got it marked as
4  an exhibit.
5  (Pause.)
6  Q. I am going to ask you to look at plaintiff's
7  exhibit five to your deposition and ask if you
8  recognize that document.
9  A. Yes.
10  Q. Okay. And that is the document that recommends
11  Mr. Cabbil for termination, correct?
12  A. Yes.
13  Q. Okay. It doesn't recommend that he be
14  terminated for anything relating to his
15  absenteeism, does it?
16  A. No.
17  Q. And it doesn't reflect that you are
18  recommending that he be terminated because of
19  the day that he left the job without permission
20  and didn't call in, does it?
21  A. No.
22  Q. It recommends that he be terminated for his
23  failure to perform his job properly on January

### Page 48

1  15th to 27, 2004, correct?
2  A. Along with the others, yes.
3  Q. The others being?
4  A. Inattention to the job, falsifying records.
5  Q. Those -- Inattention to job and falsification
6  of records and failure to perform job properly,
7  those were all rule violations that occurred
8  during this period from January 15 to 27, 2004,
9  correct?
10  A. Yes.
11  Q. Okay. So, at this time, you were recommending
12  that he be terminated because of what happened
13  from January 15th to the 27th, 2004, correct?
14  A. Yes.
15  Q. Tell me what it was that Mr. Cabbil did or
16  didn't do between January 15th and January 27,
17  2004, that caused you to recommend his
18  termination.
19  A. Poor inspection of what his job duties was
20  assigned to him causing the -- causing the
21  contractor to have to come back and redo what
22  he was approved -- what he had already
23  approved. And also, looking back when we

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 49

1    pulled the records, he said it was -- he states
2    in his -- in the daily reports that it was
3    according to our specifications and, in
4    reality, it wasn't and then that goes back to
5    inattention to his job and failure to perform
6    his job properly. And then upon reading what
7    our bridge inspector reported and then also
8    what Ken Edwards reported, they both coincide
9    together -- on the findings wasn't the same as
10   what he recorded in the daily diary.
11   Q. What do you mean it wasn't the same as what he
12      recorded in the daily diary?
13   A. He approved the spans to be completed,
14      inspected and completed, and then when Mr. --
15      the bridge inspector and Ken Edwards went back
16      up to reevaluate, it wasn't true.
17   Q. Okay. Did you talk to Mr. Cabbil about this
18      situation?
19   A. No.
20   Q. You never heard from him as to his side of what
21      happened from January 15th to the 27th?
22   A. No.
23   Q. Was Mr. Cabbil the only inspector working on

Page 50

1    the bridge project from January 15th to the
2    27th?
3    A. It was my understanding that Ken Edwards was
4       with him.
5    Q. Okay. Did Ken Edwards receive any form of
6       discipline for the work not being performed
7       properly?
8    A. No.
9    Q. Why not?
10   A. Because at the time that this was -- my
11      understanding at this time of the inspection,
12      between the 15th and the 27th, Mr. Cabbil was
13      assigned to that project. I guess -- I don't
14      know where Mr. Edwards was. My understanding
15      is that Mr. Cabbil was the inspector in charge
16      at the time.
17   Q. Okay. So you don't know whether Mr. Edwards
18      was assigned to that project during that period
19      of time or not, do you?
20   A. No.
21   Q. How would we be able to figure out whether Mr.
22      Edwards was assigned to that project?
23   A. You would have to check with Mr. Elliot.

Page 51

1    Q. Okay. Would it be reflected in the inspector's
2       daily reports whether Mr. Edwards was assigned
3       to that project?
4    A. The daily reports would be filled out by the
5       inspector there or Mr. Edwards and also on that
6       report it reflects who was present that day.
7    Q. Okay. So the reports should tell us -- the
8       daily reports should tell us whether Ken
9       Edwards was inspecting the project that day or
10      not, correct?
11   A. Should have been.
12   Q. Okay. Well, when you say, "should have been",
13      what do you mean?
14   A. Yes.
15   Q. Did you review the daily reports to see who was
16      working on that project during those days?
17   A. At what time?
18   Q. Prior to recommending Mr. Cabbil's termination.
19   A. Not on a daily basis, no.
20   Q. When you were deciding to terminate Mr. Cabbil
21      for inattention to job and the other violations
22      that occurred from January 15th to the 27th,
23      did you go back and look at the daily reports

Page 52

1    to see if Mr. Cabbil was indeed the one who
2    caused the problems?
3    A. Yes.
4    Q. Okay. What did you determine from looking at
5       those daily reports?
6    A. That he inspected it and approved it each --
7       each phase or each span, however it was done.
8    Q. Were you able to determine from those daily
9       reports whether Mr. Edwards had also inspected
10      that project?
11   A. I don't remember.
12   Q. Okay. If Mr. Edwards had been one of the
13      inspectors on that project, shouldn't he also
14      have been reprimanded or disciplined for his
15      failures on that project?
16   A. It depends on who did the actual inspection.
17      On this particular project on a bridge span
18      project, whoever went up to inspect. Maybe not
19      necessarily Mr. Edwards went up with him or
20      went up after him. I don't remember.
21   Q. You don't know who did the inspections on the
22      project, do you?
23   A. Just according to what -- Mr. Cabbil signed the

13 (Pages 49 to 52)

# FREEDOM COURT REPORTING

## Page 53

1 -- signed the sheet.
2 Q. Is the person who signs the sheet necessarily
3 the person who did the inspections?
4 A. Yes.
5 Q. If there is more than one inspector working on
6 a project and they are both doing inspection
7 work, are their names not both going to appear
8 on the daily reports?
9 A. Yes. Normally they will tell what their duties
10 were that day.
11 Q. Okay. Let me ask you to look at exhibit
12 eleven. The first page of that exhibit shows
13 that on Thursday, January 15th, Tony Cabbil and
14 Kenneth Edwards were the engineering personnel
15 on that project, correct?
16 A. Kenneth.
17 Q. Okay. What was Mr. Edwards doing on the
18 project that day?
19 A. Doesn't say.
20 Q. What was Mr. Cabbil going on the project that
21 day?
22 A. Doesn't say.
23 Q. Let me ask you to turn to the next page which

## Page 54

1 is the inspection report for January 16th for
2 that same project, correct?
3 A. Yes.
4 Q. And that is the bridge project that is
5 referenced in your recommendation for
6 termination, correct?
7 A. Yes.
8 Q. Okay. What was Mr. Cabbil doing on the project
9 that day?
10 A. Wasn't there.
11 Q. What was Mr. Edwards doing on the project that
12 day?
13 A. Inspecting the work being performed.
14 Q. Okay. Look at your termination letter again.
15 Tell me whether the spans that Mr. Edwards was
16 inspecting on that day were some of the spans
17 that were improperly inspected.
18 (Pause.)
19 Q. Span twenty-three.
20 A. Uh-huh (yes).
21 Q. Is that right?
22 A. That's what it says. I am not through reading.
23 (Pause.)

## Page 55

1 A. Okay.
2 Q. Okay. Tell me what Tony Cabbil did wrong on
3 that project that day.
4 A. Nothing.
5 Q. Okay. And yet your termination recommendation
6 says from January 15th to the 27th, 2004, was
7 the dates when he was improperly performing his
8 job, correct?
9 A. Yes.
10 Q. So, really, he didn't do anything improper on
11 the 16th, did he?
12 A. No.
13 Q. Okay. Let me ask you to turn over to the page
14 marked zero zero eight zero at the bottom.
15 (Pause.)
16 Q. Who were the inspectors on the project that
17 day?
18 A. Mr. Cabbil and Mr. Edwards.
19 Q. Okay. And that's for Thursday, January 22nd,
20 correct?
21 A. Yes.
22 Q. That is the same project, correct?
23 A. Yes.

## Page 56

1 Q. Okay. What had Mr. Cabbil done on the project
2 that day?
3 A. Specifically, it doesn't reflect it.
4 Q. What had Mr. Edwards done on the project that
5 day?
6 A. It doesn't reflect it.
7 Q. Okay. So you don't know who did the improper
8 inspection on Thursday, January 22nd, 2004, do
9 you?
10 A. No.
11 Q. Now, let's turn over to the document that is
12 marked as page zero zero eight three for Monday
13 of January 26th. That has both Mr. Cabbil and
14 Mr. Edwards working on the project that day,
15 does it not?
16 A. Yes.
17 Q. Okay. And what did Mr. Cabbil do on the
18 project that day?
19 A. Doesn't specifically say.
20 Q. What did Mr. Edwards do on the project that
21 day?
22 A. Same thing.
23 Q. So you can't tell from this report who did the

14 (Pages 53 to 56)

# FREEDOM COURT REPORTING

## Page 57

1 improper inspection on the project on January
2 26th, can you?
3 A. No.
4 Q. Are there any other documents from which you
5 could get that information?
6 A. No.
7 Q. Turn over to the next page, Tuesday, January
8 27th, 2004. It reflects that both Mr. Cabbil
9 and Mr. Edwards were inspecting on the project
10 that day, correct?
11 A. Yes.
12 Q. Okay. What was Tony Cabbil doing that day?
13 A. It doesn't specify.
14 Q. What was Mr. Edwards doing on that day?
15 A. It doesn't specify.
16 Q. Okay. So you can't tell which of them did the
17 improper inspection on January 27th, can you?
18 A. No.
19 Q. Based on what you have just reviewed, how do
20 you know that the statement in your
21 recommendation for termination that Mr.
22 Cabbil's inattention to the job and failure to
23 perform his job properly from January 15th to

## Page 58

1 27th, 2004, has resulted in P and H Stucco and
2 Construction, Incorporated, prime contractor on
3 project, to rework and resand, paint areas that
4 Mr. Cabbil did not inspect according to ALDOT
5 standards specifications section five
6 twenty-one, based on what you have just
7 reviewed, how can you tell that it was Mr.
8 Cabbil's inattention to the job and failure to
9 perform job properly?
10 A. By looking at the other diaries that he signed,
11 he was on the job himself.
12 Q. Okay. Those are the same kinds of entries as
13 the January 16th date when Mr. Edwards was on
14 the job himself, correct?
15 A. Did you say the same day?
16 Q. No. Those are the same kinds of entries.
17 A. Oh.
18 (Pause.)
19 Q. Well, let's simplify that. Sometimes Mr.
20 Cabbil was there by himself doing the
21 inspection, right?
22 A. Right.
23 Q. Sometimes Mr. Edwards was there by himself

## Page 59

1 doing the inspection, right?
2 A. Right.
3 Q. When I say "sometimes", I am talking about
4 specifically for the period of the 15th through
5 the 27th, right?
6 A. Yes.
7 Q. Okay. Sometimes they were there doing the
8 inspection work together, right?
9 A. Yes.
10 Q. Okay. How can you tell whether it was Mr.
11 Cabbil's inattention and failure to perform and
12 not Mr. Edwards'?
13 A. Off of this document, you can't.
14 Q. Okay. Were there any other documents that you
15 reviewed to determine whether it was Mr. Cabbil
16 or Mr. Edwards who had — whose inattention to
17 the job and failure to perform properly caused
18 the contractor to have to go back and redo the
19 work?
20 A. Off the recommendations from Mr. Elliot, from
21 these records here, I proceeded with
22 recommending termination.
23 Q. That is not what I asked you. The question

## Page 60

1 that I asked you was: What other documents
2 could you have looked at to determine whether
3 it was Mr. Cabbil or Mr. Edwards' inattention
4 to the job that caused the contractor to have
5 to redo the work.
6 A. None.
7 Q. None. So you're saying that it was — You're
8 saying that it was Mr. Elliot's representations
9 to you about the work that had caused you to
10 recommend terminating Mr. Cabbil rather than
11 Mr. Edwards?
12 A. Yes.
13 Q. Okay. Was there anything else besides what Mr.
14 Elliot had told you that caused you to decide
15 to recommend the termination of Mr. Cabbil for
16 these incidents?
17 A. No.
18 Q. If Mr. Elliot had testified that he didn't tell
19 you who it was who did the job improperly,
20 would that be incorrect?
21 A. Do what, now? Repeat.
22 Q. If Mr. Elliot testified that he had not told
23 you who it was who had done the job improperly,

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

## Page 61

1  would that not be true?
2  A.  I don't remember him telling me that, no.
3  Q.  Okay.  So Gary Elliot didn't tell you that Tony
4  Cabbil had not done his job right; is that
5  correct?
6  A.  No, he did tell me.
7  Q.  He did tell you that?
8  A.  Yes.
9  Q.  Okay.  What did he tell you?
10  A.  That he — What I wrote over here:  inattention
11  to his job, and they have found it was due to
12  Mr. Cabbil's inattention to his job --
13  Q.  Okay.
14  A.  — is what I was told.
15  Q.  And then you went back and reviewed those daily
16  inspection reports before you wrote your
17  termination letter, correct?
18  A.  Yes.
19  Q.  Okay.  And you have already testified that you
20  can't tell from those termination — from those
21  daily reports who did their job improperly,
22  correct?
23  A.  By the documents, no.

## Page 62

1  Q.  Okay.  So you were going just on what Gary
2  Elliot had told you about Tony Cabbil doing his
3  job improperly?
4  A.  Yes.
5  Q.  Had Gary Elliot told you that he thought Tony
6  Cabbil should be fired because he did his job
7  improperly?
8  A.  No.
9  Q.  What caused you to decide, based on what Gary
10  Elliot had told you and your review of these
11  documents, that it was proper to terminate Tony
12  Cabbil?
13  A.  According to our policies, procedures and our
14  sequence of discipline actions and the severity
15  of it, of the offense.
16  Q.  Okay.  How severe was the offense that Mr.
17  Cabbil committed?
18  A.  All of those together warrants termination
19  according to our policies.
20  Q.  How severe was the particular inattention to
21  job on January 15th through 27 and other
22  problems during that period?
23  A.  It is — It's part of our policy and procedures

## Page 63

1  when these things are committed that
2  termination is warranted.
3  Q.  Well, was — was Mr. Cabbil's inattention and
4  failures from January 15th through 27th, 2004,
5  were those in and of themselves severe enough
6  to warrant termination?
7  A.  Yes.
8  Q.  Why were they not then severe enough to warrant
9  termination of Kenneth Edwards, too?
10  A.  I wasn't informed.
11  Q.  You weren't informed, but you looked at those
12  daily reports records before you wrote this
13  termination recommendation, you have already
14  testified?
15  A.  Yes.
16  Q.  So you were informed through those documents,
17  weren't you?
18  A.  Yes.
19  Q.  Okay.  Had Kenneth Edwards ever complained to
20  you about discrimination?
21  A.  Not that I remember.
22  Q.  Okay.
23      (Pause.)

## Page 64

1  Q.  Did you ever -- Let's see.  Prior to drafting
2  your termination recommendation for Mr. Cabbil,
3  did you ever talk about the work on the bridge
4  project with Kenneth Edwards?
5  A.  Not that I remember.
6  Q.  Did you ever discuss with Kenneth Edwards Mr.
7  Cabbil's training to work on that bridge
8  project?
9  A.  Not that I remember.
10  Q.  You could have, you just don't recall?
11  A.  I don't recall.
12  Q.  Okay.  Did you ever -- Did you ever tell
13  Kenneth Edwards to document Kenneth Edwards'
14  training of Tony Cabbil on the bridge project?
15  A.  Not that I remember, no.
16  Q.  If Kenneth Edwards testified that he was
17  instructed by you to make a document that
18  showed how he had trained Tony Cabbil, would
19  that be untruthful?
20  A.  I could have.
21  Q.  You could have?
22  A.  Yeah.
23  Q.  Prior to your writing the termination

16  (Pages 61 to 64)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

## Page 65

1 recommendation that is dated March 4th, did you
2 ever explain to Kenneth Edwards how he was
3 supposed to train Tony Cabbil on the bridge
4 inspection project?
5 A. No.
6 Q. After you learned that there had been problems
7 with the inspection on the bridge project, did
8 you ever give any further instructions on how
9 Mr. Cabbil was to be trained on that bridge
10 project?
11 A. No.
12 Q. When you heard about the problems on the bridge
13 project that you believed were caused by Tony
14 Cabbil, did you immediately decide to terminate
15 Mr. Cabbil?
16 A. No.
17 Q. What caused you — Between the time that you
18 heard about the problems that Mr. Cabbil had on
19 the bridge project until you wrote your
20 recommendation for termination, what caused you
21 to decide that Mr. Cabbil should be terminated?
22 A. Documentation given to me.
23 Q. What documentation was that?

## Page 66

1 A. Documentation and verbal conversation with Mr.
2 Elliot, the bridge diaries, inspection from Mr.
3 Edwards and from the bridge inspector.
4 Q. Okay. Is that documentation other than the
5 daily reports that you have got in front of
6 you?
7 A. No.
8 Q. No? Okay. So you heard from Mr. Tilley,
9 according to your letter of March 4th, about
10 the problems with the bridge project,
11 correct?
12 A. I received his documentation.
13 Q. Okay. And that documentation is dated February
14 20th, correct?
15 A. Yes.
16 Q. Okay. So between February 20th and March 4th,
17 what — what documents did you review that
18 caused you to decide that Tony Cabbil should be
19 terminated? Was it just the daily inspector
20 daily reports that you have got in front of
21 you?
22 A. No.
23 Q. Okay. What other documents did you review that

## Page 67

1 caused you to decide between February 20th and
2 March 4th that Tony Cabbil should be
3 terminated?
4 A. The fifth division bridge inspector comments
5 and Mr. Edwards' comments and Mr. Gary
6 Elliot's.
7 Q. What were the comments of the fifth division
8 bridge inspector that caused you to decide to
9 terminate Mr. Cabbil?
10 A. I don't remember.
11 Q. Okay.
12 A. I don't have it in front of me.
13 Q. What were the comments of Mr. Edwards that
14 caused you to decide to terminate Mr. Cabbil?
15 A. I don't remember.
16 Q. What were the comments of Gary Elliot that
17 caused you to decide to terminate Mr. Cabbil?
18 A. Don't remember.
19 Q. Are you saying now that you did talk with
20 Kenneth Edwards about Tony Cabbil after
21 February 20th, 2004?
22 A. No, just read his -- He sent me something,
23 documentation.

## Page 68

1 Q. Okay. What was it that he sent you?
2 A. It was a handwritten that I — is all I
3 remember about it, it was handwritten, I think.
4 Q. Okay. Was that something that you had
5 requested that he write?
6 A. I don't remember.
7 Q. I am sorry?
8 A. I don't remember.
9 Q. Is exhibit fifteen the documentation from
10 Kenneth Edwards that you are talking about? Is
11 the little written note thing or whatever?
12 A. Yes.
13 Q. Why did you instruct Mr. Edwards to write this?
14 A. Because I wasn't there to see him do it.
15 Gathering information.
16 Q. Gathering — Why were you gathering
17 information?
18 A. Because disciplinary actions was warranted.
19 Q. Okay. Were you not gathering information on
20 Mr. Edwards at this time, too?
21 A. No.
22 Q. Okay. Even though the daily reports that you
23 got showed that you really couldn't tell who

17 (Pages 65 to 68)

# FREEDOM COURT REPORTING

## Page 69

1    had done the improper acts on January 15th
2    through the 27th, right?
3  A.  Correct.
4  Q.  Okay. What was it about Mr. Edwards' February
5    25th note to you that caused you to decide that
6    Mr. Cabbil should be terminated?
7  A.  It was part of his training that -- or he was
8    supposed to have been trained to do his
9    inspection duties and he wasn't -- he wasn't
10    performing them properly after being trained --
11  Q.  Okay.
12  A.  -- by Mr. Edwards.
13  Q.  Okay. Kenneth Edwards says that after -- it
14    sounds like after January 13th, 2004, I,
15    Kenneth R. Edwards -- I am sorry, I didn't --
16    it just -- it says Tony Cabbil began blasting
17    inspection on January 13th of 2004. I, Kenneth
18    R. Edwards, continued to point out concerned
19    areas during Tony Cabbil's inspection.
20    Correct?
21  A.  Uh-huh (yes).
22  Q.  So Kenneth Edwards was inspecting Tony Cabbil's
23    inspection, correct?

## Page 70

1  A.  That is the way it reads.
2  Q.  How can you tell that the problems that
3    occurred from January 15th to the 27th weren't
4    just as much the result of Mr. Edwards's
5    failures as Mr. Cabbil's based on this note?
6  A.  I cannot.
7  Q.  Now, tell me in what way Mr. Cabbil falsified
8    records that caused to you terminate him.
9  A.  Stating that he inspected certain spans and
10    gave them the approval to continue with the
11    next step and then, in reality, after being
12    inspected by the bridge inspector, and it
13    wasn't done properly.
14  Q.  Okay. Now, we already know from looking at
15    those dailey logs that on January 16th, Kenneth
16    Edwards was the only one inspecting that --
17    those spans, correct?
18  A.  Yes.
19  Q.  And it was the spans we have already determined
20    that had the errors on them, correct?
21  A.  Yes.
22  Q.  Did Kenneth Edwards then not falsify documents,
23    also?

## Page 71

1    (Pause.)
2  Q.  It's the second page there.
3  A.  Yeah, Ken Edwards states that he did -- that
4    they did some sandblasting and painting and
5    also, within the same span, Mr. Cabbil did the
6    same thing, also.
7  Q.  Okay. But on the 16th, Kenneth Edwards was the
8    only one there doing the inspections, right?
9  A.  Yes.
10  Q.  Okay. In what way, then, did Mr. Cabbil
11    falsify records that Mr. Edwards did not also
12    falsify records?
13  A.  He did the same.
14  Q.  Okay. And yet Mr. Edwards was never
15    disciplined for any of this, was he?
16  A.  No.
17  Q.  Okay. Your termination recommendation of March
18    4th, 2004, also indicates that in the second to
19    the last paragraph: The approximate cost to
20    ALDOT having the contractor to come back to
21    resand slash paint may be five thousand
22    dollars. Do you see that?
23  A.  Yes.

## Page 72

1  Q.  What was the actual cost to ALDOT of having the
2    contractor come back to resand or repaint?
3  A.  My understanding, none.
4  Q.  Okay. That was because the contractor absorbed
5    the expense, correct?
6  A.  Yes.
7  Q.  Look also where you have the words "NOTE" in
8    capital letters. It says Mr. Cabbil was, NOTE,
9    in capital letters, Mr. Cabbil was properly
10    trained by Mr. Kenneth Edwards, CE project
11    inspector under Mr. Gary Elliot, PE, and was
12    monitored by his supervisor. Do you see that?
13  A.  Yes.
14  Q.  How can you determine that Mr. Cabbil was
15    properly trained by Kenneth Edwards when Mr.
16    Edwards was doing inspections and falsifying
17    records in the same way that Mr. Cabbil was
18    accused of?
19  A.  Can't.
20  Q.  But yet you asked Kenneth Edwards to write a
21    letter saying that he trained Tony Cabbil,
22    didn't you?
23  A.  I was informed that he was doing the training

18  (Pages 69 to 72)

# FREEDOM COURT REPORTING

## Page 73

1 so I wanted documentation that he was being
2 trained.
3 Q. And you learned that after you had looked at
4 those daily logs and saw that Kenneth Edwards
5 was the only one on the project on the 16th,
6 didn't you?
7 A. No, I don't remember that.
8 Q. You don't remember what order that happened in?
9 A. Right.
10 Q. Now, as it turned out, Mr. Cabbil got
11 terminated for a lot more things than what you
12 recommended that he get terminated for, didn't
13 he?
14 A. I think so.
15 Q. Okay. I have already marked his actual notice
16 of proposed termination. Do you recognize that
17 document?
18 A. Yes.
19 Q. Okay. And that's what I have already marked as
20 plaintiff's exhibit six, correct?
21 A. Yes.
22 Q. Okay. Did you participate in the drafting of
23 this document?

## Page 74

1 A. No.
2 Q. Were you -- To your knowledge, were you
3 consulted by anybody who was drafting this
4 document?
5 A. No.
6 Q. You're -- This termination letter says that --
7 gives first several dates, one through six,
8 when Mr. Cabbil did not report for work but
9 called in sick, correct?
10 A. Yes.
11 Q. That is not one of the things that he was
12 originally recommended for termination for
13 doing, correct?
14 A. Correct.
15 Q. Do you know why those incidents got included in
16 the termination letter?
17 A. Because it's part of our sequence of
18 disciplinary action.
19 Q. How do you know that? How do you know that
20 that is the reason it was included in the
21 letter? Did anyone tell you that?
22 A. No.
23 Q. Are you just guessing?

## Page 75

1 A. Using a bad word: assume.
2 Q. Okay. The letter also states: On August 4th,
3 2003, you initiated a confrontation with a
4 coworker in which your behavior was disruptive.
5 Did you learn about that event while you were
6 reviewing Mr. Cabbil's file to make a
7 recommendation for termination?
8 A. No.
9 Q. No. Now, did you learn about that August 4th
10 confrontation with a coworker?
11 A. Ms. Elliot just informed me.
12 Q. When did she inform you about that?
13 A. I don't remember.
14 Q. Was it before you recommended termination or
15 after?
16 A. It would be before.
17 Q. Okay. Did she inform you about that at the
18 time that it happened?
19 A. Yes.
20 Q. Okay. You didn't think that was severe enough
21 at the time that you wrote your termination
22 recommendation to support the case for
23 termination, did you?

## Page 76

1 A. No.
2 Q. Obviously, somebody else did, correct?
3      MR. REDD: Object to the form.
4 A. (Nodded head in the affirmative.)
5 Q. Is that correct?
6      THE WITNESS: Do I have to answer that?
7 Q. Yes.
8      MR. REDD: If you know.
9 A. Oh, I don't know. I just wondered, y'all are
10 spitting out terms.
11 Q. When he objects to the form, he is objecting to
12 the question that I ask, but you still have to
13 answer it.
14 A. Oh, okay.
15 Q. Mr. Cabbil was not disciplined in any way for
16 the events of August 4th, was he?
17 A. Not to my knowledge.
18 Q. And if you'll look at -- I won't ask you about
19 all these since you didn't draft this letter,
20 but if you'll look at number twelve, it says
21 that on November 25th, 2003, you complained to
22 your supervisor about being assigned to work in
23 Tuscaloosa instead of Chilton County. Do you

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

| Page 77 | Page 79 |
|---|---|
| 1 see that there? | 1 Mr. Cabbil? |
| 2 A. Yes. | 2 A. What do you mean by "conference"? |
| 3 Q. Okay. Were you the supervisor that they are | 3 Q. Oh, I am sorry. It's referenced in the letter, |
| 4 talking about there or was that Ms. Elliot? | 4 the last paragraph, it says a pretermination |
| 5 A. Ms. Elliot. | 5 conference will be held before my designee, Ms. |
| 6 Q. Okay. Then the second reference in that | 6 L. Dee Rowe – I am sorry. A pretermination |
| 7 paragraph on November 26th, 2003, you | 7 conference to be held before my designee, Ms. |
| 8 complained to your supervisor about being | 8 L. Dee Rowe, has been set for Wednesday, April |
| 9 assigned to work in Chilton County on Monday, | 9 14th, 2004. Did you attend that pretermination |
| 10 December 1st, was that the conversation that | 10 conference? |
| 11 you were having with Mr. Cabbil about Donna | 11 A. No. |
| 12 Elliot or is this something separate from | 12 Q. Okay. After you wrote your recommendation for |
| 13 that? | 13 termination, what was your next involvement in |
| 14 A. This is something separate. | 14 the proceedings to terminate Mr. Cabbil? |
| 15 Q. Okay. What is this – What is this referring | 15 A. I wrote the letter addressing it to Mr. Nicky |
| 16 to about November 26th? | 16 Calhoun -- attention Mr. Nicky Calhoun, and |
| 17 A. I wasn't the supervisor. | 17 then he reviews it. |
| 18 Q. You did have a conversation with Mr. Cabbil | 18 Q. Okay. What was your next role in the process |
| 19 when he complained to you on November 26th, | 19 toward terminating Mr. Cabbil after writing |
| 20 2003, correct? | 20 this recommendation? |
| 21 A. Yes. | 21 A. None. |
| 22 Q. Okay. How do you know then that you were not | 22 Q. Did Mr. Calhoun discuss the recommendation with |
| 23 the supervisor that is being referred to in | 23 you after you submitted it to him? |

| Page 78 | Page 80 |
|---|---|
| 1 this letter? | 1 A. I don't remember. |
| 2 A. Well, I think he told Donna the same thing, | 2 Q. Did Mr. Calhoun ask you for any documentation |
| 3 that is why I am saying I wasn't the first one. | 3 about Mr. Cabbil after you submitted the |
| 4 Q. Okay. But you weren't the first one. When you | 4 recommendation to him? |
| 5 say the first one, you mean November 25th, | 5 A. Just what was submitted to him, what was |
| 6 right? | 6 attached to this letter. |
| 7 A. No, I mean the supervisor for the 26th. | 7 Q. Okay. And that included the inspector daily |
| 8 Q. Okay. | 8 reports, correct? |
| 9 A. He first did it. | 9 A. If that was attached to it, yes. |
| 10 Q. He first complained to Donna – | 10 Q. How did you come to find out that Mr. Cabbil |
| 11 A. Yes. | 11 actually had been terminated? |
| 12 Q. – on November 26th? | 12 A. Oh, it would be this document here. |
| 13 A. No, no, being assigned in Chilton County. | 13 Q. Well, that document just talks about a |
| 14 Q. Okay. Who -- Who is the supervisor that is | 14 pretermination conference, correct? |
| 15 being referred to when it says on November | 15 A. That he was being – Yes. |
| 16 26th, 2003, you complained to your supervisor | 16 Q. Okay. How did you come to find out that he |
| 17 about being assigned to work in Chilton | 17 actually was terminated and stopped working for |
| 18 County? | 18 the department? |
| 19 A. I can't say. | 19 A. There was a final letter sent stating that he |
| 20 Q. You don't know? | 20 was at a certain – effective a certain date. |
| 21 A. I don't know. | 21 Q. Okay. Did you receive a copy of that letter? |
| 22 Q. Okay. I may have already asked you this: Did | 22 A. Probably. |
| 23 you attend the pretermination conference for | 23 Q. Okay. Let me ask you this: Why was Donna |

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

## Page 81

1  Elliot copied on your recommendation for
2  termination when Tony Cabbil was working for
3  her husband, Gary?
4  A.  Because she was a previous supervisor.
5  Q.  Do you generally notify previous supervisors
6  about recommendations for terminations of
7  employees that they used to supervise?
8  A.  In this case, I did because she had a part in
9  the disciplinary action process.
10 Q.  What part did she have in the disciplinary
11  action reflective in the termination and
12  recommendation letter?
13 A.  None.
14 Q.  Okay.  So if a supervisor writes somebody up
15  and then the person gets transferred and their
16  recommendation -- and they are recommended for
17  termination, do you always copy the supervisor
18  who wrote the person up on the recommendation
19  for termination?
20 A.  If they were involved in the process of
21  disciplinary actions, yes, because I need -- I
22  need a history --
23 Q.  Did you --

## Page 82

1  A.  -- of what my next step would be.
2  Q.  Well, you didn't have a next step after you
3  wrote the termination recommendation, did you?
4  A.  No, this was -- this was -- this would be just
5  informing her of where we were with Mr. Cabbil.
6  Q.  Okay.  And why would you want to inform Mr.
7  Cabbil's former supervisor about where you were
8  in the process of terminating him?
9  A.  Because she was his previous supervisor.
10 Q.  Why would it matter to her at all?
11 A.  I don't know.
12 Q.  Is that just your standard practice?
13 A.  Yes.
14 Q.  Have any engineering assistants under your
15  supervision ever failed to perform their job
16  properly in a way that caused a contractor to
17  have to redo some work?
18 A.  Probably.
19 Q.  Give me some names.
20 A.  I can't.
21 Q.  Jeremy Akins one of them?
22 A.  I am not aware of that.
23 Q.  Okay.  Who made the decision to terminate

## Page 83

1  Jeremy Akins?
2  A.  I don't know.
3  Q.  Did you recommend his termination?
4  A.  No.
5  Q.  Was he working under you when he was
6  terminated?
7  A.  No.
8  Q.  Do you know what he was terminated for?
9  A.  No.
10 Q.  He had worked under you at some point,
11  correct?
12 A.  Yes.
13 Q.  Okay.  Well, then he moved out of your
14  district?
15 A.  No, I moved.
16 Q.  You moved?
17 A.  (Nodded head in the affirmative.)
18 Q.  Okay.  So he was terminated after you left the
19  district?
20 A.  Yes.
21 Q.  Are you aware that Mr. Akins had done some bad
22  inspections that caused the contractor to have
23  to redo the work that he had inspected?

## Page 84

1  A.  No.
2  Q.  Do you have any idea why Mr. Cabbil's
3  complaints about being assigned to Chilton
4  County would be one of the reasons that he was
5  being terminated?
6  A.  No.
7  Q.  Did you feel that Mr. Cabbil should have been
8  terminated for making those complaints?
9  A.  No.
10 Q.  Did you feel that Mr. Cabbil should have been
11  terminated for the absences that he had accrued
12  by calling in sick?
13 A.  With the present record, no.
14 Q.  Okay.  After he had those problems on the
15  inspection, you did feel that those supported
16  his termination?
17 A.  Yes.
18 Q.  Okay.  Why did you not mention those in your
19  termination recommendation?
20 A.  I was addressing the present problem.
21 Q.  Did you review Mr. Cabbil's performance
22  appraisal at the time that you recommended him
23  to be terminated?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

## Page 85

1  A.  I don't remember.

2  Q.  Is that something that you would normally do

3      when deciding to recommend someone for

4      termination is review their employee

5      performance appraisal?

6  A.  No.

7  Q.  Have you ever terminated -- Have you ever

8      recommended anybody's termination for failure

9      to perform job improperly in a way that caused

10     a contractor to have to redo some work?

11 A.  Do that again?

12 Q.  Sorry.

13     MR. REDD:  Object.  Asked and answered.  I

14     think that he's already said that he couldn't

15     recall any.

16     MR. SIMON:  Okay.  I think that you may be

17     right.  I will ask it again just to make sure,

18     but you can object again.

19 (BY MR. SIMON:)

20 Q.  Have you ever recommended that anybody be

21     terminated for inspection failures that

22     resulted in the contractor having to redo some

23     work?

## Page 86

1      MR. REDD:  Object to the form.

2          You can answer if you remember.

3  A.  No.

4  Q.  You don't remember?

5  A.  No.

6  Q.  Okay.  And have you ever recommended that

7      somebody be terminated for falsification of

8      documents?

9  A.  Repeat it one more time.

10 Q.  Have you ever recommend that had an employee be

11     terminated for falsification of records?

12 A.  Yes.

13 Q.  Okay.  Who have you recommended be terminated

14     for falsification of records?

15 A.  Teresa Bostick.

16 Q.  Anybody else?

17 A.  There is another lady but I don't remember her

18     name.

19 Q.  Before your deposition ends, if you do remember

20     her name, let me know, okay?  Before we finish

21     up today.

22     (Pause.)

23     MR. SIMON:  I think I am done but give me

## Page 87

1      just a second to look through these documents.

2      (Pause.)

3  Q.  I forgot about one document.  Let me ask you if

4      you recognize what I have marked as plaintiff's

5      exhibit sixteen.

6      (Pause.)

7  A.  What did you ask?

8  Q.  I was just asking if you've ever seen it

9      before.

10 A.  I don't remember it.

11 Q.  Did you ever ask Mr. Edwards to write this note

12     concerning Mr. Cabbil's weekend work habits?

13 A.  No.

14 Q.  There seem to be quite a few statements about

15     Mr. Cabbil that were dated March 15th of 2004.

16     Was there anything that you were doing with

17     regard to Mr. Cabbil's termination as of March

18     15th, 2004?

19 A.  Not that I remember.

20 Q.  Okay.

21     MR. SIMON:  That's all I have.

22     MR. REDD:  I don't have any questions.

23     Thank you.

## Page 88

1      MR. SIMON:  Thank you.  You're free to

2  go.

3      THE WITNESS:  All right.

4      (Whereupon, the deposition concluded

5      at 4:20 p.m.)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 89

```
1           CERTIFICATE
2
3    TONY CABBIL
4         vs.        CASE NO. 2:05-CV-513-T
5    STATE OF ALABAMA DEPARTMENT OF TRANSPORTATION
6
7
8         I certify that the foregoing
9    proceedings were truly and correctly reported
10   and transcribed, and that the witness was first
11   duly sworn.
12         I further certify that I am not kin to
13   any party nor am I in any way interested in
14   this case.
15
16
17   Dated this _____ day of _____, 2006.
18
19
20
21   _____
22   DAVID S. NORTHINGTON, CCR
23
```

23  (Page 89)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**