# FREEDOM COURT REPORTING

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

TONY CABBIL

vs.   CASE NO. 2:05-CV-513-T

STATE OF ALABAMA DEPARTMENT OF TRANSPORTATION

DEPOSITION OF L. DEE ROWE

The following deposition in the above-styled case was held on May 12, 2006, beginning at 1:50 p.m., at the offices of Alabama Department of Transportation, located at 2715 Skyland Boulevard, Tuscaloosa, Alabama 35401.

REPORTED BY:
DAVID S. NORTHINGTON, CCR

## Page 2

STIPULATIONS

It was stipulated and agreed by and between the parties through their respective counsel that the deposition of L. Dee Rowe may be taken at the date, time and location indicated on the preceding title page.

Further, that the signature to and the reading of this deposition by the witness is waived and that this deposition is to have the same force and effect as if full compliance had been had with all laws and rules of court relating to the taking of depositions.

Further, that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of the trial or at the time this deposition is offered into evidence or prior thereto.

Further, that notice of filing of this deposition by the Commissioner is waived.

## Page 3

APPEARANCES

FOR THE PLAINTIFF:
MR. KELL SIMON
WIGGINS, CHILDS, QUINN & PANTAZIS

FOR THE DEFENDANT:
MR. ROBERT PRESCOTT
ATTORNEY AT LAW

ALSO PRESENT:
MR. TONY CABBIL
THE PLAINTIFF

## Page 4

INDEX

TITLE PAGE                              1

STIPULATIONS                            2

APPEARANCES                             3

INDEX                                   4

WITNESS L. DEE ROWE
  X BY MR. SIMON                     5 - 58

REPORTER'S CERTIFICATE                 59

# FREEDOM COURT REPORTING

Page 5

1  I, David S. Northington, Certified
2  Court Reporter and Notary Public for the
3  State of Alabama at Large, acting as
4  Commissioner, certify that as provided by Rule
5  30 of the Alabama Rules of Civil Procedure,
6  and the foregoing stipulations of counsel,
7  there came before me at the date, time and
8  location indicated on the preceding title page,
9  L. Dee Rowe, witness in this previously-styled
10  cause, for oral examination, and the following
11  proceedings occurred:
12
13       L. DEE ROWE,
14  was called as a witness and after having been
15  first duly sworn to testify to the truth, the
16  whole truth and nothing but the truth,
17  testified as follows, to-wit:
18
19       THE COURT REPORTER: Usual stipulations?
20       MR. SIMON: Yes.
21       MR. PRESCOTT: Yes, sir.
22              EXAMINATION
23  BY MR. SIMON:

Page 6

1  Q. Could you state your full name for the record,
2     please?
3  A. I had go by L. Dee Rowe, D-E-E Rowe. If you
4     need what the "L" means, that's fine. I can
5     tell you if you need it; if you don't, fine.
6         (Whereupon, the plaintiff entered the
7         room.)
8       MR. SIMON: Have a seat, Mr. Cabbil. We
9     were just getting started.
10       THE WITNESS: Hello.
11       THE PLAINTIFF: Hi.
12  (BY MR. SIMON:)
13  Q. And I have taken your deposition before and I
14     have told you the ground rules before. But if
15     at any time you need a break during the
16     deposition, just let me know --
17  A. Okay.
18  Q. -- and we can go off the record and take a
19     break.
20         I represent, of course, Tony Cabbil in
21     his lawsuit challenging his termination from
22     the Department of Transportation.
23         What is your current position with

Page 7

1     ALDOT?
2  A. I am the fifth division engineer.
3  Q. What are your responsibilities so far as
4     personnel matters in the fifth division?
5  A. If a personnel issue inflates to the point
6     where there is a complaint or if the activities
7     of the person become -- get to the level where
8     there's going to be some discipline, I get
9     notified and sometimes get involved. I try not
10     to get involved because I am supposed to be the
11     hearing officer available, so I try not to have
12     detailed involvement.
13  Q. Okay. What was your involvement in the
14     termination and the proceedings as they related
15     to Tony Cabbil?
16  A. I reviewed the forms that were sent to me to --
17     for me to send on to the director with the
18     recommendation and then -- and then I was the
19     hearing officer for his pretermination hearing.
20  Q. Prior to -- Prior to you sending the
21     termination recommendation on to the Montgomery
22     central office, did you determine independently
23     whether you felt that Mr. Cabbil's termination

Page 8

1     was proper?
2  A. When you say "independently" --
3  Q. Did you make an independent review, for
4     instance, of the documentation that was
5     supplied to you in support of the termination
6     recommendation?
7  A. I don't recall specifically the details. What
8     would be normal would be for the supervisor
9     that's making that recommendation to me to
10     bring me the paperwork on it, the evidence, if
11     there's evidence to be had, and go over it with
12     me to point out the things of -- and if that
13     constitutes that it's not independent, I don't
14     know.
15  Q. Okay. Did you do that in Mr. Cabbil's case?
16  A. I don't really recall.
17  Q. Did you recommend that Mr. Cabbil be
18     terminated?
19  A. After the pretermination hearing, I did.
20  Q. Okay. Prior to the pretermination hearing, did
21     you recommend that Mr. Cabbil be terminated?
22  A. Actually, yes. There is a letter to the
23     director to that effect --

2 (Pages 5 to 8)

# FREEDOM COURT REPORTING

### Page 9

1  Q. Okay.
2  A. -- from me, yes.
3  Q. And it states something to the effect of you
4     believe that his termination is proper; is that
5     correct?
6  A. That's correct.
7  Q. And you still believed that after the
8     pretermination hearing as well, correct?
9  A. That's correct.
10 Q. Okay. Tell me what happened at the
11    pretermination hearing.
12 A. The hearing is taped. I guess I go on the tape
13    saying that the -- the date, the location,
14    who's present, and then it is up to the person
15    that is being terminated to respond to Mr.
16    McInnes' letter to them.
17 Q. Mr. Cabbil presented a response; is that right?
18 A. That's correct.
19 Q. And did you have testimony or statements from
20    any other individuals besides Mr. Cabbil?
21 A. Not in the pretermination hearing, no.
22 Q. So it was just Mr. Cabbil himself?
23 A. That's correct.

### Page 10

1  Q. On what did you base your decision to -- Well,
2     let me ask you this first: Were you the
3     individual who made the decision to terminate
4     Mr. Cabbil?
5  A. That's made in Montgomery.
6  Q. Okay. After the pretermination hearing, did
7     you send a recommendation for termination to
8     the central office in Montgomery?
9  A. Yes, I did.
10 Q. Okay. That was in writing?
11 A. Yes, sir.
12    MR. SIMON: Off the record.
13    (Whereupon, there was an
14    off-the-record discussion.)
15 Q. I will show you what I have marked as
16    plaintiff's exhibit nineteen and ask you if you
17    recognize that document?
18 A. I do.
19 Q. This is a letter from you to Mr. McInnes,
20    right?
21 A. That's correct.
22 Q. Stating that you concur with the recommendation
23    to terminate Mr. Cabbil, correct?

### Page 11

1  A. That's correct.
2  Q. This is the one that was done prior to the
3     pretermination conference, right?
4  A. That's correct.
5  Q. And you think there is another letter after the
6     pretermination conference in which you again
7     recommended Mr. Cabbil be terminated?
8  A. I do.
9  Q. Did you discuss Mr. Cabbil's termination with
10    Mr. McInnes at any time?
11 A. No, sir.
12 Q. So, so far as you know, Mr. McInnes had in
13    front of him the paperwork that you had sent
14    him when he made his termination decision,
15    correct?
16 A. I would think so.
17 Q. Okay.
18 A. But I don't know that.
19 Q. But you don't actually know what Mr. McInnes
20    looked at?
21 A. No, sir, I do not know.
22 Q. And, again, you were not the individual who
23    decided to terminate Mr. Cabbil; is that

### Page 12

1     correct?
2  A. That's correct.
3  Q. You state in your letter dated March 16th that
4     you concurred with Mr. Calhoun's recommendation
5     to terminate Mr. Cabbil. On what basis did you
6     concur with Mr. Calhoun's recommendation to
7     terminate Mr. Cabbil?
8  A. The documentation that was provided to me.
9  Q. Anything else?
10 A. I wouldn't -- No.
11 Q. Did you speak with Mr. Calhoun and get some
12    facts from him as well?
13 A. I don't recall.
14 Q. Let me show you what I have marked as
15    plaintiff's exhibit twenty-one. That is a copy
16    that was just made from your EEO officer's
17    file. Is it your understanding that
18    plaintiff's exhibit twenty-one represents a
19    complete set of the documentation that was
20    forwarded to you from Mr. Calhoun concerning
21    Mr. Cabbil's termination?
22 A. I don't have a recollection one way or the
23    other on that.

# FREEDOM COURT REPORTING

## Page 13

1  Q. Okay. Would you have any reason to believe
2      that the EEO officer would have anything but a
3      complete set of those documents?
4          MR. PRESCOTT: Object to form.
5  A. No. I don't.
6  Q. You can take a minute to look through those
7      documents if you want. In looking through
8      them, do you believe that they are the
9      documents that you reviewed in reaching your
10     conclusion that you concurred with the
11     recommendation to terminate Mr. Cabbil?
12         (Pause.)
13 A. The specifics of Mr. Cabbil's termination, I
14     don't -- I don't have a recollection. In
15     general, this is what would be the kind of
16     documentation that I would want to have.
17 Q. Okay.
18 A. And would have requested if I didn't get it.
19 Q. Do you know what Mr. Cabbil was initially
20     recommended for termination for?
21 A. Inattention to job was the final straw that
22     broke the camel's back.
23 Q. Okay. And what was the inattention to job?

## Page 14

1  A. It was the issue with the bridge painting
2      project where the contractor was allowed to
3      move forward with the painting before prepping
4      the beams properly.
5  Q. Okay. Were there any other incidents occurring
6      after that bridge painting project that
7      resulted in Mr. Cabbil's termination?
8  A. I don't recall.
9  Q. Okay. But the bridge painting project is the
10     one that stands out in your mind as the final
11     cause for Mr. Cabbil to be recommended for
12     termination?
13 A. That's correct.
14 Q. Let me ask you -- If you'll hand me exhibit
15     twenty-one?
16 A. (Witness complied.)
17 Q. I want to direct your attention to several
18     pages in there.
19         (Pause.)
20 Q. There is a set in exhibit twenty-one of
21     inspector's daily reports. Starting with the
22     one that I have just put in front of you, do
23     you see that?

## Page 15

1  A. I do.
2  Q. Those previously -- Those reports have been
3      marked collectively as plaintiff's exhibit
4      eleven to the depositions in this case. I know
5      the dates at the top are hard to see but that
6      is the inspector's daily report for Thursday,
7      January 15th, 2004, is it not?
8  A. Uh-huh (yes).
9  Q. If you'll look at the next one, you will be
10     able to tell --
11 A. Yes.
12 Q. -- a little clearer on the dates.
13         Let me also show you what's previously
14     been marked as exhibit five to these
15     depositions and I will ask you if you recognize
16     that document?
17 A. Yes.
18 Q. That's the recommendation for termination that
19     came from Mr. Rager, correct?
20 A. Yes, it is.
21 Q. Okay. And it states that the inattention to
22     job that you referred to earlier occurred from
23     January 15th to 27, 2004, correct?

## Page 16

1  A. Uh-huh (yes).
2  Q. Is that correct?
3  A. Yes. Yes.
4  Q. Okay. And what we have got in front of you in
5      exhibit twenty-one that I have shown you is the
6      inspector's daily reports for that time period.
7  A. Okay. Yes.
8  Q. Okay. If you'll look at the first one that I
9      have put in front of you there which is for
10     Thursday, January 15th, 2004?
11 A. (Witness complied.)
12 Q. Who did the inspection work on that project on
13     that day?
14 A. This lists engineering personnel as Tony Cabbil
15     and Ken Edwards.
16 Q. Okay. The number eight next to their names,
17     what do those mean?
18 A. Well, Tony says hours, so hours.
19 Q. Okay. So it appears from this document that
20     Tony Cabbil and Ken Edwards both spent eight
21     hours inspecting this project; is that correct?
22 A. That's correct.
23 Q. Okay. Let me also ask you to look at a

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

## Page 17

1  document that we have previously marked as
2  plaintiff's exhibit nine. That document was
3  also part of the supporting documentation for
4  the termination recommendation, correct?
5  A. That's correct.
6  Q. And it's an indication of structure
7  deficiencies on spans twenty-two, twenty-three
8  and twenty-four of the bridge project that Mr.
9  Cabbil and Mr. Edwards were working on,
10  correct?
11  A. It's -- It's documentation of the bridge
12  inspector having gone back to review what was
13  -- what was actually done by the contractor.
14  Q. Okay. And it refers specifically to what the
15  contractor did improperly on spans -- on span
16  twenty-two, twenty-three and twenty-four and
17  also bent twenty-two and bent twenty-four; is
18  that correct?
19  A. That's correct.
20  Q. Okay. Now, let me ask you to look again at the
21  inspector's daily report for January 15th.
22  They were doing work on sandblasting work on
23  span twenty-three and also putting containment

## Page 18

1  in spans twenty-three and twenty-four, correct?
2  A. It says that contractor putting up containment
3  on twenty-three. I don't know what this
4  connotation is, twenty-three H? I don't know
5  what that is. And twenty-four. Clean up on
6  twenty-five, twenty-five A, that must be
7  twenty-three A. Twenty-six. Contractor
8  sandblasting span twenty-three SBR, southbound.
9  Q. Okay. Can you tell who did the inspection work
10  on this bridge project on this particular day
11  from the document that you are looking at?
12  A. Tony Cabbil and Ken Edwards.
13  Q. Okay. Can you tell which of them failed to
14  perform their job properly in doing the
15  inspection on January 15th?
16      MR. PRESCOTT: Object to the form.
17  A. Specifically, no.
18  Q. Okay. And January 15th is one of the days
19  referenced in Mr. Rager's recommendation for
20  termination, correct?
21  A. Yes.
22  Q. At the top of that line there.
23  A. Yes, sir.

## Page 19

1  Q. Was Mr. Edwards disciplined in any way for his
2  inspection on this bridge project?
3  A. Not to my knowledge.
4  Q. Okay. Toward the end of that letter that is
5  marked as exhibit five, it indicates that there
6  was a potential cost to ALDOT resulting from
7  the inspection failures, correct?
8  A. Maybe, it states maybe.
9  Q. Okay. Did ALDOT wind up having to pay any
10  money?
11  A. I don't know.
12  Q. Okay. Do you know whether the contractor
13  absorbed the costs of the work they had to
14  redo?
15  A. I do not know.
16  Q. Let me ask you to turn over to the next
17  inspector's daily report, which was the
18  inspector's daily report for Friday, January
19  16th, 2004. Do you have that in front of you?
20  A. I do, yes.
21  Q. And Friday January 16th, 2004, is one of the
22  days that is covered in Mr. Rager's termination
23  recommendation letter, correct?

## Page 20

1  A. That's correct.
2  Q. Okay. That is one of the days on Mr. Cabbil
3  was alleged to have done improper inspection
4  work, correct?
5  A. He is saying from January 15th through the 27th
6  as a -- as a span of time.
7  Q. He doesn't set forth each day --
8  A. No.
9  Q. -- separately, in other words?
10  A. No, he does not.
11  Q. Okay. Mr. Cabbil didn't actually do any
12  inspection work on the project on Friday,
13  January 16th, 2004, did he?
14  A. I wouldn't know whether he did or not.
15  Q. Can you tell from the inspector's dailey
16  reports who did on that day?
17  A. This says Ken Edwards.
18  Q. Do you know if there were any other daily
19  inspection reports for that day?
20  A. No, I don't.
21  Q. Did you request any more when you were doing
22  the termination review for Mr. Tony Cabbil?
23  A. No.

Page 21

1  Q. If you'll look down at the middle of that
2     report for January 16th, it shows that Mr.
3     Edwards inspected the contractor blasting and
4     painting span twenty-three northbound and
5     twenty-three southbound, correct?
6  A. That's correct.
7  Q. Doing the first coat painting on twenty-three
8     northbound and southbound; is that correct?
9  A. That's correct.
10 Q. And span twenty-three was one of the spans of
11    the bridge that Mr. Tilley found problems with
12    the contractor's work on, correct?
13 A. That's correct.
14 Q. Based on the documents that we have reviewed,
15    how can you tell that it was Mr. Cabbil whose
16    improper inspection work led to the contractor
17    having to redo the work and not Mr. Edwards?
18 A. There is an inspector's report for January 20th
19    that also indicates contractor sandblasting
20    span twenty-three northbound, contractor
21    sandblasting and painting first coat on
22    twenty-three A. I can't quite read what this
23    -- what this next one says, but it's

Page 22

1     twenty-three northbound and southbound
2     complete. This one has Tony at the top.
3  Q. Okay. So Tony did the inspection by himself on
4     Tuesday, January 20th, and Ken Edwards did the
5     inspection by himself on Friday, January 16th.
6     How can you tell which one of them did the
7     improper inspection that led to the contractor
8     having to redo the work?
9        MR. PRESCOTT: Object to form.
10 A. What I don't know is if there was something
11    about what happened on the 16th that might have
12    caused the activity on the 20th to be
13    duplicated. Sandblasting and painting first
14    coat on span twenty-three. Sandblasting
15    twenty-three.
16 Q. Given that Mr. Edwards inspected by himself on
17    the 16th, Mr. Cabbil inspected by himself on
18    the 20th, is there any way that you can tell
19    which of them did the improper inspection that
20    led to the contractor having to redo the work?
21       MR. PRESCOTT: Object to form.
22 A. What Derek Tilley saw was the final. And since
23    January 20th comes after January 16th, what he

Page 23

1     saw is what Tony left behind.
2  Q. Okay. Let's flip over -- So from Mr. -- Mr.
3     Tilley, though, he didn't ever see Mr. Cabbil
4     or Mr. Edwards do any inspection on the
5     project, did he?
6  A. I don't know whether he did or not.
7  Q. And Mr. Edwards was the chief inspector on the
8     project, correct?
9  A. I actually don't know that.
10 Q. He was supposed to have been training Tony
11    Cabbil to do the inspecting, right?
12 A. I think I knew that he was training.
13 Q. Okay. Let's look at the very last day which is
14    Tuesday, January 27th. Mr. Edwards and Mr.
15    Cabbil were both inspecting on that day on that
16    project, correct?
17 A. Yes, sir.
18 Q. And they both charged eight hours of work for
19    that day --
20 A. Yes, sir.
21 Q. -- for that project?
22       Okay. How can you tell -- This -- So
23    this appears to be the last day on which there

Page 24

1     was improper inspection work done, correct? At
2     least according to Mr. Rager's letter.
3  A. Okay.
4  Q. And this inspector's daily report for the 27th
5     indicates that the contractor removed the
6     containment from span twenty-four northbound
7     and southbound, right?
8  A. That's correct.
9  Q. Okay. That would indicate that on this day,
10    January 27th, was the conclusion of the work
11    being done on span twenty-four, correct?
12 A. That's correct.
13 Q. On span twenty-four was one of the areas in
14    which Mr. Tilley found improprieties in the
15    contractor's work, correct?
16 A. That's correct.
17 Q. Now, how can you tell whether it was Mr. Cabbil
18    or Mr. Edwards who on January 27th agreed that
19    the work that the contractor had done was
20    complete and that they could remove the
21    containment system at that time?
22       MR. PRESCOTT: Object to form.
23 A. I cannot.

# FREEDOM COURT REPORTING

Page 25

1  Q. In reviewing these documents when you were
2     attempting to determine whether you thought the
3     termination of Mr. Cabbil was proper, did it
4     enter your mind that Mr. Cabbil and Mr. Edwards
5     were both doing this inspection work?
6  A. No.
7  Q. Did you ask anybody whether Mr. Edwards had
8     been disciplined for anything relating to the
9     inspection of this bridge project?
10 A. No.
11 Q. You didn't ask Mr. Calhoun that?
12 A. (No response.)
13 Q. You didn't ask Mr. Calhoun that?
14 A. I didn't ask Mr. Calhoun what?
15 Q. Whether Mr. Edwards had been disciplined for
16    his work on this inspection.
17 A. I did not that I recall.
18 Q. And you don't recall --
19 A. I will just say I don't recall.
20 Q. Okay. And you don't recall asking Mr. Rager
21    that, either?
22 A. I do not recall.
23 Q. And you don't know why Mr. Edwards was not

Page 26

1     disciplined for his inspection on this project?
2        MR. PRESCOTT: Object to form.
3  A. I don't recall whether he was or not.
4  Q. Now, Mr. Cabbil was recommended for termination
5     for inattention to job, correct?
6  A. Inattention to job, failure to perform job
7     properly, falsification of records, leaving job
8     station without permission.
9  Q. Okay. Let me ask you to look at Mr. Rager's
10    letter which was the original recommendation
11    for termination. It lists just the first three
12    that you mentioned: inattention to job,
13    failure to perform job properly, and
14    falsification of records, correct?
15 A. That's correct.
16 Q. Okay. Based on our review of the inspector's
17    daily reports, is there any way to tell whether
18    it was Mr. Cabbil's inattention to the job or
19    Mr. Edwards' inattention to the job that caused
20    the contractor to have to redo the work?
21       MR. PRESCOTT: Objection to the form.
22 A. Can you restate the question?
23 Q. Yeah. Based on your review that we have just

Page 27

1     conducted of these inspector's daily reports,
2     is there any way for you to tell whether it was
3     Mr. Cabbil's inattention to job or Mr. Edwards'
4     inattention to the job that led to the
5     contractor having to redo the work?
6        MR. PRESCOTT: Same objection.
7  A. No.
8  Q. Based on your review of these documents, is
9     there any way for you to determine whether it
10    was Mr. Cabbil's failure to perform job
11    properly or Mr. Edwards' failure to perform the
12    job properly that led to the contractor having
13    to redo the work?
14       MR. PRESCOTT: Object to the form.
15 A. Bear with me a minute.
16 Q. Sure.
17       (Pause.)
18 A. No.
19 Q. Okay. And there is a note in the middle of the
20    page that states that Mr. Cabbil is being
21    monitored by his supervisor, correct?
22 A. That is not correct.
23 Q. Okay.

Page 28

1  A. The note say Mrs. Cabbil was properly trained
2     by Mr. Kenneth Edwards.
3  Q. Okay.
4  A. And is -- I am sorry -- and is monitored by his
5     supervisor.
6  Q. Okay. Do you know which supervisor was
7     monitoring Mr. Cabbil's work?
8  A. No.
9  Q. If there is a supervisor -- Well, withdraw
10    that.
11       Based on our review of the records,
12    the daily inspector's reports and the other
13    records supplied and supported Mr. Cabbil's
14    termination, is there any way to determine
15    whether it was Mr. Cabbil or Mr. Edwards who
16    committed falsification of records in violation
17    of the state personnel board rules?
18       MR. PRESCOTT: Object to form.
19 A. Repeat the question.
20 Q. Based on your review of the inspector's daily
21    reports, is there any way for you to determine
22    whether it was Mr. Cabbil or Mr. Edwards who
23    committed a falsification of records in

# FREEDOM COURT REPORTING

Page 29

1  violation of the personnel board rule
2  referenced in the March 4th letter?
3       MR. PRESCOTT: Object to form.
4  A. No.
5  Q. Several months before his termination, Mr.
6     Cabbil filed a grievance with the
7     transportation department, correct?
8  A. That's correct.
9  Q. And you were aware of that grievance, were you
10    not?
11 A. Yes.
12 Q. What's been previously marked as plaintiff's
13    exhibit three is what I understand to be a copy
14    of the grievance that Mr. Cabbil filed. Is
15    that a copy of his grievance?
16 A. It -- Yes.
17 Q. Okay. And that grievance complains of
18    discrimination, correct?
19 A. It complains of retaliation.
20 Q. It also complains just above that of
21    discrimination on the basis of race, correct?
22 A. Yes. Yes.
23 Q. Okay. And you were the person who responded

Page 30

1  initially to Mr. Cabbil's grievance, correct?
2  Let me show you plaintiff's exhibit four, that
3  will refresh your recollection, I think.
4       (Pause.)
5  A. Yes. The initial response was mine.
6  Q. Okay. After your initial response, did Mr. --
7     Well, let me ask you this: Did Mr. Cabbil
8     accept or reject your initial response to his
9     grievance?
10 A. He dropped it.
11 Q. He dropped it?
12 A. He dropped his grievance.
13 Q. He dropped his grievance?
14 A. Yes.
15 Q. Okay. Did he -- Do you know if he accepted
16    your proposed resolution to his grievance?
17 A. If you've got the paperwork to show me, then --
18 Q. I am not trying to test your memory. Is that
19    the investigative termination for Mr. Cabbil's
20    grievance?
21 A. It is.
22 Q. Okay. If there was an investigative
23    termination done by Montgomery, that would mean

Page 31

1  that Mr. Cabbil rejected your proposed
2  resolution to his grievance, correct?
3  A. I actually don't -- I don't know on a race
4     discrimination if that gets investigated
5     regardless. I don't know.
6  Q. Okay. Did you take part at all in the
7     investigation conducted by the central office
8     about Mr. Cabbil's grievance?
9  A. My participation would have been just
10    responding to Mrs. Dietz' inquiries.
11 Q. Do you know whether you did that?
12 A. I don't recall.
13 Q. What is the exhibit number on that?
14 A. Thirteen.
15 Q. Thank you.
16      (Pause.)
17 Q. Do you know whether you facilitated Ms. Dietz'
18    conversations with the individuals who she
19    interviewed with respect to Mr. Cabbil's
20    grievance?
21      MR. PRESCOTT: Object to form.
22 A. I don't recall.
23 Q. At the time that you decided to recommend to

Page 32

1  Mr. McInnes that Mr. Cabbil be terminated, did
2  you have an opportunity to review Mr. Cabbil's
3  performance appraisal?
4  A. I would say that since it's not in this packet,
5     no.
6  Q. Okay. Did you ask for it?
7  A. No.
8  Q. Let me show you Mr. Cabbil's performance
9     appraisal that is marked as plaintiff's exhibit
10    one. Do you see that there?
11 A. I do.
12 Q. And it's dated November 18th, 2003, correct?
13 A. That's correct.
14 Q. Okay. That's a little less than four months
15    before Mr. Cabbil was recommended for
16    termination initially, correct?
17 A. That's correct.
18 Q. And Mr. Cabbil's work at that time met
19    standards, correct?
20 A. That is what is marked here, yes.
21 Q. Okay. And he got an overall rating of twenty,
22    correct?
23 A. That's correct.

8 (Pages 29 to 32)

## 367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

**Page 33**

1  Q. Okay. And his performance appraisal indicates
2     that he was compliant with all of the work
3     habit areas, correct?
4  A. That's correct.
5  Q. Okay. That is actually on the front?
6  A. Yeah.
7  Q. Attendance, punctuality, cooperation?
8  A. Exactly.
9  Q. Okay. And the back of Mr. Cabbil's performance
10    appraisal also indicates that he met standards
11    in all of the job responsibilities to which he
12    was assigned, correct?
13 A. That's correct.
14 Q. So this document shows that at least as of
15    November 18th, 2003, Mr. Cabbil was meeting
16    standards in all of his work, correct?
17    MR. PRESCOTT: Object to form.
18 A. This is what is rated on this form.
19 Q. By his supervisor, correct?
20 A. Uh-huh (yes).
21 Q. That was by Ms. Elliot who was his direct
22    supervisor, right?
23 A. That's correct.

**Page 34**

1  Q. Okay. And yet you were not able to give any
2     weight to this performance appraisal when
3     making your termination decision because you
4     didn't have it, correct?
5  A. I don't recall.
6  Q. Would you typically take into account
7     somebody's performance appraisals when you're
8     deciding whether or not to terminate them?
9  A. I think it would depend on what the infractions
10    were.
11 Q. Okay. The infractions that caused him -- or
12    that you referred to as the straw that broke
13    the camel's back were these inspection
14    deficiencies, correct?
15 A. That's correct.
16 Q. Okay. And that deals with how well Mr. Cabbil
17    was actually performing his inspection duties,
18    correct?
19 A. On that -- On those particular items, yes.
20 Q. Okay. And it dealt with, as the termination
21    letter says, Mr. Cabbil's level of
22    attentiveness to his job, right?
23 A. That's correct.

**Page 35**

1  Q. Okay. And it also had to do with whether Mr.
2     Cabbil was performing his job properly,
3     correct?
4  A. That's correct.
5  Q. And his performance appraisal doesn't give any
6     indication that Mr. Cabbil displayed any
7     inattentiveness to his job, does it?
8  A. This performance appraisal is not -- doesn't
9     cover these dates.
10 Q. That's correct, it does not. But what I am
11    asking you is for the time period that it does
12    cover: December 1st, 2002, up until December
13    1st, 2003, is there any indication that during
14    that time period, based on his performance
15    appraisal, that Mr. Cabbil had displayed any
16    inattention to his job?
17    MR. PRESCOTT: Object to form.
18 A. It indicates that he met standards.
19 Q. Okay.
20 A. The equivalent of a C in school.
21 Q. Donna Elliot testified yesterday that -- or on
22    Wednesday that meeting standards was a good or
23    a great rating?

**Page 36**

1     MR. PRESCOTT: Object to form.
2  Q. Actually, would you disagree with that?
3     MR. PRESCOTT: Object to form.
4  A. Apparently Tony disagrees, too.
5  Q. Okay. I would agree with that. But there is
6     nothing on this performance appraisal that
7     indicates that Mr. Cabbil between December of
8     2002 and December of 2003 displayed any
9     inattentiveness to his job, is there?
10    MR. PRESCOTT: Object to form.
11 A. A "meets standards" is just barely getting
12    there.
13 Q. Just barely getting there?
14 A. Uh-huh (yes).
15 Q. Okay.
16 A. I mean, that is just -- It's barely getting
17    there.
18 Q. Okay. Can you tell from the performance
19    appraisal whether Mr. Cabbil had any problems
20    with attentiveness to his job?
21 A. No.
22 Q. And can you tell from the appraisal whether Mr.
23    Cabbil had any instances of failing to perform

**FREEDOM COURT REPORTING**

Page 37

1  his job properly during the period of time
2  covered by the appraisal?
3  A. No.
4  Q. Did you talk to Donna Elliot about Mr. Cabbil
5     around the time that he filed his grievance?
6  A. Yes.
7  Q. Did Ms. Elliot indicate to you that Mr. Cabbil
8     had any problems with his job performance?
9  A. Do you have the grievance? This is just the
10    termination.
11 Q. This is your response and then your response is
12    exhibit four and the grievance that he filed is
13    exhibit three.
14        (Pause.)
15 A. What was your question?
16 Q. My question was whether -- when you spoke with
17    Donna Elliot about Mr. Cabbil's grievance,
18    whether she indicated to you that he had
19    performance problems?
20        (Pause.)
21 A. I don't recall.
22 Q. Okay. There is no indication in your proposed
23    resolution that Mr. Cabbil had any problems

Page 38

1     with his performance, is there?
2        MR. PRESCOTT: Object to form.
3  A. Not specifically. There is issues of
4     performance problems implied here.
5  Q. Where is that?
6  A. Alternate activities related to improving
7     employee's job performance will be suggested.
8     Extended period, all employees discouraged from
9     expending periods of time in project trucks.
10 Q. Is that something that Mr. Cabbil had been
11    accused of doing?
12 A. I don't recall.
13 Q. And when you wrote this sentence, alternative
14    activities related to improving employee's job
15    performance will be suggested, was that
16    targeted toward getting some alternative
17    activities for Mr. Cabbil?
18 A. All employees. Employees will be watched with
19    regard to the time and place crossword puzzles
20    are worked, not allowing activity -- the
21    activity by the employees on the clock. No.
22 Q. Okay. And Mr. Cabbil had actually complained
23    that there were other employees who were doing

Page 39

1  crossword puzzles while on the clock, right?
2  A. That's correct.
3  Q. Did you ever speak with Gary Elliot about Mr.
4     Cabbil's job performance?
5  A. I don't recall.
6  Q. Do you recall whether Gary Elliot had ever told
7     you that Mr. Cabbil was not performing his job
8     up to standards?
9  A. I don't recall.
10 Q. Do you know why Mr. Cabbil was transferred to
11    Gary Elliot's project from Donna Elliot's
12    project?
13 A. It's not uncommon to transfer any of the
14    inspectors from project to project depending on
15    the workload.
16 Q. Do you know why Mr. Cabbil was transferred from
17    Donna Elliot's project to Gary Elliot's
18    project?
19 A. I believe -- Well, I am not supposed to say, "I
20    believe". No.
21 Q. What is your belief about why Mr. Cabbil was
22    transferred?
23        MR. PRESCOTT: Object to form.

Page 40

1  A. That Donna's project was winding down or maybe
2     she -- there was a time in her project where
3     fewer people were needed for inspecting or
4     whatever.
5  Q. Were you involved in any conversations prior to
6     Mr. Cabbil being transferred to Gary Elliot
7     about transferring Mr. Cabbil to work on Gary
8     Elliot's project?
9  A. Not that I recall.
10 Q. Based on your review of the materials presented
11    to you by Mr. Calhoun, would you have
12    recommended termination of Tony Cabbil had the
13    problems with the inspection work on the bridge
14    project not been one of the reasons for
15    termination?
16        MR. PRESCOTT: Object to form.
17 Q. That was one of the most --
18 A. I think it would be very difficult for me to
19    speculate on that.
20 Q. Okay.
21        (Whereupon, there was an
22        off-the-record discussion.)
23 Q. Let me ask you to look at what I have marked as

Page 41

1  plaintiff's exhibit six. That is the notice of
2  proposed termination to Mr. Cabbil from Mr.
3  McInnes, correct?
4  A. Yes.
5  Q. Okay. Let me ask you to flip over to the
6  second page, item number twelve. It states
7  that on November 25th, and then again on
8  November 26th, Mr. Cabbil complained to his
9  supervisor. Do you know who the supervisor was
10  that Mr. Cabbil complained to on November 25th
11  and November 26th?
12  A. I do not.
13  Q. Item number thirteen states that he was
14  referred to the assistance program for
15  absenteeism, do you see that?
16  A. I do.
17  Q. Had Mr. Cabbil not been referred to EAP for
18  absenteeism on December 23rd, would he still
19  have been recommended for termination --
20    MR. PRESCOTT: Object to the form.
21  Q. -- or would you still have recommended him for
22  termination?
23  A. I think I can't speculate on that. I don't

Page 42

1  understand the question.
2  Q. If item number thirteen had never happened and
3  thus was not considered in any termination
4  recommendation, would you still have concurred
5  in the recommendation to terminate Mr. Cabbil?
6  A. The EAP referral was for absenteeism. It was
7  just a step in the -- in the policy for -- that
8  we have in the division for absenteeism that at
9  some point, after a certain number of call-in's
10  or -- yeah, call-in's, that the -- you be
11  referred to the employee assistant program to
12  see if there is something that is not obvious
13  to everybody to try to figure out why the
14  employee is having a problem getting to work or
15  getting to work on time.
16  Q. Sure. Was the EAP referral one of the reasons
17  that Mr. Cabbil was terminated?
18  A. The fact that it -- that he got to the point
19  where he needed that referral is part of this
20  process as a whole.
21  Q. But was it one of the reasons that he was
22  terminated?
23  A. No.

Page 43

1  Q. Item number fourteen states that on December
2  8th, 2003, he received a written warning
3  regarding absenteeism. That's previously been
4  marked as exhibit fourteen. That -- Oh, that
5  is the discipline -- the warning that he
6  received for being referred to the EAP program,
7  correct?
8    (Pause.)
9  A. This is not his referral.
10  Q. It's a warning for the referral, though,
11  correct? Or a warning for the absences?
12  A. It -- What it's saying is that it's his
13  seventh occasion in a twelve month period and
14  that any further call-in's will require a
15  doctor's slip, to be counseled by his
16  supervisor, and to -- that the division
17  engineer would be notified.
18  Q. Okay. Is that warning that is marked as
19  plaintiff's exhibit fourteen one of the reasons
20  that Mr. Cabbil was terminated?
21  A. This is not a warning; this is just
22  documentation.
23  Q. It says "warning" at the top, does it not?

Page 44

1  A. (No response.)
2  Q. In big letters right there?
3  A. Oh, I am sorry. Yes. I kept reading through
4  there saying this is your warning -- I am
5  sorry. Yes. Yes.
6  Q. Is that warning one of the reasons for Mr.
7  Cabbil's termination?
8  A. It's a step in that direction.
9  Q. I understand that it's a step in that direction
10  but, just as I asked you about the December 3rd
11  EAP referral which you said was not a reason
12  for his termination, is the December 8th
13  warning a reason for his termination?
14    MR. PRESCOTT: Object to form.
15  A. Can you tell me why you're asking that
16  specifically? Because this letter doesn't say
17  these are the reasons for your termination, it
18  just says it's information that's been
19  submitted.
20  Q. Well, what I am trying to understand and the
21  information that the department's producing in
22  a case like this is the reason that Mr. Cabbil
23  -- reason or reasons that Mr. Cabbil was

11 (Pages 41 to 44)

# FREEDOM COURT REPORTING

Page 45

1   terminated. I am trying to find out what
2   those reasons -- that reason or those reasons
3   are.
4   A. Absenteeism, yes. Nicky states in his
5       recommendation to me for termination that there
6       were these incidences at the work that included
7       the inattention to job, failure to perform the
8       job properly, falsification of the records,
9       leaving before the end of a shift or walking
10      off the job. He states: Further, however,
11      investigation has led me into determining a
12      pattern of violations while working with Mr.
13      Elliot and other project engineers. These are
14      absenteeism, a pattern of absences or excessive
15      absences.
16  Q. So the warning that Mr. Cabbil received on
17      December 8th, 2003, was that one of the reasons
18      that he was recommended for termination?
19  A. You don't recommend somebody for termination
20      based on a warning. It's a step in the process
21      that if the employee has -- You know, if we
22      didn't give warning, then you would be asking
23      me why I didn't warn him, so we warned him.

Page 46

1   Q. Okay. Is the warning one of the reasons he was
2       terminated?
3       MR. PRESCOTT: Object to form.
4   A. The warning in itself, all by its lonely self,
5       no.
6   Q. Okay. Are the absences about which he was
7       being warned one of the reasons he was
8       terminated?
9   A. Yes.
10  Q. Okay. Thank you. So Mr. Cabbil was terminated
11      in part because of his absences from work,
12      correct?
13  A. The -- The pattern of absences and I --
14      Actually, the failure to call in or, you know,
15      notify in an appropriate time. I guess he did
16      call in the sicknesses but we call that an
17      occasion. If you didn't have a
18      previously-approved leave slip before you left
19      a day's work and then the next morning you
20      didn't come in, you called it in, and it's an
21      occasion. So at some point -- And the letter
22      from Donna, I believe, the warning is that the
23      seventh occasion from that point on, those

Page 47

1   call-in's required either a doctor's slip or
2   some kind of -- some kind of indication that
3   there was a legitimate reason for not having
4   made arrangements to be off prior to.
5   Q. Okay. Now, according to Mr. Calhoun's
6       memorandum, Mr. Cabbil is also recommended for
7       termination because he left the job station
8       without permission, correct?
9   A. That is what that says, yes.
10  Q. Okay. Do you know what incident he is
11      referring to there?
12  A. Not specifically, no, I do not, just what I
13      have read.
14  Q. Let me show you what I have marked as exhibit
15      twelve. That is a document that references Mr.
16      Cabbil leaving the job site without permission,
17      correct?
18  A. Yes, it is.
19  Q. Is that the incident of leaving the job station
20      without permission for which Mr. Cabbil was
21      terminated?
22      MR. SIMON: Off the record for a second.
23

Page 48

1       (Whereupon, there was an
2       off-the-record discussion.)
3   A. Yes.
4   Q. Okay. So that -- that incident of leaving the
5       job station without permission for which Mr.
6       Cabbil had already been reprimanded was also
7       one of the reasons that he was terminated?
8   A. (No response.)
9   Q. I am not asking whether his receipt of the
10      reprimand was one of the reasons for his
11      termination, I am asking whether his leaving
12      the job station without permission for which he
13      had already been reprimanded --
14  A. Yes.
15  Q. -- was that one of the reasons for his
16      termination?
17  A. Yes.
18  Q. It was?
19  A. (Nodded head in the affirmative.)
20  Q. Okay. Have you had any other engineering
21      assistants in your division fail to perform
22      work properly in a way that required the
23      contractor to redo some work?

# FREEDOM COURT REPORTING

## Page 49

1      MR. PRESCOTT: Object to form.
2 A. I don't know.
3 Q. You don't know?
4 A. Have any knowledge of that, no.
5 Q. Okay. Do you have any knowledge of a
6     contractor ever having to perform work over
7     again?
8 A. Not specifically, no.
9 Q. Okay. So, to your knowledge, as we sit here
10    today, the only incident of a contractor having
11    to redo work in the division -- in the fifth
12    division since you have been the division
13    engineer is the work that the contractor had to
14    redo that Mr. Cabbil allegedly failed to
15    inspect properly, correct?
16      MR. PRESCOTT: Object to form.
17 A. Say the question again.
18 Q. As we sit here today, the only instance of a
19    contractor having to do work as a result of an
20    employee's failure to properly inspect was the
21    contractor having to redo the work that Mr.
22    Cabbil inspected, correct?
23      MR. PRESCOTT: Object to form.

## Page 50

1 A. No, I don't know that for a fact.
2 Q. Okay. But you can't think of any other
3    instances?
4 A. I cannot, no.
5      MR. PRESCOTT: Object to form.
6 Q. Did you ever speak with Anita Box about Mr.
7    Cabbil?
8 A. I don't recall.
9 Q. You reviewed the statement that she wrote about
10    him using the lady's restroom, correct?
11 A. I didn't recall that that was Anita's.
12 Q. Okay. But you recall reading that statement?
13 A. Yes.
14 Q. Correct?
15 A. (Nodded head in the affirmative.)
16 Q. Okay. Let's look at that statement.
17      (Pause.)
18 Q. I will show you what I have marked as
19    plaintiff's exhibit seventeen. Is that the
20    statement from Ms. Box that you were referring
21    to?
22 A. I -- I don't know that I've actually read this
23    statement. I don't recall whether I read this

## Page 51

1    statement before --
2 Q. Okay.
3 A. -- or not.
4 Q. Is it one of the documents in exhibit
5    twenty-one that was attached to Mr. Calhoun's
6    memorandum?
7 A. Yes.
8 Q. This incident with the restroom is one of the
9    reasons that Mr. Cabbil was terminated, right?
10 A. Yes.
11 Q. It was?
12 A. (Nodded head in the affirmative.)
13 Q. Okay. Look at the second statement in Ms.
14    Box's written.
15 A. Second paragraph?
16 Q. Yeah. Referring to the incident on Friday at
17    three p.m. on 3/12/04. Was that incident that
18    is referenced there, was that one of the
19    reasons that Mr. Cabbil was terminated, also?
20 A. I don't see where we considered that.
21 Q. Okay. So, to your understanding, that was not
22    one of the reasons for his termination?
23 A. That's correct.

## Page 52

1 Q. Okay.
2      MR. PRESCOTT: Can we take a quick break?
3      MR. SIMON: Yeah, sure. Let's take a
4    break.
5      (Recess.)
6    (BY MR. SIMON:)
7 Q. All right. Just a few more questions here and
8    then we'll let you go home, or some of us will.
9      What did you do to prepare for your
10    deposition? For this deposition?
11 A. I looked through the EEO file.
12 Q. Did you meet with anybody?
13 A. Yes.
14 Q. With counsel?
15 A. Yes.
16 Q. Okay. Did you meet with anybody else besides
17    your lawyers?
18 A. Just the group of us just to try to get our --
19    you know, everybody back because it's been so
20    long.
21 Q. Okay. Who was in that group meeting?
22 A. Gary, Donna, Lewis, Anita, I don't recall if
23    there was somebody else.

Page 53

1  Q. Okay. Was there a lawyer present during that
2     meeting?
3  A. No.
4     MR. PRESCOTT: Yes. I was present at that
5     meeting.
6     THE WITNESS: Were you? I am sorry. I am
7     sorry. Yeah. Actually, two were.
8     MR. PRESCOTT: Yes. Made quite an
9     impression that day.
10    THE WITNESS: Sorry. Sorry.
11    MR. PRESCOTT: That's okay.
12    (BY MR. SIMON:)
13 Q. That's okay. If he wasn't there, I could have
14    asked you about it. But since he was there, I
15    am not going to ask you any questions about it.
16    Did you speak with Donna Elliot after
17    her deposition?
18 A. No.
19 Q. Okay. Did you speak with Gary Elliot after his
20    deposition?
21 A. No.
22 Q. Did you speak with Lewis Rager after his
23    deposition?

Page 54

1  A. He handed me the file and said your turn,
2     that's the only thing. I didn't speak to him;
3     he spoke to me.
4  Q. Okay. Did you speak to Mr. Calhoun after his
5     deposition?
6  A. No.
7  Q. Again, I think I asked you this before, but
8     just to make sure that it's in the record: You
9     were not the person who decided to terminate
10    Tony Cabbil, correct?
11 A. That's correct.
12 Q. The person who made that decision was Mr.
13    McInnes, right?
14 A. I don't know.
15 Q. You don't know who decided to terminate him?
16    Mr. Cabbil?
17 A. It would be an assumption.
18 Q. Okay. But you don't know for sure?
19 A. No.
20 Q. Okay. And you don't know what documents the
21    person who made the decision to terminate him
22    reviewed when they were deciding, do you?
23 A. No.

Page 55

1     MR. PRESCOTT: Object to form.
2  Q. Did you ask anybody to get statements from
3     Kenneth Edwards at any point?
4  A. Not that I recall.
5  Q. Did you ask anybody to get statements from
6     Anita Box?
7  A. I don't recall.
8  Q. Did you ask anyone to get statements from Gary
9     Elliot?
10 A. I don't recall.
11 Q. Did you ask Nicky Calhoun to get any statements
12    from anybody?
13 A. Not that I recall.
14    MR. SIMON: I think I am done. Let me
15    just go through these real quick and make sure.
16    (Pause.)
17    (BY MR. SIMON:)
18 Q. Look, if you would, in exhibit twenty-one.
19    There are some typewritten memos from Donna
20    Elliot.
21    (Pause.)
22 Q. I am going to ask you to look at those real
23    quick. The first one is dated December 8th of

Page 56

1     2003.
2     (Pause.)
3  Q. Do you see that?
4  A. Yes.
5  Q. Did you ask Ms. Elliot to write any memos about
6     Tony Cabbil?
7  A. Specifically about Tony, no. I encourage
8     everybody to keep good documentation.
9  Q. Did you discuss the -- And you can look through
10    these. There's six or seven, maybe eight of
11    these memos, typed memos from Donna Elliot.
12    Did you discuss any of these typed memos with
13    Ms. Elliot?
14 A. I don't recall.
15    (Pause.)
16 Q. Mr. Cabbil actually had two pretermination
17    hearings, did he not?
18 A. We -- He asked for a copy of the tape of the
19    hearing and the EEO inadvertently erased the
20    tape when she was trying to make the copy. I
21    don't recall if he came in a second time
22    because we ended up not taping another one, I
23    think. We just used what he had written

14 (Pages 53 to 56)

**FREEDOM COURT REPORTING**

Page 57

1  because he -- because he had read that -- you
2  know, what -- he had his prepared response.
3  Q. Okay. During the -- the -- Who was the EEO
4     person who erased that tape?
5  A. Tiffany Ramsey.
6  Q. Is she an EEO officer?
7  A. She was the acting EEO at the time.
8  Q. Does she still work in the division?
9  A. She had left. She came back to work here last
10    week.
11 Q. And the tape that got erased, did it have
12    testimony from anybody besides Mr. Cabbil
13    concerning his termination?
14 A. No.
15 Q. So it was -- the only people speaking on the
16    tape would have been Mr. Cabbil and you?
17 A. That's correct.
18 Q. Anybody else?
19 A. If Tiffany spoke, it was not anything, but I
20    don't recall if she did.
21 Q. Was that tape transcribed?
22 A. No.
23 Q. You don't make a practice of transcribing those

Page 58

1     pretermination hearings?
2  A. We do not.
3        MR. SIMON: I think that's all I have.
4        MR. PRESCOTT: No questions.
5        (Whereupon, the deposition concluded
6        at 3:10 p.m.)

Page 59

1            CERTIFICATE
2
3  TONY CABBIL,
4  vs.        CASE NO. 2:05-CV-513-T
5  STATE OF ALABAMA DEPARTMENT OF TRANSPORTATION
6
7
8        I certify that the foregoing
9  proceedings were truly and correctly reported
10 and transcribed, and that the witness was first
11 duly sworn.
12       I further certify that I am not kin to
13 any party nor am I in any way interested in
14 this case.
15
16
17 Dated this ___ day of _____, 2006.
18
19
20
21 _____
22 DAVID S. NORTHINGTON, CCR
23