# FREEDOM COURT REPORTING

Page 1

1　　IN THE UNITED STATES DISTRICT COURT

2　　FOR THE MIDDLE DISTRICT OF ALABAMA

3　　　　NORTHERN DIVISION

4

5

6　TONY CABBIL

7　　vs.　　　CASE NO. 2:05-CV-513-T

8　STATE OF ALABAMA DEPARTMENT OF TRANSPORTATION

9

10

11

12　　DEPOSITION OF NICKY CALHOUN

13

14　　The following deposition in the

15　above-styled case was held on May 12, 2006,

16　beginning at 10:35 a.m., at the offices of

17　Alabama Department of Transportation, located

18　at 2715 Skyland Boulevard, Tuscaloosa, Alabama

19　35401.

20

21

22　　REPORTED BY:

23　　DAVID S. NORTHINGTON, CCR

Page 2

1　　STIPULATIONS

2

3　　It was stipulated and agreed by and

4　between the parties through their respective

5　counsel that the deposition of Nicky Calhoun

6　may be taken at the date, time and location

7　indicated on the preceding title page.

8　　Further, that the signature to and the

9　reading of this deposition by the witness is

10　waived and that this deposition is to have the

11　same force and effect as if full compliance had

12　been had with all laws and rules of court

13　relating to the taking of depositions.

14　　Further, that it shall not be

15　necessary for any objections to be made by

16　counsel to any questions, except as to form or

17　leading questions, and that counsel for the

18　parties may make objections and assign grounds

19　at the time of the trial or at the time this

20　deposition is offered into evidence or prior

21　thereto.

22　　Further, that notice of filing of this

23　deposition by the Commissioner is waived.

Page 3

1　　APPEARANCES

2

3

4

5　FOR THE PLAINTIFF:

6　　MR. KELL SIMON

7　　WIGGINS, CHILDS, QUINN & PANTAZIS

8

9

10

11

12　FOR THE DEFENDANT:

13　　MR. ROBERT PRESCOTT

14　　ATTORNEY AT LAW

15

16

17

18

19　ALSO PRESENT:

20　　MR. TONY CABBIL

21　　THE PLAINTIFF

22

23

Page 4

1　　INDEX

2

3

4　TITLE PAGE　　　　　　　1

5

6　STIPULATIONS　　　　　　2

7

8　APPEARANCES　　　　　　　3

9

10　INDEX　　　　　　4

11

12　WITNESS NICKY CALHOUN

13　　X BY MR. SIMON　　　　5 - 97

14

15　REPORTER'S CERTIFICATE　　　98

16

17

18

19

20

21

22

23

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

## Page 5

1    I, David S. Northington, Certified
2  Court Reporter and Notary Public for the
3  State of Alabama at Large, acting as
4  Commissioner, certify that as provided by Rule
5  30 of the Alabama Rules of Civil Procedure,
6  and the foregoing stipulations of counsel,
7  there came before me at the date, time and
8  location indicated on the preceding title page,
9  Nicky Calhoun, witness in this
10 previously-styled cause, for oral examination,
11 and the following proceedings occurred:
12
13    NICKY CALHOUN,
14 was called as a witness and after having been
15 first duly sworn to testify to the truth, the
16 whole truth and nothing but the truth,
17 testified as follows, to-wit:
18
19    THE COURT REPORTER: Usual stipulations?
20    MR. SIMON: That's fine.
21    MR. PRESCOTT: Yes, sir.
22    EXAMINATION
23 BY MR. SIMON:

## Page 6

1  Q.  Mr. Calhoun, my name is Kell Simon. We have
2     met before. And I represent Tony Cabbil in his
3     lawsuit against the Department of
4     Transportation where he challenges his
5     termination.
6        Have you ever given a deposition
7     before?
8  A.  Yes.
9  Q.  Okay. When have you given a deposition?
10 A.  I don't remember the exact day or the exact
11    reason, but I have.
12 Q.  Okay. Was it more than one? Have you given
13    more than one deposition?
14 A.  Yeah.
15 Q.  Okay. What was the first deposition that you
16    gave?
17 A.  I was with the County of Berry and gave a
18    deposition for a case there.
19 Q.  What kind of case was it?
20 A.  It was on — regarding a wreck.
21 Q.  Have you ever given a deposition that concerned
22    anybody's employment with anybody that you have
23    ever worked for?

## Page 7

1  A.  Termination?
2  Q.  Right.
3  A.  No.
4  Q.  Okay. Have you ever given a deposition about
5     any promotion type issues that anybody had
6     raised in a lawsuit?
7  A.  Not for promotion.
8  Q.  Okay.
9  A.  That I can recall.
10 Q.  Okay. Just a couple of ground rules before we
11    really get started:
12        If at any time you need a break during
13    this deposition, just let me know and we can
14    take a break. I will ask, though, that if I've
15    asked you a question before you asked for a
16    break, you answer the question that is on the
17    table.
18        You probably already know this but I
19    will tell you, anyway: You have to give out
20    loud, verbal answers to the questions that I
21    ask you. The court reporter can't take down if
22    you nod your head or shake your head.
23 A.  Okay.

## Page 8

1  Q.  And if I ask a question that you want to answer
2     "yes" or "no" to, make sure that you say "yes"
3     or "no" rather than "uh-huh" or "huh-huh"
4     because the court reporter also can't take that
5     down.
6        Are you taking any medications today
7     that might impair your ability to testify?
8  A.  No, sir.
9  Q.  Okay. What is your current job with the
10    Department of Transportation?
11 A.  I am fifth division construction engineer with
12    ALDOT.
13 Q.  What are your job duties as the fifth division
14    construction engineer?
15 A.  I have authority over all construction in the
16    fifth division concerning roads and bridges.
17 Q.  Do you directly supervise any ALDOT employees?
18 A.  Yes.
19 Q.  Who do you directly supervise?
20 A.  I have an assistant in this building and
21    personnel that is in my office.
22 Q.  Okay. Who is the assistant that you supervise
23    in this building?

2  (Pages 5 to 8)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

## Page 9

1  A.  I supervise Keith Hoggle, T. A. Essary.
2  Q.  Talbert —
3  A.  Uh-huh (yes).
4  Q.  — Essary?
5  A.  Correct, E-S-S-A-R-Y.
6  Q.  Anybody else?
7  A.  Brenda Patton, Kim Patterson, Gary Elliot, Kim
8      Palmer, Rob Stringfellow, and Christy Ellis.
9  Q.  Christy Ellis. Okay. What is Mr. Hoggle's job
10     title?
11 A.  He is one of my assistants.
12 Q.  He is an assistant construction engineer?
13 A.  Uh-huh (yes).
14 Q.  What about Mr. Essary?
15 A.  He is assistant, also.
16 Q.  Is he an ALDOT employee?
17 A.  Yes.
18 Q.  Are Mr. Hoggle and Mr. Essary, are they both
19     transportation managers?
20 A.  Yes.
21 Q.  What is Brenda Patton's job title?
22 A.  She is my secretary.
23 Q.  What about Kim Patterson?

## Page 10

1  A.  She is over contract compliance.
2  Q.  What is her job classification?
3  A.  She is EA two three.
4  Q.  What is Gary Elliot's job title?
5  A.  He is a transportation technologist senior.
6  Q.  Okay. What is his in-house job title?
7  A.  He is project -- senior project engineer.
8  Q.  Senior project engineer, okay.
9          What is Kim Palmer's job title?
10 A.  Kim is estimates, project estimates.
11 Q.  What is her classification?
12 A.  EA two three.
13 Q.  Rob Stringfellow?
14 A.  He is site manager coordinator.
15 Q.  Is he a transportation manager?
16 A.  Yes.
17 Q.  And Christy Ellis?
18 A.  She is an ASA one.
19 Q.  Okay. Apart from Gary Elliot, did any of these
20     individuals play any role in the
21     decision-making process for terminating Mr.
22     Cabbil?
23 A.  (No response.)

## Page 11

1  Q.  Do you understand my question?
2  A.  You're talking about other than fact-finding?
3  Q.  Right.
4  A.  Fact-finding? No, they did not have a process
5      in my — We got facts from them.
6  Q.  Okay. Did any of the people that you just
7      listed who are working under you do any
8      fact-finding about —
9  A.  Gary.
10 Q.  Gary?
11 A.  (Nodded head in the affirmative.)
12 Q.  Anybody else?
13 A.  No. We had some statements or information from
14     Rob Stringfellow.
15 Q.  Anybody else?
16 A.  That's all.
17 Q.  Now, Gary Elliot. At the time that Mr. Cabbil
18     was terminated, Gary Elliot was a project
19     engineer, correct?
20 A.  Correct.
21 Q.  He had not moved to the senior project engineer
22     job, had he?
23 A.  Not in my office, that's correct.

## Page 12

1  Q.  Okay. Now, when did you first meet Mr. Cabbil?
2  A.  I think I was involved in his first interview,
3      maybe when we interviewed for EA's.
4  Q.  Okay. Were you one of the people who decided
5      to hire Mr. Cabbil?
6  A.  It was several of us interviewing several
7      people and I would represent construction.
8  Q.  Okay. And were you — were you one of the
9      people who decided to hire him?
10 A.  We did hire him for construction.
11 Q.  Okay.
12 A.  So I was part of that.
13 Q.  You were part of the decision?
14 A.  More than likely. I interview so many people,
15     but I do remember early on having association
16     with Tony.
17 Q.  Okay. Did you write a recommendation that Mr.
18     Cabbil be hired?
19 A.  Yes.
20 Q.  Okay.
21 A.  Yes. I probably did. Now, I am just — I have
22     had so many people, but I do remember Tony
23     early on.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

## Page 13

1  Q.  So you think that you were one of the people
2     who decided to hire Tony Cabbil?
3  A.  Yes.
4  Q.  Are you certain of that?
5  A.  No.
6  Q.  What documents would you be able to look at to
7     determine whether you were one of the people
8     who decided to hire Tony?
9  A.  The office manager can get you some documents
10    where we selected him. It would have my name
11    on it then.
12  Q.  Okay. Would that be a selection form?
13  A.  Yes. Yes.
14  Q.  And you had interview forms for him as well?
15  A.  Right.
16  Q.  Would the selection form also be in Mr.
17    Cabbil's personnel file?
18  A.  I really don't know.
19  Q.  Okay. Have you reviewed Mr. Cabbil's personnel
20    file?
21  A.  No.
22  Q.  Have you ever looked through it?
23  A.  No, I have not looked at his personnel file.

## Page 14

1  Q.  Okay. Let me ask you to look at what I have
2     marked here as plaintiff's exhibit eighteen and
3     ask you if you recognize that document?
4  A.  Yes, I do.
5  Q.  What is exhibit eighteen?
6  A.  It is a memo to Ms. Rowe from me concerning Mr.
7     Cabbil.
8  Q.  And it recommends that he be terminated,
9     correct?
10  A.  Correct.
11  Q.  We had split these up earlier, made them into
12    separate exhibits, but I will ask you about
13    these. Your memo that is marked plaintiff's
14    exhibit eighteen references some documents
15    attached that support your decision to
16    recommend Mr. Cabbil's termination, correct?
17  A.  Yes, sir.
18  Q.  Okay. And let me just show you this stack of
19    documents that starts with plaintiff's exhibit
20    nine and also includes exhibit fifteen, and
21    these are Bates labeled but we got them out of
22    order.
23      MR. PRESCOTT: That's fine.

## Page 15

1  Q.  Plaintiff's exhibit ten, plaintiff's exhibit
2     eleven, plaintiff's exhibit seventeen, sixteen,
3     eight and fourteen and also twelve. I would
4     ask you if these are the documents that were
5     attached to plaintiff's exhibit eighteen when
6     you sent it to Ms. Rowe?
7  A.  Without looking at mine, I can't say for
8     certain, but these look like those that I would
9     have sent with it.
10  Q.  Where is your copy of this memorandum?
11  A.  Probably with Mrs. Rowe.
12  Q.  In her office?
13  A.  More than likely.
14  Q.  Okay.
15      MR. SIMON: Just so that we can be clear
16    about this document, can we take a break and
17    have him get his copy of the termination
18    memorandum so that we can make sure we know
19    which documents were attached to it.
20      MR. PRESCOTT: You want him to get a copy
21    of his original of plaintiff's exhibit
22    eighteen?
23      MR. SIMON: Right, his original and what

## Page 16

1     was attached to it. When it was produced to
2     us, it was produced with a lot of other
3     documents and I couldn't tell based on what we
4     got which were the documents that were actually
5     attached to his memorandum.
6      MR. PRESCOTT: Okay.
7      MR. SIMON: So if he's got those here,
8     that would make it easier to go through it.
9      MR. PRESCOTT: Off the record for a
10    second.
11      (Whereupon, there was an
12      off-the-record discussion.)
13      (Recess.)
14  (BY MR. SIMON:)
15  Q.  All right. I will represent to you --
16      MR. SIMON: Go back on the record whenever
17    you're ready.
18      MR. PRESCOTT: We can go back on the
19    record.
20      MR. SIMON: Okay.
21  (BY MR. SIMON:)
22  Q.  I will represent to you the documents that I
23     have put in front of you is that stack of

4 (Pages 13 to 16)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

## Page 17

1  exhibits with number nine being the first one
2  were the documents that we received that were
3  behind the termination recommendation letter
4  that you wrote.
5  A.  Okay.
6  Q.  But let me just go through each of them
7  separately just so I can ask you to make sure
8  we have got them.
9      Do you remember whether that
10 memorandum from Derek Tilley that I have marked
11 as plaintiff's exhibit nine was one of the
12 documents that you transmitted to Ms. Rowe with
13 the termination recommendation?
14 A.  It should have been.
15 Q.  Okay.  What about plaintiff's exhibit fifteen,
16 the letter from Mr. Edwards?
17 A.  Yes, sir.
18 Q.  Okay.  And exhibit ten, the note from Gary
19 Elliot?
20 A.  Yes, sir.
21 Q.  Exhibit eleven which was the daily inspectors'
22 reports?
23 A.  Yes, sir.

## Page 18

1  Q.  Exhibit seventeen which was the note from Anita
2  Box?
3  A.  Yes, sir.
4  Q.  Exhibit sixteen which was another note from
5  Kenneth Edwards?
6  A.  Yes, sir.
7  Q.  Exhibit eight which are a collection of Donna
8  Elliot's memos?
9  A.  Yes, sir.
10 Q.  Exhibit fourteen which was a memo from Donna
11 Elliot?
12 A.  Yes, sir.
13 Q.  And exhibit twelve which was the reprimand that
14 Mr. Cabbil received?
15 A.  Yes, sir.
16 Q.  Okay.  So, so far as you can remember, those
17 documents were all attached to your
18 recommendation for termination?
19 A.  Yes, sir, so far as I can remember.
20 Q.  Okay.  Let me ask you this: When did you first
21 hear that Tony Cabbil was being recommended for
22 termination?
23 A.  I can't say the exact date.  Of course, after I

## Page 19

1  got a letter from Lewis Rager.
2  Q.  Okay.  Was the letter that you got from Lewis
3  Rager the first you heard of Mr. Cabbil's being
4  recommended for termination?
5  A.  I can't say it was the first.  It was the first
6  that we started compiling for such.
7  Q.  Compiling for such?
8  A.  Right.
9  Q.  What do you mean, "compiling"?
10 A.  Getting the documentation.
11 Q.  Before you received Mr. Rager's letter
12 recommending that Mr. Cabbil be terminated, had
13 you had any conversations with Mr. Rager about
14 terminating Tony Cabbil?
15 A.  I can't recall.  We talked about Tony,
16 obviously, earlier, you know, about the
17 problems we had with him.
18 Q.  Okay.  What was the first conversation that you
19 had with Mr. Rager about the problems that he
20 had had or anybody had had with Tony?
21 A.  I couldn't tell you the date.
22 Q.  Okay.  What was the — What did you talk about
23 during that first conversation?

## Page 20

1  A.  And I couldn't tell you what was talked about
2  specifically.
3  Q.  Okay.  What conversations do you recall having
4  with Mr. Rager about the problems he was having
5  with Tony Cabbil?
6  A.  He called me over the phone referring to some
7  meetings he and Tony had in his office.
8  Q.  What did he tell you over the phone?
9  A.  That Tony came to him and met with him and they
10 talked about things.
11 Q.  What did they talk about?
12 A.  Whatever Tony wanted to talk about.
13 Q.  What were they?  And what were the things that Tony
14 wanted to talk about at that time?
15 A.  I don't remember specifics.  I really don't
16 remember the specifics.
17 Q.  Okay.  Did this concern Tony's conflicts with
18 Donna Elliot?
19 A.  It could have been.
20 Q.  Okay.  So you talked originally with Mr. Rager
21 about Tony Cabbil's conflicts with Donna
22 Elliot?
23 A.  Originally?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

### Page 21

1  Q.  Right.
2  A.  What do you mean?
3  Q.  Well, that was the first conversation that you
4      can remember having with Lewis Rager about Tony
5      Cabbil was concerning his conversations with
6      Donna Elliot?
7          MR. PRESCOTT:  Object to form.
8  A.  You said while ago about termination.  Now, I
9      have spoken with — on other occasions with
10     other people about Tony.
11 Q.  Right now I am just asking you about your
12     conversations with Lewis Rager about Tony
13     Cabbil.
14 A.  Okay.
15 Q.  And —
16 A.  Yes, sir?
17 Q.  And you told me that the first one that you
18     could remember, I think, was Mr. Rager calling
19     you over the phone about some meetings that he
20     had had with Tony Cabbil; is that right?
21 A.  That's right.
22 Q.  Okay.  Mr. Rager told you that Mr. Cabbil came
23     to his office to discuss things?

### Page 22

1  A.  Right.
2  Q.  Okay.  What things had Mr. Cabbil come to Mr.
3      Rager's office to discuss?
4  A.  I can't be specific about it.  I do remember it
5      was about Tony and some of his supervisors.
6  Q.  Okay.  Do you remember which supervisors it
7      was?
8  A.  I don't remember which one he had at that time.
9  Q.  Okay.  And it was — And it was a complaint
10     that he was being discriminated against, right?
11 A.  That sounds correct.
12 Q.  And at the time that you had that conversation
13     with Mr. Rager about Mr. Cabbil and his
14     conflicts with supervisors, had — was there
15     any talk of terminating Mr. Cabbil?
16 A.  I can't say yes or no at that time.
17 Q.  Okay.  So you might have discussed possibly
18     terminating Mr. Cabbil at that time?
19         MR. PRESCOTT:  Object to form.
20 A.  We might have.
21 Q.  Now, was that before or after the bridge
22     painting project that was supposedly not
23     inspected correctly?

### Page 23

1  A.  I don't remember.
2  Q.  Okay.  Do you remember whether that was before
3      or after Tony Cabbil started being supervised
4      by Gary Elliot?
5  A.  No, sir, I don't remember.
6  Q.  Okay.  How did Tony Cabbil come to be
7      supervised by Gary Elliot?
8  A.  We needed him for a bridge span project.
9  Q.  How did you — How did you make the termination
10     that Tony Cabbil was the person that you needed
11     for that bridge painting project?
12 A.  That particular bridge, I am not saying I made
13     that particular determination, but they called
14     either Lewis or myself and decided to ask
15     somebody could they have heights -- could they
16     stand heights.
17 Q.  Okay.  And was Mr. Cabbil selected for that
18     position because he was not afraid of heights?
19 A.  I think that he was asked could he stand
20     heights and was he willing to do the job.
21 Q.  Okay.  Did you ask him that?
22 A.  I didn't.
23 Q.  Somebody else did?

### Page 24

1  A.  Yes.
2  Q.  Do you know who it was?
3  A.  No.
4  Q.  Did they ask anybody else if they could stand
5      heights in order to do that job?
6  A.  I don't know.
7  Q.  Did Mr. Cabbil's going to work with Gary Elliot
8      have anything to do with his wanting to move
9      away from Donna Elliot?
10 A.  Not to my knowledge.
11 Q.  Did you ever have any conversation with Mr.
12     Cabbil about his desire to away from Donna
13     Elliot?
14 A.  Not to my knowledge.
15 Q.  Did you ever have any conversations with
16     anybody else about Tony not wanting to work
17     with Donna Elliot?
18 A.  Not to my knowledge.
19 Q.  Okay.  You said that you remembered the
20     conversation with Mr. Rager about Tony Cabbil
21     coming to Mr. Rager's office to discuss things
22     about his supervisors.  What was the next
23     conversation that you can recall having with

6  (Pages 21 to 24)

# FREEDOM COURT REPORTING

## Page 25

1    Mr. Rager about Tony Cabbil?
2  A. I have no idea.
3  Q. Prior to Mr. Rager writing the termination
4    letter about Mr. Cabbil -- or Mr. Rager's
5    termination recommendation, did you talk with
6    Mr. Rager about terminating Mr. Cabbil?
7  A. Prior to him writing it?
8  Q. Yeah.
9  A. He might have called me telling me that he was
10    writing one.
11  Q. Did he do that?
12  A. But not to my knowledge.
13  Q. Okay. So you don't remember if he called you
14    to tell you that he was writing that or not?
15  A. I don't remember him specifically, no.
16  Q. Okay. When you received Mr. Rager's written
17    recommendation for termination, before you read
18    it, did you know why he was recommending Tony
19    Cabbil for termination?
20  A. Well, I had heard of some instances with him,
21    yeah.
22  Q. Okay. So before you read Rager's
23    recommendation letter, you had already heard

## Page 26

1    about some incidents with Tony Cabbil?
2  A. Yes.
3  Q. What were those incidents?
4  A. His problem with inspection on the bridge.
5  Q. What else? What other problems?
6  A. Well, I can't remember if anything else was
7    before then.
8  Q. Okay. But you know that before you read Mr.
9    Rager's termination recommendation, you had
10    already heard about the problems with the
11    inspection on the bridge?
12  A. Yes.
13  Q. Okay. How had you heard about the problems
14    with the inspection on the bridge?
15  A. I don't remember who.
16  Q. Had you heard about it through a verbal
17    conversation or --
18  A. Yes.
19  Q. -- through written documents?
20  A. Yes.
21  Q. Okay. What was the conversation about?
22  A. That there was missing work and that had been
23    found by a bridge inspection crew.

## Page 27

1  Q. Okay. Did you -- Do you know whether you heard
2    about that from the bridge inspection crew?
3  A. No, I don't remember who I heard it from.
4  Q. Okay. When you heard about the problems with
5    the inspection, did you hear about who caused
6    those problems?
7  A. Well, I knew. I knew Tony was the inspector.
8  Q. Okay. Did you know whether there was another
9    inspector working with Tony?
10  A. I knew some other people out there.
11  Q. Okay. Out there on that same project, right?
12  A. Uh-huh (yes).
13  Q. Okay. Did you know whether Tony had -- When
14    you were hearing about the problems, did you
15    know that those problems had been caused by
16    Tony Cabbil?
17  A. Not really.
18  Q. Okay. Did you form an opinion as to whether
19    those problems had been caused by Tony Cabbil?
20    MR. PRESCOTT: Object to the form.
21  A. (No response.)
22  Q. At the -- Prior to receiving Mr. Rager's
23    recommendation for termination, had you formed

## Page 28

1    an opinion as to whether the problems had been
2    caused by Tony Cabbil?
3  A. No.
4  Q. Okay. How did you come to decide that the
5    problems with the inspection were the result of
6    Tony Cabbil's poor inspection?
7  A. After hearing and talking to Lewis in relation
8    to the letter.
9  Q. Okay. So after you received Mr. Rager's
10    recommendation for termination, you spoke with
11    him about Mr. Cabbil; is that correct?
12  A. I'm sure we talked about it or heard, you know,
13    the person whom told me before then and it
14    could have been Gary, it could have been Lewis,
15    it could have been assistants.
16  Q. Okay. Were there any documents that you could
17    have reviewed in order to confirm for yourself
18    that the problems with the inspection were Tony
19    Cabbil's fault?
20  A. At what time?
21  Q. After you received the recommendation from Mr.
22    Rager.
23  A. Mr. Rager had some documentation that he sent

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

## Page 29

1  with his recommendation.
2  Q.  Okay.  Let me show you what I have marked as
3    plaintiff's exhibit five.  Is that the
4    termination recommendation that you received
5    from Mr. Rager?
6  A.  Yes.
7  Q.  Are you saying that there were some documents
8    attached to that recommendation?
9  A.  I am saying I got some documentation after I
10    received this.
11  Q.  Okay.
12  A.  I don't know if it was with it or not.
13  Q.  Okay.  Was plaintiff's exhibit nine, the
14    memorandum from Derek Tilley, one of the pieces
15    of documentation that you had on — about the
16    inspection work on that bridge painting
17    project?
18  A.  Like I said, I don't remember whether I got it
19    from him or I got it afterwards myself but,
20    yes, that looks like it.
21  Q.  When you say afterwards, do you mean after you
22    received the termination recommendation?
23  A.  Yes.

## Page 30

1  Q.  Okay.  You had mentioned that Mr. Rager's
2    recommendation letter was the — what caused
3    you to start compiling the documents related to
4    Mr. Cabbil's termination, correct?
5  A.  Yes.
6  Q.  Okay.  Is exhibit eleven part of the
7    documentation that you compiled in support of
8    Mr. Cabbil's termination?
9  A.  Yes.
10  Q.  At some point in time, did you make a
11    determination as to whether the problems with
12    the inspection on the bridge painting project
13    were the fault of Mr. Cabbil?
14  A.  Repeat that, please.
15  Q.  At some point in time, did you make a
16    determination that the problems on the bridge
17    painting project were the result of Mr.
18    Cabbil's poor inspection work?
19  A.  The information we had was that he was
20    inspector on it at that time.
21  Q.  Okay.  Did you make a determination in your own
22    mind that Mr. Cabbil had caused the problems
23    with the painting project?

## Page 31

1  A.  It was his responsibility and so, therefore, it
2    was his duty to see that it was done.
3  Q.  Did you make a determination that Mr. Cabbil
4    inspected the project poorly and caused the
5    contractor having to redo the work?
6  A.  I think he was part of it.
7  Q.  You think he was part of it?
8  A.  (Nodded head in the affirmative.)
9  Q.  Who else was part of it?
10  A.  I don't -- I am not -- It was his duty to be
11    there and inspect it.  If he wasn't, he was to
12    see that it was inspected by somebody else.
13  Q.  Okay.  Who else — Who else had the duty of
14    inspecting that project?
15  A.  I see here Ken Edwards was another employee
16    there.
17  Q.  Okay.  Who else?  Anybody else?
18  A.  I see Tony Cabbil.
19  Q.  Anybody besides Tony Cabbil and Ken Edwards do
20    any inspection work on that project?
21  A.  Well, I really don't know without getting all
22    the inspector reports.
23  Q.  Okay.  Now, let me ask you to look again at Mr.

## Page 32

1    Rager's recommendation for termination which I
2    think is in that stack there.
3    (Pause.)
4  Q.  Okay.  Mr. Rager in the -- in the -- toward the
5    top there references January 15th through 27th
6    as the time period when the problems with the
7    inspection took place, correct?
8  A.  Yes.
9  Q.  Okay.  Look through those inspector daily
10    reports that I have marked as exhibit eleven
11    and tell me whether that is the inspector daily
12    reports for that time period referenced in Mr.
13    Rager's letter.
14  A.  I am assuming that is the 15th.  It says —
15  Q.  The one that comes right before the 16th,
16    right?
17  A.  Yes.
18  Q.  Okay.  Some of the dates are a little off, but
19    you can usually tell from the other pages what
20    the dates were.
21  A.  The 20th is before the 21st.
22  Q.  Right.
23  A.  There is one before the Thursday of January

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

## Page 33

1  something before Friday, January 23rd.
2  Q.  So that would be Thursday, January 22nd,
3      correct?
4  A.  It looks like it.  And the January 24th,
5      January 26th and January 27th.
6  Q.  So that is a collection of all the inspector
7      daily reports for the time period referenced in
8      Mr. Rager's letter, correct?
9  A.  Well, for the time frame, yes, sir.
10 Q.  Okay.  Are there any other documents besides
11     these inspectors' daily reports that you looked
12     at in order to determine who had been doing the
13     inspection work on the project, that bridge
14     project on those days?
15 A.  I may have looked in the — No, sir, I don't
16     remember there being anything but these.
17 Q.  Okay.  And so from these documents that I have
18     marked as plaintiff's exhibit eleven, you
19     concluded that it was Mr. Cabbil who improperly
20     inspected the bridge project; is that correct?
21 A.  Looking through this and the bridge
22     inspections, yes.
23 Q.  Okay.  So it was looking through the daily logs

## Page 34

1  and then also Mr. Tilley's memorandum
2  concerning his inspection of the bridge?
3  A.  Correct.
4  Q.  Is that what you were referring to?
5  A.  Correct.
6  Q.  Okay.  So those are the two sets of documents
7      that you reviewed to determine that Mr. Cabbil
8      had done the inspections improperly?
9  A.  Yes, sir.
10 Q.  Okay.  Now, look at the first page of
11     plaintiff's exhibit eleven —
12 A.  Okay.
13 Q.  — which is for Thursday, January 15th, 2004,
14     correct?
15 A.  Yes, sir.
16 Q.  Okay.  Who were the inspectors on the project
17     that day?
18 A.  Tony Cabbil and Ken Edwards.
19 Q.  And how many hours did Mr. Cabbil spend
20     inspecting the project that day?
21 A.  Eight.
22 Q.  And how many hours did Mr. Edwards spend
23     inspecting the project that day?

## Page 35

1  A.  Eight.
2  Q.  Mr. Edwards was the chief inspector on the
3      project, correct?
4  A.  Yes.
5  Q.  Okay.  Mr. Cabbil was working under Mr.
6      Edwards, correct?
7  A.  Yes.
8  Q.  Can you tell from this document who — whether
9      it was Mr. Cabbil or Mr. Edwards who inspected
10     the bridge project incorrectly?
11 A.  Tony Cabbil signed it.
12 Q.  Tony Cabbil signed the inspector's daily
13     report, correct?
14 A.  Yes.
15 Q.  Okay.  There is just -- On a project like this,
16     there is just one inspector's daily report,
17     correct?
18 A.  Well, you could have others.
19 Q.  Okay.  Were there any other inspector's daily
20     reports for this project on that day?
21 A.  I am assuming not but I didn't look.
22 Q.  Okay.  You're saying that you can tell that
23     Tony Cabbil made the mistakes on the inspection

## Page 36

1  because he signed the inspector's daily report?
2  A.  I am saying that he says that he put up
3      containments, he cleaned up spans and
4      sandblasted spans by signing on to this —
5  Q.  Well —
6  A.  — information.
7  Q.  He is saying the contractor did that work,
8      correct?
9  A.  Yes.
10 Q.  Okay.
11 A.  He is saying that he inspected it, though, as
12     inspector.
13 Q.  Right, and Kenneth Edwards was also the
14     inspector, correct?
15 A.  He was also there.
16 Q.  Okay.  Would it be standard if two people are
17     inspecting the project for them both to sign
18     the inspector's daily report or would just one
19     person typically sign it?
20 A.  Well, Mr. Edwards didn't sign it.  He was there
21     with Tony as engineering personnel on the job.
22 Q.  Okay.  My question was: Would it be standard
23     for everybody who was doing the inspection work

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 37

1  on a project to sign the inspector's daily
2  report or would just one of the inspectors sign
3  the report?
4  A.  The inspectors – This is an inspector's daily
5  report. In this case, both of them were there.
6  Tony signed it that it was the daily
7  operations. If Ken wanted to say that he
8  inspected, was there and did certain things, he
9  could put his down and sign under it.
10 Q.  So you can't tell – You can't tell what
11  Kenneth Edwards was doing on the project on
12  January 15th, could you?
13 A.  I can't tell that he did anything.
14 Q.  Okay. But he did charge eight hours to that
15  project –
16 A.  Yes.
17 Q.  – on that day, correct?
18 A.  Yes.
19 Q.  Okay. Could --
20 A.  Yes.
21 Q.  Could some of his hours have been inspecting
22  the containment in spans twenty-three and
23  twenty-four?

Page 38

1  A.  Could have been.
2  Q.  And could some of his work have been inspecting
3  the contractor cleaning up in spans
4  twenty-five, twenty-five A and twenty-six?
5  A.  Could have been.
6  Q.  And could some of his work on this project have
7  been inspecting the contractor's sandblasting
8  in span twenty-three SBR?
9  A.  Could have been.
10 Q.  How do you know which part of the inspection
11  work Kenneth Edwards did on that day versus
12  which part of the inspection work Tony Cabbil
13  did on that day?
14 A.  I can't tell that Ken did anything but Tony
15  signed it saying that this was done.
16 Q.  Okay. Well, let's look at the next page.
17  (Pause.)
18 Q.  Who was the inspector on the project on Friday,
19  January 16th?
20 A.  It listed Ken Edwards.
21 Q.  Is Tony Cabbil listed as an inspector on the
22  project?
23 A.  No.

Page 39

1  Q.  Now, look back at Mr. Rager's recommendation
2  for termination. The 16th is included in the
3  time span for the improper inspection work, is
4  it not?
5  A.  Yes, sir.
6  Q.  That references the 15th to the 27th, correct?
7  A.  Yes, sir.
8  Q.  Okay. Tell me what improper inspection work
9  Tony Cabbil did on Friday, January 16th.
10 A.  He was not there that day.
11 Q.  Okay. Kenneth Edwards?
12 A.  Excuse me. He did not inspect this part that
13  day. He could have written another inspector's
14  report if he was there. He could have done one
15  himself.
16 Q.  Did you see any inspection report from Tony
17  Cabbil for Friday, January 16th, 2004?
18 A.  No, sir.
19 Q.  Kenneth Edwards inspected the contractor
20  blasting at span twenty-three, correct?
21 A.  Yes, sir.
22 Q.  And Kenneth Edwards also inspected the
23  contractor painting at span twenty-three,

Page 40

1  correct?
2  A.  Yes, sir.
3  Q.  Let me ask you to look at Derek Tilley's
4  memorandum, which I believe is also in front of
5  you.
6  A.  Okay.
7  Q.  Span twenty-three was one of the areas that was
8  improperly inspected, correct?
9  A.  Yes, sir.
10 Q.  Okay. Did Kenneth Edwards do improper
11  inspections on Friday, January 16th, 2004?
12   MR. PRESCOTT: Object to form.
13 A.  Ken Edwards was inspector on that span.
14 Q.  On that span?
15 A.  (Nodded head in the affirmative.)
16 Q.  That Derek Tilley references as having been
17  improperly inspected, correct?
18 A.  That was improperly inspected, correct.
19 Q.  And so far as we can tell from these documents,
20  Mr. Cabbil was not inspecting on that date,
21  correct?
22 A.  He was not inspecting on that date.
23 Q.  On that date?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

### Page 41

1  A.  Right.

2  Q.  Which was the 16th. How can you tell, then,

3      given that Mr. Edwards was the only inspector

4      on the 16th, that it was not Mr. Edwards' poor

5      inspection that caused the contractor to have

6      to redo the work?

7        MR. PRESCOTT: Object to form.

8        You can answer.

9  A.  At this point, I can't tell.

10  Q.  You can't tell?

11  A.  (Shook head in the negative.)

12  Q.  And the only way that you can tell on the 15th

13      who did the inspection improperly was your

14      belief that it was Tony Cabbil because he

15      signed the report, correct?

16  A.  By looking at these two, yes, sir.

17  Q.  Was Kenneth Edwards ever disciplined for poor

18      inspection on this project?

19  A.  Not by me.

20  Q.  Why not?

21  A.  At that point, we had him chief inspector over

22      — an inspector that was suppose to be in

23      charge of it.

### Page 42

1  Q.  But the inspector who was supposed to be in

2      charge of it was Mr. Cabbil, correct?

3  A.  He was inspector.

4  Q.  And Mr. Cabbil wasn't even there on all of the

5      days in which the improper inspection was

6      supposed to have taken place, was he?

7  A.  He —

8  Q.  He was not there on the 16th, was he?

9  A.  He was not there on the 16th.

10  Q.  Okay. You don't know which day the improper

11      inspection occurred, do you?

12  A.  No.

13  Q.  Okay. So it could be that the improper

14      inspection was all done by Kenneth Edwards,

15      couldn't it?

16        MR. PRESCOTT: Object to form.

17  A.  (No response.)

18  Q.  You can't sitting here today —

19  A.  Well —

20  Q.  — tell me that Kenneth Edwards did not do

21      improper inspection, can you?

22        MR. PRESCOTT: Object to form.

23  A.  Okay.

### Page 43

1        MR. PRESCOTT: You can go ahead and

2      answer.

3  A.  Your question was?

4      (BY MR. SIMON:)

5  Q.  You cannot tell that Kenneth Edwards did not do

6      improper inspection on that project, can you?

7        MR. PRESCOTT: Same objection.

8  A.  Looking at these two sheets, no.

9  Q.  Are there any other documents that you can look

10      at to determine that Mr. Edwards inspected the

11      project properly and Mr. Cabbil did not —

12        MR. PRESCOTT: Object to form.

13  Q.  — on the 15th and 16th?

14  A.  I might look through these others and see who

15      finished it.

16  Q.  Go ahead and look through those other documents

17      and tell me who finished the project.

18      (Pause.)

19  A.  On January 20th, Tony Cabbil states that

20      contractor sandblasted and painted first span

21      twenty-three A, southbound lane, twenty-three

22      northbound lane, and then southbound complete.

23  Q.  Okay. So Tony Cabbil noted that span — that

### Page 44

1      the work on span twenty-three was complete on

2      that day?

3  A.  He says the last word, "complete".

4  Q.  And would Tony Cabbil have gone back on the

5      20th and reinspected the entire span including

6      the part of it that Kenneth Edwards had already

7      inspected on the 16th?

8  A.  He should have.

9  Q.  You can't tell from this document whether he

10      did?

11  A.  No, I cannot tell whether he went back and

12      did —

13  Q.  Okay.

14  A.  — what was done the day before.

15  Q.  And you can't — And you can't tell whether

16      Kenneth Edwards did improper inspections on the

17      16th, right?

18        MR. PRESCOTT: Object to form.

19  A.  I can't tell.

20  Q.  Okay. So are you saying that because span

21      twenty-three was completed on January 20th that

22      — and Tony Cabbil was the person inspecting

23      the project that day that it was Tony Cabbil's

11 (Pages 41 to 44)

# FREEDOM COURT REPORTING

Page 45

1    fault that improper inspections had been done
2    on that project over the past three days?
3    A.  On that project? No.  He is saying that span
4    twenty-three was complete.
5    Q.  And from him saying that span twenty-three is
6    complete, can you tell that he improperly
7    inspected the project?
8    A.  I am repeating.  He is saying that he completed
9    span twenty-three A southbound, twenty-three
10   northbound, and southbound is complete.
11   Q.  Can you tell conclusively from this Wednesday
12   -- I am sorry, Tuesday, January 20th report
13   that Kenneth Edwards did not improperly inspect
14   this project?
15        MR. PRESCOTT: Object to form.
16   A.  Not by this report, no.
17   Q.  Okay.  Can you tell from any of these documents
18   that Kenneth Edwards did not improperly inspect
19   this project?
20        MR. PRESCOTT: Object to form.
21   A.  No, sir.
22   Q.  Kenneth Edwards was the chief inspector on this
23   project, correct?

Page 46

1    A.  He was chief inspector.
2    Q.  And he was training Tony Cabbil on how to do
3    the inspections, correct?
4    A.  He had trained him.
5    Q.  Why was Tony Cabbil disciplined for improper
6    inspection on this project and Kenneth Edwards
7    was not?
8        MR. PRESCOTT: Object to form.
9    A.  Ken taught him how to inspect it and Ken was
10   chief inspector on that project and other
11   projects, so --
12   Q.  And there --
13   A.  -- if there was a problem with the inspection,
14   he and Tony should have gotten together and
15   talked about it.
16   Q.  Okay.  Even if Ken was the only inspector on
17   the project on a particular day?
18   A.  Well, if he was the only inspector, it was his
19   responsibility on that part if it was not -- A
20   paint job, you try to get through with a
21   section before you move the containment.  So,
22   at the end, usually, a contractor will say may
23   I move up?

Page 47

1    Q.  And we have already established that the part
2    of the project that Ken Edwards inspected alone
3    on Friday, January 16th, was part of the
4    project that had the mistakes on it, correct?
5    A.  That's correct, the same part that was said on
6    this day by Tony.
7    Q.  Then why was Ken Edwards not disciplined for
8    improper inspection on this project?
9        MR. PRESCOTT: Object to form.
10   A.  I don't know.
11   Q.  You don't know?
12   A.  (Shook head in the negative.)
13   Q.  Why was Tony Cabbil disciplined for improper
14   inspection on this project when you really
15   can't tell whether it was Cabbil or Edwards who
16   made in mistakes?
17        MR. PRESCOTT: Object to form.
18   A.  It was not at all in one spot.
19   Q.  The problems with the inspection were not all
20   in one spot?
21   A.  Correct.
22   Q.  Is that what you're saying?
23   A.  (Nodded head in the affirmative.)

Page 48

1    Q.  There is other days when Cabbil and Edwards
2    were inspecting the project together, correct?
3    Let me ask you to look at Thursday, January
4    22nd.  Do you see that page?
5    A.  Okay.
6    Q.  They have now moved on to sandblasting
7    twenty-four, correct?
8    A.  Correct.
9    Q.  The contractor sandblasted twenty-four,
10   correct?
11   A.  Yes.
12   Q.  Okay.  And Tony Cabbil and Kenneth Edwards both
13   charged eight hours for that day, correct?
14   A.  Yes.
15   Q.  And you can't tell which of them was actually
16   up in the containment doing the inspection on
17   that day, can you?
18   A.  No, sir.
19   Q.  Okay.  Why, then, if you can't tell who was
20   doing the inspection on that day, was Tony
21   Cabbil disciplined for this incident but not
22   Kenneth Edwards?
23        MR. PRESCOTT: Object to form.

12  (Pages 45 to 48)

# FREEDOM COURT REPORTING

Page 49

1   A.  The deficiencies I am talking about are primer.
2      This is about sandblasting.
3   Q.  The sandblasting of a bridge would affect how
4      the primer went on to the bridge, would it not?
5   A.  Correct.
6   Q.  So the problems with the primer could have been
7      caused by improper sandblasting, could they
8      not?
9   A.  Well, I can't say one way or another.  The
10     deficiencies are not stating that.
11  Q.  You can't tell from Derek Tilley's report or
12     any other documents what the source of the
13     problems with the primer was, can you?
14        MR. PRESCOTT:  Object to form.
15  A.  It is saying that it's thin or not primed at
16     all.
17        (Pause.)
18  Q.  Tell me, in reviewing these documents, which
19     inspector's daily report indicates that they
20     were putting the primer on span twenty-four.
21  A.  On twenty-four?
22  Q.  On span twenty-four, correct.
23        (Pause.)

Page 50

1   A.  The first coat being placed on twenty-four is
2      at the —
3   Q.  January 24th?
4   A.  — the day before the 26th, is that the —
5   Q.  It appears to be Saturday, January 24th?
6   A.  Okay.
7   Q.  They were putting primer on on that day or they
8      were painting on that day?
9   A.  The first coat is all I see here.
10  Q.  Does that mean primer or does that mean paint?
11  A.  That could be either.
12  Q.  Okay.  So you can't tell from these documents
13     which day they actually put the primer on span
14     twenty-four, can you?
15  A.  To be specific, either it needs to state primer
16     or coat.
17  Q.  Okay.  So you can't tell which day — You can't
18     tell whether it was Mr. Cabbil or Mr. Edwards
19     who inspected them putting the primer on span
20     twenty-four, can you?
21  A.  I can be fairly certain because the contractor
22     continued to sandblast Friday and now it is
23     saying that he is blasting — or blowing on

Page 51

1      span twenty-four and then he starting painting
2      on Saturday, the 24th.
3   Q.  Okay.  And from this, then, you conclude that
4      they for certain did the primer on the 24th?
5   A.  The primer would have to be first.
6   Q.  Okay.
7   A.  But, no, not for certain.
8   Q.  Now, let me ask you to look at Monday, January
9      26th.
10        (Pause.)
11  Q.  It also references a first coat on the
12     remaining half of span twenty-four, correct?
13  A.  Yes, sir.
14  Q.  So they could have been priming on the 26th as
15     well, correct?  On span twenty-four?
16  A.  Could have been.
17  Q.  Okay.  It is just as likely that they were
18     doing primer on the 26th as it is that they
19     were doing it on the 24th, correct?
20  A.  Well, correct.
21  Q.  And who was the inspection work on the project
22     on Friday, January 26th?
23  A.  Tony Cabbil signed the inspection report.

Page 52

1   Q.  Who was doing the inspection on that day?
2   A.  Tony Cabbil was inspector on the report.
3   Q.  Okay.  And who else was inspecting with him on
4      that day?
5   A.  Ken Edwards.
6   Q.  Okay.  And Edwards actually has more time
7      inspecting the project on the 26th than Cabbil
8      does, doesn't he?
9   A.  Yes, sir.
10  Q.  Can you — How can you tell that it was Mr.
11     Cabbil's inspection that caused the contractor
12     to have to redo the work on that day rather
13     than Mr. Edwards?
14        MR. PRESCOTT:  Object to form.
15  A.  Mr. Cabbil signed the report.
16  Q.  With Mr. Edwards being his chief inspector,
17     correct?
18  A.  Correct.
19  Q.  And with Mr. Edwards doing the inspection work
20     on the project that day, correct?
21  A.  Could have.
22  Q.  And you reviewed these documents when you
23     decided to recommend Mr. Cabbil's termination,

13  (Pages 49 to 52)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| Page 53 |
|---|

1    correct?
2  A.  Yes.
3  Q.  And you didn't recommend that Ken Edwards be
4    terminated for these incidents, did you?
5  A.  No, sir.
6  Q.  You didn't recommend that he be given a written
7    reprimand?
8  A.  No.
9  Q.  Didn't recommend that he be suspended?
10  A.  No.
11  Q.  Didn't recommend that he get a verbal
12    reprimand, did you?
13  A.  I don't remember that.
14  Q.  You might have recommended that Ken Edwards get
15    a verbal reprimand?
16  A.  Probably talked to him.
17  Q.  Did --
18  A.  I probably would have told the project engineer
19    to talk to him.
20  Q.  Okay. If there was a verbal reprimand of Mr.
21    Edwards, that would appear in his personnel
22    file, correct?
23  A.  Not necessarily.

| Page 54 |
|---|

1  Q.  But you didn't have any personal knowledge that
2    Mr. Edwards received a verbal reprimand for
3    this inspection work, do you?
4  A.  No, sir.
5  Q.  Okay. And yet he was the one that was supposed
6    to have trained Mr. Cabbil on how to do the
7    inspection, correct?
8  A.  Yes, sir.
9  Q.  Was it at your instruction that Mr. Edwards
10    train Mr. Cabbil to do this inspection work?
11  A.  I don't remember that.
12  Q.  Did you -- Did you ever have any conversations
13    with Kenneth Edwards about training Mr. Cabbil
14    to do the bridge inspection?
15  A.  Not to my knowledge.
16  Q.  Did you ever have any conversations with Mr.
17    Edwards about the inspection work on the bridge
18    project?
19  A.  Not to my knowledge.
20  Q.  So you didn't talk to Mr. Edwards after you
21    received the termination recommendation, did
22    you?
23  A.  No, sir.

| Page 55 |
|---|

1  Q.  And you didn't talk to Mr. Edwards after you
2    reviewed the inspector's daily reports about
3    this project, did you?
4  A.  I don't remember making -- No, sir.
5  Q.  How much money did the improper inspections
6    wind up costing the transportation department?
7  A.  We did not get requested to have a claim from
8    the contractor --
9  Q.  Okay.
10  A.  -- on that.
11  Q.  So the contractor absorbed the cost of the poor
12    work that they did, correct?
13  A.  Correct.
14  Q.  The transportation department didn't wind up
15    paying any money for the work the contractor
16    had done improperly, did they?
17  A.  Not to the contractor.
18  Q.  At the time that you -- At the time that you
19    received the termination recommendation from
20    Mr. Rager that you have got there in front of
21    you --
22       I don't know what the exhibit number
23    is.

| Page 56 |
|---|

1      MR. PRESCOTT: Plaintiff's exhibit number
2    five.
3      MR. SIMON: Thank you.
4    (BY MR. SIMON:)
5  Q.  -- did you decide at that time that it was
6    appropriate to terminate Mr. Cabbil?
7  A.  It was his recommendation that we begin to
8    compile everything we had.
9  Q.  Okay. When you say that you began to compile
10    everything that you had, how did you go about
11    doing that?
12  A.  Probably requested Mr. Rager, Mr. Elliot, Ms.
13    Elliot and any employees' documentation that
14    was relevant to Mr. Cabbil's work.
15  Q.  Did you receive any documentation showing --
16    from any of those people showing that Mr.
17    Cabbil had failed to perform his job properly
18    or displayed any inattention to his job?
19  A.  Well, this is saying that from Mr. Rager.
20  Q.  Okay. And what Mr. Rager is saying Mr. Cabbil
21    did improperly was the inspection work from
22    January 15th to the 27th, correct?
23  A.  That is part of it, yes, sir.

14  (Pages 53 to 56)

# FREEDOM COURT REPORTING

## Page 57

1  Q.  Okay.  Was there any other poor inspection work
2      that Mr. Cabbil had done that you knew of apart
3      from the work from January 15th to the 27th
4      that Mr. Rager discusses in his letter?
5  A.  I think I did get some information as we put
6      together all this documentation of other
7      inspection-related duties.
8  Q.  Okay.  And you put this documentation together
9      to support the decision to terminate Tony
10     Cabbil, correct?
11 A.  Correct.
12 Q.  Mr. Rager said that Tony Cabbil should be
13     terminated for inattention to job, failure to
14     perform job properly and falsification of
15     records from January 15th to 27th, correct?
16 A.  Yes, sir.
17 Q.  Okay.  Did he give any other reasons, Mr.
18     Rager, for terminating Mr. Cabbil?
19 A.  He is just saying inattention to job, failure
20     to perform job properly, falsification of
21     records.
22 Q.  Okay.  And the facts to back up those three
23     allegations were what happened on January 15th

## Page 58

1      to 27th according to Mr. Rager, correct?
2  A.  According to Mr. Rager.
3  Q.  Were there any other reasons that Mr. Rager
4      thought that Mr. Cabbil should be terminated
5      based on Mr. Rager's March 4th letter?
6  A.  He does not mention it here.
7  Q.  Okay.  And one of the references that he makes
8      is to falsification of records, correct?
9  A.  Yes.
10 Q.  And what was the falsification of records?
11     Explain that to me.
12 A.  He is saying by reporting his inspector's daily
13     report, had completed the work.
14 Q.  Okay.  One of those inspector's daily reports
15     had been completed by Kenneth Edwards, correct?
16 A.  Yes.
17 Q.  Okay.  Had Kenneth Edwards falsified his
18     records?
19     MR. PRESCOTT:  Object to form.
20 A.  I couldn't say.
21 Q.  You couldn't say.  Did Mr. Cabbil falsify his
22     records?
23 A.  He signed the report we are referring to.

## Page 59

1  Q.  Kenneth Edwards signed one of the reports we
2      were referring to, also, didn't he?
3      MR. PRESCOTT:  Object to form.
4  A.  He signed a particular day doing a particular
5      thing, yes, sir.
6  Q.  Okay.  You say that Mr. Cabbil did falsify
7      records but that you can't determine whether
8      Mr. Edwards falsified records.  How is it that
9      you can determine that Mr. Cabbil falsified his
10     reports but you can't determine it from Mr.
11     Edwards from the report that he signed on
12     January 16th?
13     MR. PRESCOTT:  Object to form.
14 A.  The part that Ken Edwards was on was completed
15     in this day by Mr. Cabbil.
16 Q.  And you have already testified that you don't
17     know whether Mr. Cabbil went back and
18     reinspected the work that Kenneth Edwards had
19     already inspect and had wrote down as being
20     done on the 16th.
21     MR. PRESCOTT:  Object to form.
22 Q.  Is that correct?
23 A.  I said that and also I said that routinely,

## Page 60

1      before a contractor can move up, you tell him
2      that the section that you're working on is
3      complete.
4  Q.  And would it have been improper for Mr. Cabbil
5      to have relied on Mr. Edwards' inspection on
6      the day that Mr. Cabbil was out to say that
7      that inspection was complete?
8  A.  He could have relied on Mr. Edwards.  Could
9      have.
10 Q.  Now, let's go back to the March 4th letter that
11     Mr. Rager wrote to you concerning the
12     recommendation for termination.  After you
13     received this letter, you made requests to
14     other individuals for documents that would
15     support the recommendation for termination,
16     correct?
17 A.  Correct.
18 Q.  And what you got was quite a few documents that
19     didn't have anything to do with Mr. Cabbil's
20     actual job performance; isn't that correct?
21 A.  I said I do remember another incident.
22 Q.  Which incident was that?
23 A.  From measuring that was not done and some —

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 61

1    maybe some more.
2    Q. Who did you make -- I am sorry. You said that
3    you made requests to Lewis Rager, Donna Elliot
4    and Gary Elliot for that documentation,
5    correct?
6    A. Yes.
7    Q. Okay. Did you make any requests to Ken Edwards
8    for documentation?
9    A. Not personally.
10   Q. Did you direct anyone to make any requests to
11   Ken Edwards?
12   A. We requested to get whatever they could come up
13   with for documentation.
14   Q. Whatever they could come up with in order to
15   support the termination of Mr. Cabbil, correct?
16   A. Correct.
17   Q. So you had already decided as of the time you
18   received Mr. Rager's letter that you wanted to
19   terminate Mr. Cabbil, right?
20       MR. PRESCOTT: Object to form.
21   A. After reading this letter -- or requesting
22   termination, we requested more to support our
23   termination request.

Page 62

1    Q. Okay. Why did you request more?
2    A. Because this in itself was a start. We did not
3    -- Or I did not think that this was all of it.
4    Q. Why --
5    A. After talking to the project engineer, they
6    began telling me of other instances.
7    Q. Why did you not think that this was all of it?
8    A. Because after talking to the project engineers,
9    they brought up other instances.
10   Q. Okay. Which -- Why did you talk to those other
11   project engineers?
12   A. Routine verification.
13   Q. Okay. And what did you hear from those other
14   project engineers that made you think that
15   termination really was appropriate?
16   A. Documentation I sent with it.
17   Q. Okay.
18   A. With this.
19   Q. You said that you talked with those other
20   project engineers. What did they tell you that
21   made you think that termination was appropriate
22   for Mr. Cabbil?
23   A. They told me about some documentation they had

Page 63

1    about other instances and I asked them for
2    that.
3    Q. Okay. And, again, that was Mr. and Mrs. Elliot
4    and Mr. Rager that you asked for that
5    documentation; correct?
6    A. Two project engineers and their -- they were to
7    get it up.
8    Q. Okay. So you didn't?
9    A. And -- Yes, sir.
10   Q. Okay. Did you not think that what Mr. Rager
11   had put in his letter of March 4th was enough
12   evidence to terminate Mr. Cabbil?
13   A. I wanted to make a good recommendation, I
14   wanted to get all the facts.
15   Q. You wanted to make a good recommendation for
16   termination, correct?
17       MR. PRESCOTT: Object to form.
18   A. Yes.
19   Q. What constitutes a good recommendation for
20   termination?
21   A. Getting as much documentation as I could.
22   Q. If you had submitted simply the evidence from
23   the documentation that you received -- I am

Page 64

1    sorry, that -- the evidence discussed in the
2    March 4th, 2004, letter recommending Mr.
3    Cabbil's termination, would that have been
4    enough to terminate Mr. Cabbil?
5    A. Are you asking a hypothetical? Because that
6    wasn't the only thing I knew about.
7    Q. Okay. If it had been the only thing that you
8    knew about, would you have recommended the
9    termination of Mr. Cabbil based solely on this
10   information?
11       MR. PRESCOTT: Object to form.
12   A. That would depend on the person. It would
13   depend on what I knew.
14   Q. Okay. And when you received this
15   recommendation for termination of Mr. Cabbil,
16   you didn't know anything else about him,
17   really, did you?
18       MR. PRESCOTT: Object to form.
19   A. Yeah, I knew of Tony.
20   Q. Okay. Did you know that he had done things
21   that might warrant terminating him?
22       MR. PRESCOTT: I object to form.
23   A. I knew he had other situations.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 65

1  Q.  What other situations did you know about?
2  A.  Some of them I listed in the documentation.
3  Q.  I want you to tell me at the time you received
4     this letter on March 4th what other situations
5     you knew about with Mr. Cabbil?
6        MR. PRESCOTT:  Object to form.
7  A.  I can't place the timing.
8  Q.  You knew about him having that meeting with Mr.
9     Rager where he talked about Ms. Elliot,
10    correct?
11 A.  Right.
12 Q.  Okay.  Did you know about anything else about
13    Mr. Cabbil at the time of March 4th?
14 A.  I could have.
15 Q.  Okay.  Do you remember any of what it was?
16 A.  I don't remember any -- exactly which.
17       (Pause.)
18    MR. SIMON:  I am looking for one document
19    that I can't put my hands on.
20       (Pause.)
21 Q.  Have you got plaintiff's exhibit eighteen there
22    in front of you?  It's the March 15th
23    memorandum.

Page 66

1        MR. PRESCOTT:  We do.
2        MR. SIMON:  Okay.
3        (Pause.)
4     (BY MR. SIMON:)
5  Q.  Now, there is the memorandum that you wrote to
6     Ms. Rowe recommending Mr. Cabbil's termination,
7     correct?
8  A.  Correct.
9  Q.  Okay.  And you wrote this memorandum after you
10    gathered all the documentation that you needed
11    to support the recommendation from Mr. Cabbil's
12    termination, right?
13 A.  Correct.
14 Q.  Okay.  All right.  And you did your own
15    independent investigation that led you to
16    determine that Mr. Cabbil should be terminated,
17    correct?
18 A.  I compiled the information with this with
19    documentation from others.
20 Q.  Okay.  You weren't just going on Mr. Rager's
21    recommendation, right?
22 A.  I added a lot of other documentation.
23 Q.  Okay.  You made your own independent decision

Page 67

1     to terminate Mr. Cabbil, correct?
2  A.  That's correct.
3  Q.  Did you look at Mr. Cabbil's performance -- his
4     last performance appraisal at the time that you
5     made the decision to terminate him?
6  A.  I don't remember if I did or not.
7  Q.  Okay.  Well, let me show you it.  It's marked
8     as plaintiff's exhibit one.
9        (Pause.)
10 Q.  It reflects that Mr. Cabbil met standards in
11    his work, correct?
12 A.  It's marked "meets standards", correct.
13 Q.  Okay.  And it was done on November 18th, 2003,
14    right?
15 A.  Yes, sir.
16 Q.  And it was signed by Donna Elliot and Lewis
17    Rager, correct?
18 A.  Correct.
19 Q.  Okay.  And if you'll flip over to the back of
20    that document?
21 A.  (Witness complied.)
22 Q.  You will see that Mr. Cabbil met standards
23    there, all of his work responsibilities,

Page 68

1     correct?
2  A.  Yes, sir.
3  Q.  Okay.  And if you'll flip back over to the
4     front?
5  A.  (Witness complied.)
6  Q.  You will see that Mr. Cabbil was marked as
7     "compliant" with each of his work habit areas,
8     correct?
9  A.  That's correct.
10 Q.  He was compliant in attendance, right?
11 A.  Correct.
12 Q.  Up through November 18th, 2003, correct?
13 A.  Correct.
14 Q.  He was compliant in his punctuality up through
15    November 18th, 2003, correct?
16 A.  Correct.
17 Q.  He was compliant in his cooperation with
18    coworkers on -- as of November 18th, 2003,
19    correct?
20 A.  Correct.
21 Q.  And he was compliant with the ALDOT rules as of
22    November 18th, 2003, correct?
23 A.  Correct.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 69

1  Q.  Okay.  Did Mr. Cabbil's performance of meeting
2      standards and being compliant on all his work
3      habits, did you consider that when you made the
4      decision to terminate Mr. Cabbil?
5  A.  I considered the documentation that I sent with
6      it and made the determination from that.
7  Q.  So you didn't consider his performance
8      appraisals that said that he met standards in
9      November of 2003?
10  A.  I didn't send it as documentation.
11  Q.  I understand that, but you told us a minute ago
12      that you made your own independent decision
13      that Mr. Cabbil should be terminated.  What I
14      am asking you is:  Did you consider Mr.
15      Cabbil's meeting standards performance up to
16      November 18th, 2003, when you decided to
17      terminate him?
18      MR. PRESCOTT:  Object to form.
19  A.  A copy of this, I didn't have or didn't have to
20      put -- or did not put with that.
21  Q.  You didn't have Mr. Cabbil's performance
22      appraisal?
23  A.  I did not put it with that, no.

Page 70

1  Q.  Okay.  So you -- Why did you not review Mr.
2      Cabbil's performance appraisal when you were
3      deciding whether to terminate him for poor
4      performance?
5  A.  I may have asked the project engineer and asked
6      him about previous --
7  Q.  Well, it wasn't Gary Elliot who was project
8      engineer at the time that this performance
9      appraisal was done, was it?  It was Donna
10      Elliot, right?
11  A.  No, that's correct.  Donna Elliot.
12  Q.  And Donna Elliot's November 18th performance
13      appraisal was the last appraisal Mr. Cabbil got
14      before he was fired, right?
15  A.  What date was he --
16  Q.  Well, your recommendation for termination was
17      March 15th, right?
18  A.  It looks like it would have been the last one,
19      yeah.
20  Q.  The last one?
21  A.  (Nodded head in the affirmative.)
22  Q.  So you're telling us today that you didn't look
23      at Mr. Cabbil's performance appraisal -- his

Page 71

1      last performance appraisal when you decided to
2      terminate him; is that correct?
3  A.  I am saying I might not have looked at it but
4      we probably have talked to project engineers
5      about his previous work history and it probably
6      would have been a part of the discussion.
7  Q.  Okay.  And when you talked to the project
8      engineer who did his performance appraisal,
9      which was Donna Elliot, did she not tell you
10      that his performance met standards?
11  A.  Most likely did.
12  Q.  Did Ms. Elliot not tell you that he was
13      compliant with the attendance policies?
14  A.  She most likely would have.
15  Q.  Did she not tell you that he was compliant with
16      punctuality?
17  A.  Most likely would have.
18  Q.  And did Mrs. Elliot not tell you that he was
19      compliant with cooperation with coworkers?
20  A.  Most likely.
21  Q.  And would Ms. Elliot not have told you that Mr.
22      Cabbil was compliant with the rules?
23  A.  Most likely, she would have said it was on

Page 72

1      this.
2  Q.  Okay.  Now, your letter on page two says that
3      Mr. Cabbil did not cooperate with his
4      coworkers, does it not?
5  A.  That's correct.
6  Q.  If Ms. Elliot in November of 2003 said that he
7      was cooperating with coworkers and she told you
8      when you asked her that he was cooperating with
9      coworkers, how did you come to determine that
10      Mr. Cabbil had not cooperated with his
11      coworkers?
12      MR. PRESCOTT:  Object to form.
13  A.  I said that when I talked to Ms. Elliot, as I
14      normally would have, about his previous grades,
15      then she would have most likely said that.  I
16      had documentation that I based my other
17      decisions --
18  Q.  Okay.  What did Mr. Cabbil do that showed that
19      he was not cooperating with his coworkers?
20  A.  Other things that is in that packet.
21  Q.  But so far as you knew, up until November 18th,
22      2003, Mr. Cabbil had been cooperating with his
23      coworkers, right?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

## Page 73

1    MR. PRESCOTT: Object to form.
2  A.  (No response.)
3  Q.  So any information that you have about Mr.
4      Cabbil not cooperating with coworkers would
5      have been through the documentation that you
6      sent to Ms. Rowe supporting the termination,
7      correct?
8  A.  In assembling the documentation, we found out
9      other stuff, yes.
10 Q.  Okay. Is there anything that Mr. Cabbil did to
11     not cooperate with his coworkers that you
12     didn't have documentation of but that you heard
13     about from one of the project engineers?
14 A.  I can't say. You know, I get reports from
15     project engineers regularly.
16 Q.  So were there any reports from project
17     engineers that you had received that indicated
18     that Mr. Cabbil was not cooperative with his
19     coworkers?
20 A.  I would have put it in that documentation,
21     those that I could verify.
22 Q.  Some of the documentation that you received
23     came on the same day that you wrote the

## Page 74

1      termination recommendation, correct?
2  A.  Yes, sir.
3  Q.  Okay. Tell me how you came to be in possession
4      of plaintiff's exhibit sixteen which is the
5      letter from Kenneth Edwards.
6  A.  After talking to the project engineer and he
7      was telling me that — about Ken's instructions
8      to Tony, I asked did he put that in writing.
9  Q.  You asked the project engineer that?
10 A.  To get the information in writing.
11 Q.  You asked Gary Elliot to get that information
12     in writing?
13 A.  I may have asked him or I may have asked my
14     district or I may have asked an assistant to
15     get it for me.
16 Q.  Okay. So you don't know who it was that you
17     asked to get Kenneth Edwards to write that
18     statement?
19 A.  I don't remember.
20 Q.  But you did ask somebody to get in written
21     statement from Kenneth Edwards, correct?
22 A.  That is most likely since I have got it in a
23     document.

## Page 75

1  Q.  So this is not something that Kenneth Edwards
2      would have just written up in the normal course
3      of business, correct?
4  A.  He did it on March 15th.
5  Q.  He did it specifically to support this
6      termination recommendation, right?
7      MR. PRESCOTT: Object to form.
8  A.  He did it on March 15th.
9  Q.  He did it specifically to support the
10     termination recommendation, correct?
11     MR. PRESCOTT: Object to form.
12 A.  He did it for a documentation —
13 Q.  I am not asking —
14 A.  — for an action.
15 Q.  In support of the termination recommendation,
16     right?
17     MR. PRESCOTT: Same objections.
18 A.  He got this information and put it in writing
19     so that I would have documentation.
20 Q.  And he put it in writing because you instructed
21     somebody to have him put it in writing,
22     correct?
23     MR. PRESCOTT: Object to form.

## Page 76

1  A.  To put his documentation — put his actions in
2      writing.
3  Q.  And you don't remember who you instructed to
4      have him do that, do you?
5  A.  No, I don't.
6  Q.  Let's look at Ms. Box's memo of March 15th,
7      2004 -- Oh, I am sorry. I haven't given it to
8      you yet.
9      (Pause.)
10 A.  Okay.
11 Q.  That one is also dated March 15th, correct?
12 A.  Yes.
13 Q.  And it discusses some incidents that occurred
14     after the Lewis Rager's recommendation for
15     termination, correct?
16 A.  (No response.)
17 Q.  Rager's recommendation is March 4th, right?
18 A.  Yes.
19 Q.  So this bathroom incident and the incident on
20     Friday at three p.m., those were both after Mr.
21     Rager had made his termination recommendation,
22     right?
23 A.  Yes, this one was.

19 (Pages 73 to 76)

# FREEDOM COURT REPORTING

## Page 77

1  Q.  What about Mr. Edwards?
2  A.  The one that Ken wrote doesn't have a date that
3      he told, this is just a summary.
4  Q.  It is just Mr. Edwards' general interpretation
5      of how Mr. Cabbil was, right?
6  A.  It's just saying that he explained something —
7      work activities to him.
8  Q.  Okay.  And — But what Ms. Box wrote, she wrote
9      on March 15th, 2004, correct?
10  A.  She wrote on March 15th, correct.
11  Q.  And it concerned incidents several days before
12      that, right?
13  A.  Correct.
14  Q.  Okay.  Who did you ask to get these statements
15      from Anita Box?
16  A.  Any number of people, as I said before.
17  Q.  Did you ask Mr. Rager to get Ms. Box to write
18      this up?
19  A.  I don't know exactly who.
20  Q.  But you asked someone to have Ms. Box write
21      this up, correct?
22  A.  Correct.
23  Q.  Okay.  If Ms. Box testified that she just wrote

## Page 78

1      it up on her own because she felt like it, that
2      wouldn't be true, would it?
3      MR. PRESCOTT:  Object to form.
4  A.  No.
5  Q.  How did you come to hear about these incidents
6      that Ms. Box had witnessed?
7  A.  I don't remember from who.
8  Q.  When did you first hear about them?
9  A.  I don't remember when.
10  Q.  Did you ever talk to Ms. Box about these
11      incidents?
12  A.  I really don't remember if I talked to her or
13      not.
14  Q.  Would this bathroom incident be something that
15      a project engineer would typically report to
16      you?
17  A.  They report to me about anything.
18  Q.  Did you -- This incident on — that Ms. Box
19      documents on Friday at three p.m. on March
20      12th, 2004, is this a reason -- is this one of
21      the reasons that Mr. Cabbil was terminated?
22  A.  Are you asking is this the reason?
23  Q.  Is that one of the reasons that he was fired?

## Page 79

1  A.  All of this is part of the reasons.
2  Q.  Okay.  So this incident on Friday at three p.m.
3      on March 12th, 2004, is one of the reason that
4      is Mr. Cabbil was fired?
5  A.  All of this was part of the decision.
6  Q.  Okay.  That is not my question.  I am asking
7      you if this particular incident on Friday at
8      three p.m. on March 12th, 2004, is one of the
9      reasons that Mr. Cabbil was fired?
10      MR. PRESCOTT:  Object to form.  Asked and
11      answered.
12  Q.  I am not asking whether it — all of this was,
13      I am asking you whether this particular
14      incident is one of the reasons that he was
15      fired.
16  A.  This is part of the documentation.  I can't say
17      that particular incident was.
18  Q.  Okay.
19  A.  The only --
20  Q.  Part of the documentation, but you don't know
21      whether this was one of the reasons that he was
22      fired?
23  A.  It is part of the documentation.

## Page 80

1  Q.  Is this one of the reasons -- Is this incident
2      one of the reasons that you recommended that he
3      be terminated?
4  A.  I recommended according to those sections that
5      I listed on the front page.
6  Q.  That is not what I asked you.
7  A.  And these are --
8  Q.  I asked you --
9  A.  -- are documentations to support those.
10  Q.  Okay.  I asked you if this particular incident
11      on Friday at three p.m. on March 12th, 2004, is
12      one of the reasons that you recommended Mr.
13      Cabbil for termination.
14  A.  I am not saying it is or not.
15  Q.  Is the bathroom incident on March 9th, 2004,
16      one of the reasons that you recommended Mr.
17      Cabbil for termination?
18  A.  It's part of the documentation and it probably
19      would have been.
20  Q.  Okay.  I am asking you:  You made an
21      independent decision to recommend Mr. Cabbil
22      for termination, right?
23  A.  Yes.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

## Page 81

1  Q.  You made that based on some things that Mr.
2      Cabbil did, correct?
3  A.  Correct.
4  Q.  Or didn't do, correct?
5  A.  Correct.
6  Q.  Is this bathroom incident one of the incidents
7      that was in your mind as one of the reasons
8      that you were recommending that Mr. Cabbil be
9      terminated?
10      MR. PRESCOTT: Object to the form.
11  A.  It's part of the package.  It is part of the
12      documentation.
13  Q.  I understand that it's part —
14  A.  Part.
15  Q.  I understand that you forwarded this document
16      to Ms. Rowe, okay?
17  A.  Uh-huh (yes).
18  Q.  It is part of the documentation.  We don't have
19      any questions about that.  What I am asking you
20      is: In your mind, was this bathroom incident
21      one of the reasons that you decided to
22      recommend Tony Cabbil?
23      MR. PRESCOTT: Object to the form.

## Page 82

1  A.  One of the reasons.
2  Q.  But the incident on Friday at three p.m. on
3      March 12th was not one of the reasons that you
4      decided to recommend Mr. Cabbil for
5      termination?
6      MR. PRESCOTT: Object to the form.
7  A.  I am not necessarily saying that because it was
8      on the same sheet of paper, however.
9  Q.  If this incident on Friday, 3/12/04 at three
10      p.m. had not happened, would you still have
11      recommended Mr. Cabbil for termination?
12      MR. PRESCOTT: Object to form.
13  A.  If this —
14  Q.  Right.  If that incident had not happened —
15  A.  — had not happened?
16  Q.  — would you still have recommended Mr. Cabbil
17      for termination?
18  A.  I probably would have.
19  Q.  You would have?
20  A.  (Nodded head in the affirmative.)
21  Q.  Okay.  When did you start preparing this
22      memorandum that is dated March 15th of 2004?
23  A.  I started preparing this after I got the

## Page 83

1      termination request from Mr. Rager.
2  Q.  Okay.  You started drafting this memo after you
3      got the termination request?
4  A.  After I got the documentation.
5  Q.  Okay.  Do you know if you spent more than one
6      day on drafting this March 15th, 2004,
7      memorandum?
8  A.  Oh, yes.
9  Q.  You did?
10  A.  (Nodded head in the affirmative.)
11  Q.  How many days did you spend drafting it?
12  A.  Most likely from March 4th till the date of the
13      letter, I had something to do with it.
14  Q.  So starting on March — So you started
15      drafting the termination recommendation on
16      March 4th?
17  A.  No, I didn't say I drafted the letter.  I
18      started working on the documentation —
19  Q.  Okay.
20  A.  — to do the letter.
21  Q.  Do you remember when you actually started
22      drafting the March 15th letter?
23  A.  No, sir, I don't remember.

## Page 84

1  Q.  Could it be that you started it as early as
2      March 4th?
3  A.  I don't know the exact date I started drafting
4      this letter.
5  Q.  Could it be March 4th?
6  A.  It would not likely be on March 4th because --
7  Q.  Why not?
8  A.  -- because the documentation would take longer
9      to get up than one day.
10  Q.  You were not the person that made the final
11      decision to terminate Mr. Cabbil, were you?
12  A.  No, sir.
13  Q.  Who made that decision?
14  A.  The director.
15  Q.  That is Mr. McInnes, right?
16  A.  Yes.
17  Q.  Did you speak with Mr. McInnes about the
18      termination of Mr. Cabbil?
19  A.  No, sir.
20  Q.  Do you know what documents Mr. McInnes reviewed
21      when he decided to terminate Mr. Cabbil?
22  A.  No, sir.
23  Q.  Do you know who Mr. McInnes spoke with when he

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 85

1    decided to terminate Mr. Cabbil or in the
2    process of deciding to terminate Mr. Cabbil?
3    A.  No, sir.
4    Q.  So your role in the termination was gathering
5        the documents and then submitting the
6        recommendation for termination to Ms. Rowe; is
7        that right?
8    A.  Yes, sir, in the chain of command.
9    Q.  In the chain of command?
10   A.  (Nodded head in the affirmative.)
11   Q.  Okay.  Did you talk with Lewis Rager after his
12       deposition on Wednesday?
13   A.  I have talked to him.
14   Q.  Have you spoken with him about his deposition?
15   A.  He said that it was rough.
16   Q.  He said it was rough?  What did he say about it
17       being rough?
18   A.  It just took long.
19   Q.  It took long?
20   A.  (Nodded head in the affirmative.)
21   Q.  Did he tell you what questions I asked him
22       during his deposition?
23   A.  No, sir.

Page 86

1    Q.  He didn't?
2    A.  (Shook head in the negative.)
3    Q.  Did he tell you any of the things that he
4        testified to during his deposition?
5    A.  He mentioned the letter.
6    Q.  Which letter was that?
7    A.  His letter.
8    Q.  His letter, his termination recommendation
9        letter?
10   A.  Yes.
11   Q.  Did he mention the inspector reports?
12   A.  I don't remember.  We didn't speak long.
13   Q.  How long did you speak?
14   A.  A few minutes.
15   Q.  Where did that conversation take place?
16   A.  In somebody else's office.  It was just in
17       passing.
18   Q.  Was that on Wednesday or Thursday?
19   A.  It probably was the day of.
20   Q.  The day of the deposition?
21   A.  Well, no.  No.  It must have been afterwards.
22   Q.  Okay.  But his deposition on Wednesday ended
23       around four thirty, so do you think that you

Page 87

1    talked with — We didn't go the whole day.  He
2    didn't start until one o'clock or so — well,
3    two fifteen, actually.  Do you think that you
4    talked to him about it on Thursday?
5    A.  The next day, yeah.
6    Q.  So he was up here?
7    A.  He worked in the office.
8    Q.  Oh, Mr. Rager works in this office?
9    A.  Yeah.
10   Q.  Okay.  He is the district engineer for district
11       two, right?
12   A.  He was.
13   Q.  Oh.
14   A.  He is no longer district engineer.
15   Q.  Oh, when did he — Oh, that's right.  He is the
16       plans and designs engineer, right?
17   A.  Correct.
18   Q.  Okay.  And you said that conversation took
19       place in someone else's office?
20   A.  Yes.
21   Q.  Whose office did it take place in?
22   A.  Kim Patterson's office.
23   Q.  Did Kim Patterson hear the conversation, also?

Page 88

1    A.  Most of it, yes, sir.
2    Q.  Okay.  Well, I --
3    A.  Well, no.  No, she was in the office but not
4        all the time.
5    Q.  Did you talk to Gary Elliot about his
6        deposition?
7    A.  (Nodded head in the affirmative.)
8        MR. PRESCOTT:  Is that a yes?
9        THE WITNESS:  Yes.
10   (BY MR. SIMON:)
11   Q.  When did you talk to Gary Elliot about his
12       deposition?
13   A.  The next day.
14   Q.  Also yesterday, Thursday?
15   A.  No, the next day after his.
16   Q.  Well, his was on Wednesday, also.
17   A.  Okay.
18   Q.  Sorry, I don't mean to be confusing.
19   A.  Okay.  The next day after his deposition.
20   Q.  Okay.  And what did — Where did you have that
21       conversation with Gary Elliot?
22   A.  It was in his office — Well, his office
23       coexists with Christy Ellis.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 89

1  Q.  I am sorry?
2  A.  His office coexists, is in the same room as
3      Christy Ellis.
4  Q.  Okay.
5  A.  ASA.
6  Q.  Was it just the two of you, you and Mr. Elliot,
7      who talked about —
8  A.  Yes.
9  Q.  — his deposition?
10  A.  Yes.
11  Q.  What did he tell you about the deposition?
12  A.  It was rough.
13  Q.  I didn't realize I was that hard on people.
14      What did he say was rough about the
15      deposition?
16  A.  He was — that he learned a lot about what to
17      document from now on.
18  Q.  I am sorry?  He learned about what?
19  A.  About documentation.
20  Q.  What did he say that he learned about
21      documentation?
22  A.  He didn't elaborate.
23  Q.  Well, did he say that there was anything else

Page 90

1      that was rough about that deposition?
2  A.  Well, the length of time.  He is a big fellow.
3  Q.  We gave him breaks when he needed them.
4  A.  Did you?
5  Q.  It did go pretty long, though.
6      Did Gary Elliot tell you that the
7      questions that I asked about the
8      documentation?
9  A.  Did he tell me about what?
10  Q.  Did he tell you about what questions I asked
11      him about the documentation?
12  A.  In general, just questions about what we had on
13      here.
14  Q.  Okay.  He told you about the inspector daily
15      reports that I asked him about?
16  A.  He did say that.
17  Q.  The same reports that I asked you about?
18  A.  Right.
19  Q.  What did he tell you about the daily inspection
20      reports?
21  A.  Just in general, the documentation.
22  Q.  Did he tell you that he couldn't tell based on
23      those reports who had messed up the

Page 91

1      inspections?
2  A.  No, he didn't elaborate there.  In fact, I
3      didn't want to —
4  Q.  Did you talk to Donna Elliot after her
5      deposition?
6  A.  Just briefly.  She was waiting in my office at
7      dinner, too, and I talked to her on the way
8      out.
9  Q.  What did she say about her deposition?
10  A.  That it was rough.
11      (Whereupon, there was an
12      off-the-record discussion.)
13  Q.  Did she say what areas of inquiry I got into
14      during her deposition?
15  A.  She didn't say a whole lot.
16  Q.  Let me ask you about the — your March 15th
17      termination recommendation that you have got in
18      front of you.  The — And look at the second
19      page there where you say that Mr. Cabbil has an
20      attitude that he is being picked on or singled
21      out.  Was that under Donna Elliot or Gary
22      Elliot or both?
23  A.  This was just an opinion and — based on what

Page 92

1      all of them were saying.
2  Q.  When you said that Mr. Cabbil has a threatening
3      attitude and his coworkers don't want to work
4      around him, was that under Donna Elliot or Gary
5      Elliot or both?
6  A.  It was probably all of it, just in the
7      documentations.
8  Q.  Okay.  Was Mr. Cabbil put on unpaid leave until
9      his termination was final?
10  A.  We asked for it but I don't remember whether it
11      was or not.
12  Q.  If you had not received the March 4th, 2004,
13      recommendation for termination from Mr. Rager,
14      would you still have recommended that Mr.
15      Cabbil be terminated?
16  A.  If it had not been for this letter you're
17      referring to and then we following up on and it
18      finding out other documentation, if it had been
19      just this, it's speculative.  If it was just
20      this occasion, this incident, probably not.
21  Q.  And I guess my question was actually a little
22      bit different:  If you had not received a
23      recommendation for termination from Mr. Rager,

23 (Pages 89 to 92)

# FREEDOM COURT REPORTING

### Page 93

1  you wouldn't have recommended that Mr. Cabbil
2  be terminated on your own, would you?
3  A.  It would have had to have been from his -- It
4  was his and the project engineer's
5  recommendation.
6  Q.  Okay.
7      MR. SIMON:  I think that's all I have but
8  give me just a minute.
9      MR. PRESCOTT:  Sure.
10     (Pause.)
11  (BY MR. SIMON:)
12  Q.  Let me show you what I have marked as
13  plaintiff's exhibit twenty.  This is a memo to
14  you from Gary Elliot, correct?
15  A.  Yes.
16  Q.  And it's dated March 15th, correct?
17  A.  Yes.
18  Q.  What does this memo concern?
19  A.  He is referring to Tony's actions.
20  Q.  His what?
21  A.  His actions.
22  Q.  Okay.  And specifically it says that Tony
23  doesn't get along with any employees in this

### Page 94

1  office, correct?
2  A.  Yes, that is what he says.
3  Q.  He doesn't refer to any specific incidence of
4  Tony not getting along in the office, does it?
5  A.  It mentions the lady's restroom.
6  Q.  Right, but that is not really a matter of
7  getting along with people, is it?
8  A.  Well --
9  Q.  Well, I will withdraw that question.  You can
10  construe it however you want.
11      Did you ask Gary Elliot to write this
12  letter?
13  A.  I more than likely did.
14  Q.  Okay.  It is addressed to you, right?
15  A.  Yes.  Yes.
16  Q.  What exactly did you ask Mr. Elliot for on
17  March 15th, 2004?
18  A.  For -- To write down his -- any of his
19  documentation that he wanted to give me.
20  Q.  Okay.  Did you ask him more specifically for
21  documentation about Mr. Cabbil's attitude?
22  A.  I can't say that.  Documentation is what I was
23  looking for on what I had learned.

### Page 95

1  Q.  So you had learned about Mr. Cabbil not getting
2  along with employees in the office prior to Mr.
3  Elliot writing you this memorandum?
4  A.  Yes.
5  Q.  Okay.  And so you were just asking Mr. Elliot
6  to put that down in writing, correct?
7  A.  That's correct.
8  Q.  To support Mr. Cabbil's termination, correct?
9  A.  Correct.
10  Q.  Did you take part at all in responding to the
11  grievance that Mr. Cabbil filed?
12  A.  No, sir.
13  Q.  Okay.  Were you aware that Mr. Cabbil had filed
14  a grievance?
15  A.  I was aware of it, I don't know at what time.
16  Q.  And do you know -- Do you remember who the
17  grievance was filed against?
18  A.  I believe it was Donna.
19  Q.  Okay.  And were you made aware of that
20  grievance around the time it was filed?
21  A.  I don't remember when I was informed about it.
22  It could have been before or after.
23  Q.  You knew that Mr. Cabbil had complained about

### Page 96

1  Donna being racially prejudiced while he was
2  working under her, right?  You have already
3  testified to that.
4  A.  And that's what I understand the complaint was
5  about, yes.
6  Q.  Okay.  Did anybody ask you questions as part of
7  an investigation of Mr. Cabbil's complaint?
8  A.  No, sir.
9  Q.  Nobody from Montgomery called you to -- or came
10  up here and met with you and asked you
11  questions about Mr. Cabbil?
12  A.  They may have asked me did I know about it but
13  I really don't remember them asking me
14  anything.
15  Q.  Do you remember talking to Sandy Dietz about
16  Mr. Cabbil's grievance?
17  A.  I talk to Sandy a lot.
18  Q.  I am sure.
19  A.  I just can't place her about this situation.
20  Q.  Okay.  Did you talk to Ms. Dietz about Mr.
21  Cabbil's termination?
22  A.  I don't remember talking to her about this
23  termination, no.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 97

1  Q.  Did you -- Were you aware that Mr. Cabbil had
2      been referred to the EAP for absenteeism at
3      some point?
4  A.  At some point, I would have learned about that.
5  Q.  Okay.  Was that also one of the reasons that
6      you felt that he should be terminated?
7  A.  Well, that is part of the progressive
8      discipline that I would consider.
9  Q.  If Mr. Cabbil had not had that EAP referral for
10     those absences, would you still have
11     recommended his termination?
12 A.  Yes, sir.
13     MR. SIMON:  That's all.
14     MR. PRESCOTT:  No questions.
15     (Whereupon, the deposition concluded
16     at 12:37 p.m.)
17
18
19
20
21
22
23

Page 98

1      CERTIFICATE
2
3  TONY CABBIL
4      vs.      CASE NO. 2:05-CV-513-T
5  STATE OF ALABAMA DEPARTMENT OF TRANSPORTATION
6
7
8      I certify that the foregoing
9  proceedings were truly and correctly reported
10 and transcribed, and that the witness was first
11 duly sworn.
12     I further certify that I am not kin to
13 any party nor am I in any way interested in
14 this case.
15
16
17     Dated this _____ day of _____, 2006.
18
19
20
21     _____
22     DAVID S. NORTHINGTON, CCR
23

25 (Pages 97 to 98)