# FREEDOM COURT REPORTING

---

**Page 1**

```
 1    IN THE UNITED STATES DISTRICT COURT
 2       FOR THE MIDDLE DISTRICT OF ALABAMA
 3              NORTHERN DIVISION
 4
 5
 6  TONY CABBIL
 7     vs.        CASE NO. 2:05-CV-513-T
 8  STATE OF ALABAMA DEPARTMENT OF TRANSPORTATION
 9
10
11
12        DEPOSITION OF ANITA BOX
13
14       The following deposition in the
15  above-styled case was held on May 12, 2006,
16  beginning at 10:09 a.m., at the offices of
17  Alabama Department of Transportation, located
18  at 2715 Skyland Boulevard, Tuscaloosa, Alabama
19  35401.
20
21
22       REPORTED BY:
23       DAVID S. NORTHINGTON, CCR
```

---

**Page 2**

```
 1            STIPULATIONS
 2
 3        It was stipulated and agreed by and
 4  between the parties through their respective
 5  counsel that the deposition of Anita Box may be
 6  taken at the date, time and location indicated
 7  on the preceding title page.
 8        Further, that the signature to and the
 9  reading of this deposition by the witness is
10  waived and that this deposition is to have the
11  same force and effect as if full compliance had
12  been had with all laws and rules of court
13  relating to the taking of depositions.
14        Further, that it shall not be
15  necessary for any objections to be made by
16  counsel to any questions, except as to form or
17  leading questions, and that counsel for the
18  parties may make objections and assign grounds
19  at the time of the trial or at the time this
20  deposition is offered into evidence or prior
21  thereto.
22        Further, that notice of filing of this
23  deposition by the Commissioner is waived.
```

---

**Page 3**

```
 1           APPEARANCES
 2
 3
 4
 5  FOR THE PLAINTIFF:
 6    MR. KELL SIMON
 7    WIGGINS, CHILDS, QUINN & PANTAZIS
 8
 9
10
11
12  FOR THE DEFENDANT:
13    MR. ROBERT PRESCOTT
14    ATTORNEY AT LAW
15
16
17
18
19  ALSO PRESENT:
20    MR. TONY CABBIL
21    THE PLAINTIFF
22
23
```

---

**Page 4**

```
 1              INDEX
 2
 3
 4  TITLE PAGE                        1
 5
 6  STIPULATIONS                      2
 7
 8  APPEARANCES                       3
 9
10  gINDEX                            4
11
12  WITNESS ANITA BOX
13    X BY MR. SIMON                5 - 26
14
15  REPORTER'S CERTIFICATE           27
```

# FREEDOM COURT REPORTING

Page 5

1  I, David S. Northington, Certified
2  Court Reporter and Notary Public for the
3  State of Alabama at Large, acting as
4  Commissioner, certify that as provided by Rule
5  30 of the Alabama Rules of Civil Procedure,
6  and the foregoing stipulations of counsel,
7  there came before me at the date, time and
8  location indicated on the preceding title page,
9  Anita Box, witness in this previously-styled
10 cause, for oral examination, and the following
11 proceedings occurred:
12
13      ANITA BOX,
14 was called as a witness and after having been
15 first duly sworn to testify to the truth, the
16 whole truth and nothing but the truth,
17 testified as follows, to-wit:
18
19     THE COURT REPORTER: Usual stipulations?
20     MR. SIMON: That's fine.
21     MR. PRESCOTT: Yes, sir.
22         EXAMINATION
23 BY MR. SIMON:

Page 6

1  Q. Ms. Box, what did you do to prepare for your
2     deposition today?
3  A. I didn't.
4  Q. You didn't -- Did you --
5  A. I mean --
6  Q. Did you meet with anybody about your
7     deposition?
8  A. Today?
9  Q. Did you -- Prior to today, did you meet with
10    anybody about your deposition?
11 A. About what I was going to say?
12 Q. Yes.
13 A. No.
14 Q. Okay. Have you talked with Lewis Rager since
15    his deposition on Wednesday?
16 A. No.
17 Q. You have not?
18 A. (Shook head in the negative.)
19 Q. Have you talked with Gary Elliot since his
20    deposition on Wednesday?
21 A. Not about this.
22 Q. Okay. So you haven't spoken with him about
23    what he testified to in his deposition?

Page 7

1  A. No.
2  Q. Okay. Have you talked with Donna Elliot since
3     her deposition on Wednesday?
4  A. No.
5  Q. Have you spoken with Nicky Calhoun about Mr.
6     Cabbil or anything related to this case --
7  A. No.
8  Q. -- since it was filed?
9  A. No.
10 Q. Have you spoken with Ms. Rowe about this case
11    since it was filed?
12 A. No.
13 Q. Let me show you what I have marked as
14    plaintiff's exhibit seventeen. It's a two-page
15    -- Let me show you this, what I have marked as
16    plaintiff's exhibit seventeen, and ask you if
17    you recognize that document.
18 A. I do.
19 Q. Did someone ask you to prepare that document?
20 A. No.
21 Q. It was prepared on March 15th, 2004, correct?
22 A. Uh-huh (yes).
23 Q. Okay. And it concerns two different incidents,

Page 8

1     correct?
2  A. Yeah.
3  Q. Okay. Why did you write this statement?
4  A. Why?
5  Q. Yes.
6  A. Because this was something that I had never,
7     you know, had happen before and I thought this
8     was just a -- just something that was uncalled
9     for.
10 Q. When you say "this", what are you --
11 A. The bathroom incident.
12 Q. Okay. So you wrote -- you wrote about the
13    bathroom incident because it is nothing that
14    you had ever seen happen before, correct?
15 A. That is correct.
16 Q. Okay. Was this the first time that you had
17    known that Mr. Cabbil did this, what happened
18    on March 9th, 2004?
19 A. Yes.
20 Q. Okay. Do you know if he did it at any time
21    after March 9th, 2004?
22 A. No, I don't know that.
23 Q. Okay. So March 9th of 2004 was the only day

2 (Pages 5 to 8)

# FREEDOM COURT REPORTING

Page 9

1  that you are aware of that Mr. Cabbil used the
2  lady's restroom?
3  A. Ken Edwards told me that he had been using the
4  ladies restroom and he had advised him not to
5  and he continued to do it.
6  Q. Okay. When did Ken Edwards tell you that?
7  A. The morning that this happened.
8  Q. Okay. Did you write this – Let me ask you
9  this: Why did you wait six days from the date
10  of the incident until you wrote this memo up?
11  A. Well, I had jotted down a little note, you
12  know, with the date and then this one, too, and
13  then I came back on the 15th and just wrote it
14  all. The incident where evidently there was
15  something going on about him working on
16  Saturday and when he went out the door, he said
17  well, I wasn't going to work, no way. And so I
18  just jotted it down and then I do that lots of
19  times so that I won't forget to write down
20  things.
21  Q. Where did you jot it down?
22  A. On a piece of paper.
23  Q. Do you still have that piece of paper?

Page 10

1  A. No, huh-huh. When I rewrote this, I just
2  jotted down "bathroom incident" and the date
3  just so I wouldn't forget the date.
4  Q. Okay. Why did you – Why did you put this –
5  Why did you take your written-down notes that
6  you made at the time of the incident and
7  combine them into this final document that you
8  wrote on March 15th, 2004?
9  A. It – Well, just that this happened this day.
10  I do that all the time.
11  Q. You do that all the time?
12  A. Uh-huh (yes).
13  Q. Okay. Did you talk with Mr. Rager about this
14  incident?
15  A. No.
16  Q. Did you talk with Mr. Calhoun about this
17  incident?
18  A. No.
19  Q. Did you talk with Ms. Rowe about this incident?
20  A. No.
21  Q. Did you speak with anybody who was in a
22  classification higher than you about this
23  incident?

Page 11

1  A. Gary.
2  Q. Okay. Gary Elliot?
3  A. Uh-huh (yes).
4  Q. He was in a classification higher than you at
5  that time?
6  A. Well, he was the project engineer and he was
7  not my grading supervisor but he was the
8  project engineer which I was working in the
9  office under him at the time.
10  Q. Okay.
11  A. We were the same classification, though.
12  Q. Okay. Did you write this up for Mr. Elliot?
13  A. Not for him, just for my benefit.
14  Q. Okay. What would be the benefit to you of
15  writing something like this up?
16  A. Because this was something that was un – not
17  normal to me.
18  Q. The bathroom incident are you talking about?
19  A. Uh-huh (yes).
20  Q. Okay. Why did you include this other incident
21  on – that occurred supposedly on Friday, March
22  12th, 2004, at three p.m.? why did you include
23  that in this memo?

Page 12

1  A. Well, my office is right by the front door and
2  I – I am also right beside Gary Elliot's
3  office at the time and I overheard the
4  conversation or most of the conversation about
5  working on Saturday and I felt like evidently
6  there must have been a problem. I knew that
7  Ken Edwards had been working some holidays and
8  Saturdays and I heard him tell Tony and he
9  wasn't going to have to work, you know, the
10  next day, the Saturday. Then when Tony went
11  out the door – Our door closes very slowly and
12  as he went out, he said he wasn't going to
13  work, anyway.
14  Q. Well –
15  A. We just – You know, we are instructed –
16  Well –
17  Q. Go ahead.
18  A. When we think there might be some sort of
19  problem or something, and I just always keep
20  notes on things.
21  Q. Okay. And who did you give this paper to?
22  A. Well, Gary had – I gave it to him, to Gary.
23  Q. You gave it to Gary?

3 (Pages 9 to 12)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

FREEDOM COURT REPORTING

Page 13

1  A. Uh-huh (yes).
2  Q. Okay. Did you keep a copy of it for yourself?
3  A. I did.
4  Q. Do you have a file where that is kept?
5  A. I just have a copy of this.
6  Q. Where do you keep it?
7  A. In my file cabinet beside my desk.
8  Q. Okay. What kind of file is it in?
9  A. It's just in there like this.
10 Q. Just --
11 A. Just stuck there, just like this.
12 Q. Just in there loose?
13 A. I don't have anything else.
14 Q. Do you have loose files like this about other
15    employees who work in your project office?
16 A. I do now because I am a project engineer and I
17    have people that work under me --
18 Q. Okay.
19 A. -- that I am responsible for.
20 Q. Who else do you have loose files like this on?
21 A. Nobody.
22 Q. Nobody?
23 A. (Shook head in the negative.)

Page 14

1  Q. Just Mr. Cabbil?
2  A. This -- I just stuck this in there, yes.
3  Q. Okay. How did it get to Nicky Calhoun?
4  A. I don't know.
5  Q. Okay. Did you give a copy of this to Mr.
6     Elliot?
7  A. Yes.
8  Q. Why did you give a copy of it to Mr. Elliot?
9  A. Because he was the supervisor.
10 Q. Did Mr. Elliot ask you for this document?
11 A. I don't remember if he asked me or if I just
12    gave it to him. I may have just gave it to
13    him.
14 Q. Did you know that this document was going to be
15    used in Mr. Cabbil's termination proceedings?
16 A. No.
17 Q. Did you know that Mr. Cabbil was already
18    recommended for termination at the time that
19    you wrote this document?
20 A. No.
21 Q. Let me show you what I have marked as
22    plaintiff's exhibit eighteen and ask you if you
23    recognize that document?

Page 15

1  A. No.
2  Q. It is dated the same day as your memorandum,
3     correct?
4  A. Yes.
5  Q. And it even references your memorandum, doesn't
6     it? Look at the second page, one occurrence of
7     personal hygiene.
8  A. I don't know if that is referencing this or
9     not.
10 Q. Do you know whether Mr. Calhoun had this -- had
11    your memorandum in his hands at the time that
12    he put together this recommendation for
13    termination?
14 A. No.
15 Q. Does Mr. Cabbil have any kind of speech
16    impediment or anything?
17 A. I don't know.
18 Q. How come -- Look at the --
19 A. That is the way he said it and that is how I
20    wrote it.
21 Q. Look at the bottom of your memo.
22 A. Uh-huh (yes).
23 Q. This -- That is how he said it?

Page 16

1  A. Uh-huh (yes).
2  Q. Is that how Mr. Cabbil usually talks or is that
3     something --
4  A. I don't know.
5  Q. -- that is not normal?
6  A. I have never talked to him.
7  Q. You had never talked to Mr. Cabbil before?
8  A. I had spoken and said good morning and that was
9     it.
10 Q. That's it?
11 A. (Nodded head in the affirmative.)
12 Q. Did you ever talk to Gary Elliot about that
13    particular incident on Friday the 12th of
14    March?
15 A. Uh-huh (yes).
16 Q. What was your conversation with Mr. Gary Elliot
17    about that incident?
18 A. I was disgusted that this had happened and I
19    told him.
20 Q. You were -- Why were you disgusted?
21 A. Because it's nasty to urinate on the seat and
22    not -- especially just to do it and not clean
23    it up.

4 (Pages 13 to 16)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 17

1  Q. No, I am talking about the incident that
2     occurred on Friday. Not the bathroom incident
3     but the incident of Tony's conversation with
4     Gary Elliot that you have documented here.
5  A. Yeah, I asked him if he heard what he said.
6  Q. You asked who?
7  A. Gary.
8  Q. Did Tony Cabbil work out of your project
9     office?
10 A. Yes.
11 Q. You shared a project office with Gary Elliot,
12    correct?
13 A. Right.
14 Q. Okay. How often would you see Mr. Cabbil on a
15    daily basis?
16 A. Just in the morning.
17 Q. And you never had a conversation with Tony
18    Cabbil the whole time that he worked there?
19 A. Not that I can recall.
20 Q. How long did he work there at the same time
21    that you were working out of that office?
22 A. I don't know, just long enough for this bridge
23    painting project.

Page 18

1  Q. What — Do you have any understanding about
2     what happened on that bridge painting project?
3  A. Not very much.
4  Q. What is your understanding about what happened
5     on the bridge painting project?
6  A. The only thing I know is that there was a
7     conflict about the paint, that the bridge had
8     not been inspected well, had not been painted
9     and that it could have cost the contractor a
10    great deal of money to go back to that area.
11 Q. How did you find out about that?
12 A. Just talking with — making calls to the
13    contractor and just listening to the
14    conversations about it. I was the office
15    engineer working under Gary so we, you know,
16    spoke about the problems. I did all the
17    estimates and, you know, what have you as far
18    as that goes, so.
19 Q. So you worked on that painting project as well?
20 A. Not on the bridge but I did the estimates for
21    it.
22 Q. Okay. So at the time that you were working in
23    that project office where Gary Elliot was also

Page 19

1     working, you were not a project engineer?
2  A. No. No.
3  Q. Okay. You were the office engineer?
4  A. Uh-huh (yes).
5  Q. That meant that you stayed in the office all
6     day; is that correct?
7  A. Most of the time.
8  Q. Okay. What else did you do besides stay in the
9     office?
10 A. I just rarely would go outside to work.
11 Q. Okay. How did you — How did you come to find
12    out that there had been a conflict about the
13    painting on that bridge project?
14 A. Just — We always get together in the mornings
15    the first thing and discuss, you know, what was
16    going on in the days, you know, what was fixing
17    to go on during that day or whatever.
18 Q. Who did you hear it from that there had been
19    that conflict on that project?
20 A. I really don't know. It was probably either
21    Gary or Ken.
22 Q. Okay.
23 A. Or just overheard them.

Page 20

1  Q. What was your understanding of — When you say
2     the bridge had not been painted well, what was
3     your understanding about what the reason was
4     that the bridge had not been painted well?
5  A. The only thing I know is that Derek Tilley went
6     out to inspect it and found that there were
7     areas that had not been painted correctly.
8     There was — I don't know if it was — had not
9     been blasted or not been covered well or what,
10    you know, but just after that inspection is
11    when I heard.
12 Q. And you are not sure who you heard it from?
13 A. No. I may have read the — later that under —
14    the letter that Derrick wrote. I am not sure
15    how I found out.
16 Q. Okay. Do you have any knowledge as to whether
17    Mr. Cabbil was involved in any way in the
18    conflict about the paint?
19 A. I know that he and Ken Edwards were out there
20    doing the inspection and, other than that, I
21    don't know who did what.
22 Q. So you don't know whether it was Mr. Cabbil's
23    fault or Mr. Edwards' fault or somebody else's

5 (Pages 17 to 20)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

**FREEDOM COURT REPORTING**

Page 21

1   fault that the painting had been done
2   improperly?
3   A. Well, Tony was the one that was going up doing
4      the inspection at that time.
5   Q. How do you know that?
6   A. Because of just the diaries and because Ken was
7      — had been training him and he was the one
8      going up doing it.
9   Q. You have looked at the diaries yourself and
10     determined —
11  A. Yes.
12  Q. — that Mr. Cabbil was the one who did the
13     painting improperly — or inspected the
14     painting improper improperly?
15  A. Well, I can't remember what all the diary says,
16     but I know that he was the one supposed to be
17     going up and inspecting it.
18  Q. How do you know that?
19  A. Because Ken was doing it first and that is why
20     he came over to our office, to do it.
21  Q. Okay. Let me show you what I have marked here
22     as plaintiff's exhibit eleven and I will just
23     ask you to look through those. Is that the

Page 22

1   diaries that you are referring to that you
2   looked at?
3   A. Well, I saw every diary everyday because I
4      would take this information and put it in a
5      brown master diary.
6   Q. Okay. Tell me, on that first page, who were
7      the inspectors on the project that day?
8   A. Tony and Ken.
9   Q. Tony and Ken?
10  A. Uh-huh (yes).
11  Q. And can you tell who did the inspection work
12     that day?
13  A. Well, Tony did the diary.
14  Q. Tony did the diary, but can you tell who
15     actually did the inspection work that day?
16  A. Tony did it so far as I am concerned.
17  Q. How can you tell that Tony did it rather than
18     Ken?
19  A. Because he was doing the diary. Usually, you
20     know, that's what happened. Usually the person
21     doing the inspection would do the diary, but
22     maybe not in every case.
23  Q. Ken charged eight hours on that day?

Page 23

1   A. Uh-huh (yes).
2   Q. That is the 15th of January; is that right?
3   A. I think that is what that says.
4   Q. Okay. Do you have any personal knowledge as to
5      who was actually up doing the inspecting on the
6      bridge that day?
7   A. I didn't see it.
8   Q. Okay. And you just infer from the fact that
9      Tony was the one who filled out the report that
10     he was the one who did the inspecting?
11  A. That's what I would think by looking at this.
12  Q. Okay. But Ken's got — Ken Edwards has eight
13     hours charged to the project in a day —
14  A. Uh-huh (yes).
15  Q. — also that day, correct?
16  A. Uh-huh (yes).
17  Q. Can you tell what Ken Edwards was doing on the
18     project for those eight hours from looking at
19     that report?
20  A. All I know is they are out there together.
21  Q. Okay. They are out there together but you
22     don't know from looking at that report which
23     one was actually inspecting the painting work

Page 24

1   on the bridge, do you?
2   A. Well, I would say that Tony was because he
3      signed it.
4   Q. Because he signed it?
5   A. I don't know.
6   Q. Okay. Flip over to the next page there.
7   A. (Witness complied.)
8   Q. That is January 15th, correct?
9   A. Yes.
10  Q. Who did the inspection work on the project that
11     day?
12  A. I would say Ken did because Tony is not listed.
13  Q. So on that day, so far as you can tell, Tony
14     Cabbil didn't do any inspecting on the project
15     that day; is that right?
16  A. Right.
17  Q. Okay. When you looked at that particular daily
18     report, you wouldn't have any reason to believe
19     that Tony Cabbil did any improper inspection on
20     that day, would you?
21  A. Didn't say it.
22  Q. Okay.
23  A. I don't know.

6 (Pages 21 to 24)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

**FREEDOM COURT REPORTING**

Page 25

1  Q. And, again, with regard to your statement that
2     you wrote on March 15th, 2004, Gary Elliot did
3     not ask you for a copy of that statement?
4  A. He may have, I may have just given it to him.
5  Q. And was it your testimony that Nicky Calhoun
6     did not ask you for a copy of that statement?
7  A. No.
8  Q. And Lewis Rager did not ask you for a copy of
9     that statement?
10 A. No. Not directly, anyway.
11 Q. They may have asked you indirectly?
12 A. No, I am just saying I didn't talk to them
13    about it.
14 Q. Okay. When you say not directly, what did you
15    mean?
16 A. I mean they could have asked for this but not
17    me.
18 Q. Okay. So they may have asked Gary Elliot or
19    somebody else for it so far as you know?
20 A. Right.
21 Q. Okay.
22    MR. SIMON: That's all I have got.
23    MR. PRESCOTT: No questions.

Page 26

1     MR. SIMON: Okay. We are done.
2     (Whereupon, the deposition concluded
3     at 10:26 a.m.)

Page 27

1                CERTIFICATE
2
3  TONY CABBIL
4  vs.          CASE NO. 2:05-CV-513-T
5  STATE OF ALABAMA DEPARTMENT OF TRANSPORTATION
6
7
8     I certify that the foregoing
9  proceedings were truly and correctly reported
10 and transcribed, and that the witness was first
11 duly sworn.
12    I further certify that I am not kin to
13 any party nor am I in any way interested in
14 this case.
15
16
17 Dated this _____ day of _____, 2006.
18
19
20
21 _____
22 DAVID S. NORTHINGTON, CCR
23

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660