**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| **TONY CABBIL,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| ) | |
| v. ) | **CIVIL ACTION NUMBER:** |
| ) | **2:05-cv-513-T** |
| ) | |
| **STATE OF ALABAMA DEPARTMENT** ) | |
| **OF TRANSPORTATION and JOE** ) | |
| **MCINNES, in his official capacity as** ) | |
| **Director of the State of** ) | |
| **Alabama Department of** ) | |
| **Transportation;** ) | |
| ) | |
| **Defendants.** ) | |

**PLAINTIFF'S TRIAL BRIEF**

**I.    Introduction to Claims**

This is an action for legal and equitable relief to redress the retaliatory and discriminatory termination of the plaintiff, Mr. Tony Cabbil.  Mr. Cabbil seek to redress his rights and entitlements secured by Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e et seq., as amended by the Civil Rights Act of 1991 and 42 U.S.C. §1981through 42 U.S.C. § 1983.  Mr. Cabbil requests that this Court (1) issue a declaratory judgment that the employment policies, practices, procedures, conditions and customs of the defendant are violative of his rights under those statutes (2) grant him a permanent injunction enjoining the defendant, its agents, successors, employees, attorneys and those acting in concert with the defendant and at the defendant's request from continuing to violate Title VII and 42 U.S.C. §1981; (3) enter an Order requiring the defendant to make Cabbil whole by awarding him backpay (plus interest), compensatory damages, lost seniority, nominal damages,

1

benefits and loss of pension; and, (4) order such other relief and benefits as the cause of justice may require, including, but not limited to, an award of costs, attorneys' fees and expenses. Mr. Cabbil was permanently disabled in a car accident subsequent to his termination and is not seeking instatement.

## II.     Statement of Facts

Tony Cabbil, an African-American, was hired by the Alabama Department of Transportation on July 30, 2001 as an Engineering Assistant. Mr. Cabbil received meets standards appraisals during his initial employment period and had no warnings or reprimands during that period. Approximately one year later, Mr. Cabill was placed under the supervision of Donna Elliot. In November 2003, Cabbil complained to Mr. Rager, Ms. Elliot's supervisor, that he believed he was being discriminated against because of his race by Ms. Elliot. Mr. Rager failed to investigate the allegations other than to speak with Ms. Elliot about them. In December 2003, Mr. Cabbil filed a grievance under the procedure established in *Reynolds* contending that he had been treated unfairly with respect to job assignments and other issues because of his race and in retaliation for his previous complaints of discrimination. This charge was filed against both Ms. Elliot and Mr Rager. That same month Mr. Cabbil was transferred to a new position under the direct supervision of a new supervisor, Gary Elliot. Gary Elliot is Donna Elliot's husband.

Shortly after the critical internal investigation, Mr. Rager, who was not Mr. Cabbil's immediate supervisor, recommended plaintiffs' termination. Mr. Rager's supervisor, Nicky Calhoun then asked Mr. Lager, Donna Elliot and Gary Elliot for "whatever they could come up with to support the termination of Mr. Cabbil." Mr. Calhoun was aware of Mr. Cabbil's claim of discrimination. Mr. Calhoun then passed his recommendation that Mr. Cabbil be terminated to the

the Division Engineer, Dee Rowe who had been involved in the investigation of Mr. Cabbil's complaint. Ms. Rowe then passed that recommendation to Joe McInnes. On April 27, 2004, Mr. Cabbil was notified that he was being terminated from his job at ALDOT. His employment was terminated as of April 27, 2004.

Mr. Cabbil was allegedly terminated for the failure to properly inspect painting being done on a bridge. All of the Defendants' employees recommending termination allegedly based their decision upon documentation which they later admitted failed to show whether Mr. Cabbil or his co-worker, Mr. Edwards, was the person who failed to properly inspect the paint job. Mr. Edwards, the Chief Inspector on the Hugh Thomas painting project, was assigned to supervise and train Mr. Cabbil on how to perform the bridge inspection duties– a job he had never performed before. The defendants records show that Mr. Edwards recorded time for inspecting the bridge and the spans of the bridge at issue on many of the days the defendants assert Mr. Cabbil failed to properly inspect the bridge. On one date cited as a reason for Mr. Cabbil's termination, Mr. Cabbil was not even at work and Mr. Edwards was the only individual performing inspection as shown by the defendants' records that were allegedly relied upon as the reason for Mr. Cabbil's termination. Mr. Edwards was neither terminated or disciplined for this incident. Mr. Edwards, though also African-American, had not filed a claim of discrimination. White employees were not terminated for infractions of similar severity.

Mr. Cabbil was given his termination letter in the presence of Nicky Calhoun, Lewis Rager, Gary Elliott, Donna Elliott, and Tiffany Ramsay, the EEO officer. Mr. Cabbil was replaced by a white employee. The reasons given for plaintiff's termination are not legitimate and are a pretext for illegal discrimination and retaliation.

**III.   CLAIMS**

    **A.   Mr. Cabbil's Retaliation Claim.**

To prove a *prima facie* case of retaliation through circumstantial evidence, Mr. Cabbil must show that (1) he engaged in protected activity, (2) he was subjected to an adverse employment action, and (3) the adverse employment action was causally related to the protected activity. *Cooper v. Southern Co.*, 390 F.3d 695, 740 (11th Cir. 2004).

Mr. Cabbil has unquestionably engaged in protected activity. He complained verbally to his supervisors in late 2003 about what he perceived to be racially discriminatory attitudes and actions on the part of Donna Elliott and Lewis Rager, and then filed a formal grievance alleging race discrimination and naming Ms. Elliott and Mr. Rager on December 19, 2003. Indeed, this Court has determined that participation in the *Reynolds* Grievance procedure is protected activity.

Nor can it be disputed that ALDOT took an adverse action against Mr. Cabbil when ALDOT terminated his employment.

**Causal connection.**  The law in this Circuit is that to satisfy the causal connection element, the plaintiff "merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997).

The simplest way for a plaintiff to prove the causation element of the *prima facie* case of retaliation is through the temporal proximity of his complaints to his termination. "A plaintiff satisfies this [causation] element if [s]he provides sufficient evidence of knowledge of the protected expression and that there was a close temporal proximity between this awareness and the adverse action." *Higdon v. Jackson,* 393 F.3d 1211, 1220 (11th Cir.2004). "Close temporal proximity between the protected activity and the adverse action may be sufficient to show that the two were

4

not wholly unrelated." *Bass v. Bd. of County Comm'rs,* 256 F.3d 1095, 1119 (11th Cir.2001) (citation omitted). Here, a two-and-one-half month period elapsed between the filing of Mr. Cabbil's grievance (December 19, 2003) and the initial termination recommendation (March 4, 2004). While the question of the precise temporal proximity which will allow the plaintiff to state a *prima facie* case is unsettled, the two-and-one-half month period appears to still be valid. *See Clark Cty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (citing with approval circuit court cases invalidating temporal proximities of three and four months)(*cited in Hammons v. George C. Wallace State Community College*, Slip Copy, 2006 WL 655061 (11th Cir. 2006).

However, Mr. Cabbil need not rely solely on temporal proximity to establish causation, as there is ample additional evidence of the causal connection between Mr. Cabbil's complaints of discrimination and his termination.

First, and most importantly, there is the fact that, though all of the recommending officials – Elliott, Rager, Calhoun, and Rowe -- admitted that they could not determine from the documents they reviewed during the termination process whether it was Mr. Cabbil or Mr. Edwards (or both) who committed the inspection errors on the bridge project, only Mr. Cabbil was terminated for these errors. Evidence that defendant treated the plaintiff differently from similarly situated employees is relevant to causation. *See, e.g. Moon v. Transport Drivers, Inc.,* 836 F.2d 226, 230 (6th Cir.1987); *Sumner v. United States Postal Service,* 899 F.2d 203, 209 (2d Cir.1990). The testimony quoted at length above shows that every supervisor in the chain of command – Gary Elliott, Lewis Rager, Nicky Calhoun, and Dee Rowe – relied on the Inspectors' Daily Reports from January 15 to 27th as the grounds on which they decided to terminate Mr. Cabbil. Each of those supervisors then admitted during their depositions that they could not determine, upon review of those same documents, whether it had been Mr. Cabbil or Mr. Edwards who made the errors in inspection. Yet, as they all

testified, Mr. Edwards was not disciplined in any way for the inspection errors. Both Mr. Edwards and Mr. Cabbil were ALDOT engineers assigned to inspect the bridge project. Both charged time to the project through the Inspector Daily Reports, and both were given the responsibility for ensuring that the inspection of the project was done properly. The only fact which distinguishes Mr. Edwards from Mr. Cabbil is that Mr. Cabbil had recently filed a grievance, while Mr. Edwards had not.

The complete breakdown of the alleged justification for Mr. Cabbil's termination gives rise to the inference that Mr. Cabbil's complaints and his termination were not "completely unrelated." Mr. Rager, Mr. Elliott, Mr. Calhoun, and Ms. Rowe all admit that the main reason for Mr. Cabbil's termination - the inspection errors - could not be ascribed to Mr. Cabbil with any degree of certainty, and that Mr. Edwards could just as easily have been the one who committed the errors, that these officials were simply seeking information to build a documentary record to terminate Mr. Cabbil, and found it in the inspectors' reports on which his signature appeared.

There are numerous other facts which support the finding of a causal connection between Mr. Cabbil's complaints of discrimination and his termination. These include:

- The fact that Mr. Cabbil continued to inspect the Hugh Thomas Bridge project, sometimes by himself, after Derrick Tilley's February 20, 2004 report and Mr. Rager's recommendation that Mr. Cabbil be terminated for his inability to inspect properly;

- Calhoun's admission that after receiving the termination recommendation, he commenced to seek out documentation to build a record to terminate Mr. Cabbil;

- The inconsistencies between Calhoun's description of Mr. Cabbil's work behaviors and those of his supervisor, Gary Elliott;

- The inconsistencies about the justifications for Mr. Cabbil's termination, including Dee Rowe's testimony that neither the referral to EAP for absenteeism nor the warning for absenteeism on December 8, 2003 were reasons for Mr. Cabbil's termination, despite their appearance on the final termination letter

6

- Rager's testimony that he did not feel that the warning letter regarding absences and the written reprimand regarding leaving the job were significant enough to warrant terminating Mr. Cabbil "according to our policies and procedures."

These facts, in addition to the temporal proximity of the complaint to the termination recommendation, and the admissions that it could not be determined who was at fault for the inspection problems show a causal connection between Mr. Cabbil's complaints of discrimination and the decision to terminate his employment.

**B.   Defendant has not articulated a legitimate, nondiscriminatory reason for Mr. Cabbil's termination.**

Once the plaintiff has established his prima facie case of discrimination, "the defendant must clearly set forth, through the introduction of *admissible evidence*, the reason for its adverse employment decision, and that reason 'must be legally sufficient to justify a judgment for the defendant.'"*Walker v. Mortham*, 158 F.3d 1177, 1184 (11th Cir. 1998)(quoting *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 255 (1981))(emphasis supplied). This reason must be articulated by the individual who made the decision to take the adverse action. *See Walker*,158 F.3d at 1181 &n.8 ("The defendant cannot testify in abstract terms as to what might have motivated the decision-maker; it must present specific evidence regarding the decision-maker's actual motivations with regard to each challenged employment decision."). The articulation must also include evidence of what the decisionmaker knew and when he knew it. *Steger v. General Elec. Co.*, 318 F.3d 1066, 1076 (11th Cir. 2003)(emphasis supplied)("The evidence must include facts which show *what the decision-maker knew at the time when the decision was made*"); *Turnes v. AmSouth Bank NA*, 36 F.3d 1057 (11th Cir. 1994)("AmSouth came forward with no explanation of why it rejected Turnes based on what it knew when it rejected him. Therefore, Turnes' 'prima facie case stands unrebutted, and discrimination is established.'")(citation omitted). The reason must also be the reason that was

"actually relied on" by the decisionmaker in deciding to discharge the plaintiff. *Increase Minority Participation by Change Today of Northwest Florida (IMPACT) v. Firestone*, 893 F.2d 1189, 1194 (11th Cir. 1990)("This Court has expressly held that under *Burdine*, there must be `evidence that asserted reasons for discharge ***were actually relied on*'** or `the reasons are not sufficient to meet the defendant's rebuttal burden.")(emphasis supplied). As held in *Lee v. Russell County Board of Education*, 684 F.2d 769, 775 (11th Cir. 1982), "[i]f there was no evidence that asserted reasons for discharge were actually relied on, the reasons are not sufficient to meet defendant's rebuttal burden." *Id.* All of these parameters exist to allow the defendant to satisfy its intermediate burden under *McDonnell Douglas*, to "produce admissible evidence which would allow the trier of fact to conclude that the employment decision *had not been motivated* by discriminatory animus." *Burdine*, 450 U.S. at 257 (cited, with emphasis added, in *Turnes v. AmSouth Bank, NA*, 36 F.3d 1057, 1062 (11th Cir. 1994)).

As discussed above, at the defendant's articulation stage in the *McDonnell Douglas* model, "The evidence must include facts which show ***what the decision-maker knew at the time when the decision was made***." *Steger*, *supra* at 1076. Was Cabbil terminated because of the errors in the inspection? For his absenteeism? For using the women's restroom instead of the men's? "The introduction of 'personnel records which *may* have indicated that the employer based its decisions on one or more of the possible valid grounds' will not suffice to meet the defendant's rebuttal burden." *Steger v. General Electric Co.*, 318 F.3d 1066,1076 (11th Cir. 2003).

  **C.**  **Defendants' articulated reason for Mr. Cabbil's termination is a pretext for retaliation and race discrimination.**

Assuming *arguendo* that defendants articulate a legitimate, non-discriminatory or retaliatory reason for Mr. Cabbil's termination, the burden then shifts back to Mr. Cabbil to demonstrate pretext

8

– "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's legitimate reasons for its action that a reasonable factfinder could find [all of those reasons] unworthy of credence.'" *Watkins v. Sverdrup Technology, Inc.*, 153 F.3d 1308, 1314 (11th Cir. 1998)(*quoting Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997), *cert. denied*, 522 U.S. 1045 (1998)).

In this case, the primary weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions are the same ones discussed *supra* which demonstrated the causal connection between the plaintiff's complaints of discrimination and his termination. All of the supervisors in the chain of command agreed that the documents which they contended during the termination process showed that Mr. Cabbil had failed to perform his job properly in fact did not show that at all. All of them admitted that they recommended Mr. Cabbil's termination based on the Inspector Daily Reports, but then all testified that they could not determine that Mr. Cabbil had been responsible for the inspection errors, because those reports reflect that Kenneth Edwards worked just as much on the bridge project as Mr. Cabbil, and the reports don't delineate which inspections were performed by Mr. Edwards and which by Mr. Cabbil. A reasonable inference from these facts is that Mr. Rager, unhappy with the grievance that Mr. Cabbil had filed against him and with Mr. Cabbil's prior complaints, seized on the first available opportunity to terminate him - Mr. Tilley's report and Mr. Cabbil's signatures on the Inspector Daily Reports. Mr. Rager testified that the other rule violations committed by Mr. Cabbil around the same time frame - leaving the job site without permission and the attendance problems - were not sufficient to fire him, so Mr. Rager needed more - the inspection errors. A reasonable supervisor, faced with documentation showing that it was equally likely that one or both of two employees had committed serious errors, would not simply have terminated one of those employees and not discipline the other one at all. Mr. Rager's focus on Mr. Cabbil, and

9

complete exclusion of Mr. Edwards, shows that he was not actually concerned about the failures to perform job properly and falsification of records that led to the errors on the bridge painting, but that there was some ulterior motive to terminate Mr. Cabbil.

Defendants contend that Mr. Cabbil has improperly attempted to "shift the blame for this deficiency upon Mr. Edwards. This contention is incorrect, for several reasons. First, Mr. Edwards performed inspections on several days - all of the recommending officials testified that they could not determine from the documentation they had who performed the inspection work on the days when both Mr. Cabbil and Mr. Edwards are listed on the Inspector Daily Reports. Both are listed on the Reports on the following dates: January 15, 22, 26, and 27. It is important to remember that none of the recommending officials ever spoke with Mr. Edwards or Mr. Cabbil about who was actually doing the inspection work at that time - all they had in front of them were the Inspector Reports which show both men doing inspections.

Defendants' contention that "plaintiff was responsible for the other days" is also incorrect, for the same reasons. Kenneth Edwards was the plaintiff's supervisor, was training him on how to perform the inspections, and, as far as can be gleaned from the documents, was working side by side with Mr. Cabbil on the inspections. Edwards' affidavit, submitted with defendants' Memorandum, attempts to cast the blame on Mr. Cabbil, but even Mr. Edwards cannot deny that he may have participated in the inspections on the days from January 15-27:

> In reviewing these reports for the dates January 15, 2004 through January 25, 2004, my name appears on several reports. That my name is on these reports does not signify that I performed the shotblast/paint inspections. This merely served as a method by which to reflect the number of hours that I worked on that date. As I may have been at several sites on a day, for simplicities' sake, my hours would have been annotated on one project's daily report. I noted only one day, January 16, 2004, when I actually signed the daily report. On this date, I performed the inspections because Mr. Cabbil was not

> on the job that date. To my knowledge, there were not deficiencies
> in the contractor's performance on the date that I inspected the job.

Edwards' Affidavit at 2 (attached to defendants' Evidentiary Materials). As can be seen, Mr. Edwards does not testify here that he did not perform the inspection work alongside Mr. Cabbil, but only that the fact that his name appears on the report does not necessarily mean that he did inspections on that project on that day. This fact, however, was apparently not known to the recommending officials even at the time of their depositions, when they all testified that they could not determine who did the inspection work. Thus, Mr. Edwards' status and whereabouts on January 15-27 were certainly not known to them at the time they decided to terminate Mr. Cabbil and not Mr. Edwards, and each appeared equally at fault in the documents. It cannot be known today, nor could it at the time the termination was recommended and completed, who made the inspection errors. The recommenders knew that at the time, and still terminated only Mr. Cabbil. The defendants' proffered justification for Mr. Cabbil's termination was a pretext for retaliation.

     Numerous other facts support a finding of pretext. As early on as Mr. Cabbil's initial complaints of discrimination, Mr. Rager demonstrated his animosity toward Mr. Cabbil's complaints by determining, without speaking with anyone besides Donna Elliott, that he simply did not believe Mr. Cabbil's complaints of discrimination by Donna Elliott, and therefore refused to investigate them further. Ms. Rowe found Mr. Rager's investigation to have been flawed, and that Ms. Elliott had been using language which could be construed as racially offensive (her references to African-American employees as "boy" and "girl"). Ms. Rowe also claimed to have counseled Mr. Rager about his investigations of such complaints in the future, but Rager testified that she in fact had not. Both Rowe's and Rager's attitudes about complaints of race discrimination – Rager's failure to investigate and Rowe's failure to even attempt to cure – show that both supervisors approached

complaints of discrimination dismissively, and even with animosity.

Furthermore, while defendants claim that Mr. Cabbil was legitimately terminated because he made errors on "vital inspections" on the bridge project, if the inspections were so vital, and Mr. Cabbil's failures so serious, why did defendants continue to allow him to inspect the project every day, and for four days by himself, after he had been recommended for termination for his failures with respect to these "vital inspections"? Gary Elliott testified even after Mr. Tilley's report, he trusted Mr. Cabbil to continue to perform the bridge inspection work. A finding of pretext is further supported by this contradiction.

While defendants, and Mr. Rager in particular, focused on the "severity" of the inspection problems, subsequent inspection reports reveal that the missed spots and deficiencies appear to be routine. In January 2005, Derek Tilley inspected the Hugh Thomas Bridge painting project again, and noted similar deficiencies to those identified in his February 20 report which was the basis for Mr. Cabbil's termination. Mr. Tilley's January 2005 report finds bearings needing final coats in spots, spots needing touch ups, spots missed, spots not painted, and lower angles of X frames needing paint. Gary Elliott's notes concerning Mr. Tilley's inspections reflect "vertical supports at bearings have areas of packed rust with areas of no paint," gusset plates with areas missed around bolts, and "lots of areas of missed paint on stringers in numerous areas." There is no evidence that anyone was disciplined in any way for these apparent oversights, which appear no more severe than those alleged to have been committed by Mr. Cabbil from January 15-27, 2004.

Defendants also contend that Mr. Cabbil's failure to perform his job properly is reflected in Mr. Elliott's conversation with Mr. Cabbil in February 2004 which showed that Mr. Cabbil had not been in the containment area "for a week." This "week", however, was not during the time period at issue - January 15-27, but rather several weeks after that, after Mr. Tilley had submitted his report,

and during a period when Mr. Elliott testified that he trusted Mr. Cabbil's work.

Nor are the reasons other than those related to the bridge inspection given for Mr. Cabbil's termination free of pretextual underpinnings. Nicky Calhoun's recommendation, created after he requested documentation from all supervisors so he could build up a record to terminate Mr. Cabbil, states that Mr. Cabbil is not only being terminated for inspection failures, but also for absenteeism, leaving the job without permission, absenteeism, disruptive conduct, poor housekeeping, insubordination, and use of abusive or threatening language. With respect to the absenteeism and leaving the job without permission, Rager has already testified that those incidents would not support the termination of an employee "according to our policies and procedures." The other allegedly improper behaviors - insubordination, use of abusive or threatening language, and disruptive conduct - are belied both by Mr. Cabbil's performance appraisals and Gary Elliott's testimony about Mr. Cabbil's behavior. On November 18, 2003, Donna Elliott evaluated Mr. Cabbil's performance, and stated that he was compliant with the guidelines on attendance, punctuality, cooperation with co-workers, and compliance with rules. Ms. Elliott also found that Mr. Cabbil's work performance met standards in each of responsibilities measured. These ratings matched those Mr. Cabbil had received from Ms. Elliott on November 19, 2002. Ms. Elliott's performance appraisal of Mr. Cabbil at the end of 2003 offered no criticisms of his work, work habits, and did not mention, though there was space for it, any difficult behaviors displayed by Mr. Cabbil. Less than one month after this appraisal, Mr. Cabbil was transferred to work under Gary Elliott, who testified during his deposition that Mr. Cabbil was not abusive or threatening, that he did not question his supervisors' authority, and that he took constructive criticism, Thus, defendants' own records concerning Mr. Cabbil's performance under Donna Elliott and the testimony of Gary Elliott establish that Mr. Cabbil was not viewed by his supervisors as the difficult, threatening employee he is portrayed as in his termination

letters, or at least that he was not so viewed until Calhoun began compiling a record to terminate Mr. Cabbil. This glaring inconsistency is further grounds for this Court to find that defendants' articulated reason for Mr. Cabbil's termination is a pretext for their true reason for terminating him - that he complained that his supervisors discriminated against him.

The women's restroom incident also supports a finding of pretext, in that the individual who reported it - Anita Box - testified that she wrote a memo about it on her own, but Nicky Calhoun testified that he had instructed her to write the memo. When asked "If Ms. Box testified that she just wrote it up on her own because she felt like it, that wouldn't be true, would it?" Mr. Calhoun answered "No." Ms. Box, however, testified that she had not even discussed the incident with Calhoun. Box testified that she wrote up the statement not because she had been asked to do so, but "because this was something that I had never, you know, had happen before and I thought this was just a – just something that was uncalled for." When asked directly "Did someone ask you to prepare that document", Ms. Box testified, "No."

"Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination and it may be quite persuasive." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000) (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 517 (1993)). "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose," and further that "once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Id.* at 2108-2109. For all of the reasons discussed above, the defendants' explanation for Mr. Cabbil's termination is "unworthy of credence." The fact that, to the officials who recommended Mr. Cabbil's termination, it was not

14

possible to tell whether it was Mr. Cabbil or Mr. Edwards who committed the inspection errors, their decision to terminate Mr. Cabbil and not to discipline Mr. Edwards simply makes no sense at all, and shows that they were biased against Mr. Cabbil. This bias can reasonably be ascribed to the grievance Mr. Cabbil filed less than three months before he was recommended for termination. All of the other inconsistencies and irregularities discussed herein support such a finding. As such, summary judgment must be denied, and plaintiff permitted to proceed to trial on his retaliatory termination claim.

### D. Mr. Cabbil was discriminated against because of his race.

A prima facie case of discrimination in termination is established where the plaintiff proves by a preponderance of the evidence that he or she is a member of a protected class, was qualified for the position held, and was discharged and replaced by a person outside of the protected class *or* was discharged while a person outside of the class with equal or lesser qualifications was retained. *Lee v. Russell County Bd. of Educ.,* 684 F.2d 769, 773 (11th Cir.1982).

Here, Plaintiff is African-American, was qualified for his job (having met the posted qualifications for it), was discharged, and was replaced by a white employee, Rhonda Davis. Mr. Cabbil has also shown that a white employee accused of similar misconduct to that for which he was terminated was treated differently. Jeremy Akins, a white Engineering Assistant working under Gary Elliott, failed to perform his job properly in a manner that required the contractor to go back and do work over again, just as Mr. Cabbil was accused of doing. Akins had not inspected a contractor's work properly, leading to it having to be re-done. Elliott did not know how much Akins' oversights cost the contractor, but, according to Elliott, the contractor "did have to go back and redo a section and reroll it and fix it." Akins was not terminated for these errors. Elliott did report Akins' mistakes to Lewis Rager. Here, even under the defendants' version of the facts, Mr. Cabbil's inspection

errors caused the contractor to have to re-do some of its painting and shot/sandblasting work, at no cost to ALDOT.  Neither Mr. Elliott nor any other ALDOT official has offered any explanation as to why Mr. Akins was not terminated for his failure to perform his

job properly, when Mr. Cabbil was.

### IV.    DAMAGES

#### A.    Declaratory and Injunctive Relief

Plaintiff seeks declaratory and injunctive relief, including but not limited to backpay (plus interest) and other appropriate relief.

#### B.    Compensatory Damages

Plaintiff has suffered loss of employment opportunity, emotional distress, mental anguish, embarrassment and humiliation for which she seeks compensatory and punitive damages.

Plaintiff seeks compensatory damages as to **each** of his distinct claims under Title VII for retaliation and discrimination, thus resulting in a maximum damage limitation of $600,000.00.  As plaintiff could have brought each of these claims separately he should not now be penalized for concurrently bringing these claims before the court by being limited to a single $300,000.00 cap for all claims.  To impose such a limitation would be in direct contradiction with the spirit of Title VII and to the legislator's intent in enacting 42 U.S.C. §1981a.  If the plaintiff is limited to recovery of only $300,000 for all her claims of discrimination, and  retaliation, then the result is a framework under which a defendant has **no risk** of further punishment and **no effective deterrent** for taking additional unlawful retaliatory actions against a victim in an effort to quiet their claims.  Accordingly, within the spirit of Title VII, in furtherance of pubic policy, and in congruence with the intent of Congress, the plaintiff has presented substantial basis upon which he should be allowed to recover damages as to each of his distinct claims under Title VII for discrimination and retaliation,

resulting in a limitation of damages of $600,000.00.

     **C.**    **Costs and Attorney's Fees**

Plaintiff seeks an award of costs and expenses incurred in the prosecution of this action, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988.

                                                     Respectfully submitted,

                                                     s/ Russell W. Adams
                                                     Russell W. Adams
                                                     Counsel for Plaintiff
                                                     Alabama State Bar No. 3760-A62R

OF COUNSEL:

WIGGINS, CHILDS, QUINN & PANTAZIS, L.L.C.
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
(205) 314-0500

**CERTIFICATE OF SERVICE**

     I hereby certify that on the 27th day of September, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following (or by U.S. Mail to the non-CM-ECF participants):

Jim R. Ippolito
Andrew Redd
Robert Prescott
Alabama Department of Transportation
1409 Coliseum Boulevard
Montgomery, Alabama 36110

                                                     s/ Russell W. Adams
                                                   Counsel for Plaintiff